# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK DIVISION

- - -

IN RE:  PROTON-PUMP INHIBITOR  : MDL NO. 2789
PRODUCTS LIABILITY LITIGATION  : Case No.
(NO. II)                        : 2:17-MD-2780 (CCC)(MF)
                                : Judge Claire C. Cecchi
                   - - -
This Document Relates to:
ALL ACTIONS


                   - - -

         DEPOSITION OF SCOTT VAN NICE

                   - - -



              January 31, 2018
              10:05 a.m.
              ULMER & BERNE, LLP
              600 Vine Street, Suite 2800
              Cincinnati, Ohio 45202



                   - - -




      Reported by:  Sara S. Clark, RMR/CRR/CRC

         Golkow Litigation Services
      877.370.3377 ph | 917.591.5672 fax
            deps@golkow.com

                   - - -

**EXHIBIT B**

Scott Van Nice

Page 2

```
 1          A P P E A R A N C E S
 2    Roger C. Denton, Esquire
      SCHLICHTER, BOGARD & DENTON, LLP
 3    100 S. Front Street, Suite 1200
      St. Louis, MO 63102
 4    800.873.5297
      rdenton@uselaws.com
 5
        on behalf of the Plaintiffs.
 6
 7    Jeffrey R. Schaefer, Esquire
      K.C. Green, Esquire
 8    ULMER & BERNE, LLP
      600 Vine Street, Suite 2800
 9    Cincinnati, OH 45202
      513.689.5000
10    jschaefer@ulmer.com
      kcgreen@ulmer.com
11
        on behalf of the Defendant,
12      Procter & Gamble
13    (VIA TELEPHONE:)
      Tracy A. Finken Magnotta, Esquire
14    ANAPOL WEISS
      One Logan Square, 130 North 18th Street
15    Philadelphia, PA 19103
      215.735.1130
16    tfinken@anapolweiss.com
17      on behalf of the Plaintiffs.
18    (VIA TELEPHONE:)
      Mark W. Cowing, Esquire
19    SHOOK, HARDY & BACON, LLP
      2555 Grand Boulevard
20    Kansas City, MO 64108
      816.474.6550
21    mcowing@shb.com
22      on behalf of the Defendants,
        Takeda.
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S
 2    (VIA TELEPHONE:)
      Martha K. Harrison, Esquire
 3    ROPES & GRAY LLP
      Prudential Tower
 4    800 Boylston Street
      Boston, MA 02199-3600
 5    617.951.7967
      martha.harrison@ropesgray.com
 6
        on behalf of the Defendant,
 7      GSK Consumer Health, Inc.
 8    (VIA TELEPHONE:)
      Shevon L. Scarafile, Esquire
 9    MORGAN, LEWIS & BOCKIUS, LLP
      1701 Market Street
10    Philadelphia, PA 19103-2921
      215.963.5250
11    shevon.scarafile@morganlewis.com
12      on behalf of the Defendant,
        Merck & Company.
13
14          - - -
15    ALSO PRESENT:
16      Megan Frient - Procter & Gamble
        Hunter Bryant - Sign Language Interpreter
17      Paige Genet - Sign Language Interpreter
18          - - -
19
20
21
22
23
24
25
```

Page 4

```
 1              - - -
 2            STIPULATIONS
 3              - - -
 4        It is stipulated by and among counsel for the
 5    respective parties herein that this deposition of SCOTT
 6    VAN NICE, the Witness herein, called by the Plaintiffs
 7    under the statute, may be taken at this time and
 8    reduced to writing in stenotypy by the Notary, whose
 9    notes may thereafter be transcribed out of the presence
10    of the witness; and that proof of the official
11    character and qualifications of the Notary is waived.
12              - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            I N D E X
 2              - - -
 3    WITNESS                      PAGE
 4    SCOTT VAN NICE
 5    Examination By Mr. Denton:        6
 6              - - -
 7    EXHIBIT        DESCRIPTION          PAGE
 8      1    White Paper written by Van    11
           Nice
 9
10      2    1/24/18 Letter to Denton &    35
           Finken from Green
11      3    30(b)(6) Notice of Deposition  84
12
13              - - -
14        Certified Question on Page 17
15        Certified Question on Page 18
16              - - -
17
18
19
20
21
22
23
24
25
```

Scott Van Nice

Page 6

```
 1                     - - -
 2           P R O C E E D I N G S
 3                     - - -
 4           SCOTT VAN NICE
 5  being by me first duly sworn, as hereinafter certified,
 6  testifies and says as follows:
 7                EXAMINATION
 8  BY MR. DENTON:
 9      Q.  Good morning, sir.
10      A.  Good morning.
11      Q.  My name is Roger Denton, and I'm here to ask
12  you some questions today.
13          I understand your name is Scott Van Nice?
14      A.  Yes, that's right.
15      Q.  And you work for P&G?
16      A.  Yes, that's right.
17      Q.  What is your title or job responsibility?
18      A.  My title would be forensic analyst.
19      Q.  I understand you're a lawyer?
20      A.  Yes, that's right.
21      Q.  You have a license to practice law in the
22  state of Ohio?
23      A.  Yes.
24      Q.  You also have training and background in
25  e-discovery?
```

Page 7

```
 1      A.  Yes.
 2      Q.  How long have you worked in the field of
 3  e-discovery?
 4      A.  Approximately since about 2008.
 5      Q.  And when did you start with P&G?
 6      A.  Around the fall of 2002.
 7      Q.  Do you have other college degrees besides
 8  law?
 9      A.  Yes.  I have a bachelor's of science from
10  Rochester Institute of Technology.
11      Q.  And was there a particular field or major?
12          INTERPRETER:  Could you repeat the question
13  for the interpreter, please?
14          MR. DENTON:  I'm sorry.  I got confused.
15  BY MR. DENTON:
16      Q.  I would like to know what major your BS
17  degree was in, please.
18      A.  Information technology.
19      Q.  Do you have any other advanced degrees
20  besides the BS in information technology and your law
21  degree?
22      A.  No, I don't.
23      Q.  In looking at your LinkedIn page, it appears
24  that you are in charge of the e-discovery at P&G.
25          Is that accurate?
```

Page 8

```
 1      A.  Yes, that's accurate.
 2      Q.  And I understand from your LinkedIn page that
 3  you have given Rule 30(b)(6) depositions in the past.
 4      A.  Yes, that's correct.
 5      Q.  Could you approximate for me how many times
 6  you have given a deposition.
 7      A.  This is my second time.
 8      Q.  Are you familiar with the concept of a Rule
 9  30(b)(6) designated witness?
10      A.  Yes.
11      Q.  You understand you're here to speak on behalf
12  of P&G based upon the topics your lawyers have sent me
13  in the letter?
14          MR. SCHAEFER:  Object to form.
15      Q.  Pursuant to your LinkedIn page, it indicates
16  you have a certification in electronic discovery and
17  computer forensics.
18          Is that accurate?
19      A.  Yes.
20      Q.  Could you explain to me what a certification
21  in electronic discovery is.
22      A.  It means that I am proficient in the area of
23  electronic discovery with tools -- a tool specifically
24  called EnCase from Guidance Software.
```

Page 9

```
 1      Q.  And what is Guidance Software?
 2      A.  Guidance Software is a software vendor that
 3  provides a variety of products for electronic
 4  discovery, to incident response and digital forensics.
 5      Q.  Are you involved with -- strike that.
 6          Have you provided services for P&G in
 7  electronic discovery in previous litigation?
 8      A.  Yes.
 9      Q.  Approximately how many times?
10      A.  I can't speculate because it cycles every
11  year.
12      Q.  Okay.  How many litigations are you currently
13  involved with P&J involving your role in electronic
14  discovery?
15      A.  Did you say P&J?
16      Q.  P&G.  I'm sorry.
17      A.  Do you mind repeating the question again?
18      Q.  Sure.
19          I'm trying to find out how many current
20  litigations are you working on in electronic discovery
21  for P&G.
22      A.  What do you mean by "litigation"?
23      Q.  Well, you understand the current litigation
24  I'm here about involves Prilosec OTC?
25      A.  Yes.
```

3 (Pages 6 to 9)

Scott Van Nice

## Page 10

1      Q.  Okay.  Are you involved with any other
2   litigations involving different products for P&G
3   currently?
4      A.  As a 30(b)(6) witness, no.
5      Q.  What about working in electronic discovery
6   generally, other litigations?
7      A.  No.
8      Q.  Okay.  Can you tell me when you first were
9   aware that P&G had been made a party defendant in a PPI
10   or Prilosec lawsuit.
11      A.  I was aware of this several months ago.
12      Q.  Are you involved with identifying custodians
13   or sources of relevant information in this particular
14   litigation, the Prilosec litigation?
15      MR. SCHAEFER:  I'll object and instruct the
16   witness not to answer to the extent that it calls for
17   disclosure of any work product or privileged
18   information, who he is working with in his capacity in
19   this litigation, apart from the disclosure for the
20   deposition here today.
21      MR. DENTON:  So where do we go from here?
22   Did you instruct him not to answer?
23      MR. SCHAEFER:  To the extent, yes, you're
24   asking about his role in this litigation working with
25   us in e-discovery apart from the deposition here today,

## Page 11

1   yes, I'll object and instruct him not to answer.
2   That's work product, his role in this litigation, apart
3   from that.
4      MR. DENTON:  We respectfully disagree, but we
5   won't fight here today about that.
6      MR. SCHAEFER:  Understood.
7      MR. DENTON:  Would you mark this as
8   Exhibit 1, please.
9         ---
10      (Exhibit 1 marked.)
11         ---
12   BY MR. DENTON:
13      Q.  Can you please identify Exhibit 1, sir.
14      A.  Yes.  This is a white paper that I put
15   together in collaboration with Guidance Software.
16      Q.  And this material is available over the
17   internet; is that accurate?
18      A.  My understanding, it is.
19      Q.  When did you prepare this paper, Exhibit 1?
20      A.  To the best of my knowledge, this was around
21   2012.
22      Q.  This paper indicates that one of your roles
23   at P&G is to identify custodians and sources of
24   information in litigation; is that accurate?
25      MR. SCHAEFER:  Roger, I'll just ask for a

## Page 12

1   continuing objection regarding your testimony here --
2   or regarding your questions, excuse me, on this
3   article, so as not to interrupt the deposition.  But
4   this really is -- as a 30(b)(6) deposition, you're
5   asking the witness questions about an article he wrote.
6   He's not here as an individual or as an expert witness.
7   And I won't interrupt with the additional objections if
8   we can agree that with regard to this paper, you'll
9   give me a continuing objection.
10      MR. DENTON:  I will give you a continuing
11   objection.
12      MR. SCHAEFER:  Thank you.
13      MR. DENTON:  But he's allowed to answer the
14   questions?
15      MR. SCHAEFER:  Absolutely.
16      MR. DENTON:  Okay.
17   BY MR. DENTON:
18      Q.  Now, do you remember the question?  Probably
19   not.
20      A.  Do you mind repeating the question, please?
21   I'm getting old.
22      Q.  Me, too.
23      MR. DENTON:  Could you read it back, please?
24      (Record read as requested.)
25      A.  Yes.  At direction of counsel, yes.

## Page 13

1      Q.  Okay.  Have you done so in the Prilosec OTC
2   litigation, that is, identify custodians and sources of
3   information relevant to the Prilosec OTC litigation?
4      MR. SCHAEFER:  I'll object and instruct the
5   witness not to answer.  Here again, you're going into
6   questions about his role in working with us in
7   discovery, and that is work product information.
8      MR. DENTON:  Well, we may have to get a
9   ruling, because the primary reason I'm here, sir, is to
10   find out about sources of information, where it's kept,
11   what's been done, identifying relevant information and
12   relevant custodians.  Certainly this gentleman does
13   that as his work at P&G.  I guess, why are we here if
14   he's not going to answer these questions?
15      MR. SCHAEFER:  Well, you're certainly able to
16   ask those questions, and I'm not objecting to those
17   questions.  But the questions you're asking him are
18   about the work he has done, if any, in this litigation
19   with respect to identifying custodians, not questions
20   about his knowledge of the data systems and
21   infrastructure and ways in which data are handled at
22   P&G.  Those questions are fine.
23      But as you can tell from Mr. Van Nice's
24   responsibilities at Procter & Gamble, he interfaces
25   with the legal department and works on these cases in

Scott Van Nice

Page 14

```
 1    terms of discovery, and those questions are not fair
 2    game and I'll object to them.
 3         MR. DENTON:  I disagree.
 4         So I assume you're going to continue to
 5    instruct him not to answer the names of custodians and
 6    sources of materials that are relevant to this
 7    litigation.  Is that my understanding, Counsel?
 8         MR. SCHAEFER:  You asked him if he's working
 9    with Procter & Gamble to identify custodians in
10    litigation.  If you want to ask him questions about
11    specific data systems and the persons that are involved
12    with those data systems, that's different than asking
13    him about who the custodians that will be identified in
14    this litigation at the appropriate time are and his
15    involvement in identifying those people.
16         MR. DENTON:  Well, we strongly disagree.  I
17    can see we're going to have to come back after a Court
18    ruling, but we'll get as much as we can today.
19    BY MR. DENTON:
20         Q.  Sir, do you know whether or not Procter &
21    Gamble has identified custodians that possess relevant
22    information to Prilosec OTC litigation?
23         A.  Do you mind repeating the question?  I want
24    to make sure that I understood you.
25         Q.  Sure.
```

Page 15

```
 1         Sir, are you aware whether or not P&G has
 2    identified custodians who have relevant information to
 3    the Prilosec OTC litigation?
 4         A.  I'm not specifically aware.
 5         Q.  Is your role currently the same at Procter &
 6    Gamble as it was when you prepared this paper,
 7    Exhibit 1, in 2012?
 8         A.  It is.
 9         Q.  The contents of this paper, Exhibit 1, do
10    they still accurately describe the process at P&G for
11    collecting and identifying custodians and sources of
12    information?
13         A.  At a high level, yes.
14         Q.  All right.  Can we go to Page 5 of Exhibit 1,
15    please.  I draw your attention to a paragraph numbered
16    1, titled "30(b)(6) Witness."
17         Do you see where I'm pointing you to?
18         A.  Yes.
19         Q.  And you understand you are the 30(b)(6)
20    witness today for P&G on the Prilosec OTC litigation?
21         MR. SCHAEFER:  Object to form.
22         THE WITNESS:  May I answer?
23         MR. SCHAEFER:  Yes.
24         A.  Yes.
25    BY MR. DENTON:
```

Page 16

```
 1         Q.  In Paragraph 1 on Page 5, you state, quote,
 2    He or she should be able to testify how the company
 3    identifies data, what steps were taken to collect,
 4    preserve, and maintain the authenticity of the data, as
 5    well as maintain a chain of custody that's provided to
 6    counsel for review.
 7         Did I read that accurately?
 8         MR. SCHAEFER:  Object to form.
 9         A.  Yes.
10         Q.  And in this case, that person is you,
11    correct?
12         A.  Yes.
13         Q.  Are you capable today to testify how the
14    company identifies data?
15         A.  Yes.
16         Q.  Are you able to testify today what steps were
17    taken to collect and preserve data in this litigation?
18         A.  Yes.
19         Q.  Let's start with that question.  What did P&G
20    do to collect and preserve data for the Prilosec OTC
21    litigation?
22         MR. SCHAEFER:  I'll object to that question.
23    And to the extent the witness is able to answer, he
24    may.  But discovery's ongoing in this litigation.  It's
25    not in the past tense.  And to ask him about an ongoing
```

Page 17

```
 1    process as if it's complete is objectionable.
 2         MR. DENTON:  I disagree.  That was not the
 3    question.  We prefer not to have speaking and leading
 4    objections going forward.
 5    BY MR. DENTON:
 6         Q.  You may answer the question, sir.
 7         A.  Do you mind repeating the question?
 8         Q.  Let me ask it differently.
 9         What steps were you involved with to collect
10    and preserve data to date in the Prilosec OTC
11    litigation?
12         A.  At a high level, the steps that I was
13    involved with to work at the direction of counsel
14    related to e-mail holds.
15         Q.  Have you been involved with any other action
16    to collect or preserve data that P&G may have related
17    to the Prilosec OTC litigation?
18         A.  No.
19         Q.  Has anyone else in your department or anyone
20    else you're aware of taken steps to collect and
21    preserve data in addition to e-mail holds?
22         A.  Yes.
23         Q.  Can you describe what has been done with
24    respect to the preservation and collection of data
25    other than e-mails?
```

Page 18

1       MR. SCHAEFER: I'm going to object and
2  instruct the witness not to answer. You're, again,
3  going into work product on this ongoing litigation and
4  asking questions about how we're responding to
5  discovery. That's not the purpose of this deposition.
6       MR. DENTON: I disagree. So was that an
7  instruction for him not to answer?
8       MR. SCHAEFER: To the extent his answer
9  involves privileged or work product, yes, I'm
10  instructing him not to answer. You're asking questions
11  about ongoing conduct in discovery. This is -- apart
12  from being beyond the subject matter of the topics for
13  which Mr. Van Nice is being presented today, you're
14  going into issues of discovery, on discovery, and that
15  implicate work product, ongoing legal work at Procter &
16  Gamble with us, outside counsel, and I'm instructing
17  him not to answer.
18       MR. DENTON: All right. Certify that
19  question.
20  BY MR. DENTON:
21       Q. Let's talk about the e-mail holds. You were
22  involved with that, as I understand.
23       A. At the direction of counsel, yes.
24       Q. Okay. First of all, when was the e-mail hold
25  put in place for the Prilosec OTC litigation?

Page 19

1       MR. SCHAEFER: I'll object to that and
2  instruct the witness not to answer. That is work
3  product.
4       MR. DENTON: It is not. Not when.
5       Again, certify the question.
6       We're going to be coming back at defendants'
7  response, I believe.
8  BY MR. DENTON:
9       Q. How did you go about identifying which
10  employees of Procter & Gamble should have an e-mail
11  hold for the Prilosec OTC litigation?
12       MR. SCHAEFER: I'm going to object again and
13  instruct the witness not to answer. This is all work
14  product. This is not the purpose of this deposition.
15  He's not been prepared on this topic. And I think
16  that's reasonable and instruct him not to answer to the
17  extent it implicates the ongoing work product and work
18  with outside counsel and legal department at Procter &
19  Gamble.
20       Q. Are you aware --
21       MR. DENTON: Again, I disagree.
22       Can I have a continuing certification to your
23  work product?
24       MR. SCHAEFER: Correct. But I'm going to
25  have to object to the questions.

Page 20

1       MR. DENTON: I understand that. But I don't
2  want to have to say every time I'm certifying that
3  question.
4       MR. SCHAEFER: Absolutely. I'm fine with
5  that.
6       MR. DENTON: All right.
7  BY MR. DENTON:
8       Q. Do you have a list, sir, of the employees at
9  P&G that were subject to an e-mail hold?
10       A. Yes.
11       Q. Can you give me the approximate number of
12  employees that were subject to that hold?
13       MR. SCHAEFER: I'll object and instruct not
14  to answer.
15       MR. DENTON: How could that possibly be
16  privileged, the number of employees?
17       MR. GREEN: This is all outside the scope.
18       MR. DENTON: One at a time, K.C.
19       Go ahead, sir.
20       MR. SCHAEFER: You're asking him questions
21  about his ongoing work with the legal department at
22  Procter & Gamble and with outside counsel in the
23  conduct of discovery in this litigation. This is not a
24  deposition about discovery on discovery. There's no
25  evidence that there's any deficiency and that you're

Page 21

1  entitled to inquire into these matters. And so on that
2  basis, I have to say that's work product, instruct the
3  witness not to answer questions about how we are
4  conducting discovery. You can have a continuing
5  objection to that. That's simply work product, and
6  you're not -- I'm not going to let the witness answer
7  to it.
8       MR. DENTON: I thought he was here to talk
9  about e-mails. That's Number 1 on your letter.
10       MR. SCHAEFER: I haven't heard one question
11  about e-mails yet.
12       MR. DENTON: That's all I've been talking
13  about. How many employees' e-mails have been
14  collected? I just want a number.
15       MR. SCHAEFER: I'm instructing him not to
16  answer. As you well know, you're not yet in a position
17  of having disclosed custodians to you.
18       MR. DENTON: Actually, we are, and that's
19  part of the problem. I'm trying to understand why we
20  don't have custodians produced. But that's not a fight
21  in front of --
22       MR. SCHAEFER: That's exactly why it's
23  outside this deposition, and the purpose of this
24  deposition is the topics that we've identified in the
25  infrastructure and the systems. Not the legal work

Scott Van Nice

Page 22

1   Mr. Van Nice has been involved with in the litigation,
2   but the infrastructure and the systems and the way they
3   operate at Procter & Gamble.  Questions of that nature,
4   I won't object to.
5   BY MR. DENTON:
6       Q.   What e-mail system does Procter & Gamble use
7   currently?
8           MR. GREEN:  Good question.
9           MR. DENTON:  Thank you, K.C.
10      A.   So your question was again?
11      Q.   What is the current e-mail system at P&G?
12      A.   Current e-mail system is Microsoft 365.
13      Q.   And approximately when did that go into
14  effect, that system?
15      A.   Approximately started using Microsoft Outlook
16  around 2005, and throughout different upgrades, we are
17  now on 365.  So, again, that is the current e-mail
18  system.
19      Q.   Do you know and have any information on the
20  e-mail system P&G used before Outlook in 2005?
21      A.   Generally speaking, yes.
22      Q.   Could you share that with me, please.
23      A.   Yes.  The e-mail system prior to Outlook was
24  Lotus Notes, developed and owned by IBM.
25      Q.   Do you know whether or not any of the Lotus

Page 23

1   Notes e-mails were brought forward into the Microsoft
2   e-mail system?
3       A.   No.
4       Q.   You don't know, or the answer is no?
5       A.   No, I don't know.
6       Q.   Does each employee at Procter & Gamble have a
7   dedicated e-mail address?
8       A.   Generally speaking, yes.
9       Q.   Are there any exceptions to that that you're
10  aware of?
11      A.   One exception might be plant employees, for
12  example.
13      Q.   Okay.  But office employees would have a
14  dedicated e-mail address?
15      A.   Yes, generally.
16      Q.   Okay.  Are office employees who have
17  computers allowed to create Outlook folders on their
18  computer for e-mail?
19      A.   Yes.
20      Q.   Can you explain to me if an employee deletes
21  an e-mail for whatever reason, whether or not that
22  e-mail can be retrieved from the server?
23      A.   If an employee deletes an e-mail, it is
24  possible to recover that e-mail from the server.
25      Q.   Okay.  Do you know how far back in time you

Page 24

1   at P&G would be able to retrieve a deleted e-mail?
2       A.   My understanding is that we have up to 28 to
3   30 days to recover deleted e-mails from the server.
4       Q.   Okay.  Once that 28 to 30 days goes by, then
5   the e-mail is not retrievable, the deleted e-mail?
6       A.   That's my understanding, yes.
7       Q.   And has that generally been the rule since
8   Microsoft Office went into effect?
9       A.   Yes.
10      Q.   Do the office employees at P&G have the
11  ability to use any instant messaging software?
12      A.   Yes.
13      Q.   What is the name of that software?
14      A.   The current instant messaging software is
15  called Skype.
16      Q.   And how long has Skype been in effect?
17      A.   To the best of my knowledge, approximately
18  one year.
19      Q.   And was there an instant messaging system
20  prior to Skype?
21      A.   Yes.
22      Q.   And what was that software?
23      A.   That was called Lync, L-Y-N-C.
24      Q.   And how long was Lync in effect?
25      A.   I can't speculate.  Several years.

Page 25

1       Q.   Any instant messaging prior to Lync that was
2   available for P&G employees?
3       A.   Prior to Lync, yes.
4       Q.   And what was that?
5       A.   If I remember, if memory serves me, that was
6   called Sametime.
7       Q.   Do you know approximately how many total
8   years P&G employees have had some form of instant
9   messaging?
10      A.   Well, to the best of my knowledge, based on
11  when I arrived at P&G, which was 2002, I would say at
12  least since 2002.
13      Q.   Okay.  Do you know if there are any systems
14  in place to retain instant messages at P&G?
15      A.   No.
16      Q.   Again, my questions probably aren't clear.
17  Is that a no, there aren't such things, or no, you
18  don't know?  I'm sorry my questions aren't well
19  phrased.
20          MR. SCHAEFER:  No objection there.
21      A.   There's no such thing.
22      Q.   There's no such thing to maintain instant
23  messages?
24      A.   That's correct.
25      Q.   Do employees have the ability to print an

Scott Van Nice

Page 26

1    instant message?
2        A.  Yes.
3        Q.  Does the instant messaging system allow for
4    attachment of a document?
5        A.  The current one, yes.
6        Q.  And that would be Skype?
7        A.  Yes.
8        Q.  Can the instant messaging systems be set up
9    to retain those messages at a server level?
10       A.  To the best of my recollection, no.
11       Q.  Let's talk about voice mail a second.
12          Do the employees have access to voice mail on
13   their phones in their offices?
14       A.  Generally speaking, yes.
15       Q.  Are those voice mail messages retained by a
16   server?
17       A.  If the employee opts to have voice mail
18   message, that is possible.
19       Q.  If an employee receives a voice message, they
20   have the option to delete it at their phone, correct?
21       A.  My understanding is yes.
22       Q.  And if the employee deletes a voice mail, is
23   there any way to retrieve that voice mail from a
24   server?
25       A.  I can't speculate.

Page 27

1        Q.  You just don't know that answer; is that
2    fair?
3        A.  Yes, that's fair.
4        Q.  What type of devices or computers are
5    employees allowed to use?  Are they desk models or are
6    they laptops, or are they both?
7        A.  The recommended corporate model would
8    typically be either a Dell or HP Windows PC.
9        Q.  So that's a desktop unit?
10       A.  No, that would be a laptop.
11       Q.  Okay.  Are employees provided with any mobile
12   device, such as iPads or phones?
13       A.  Employees can request a mobile device.
14       Q.  Do you have -- strike that.
15          If an employee has a mobile device, can they
16   send e-mails from their business account and receive
17   e-mails from their business account?
18       A.  Yes.  If their mobile phone is set up under
19   Procter & Gamble's policy and guidelines, yes.
20       Q.  If an employee sends or receives an e-mail on
21   a mobile device, is that e-mail retained on the server?
22       A.  Yes.
23       Q.  One of the topics listed in the letter is
24   document management including document retention.
25          Are you aware of that?

Page 28

1        A.  Do you mind showing me the document?
2        Q.  Sure.  Number 4, I believe.
3        A.  Yes.
4        Q.  Thank you.
5          What can you tell me that you're prepared to
6    testify about concerning document management at P&G?
7          MR. SCHAEFER:  Object to the form.
8        A.  It would help if you could clarify what you
9    mean by "document management system."
10       Q.  Well, that's part of the problem, because
11   that's -- strike that.
12          What do you mean by "document management"?
13       A.  Well, it has many different interpretations.
14   It could be a software called DocumentUp, or maybe
15   you're talking about Microsoft Word and so forth.  So I
16   would like to understand what you are seeking.
17       Q.  Well, I'm trying to find out sources of
18   materials relevant to the Prilosec OTC litigation.
19       A.  Well, to my knowledge, there is no
20   enterprise-wide document management system.
21       Q.  I assume the employees use Word as a
22   software, Microsoft Word?
23       A.  Yes.
24       Q.  PowerPoint?
25       A.  Yes.

Page 29

1        Q.  Excel?
2        A.  Yes.
3        Q.  Any other Microsoft products software that
4    the employees have access to?
5        A.  Whatever is generally available through the
6    Microsoft Office suite would be available to the
7    employees.
8        Q.  How do -- employees who create a Word
9    document, for example, where are those saved?  What
10   source are they saved in?
11       A.  The employees themselves have the option to
12   make their determination or judgment as to where they
13   want to save the document.
14       Q.  But I have to believe a company as large as
15   P&G has dedicated storage space for documents related
16   to a product.  Is that accurate?
17       A.  No, that's not accurate.
18       Q.  Well, if one wanted to find all of the
19   marketing materials, for example, on Prilosec OTC, is
20   there any particular source on the server that one
21   would look at?
22       A.  It would depend what marketing documents
23   you're looking for.
24       Q.  Any marketing related to Prilosec OTC.  Let's
25   start with TV ads.

8  (Pages 26 to 29)

Scott Van Nice

Page 30

1    A.  Well, if an employee is creating a document
2  related to TV ads, the employee could be saving it on a
3  hard drive.  They could be saving it in another file
4  share solution.  I can't speculate where the employee
5  might be saving it.
6    Q.  Well, are there any policies or guidelines
7  for the P&G employees on where to save certain types of
8  documents related to Prilosec OTC?
9    A.  I can't speak to the guidelines or policies
10 where the employees save documents related to Prilosec.
11 I can speak to what P&G recommends where they save
12 documents generally.
13   Q.  Okay.  Speak to that, then, please.
14   A.  Okay.  The employees may opt to save
15 documents on their computer on the hard drive, or they
16 are allowed to save documents on an external hard drive
17 device, like a USB drive, for example.  Or they may --
18 they're allowed to save documents in a repository, like
19 box.net or OneDrive, which is part of the Microsoft, or
20 SharePoint.  And so I can speak to those at a high
21 level.
22   Q.  Let's start with SharePoint.  What kinds of
23 documents are maintained in SharePoint?
24   A.  To the best of my knowledge, that would be
25 user-created documents.

Page 31

1    Q.  Are there dedicated share drive spaces for
2  Prilosec OTC?
3    A.  I don't know.
4    Q.  Do you know who might be able to answer such
5  a question?
6    A.  I can't recall.
7    Q.  Is there a document retention policy at P&G?
8    A.  Yes.
9    Q.  Do you know, at a high level, what that
10 policy is currently?
11   A.  Yes.
12   Q.  Could you tell us about that, please.
13   A.  The policy is called the Records Retention
14 Schedule, RRS.  And it is an interactive process that
15 allows the employee themselves who own the document to
16 identify how long they should keep the document, text,
17 for example, or PII data, based on other categories, as
18 well as depending on what it is subject to in terms of
19 local law in the country.
20   Q.  Is that document retention program in
21 writing?  Is that a policy that's written down?
22   A.  Yes.
23   Q.  Did you bring a copy of that with you?
24   A.  No.
25   Q.  Do you have access to a copy of the document

Page 32

1  retention policy?
2    A.  Yes.
3    Q.  You mentioned in your previous answer PII
4  data.  What is that?
5    A.  PII stands for personally identifiable
6  information, like a Social Security number, for
7  example, e-mail address.
8    Q.  Okay.  Let's go back to RRS, the record
9  retention policy.  Is it at the discretion of the
10 employee whether to retain or delete a document?
11   A.  Every employee is expected to comply with the
12 records retention policy and they're expected to follow
13 the retention schedule in RRS.  So each employee
14 themselves are responsible for that.
15   Q.  Well, for example, how long are employees
16 supposed to keep documents they create, for example,
17 something related to Prilosec OTC?
18       MR. SCHAEFER:  I'll object.  That's vague.
19       MR. DENTON:  Well, it's vague because I don't
20 have the doggone policy in front of me.  It should have
21 been brought and was requested.
22   A.  I can't speculate because I don't know what
23 kind of data formats that are in the Prilosec that
24 may be subject to RRS.  And like I said before, sir, RRS
25 lists out all sorts of different categories, from tax,

Page 33

1  finance, PII and so forth.  It's extremely numerous in
2  terms of categories.
3    Q.  If we had a copy of the RRS policy here
4  today, you could answer these questions, couldn't you,
5  sir?
6        MR. SCHAEFER:  I'll object.
7    A.  To the best of my ability, I may be able to
8  answer that.
9        MR. DENTON:  All right.  Let's take a break.
10       (Recess taken.)
11 BY MR. DENTON:
12   Q.  The Record Retention System policy, sir, did
13 you have any involvement in drafting that document?
14   A.  No, I didn't.
15       And I would like to make one point of
16 clarification.  I mentioned RRS as an interactive tool,
17 not a document, per se.  It's a tool that guides the
18 employee through what is the appropriate retention
19 limit for their documents.
20   Q.  So is the RRS printed or paper document in
21 any form?
22   A.  No.  It's an interactive tool, like I said
23 before, prior to the break.  It's a website, and the
24 employee goes to the website and they click through
25 until they are able to identify how long they should

Scott Van Nice

Page 34

1  keep a specific document type.
2      Q.  So this interactive software instructs the
3  employee how long to keep a document based under the
4  policy?
5      A.  Correct.
6      Q.  And is that interactive tool installed on all
7  of the company computers?
8      A.  No, it's not.
9      Q.  How does the employee access the interactive
10  software?
11      A.  They access one central website internally in
12  the P&G environment.
13      Q.  All right.  So if I understand this, if an
14  employee has a document that they create, they then
15  would need to go to the interactive website to
16  determine how long they are to retain such a document?
17      MR. SCHAEFER:  Object to form.
18      A.  If they are the owner of that document, then
19  they are expected to be familiar with how long to keep
20  that specific document type.
21      Q.  Okay.  But the website is there for reference
22  for them?
23      A.  Yes.
24      Q.  Is that a website created by P&G?
25      A.  Yes.

Page 35

1      Q.  Is there a particular name for that website?
2      A.  Yes.
3      Q.  What's the name?
4      A.  To the best of my memory, the name is
5  recordsretentionschedule.PG.com, or it might be
6  recordsretention.PG.com.
7      Q.  Okay.  And I assume that website is only
8  available to P&G employees.
9      MR. SCHAEFER:  Object to form.
10      A.  Yes.
11      Q.  All right.
12      MR. DENTON:  Let's mark this as Exhibit 2.
13      ---
14      (Exhibit 2 marked.)
15      ---
16  BY MR. DENTON:
17      Q.  Sir, I have handed you Exhibit 2, which is a
18  letter from counsel to me.
19      Have you seen this letter before?
20      A.  Yes, this looks familiar.
21      Q.  Okay.  Just to help us stay oriented, I want
22  to talk to you about Number 5, file sharing.  Okay?
23      A.  (Nods head.)
24      Q.  What software or systems are used at P&G that
25  allows employees to have file sharing?

Page 36

1      A.  As I previously mentioned, box.net, OneDrive,
2  SharePoint.  Those are the three common vehicles, so to
3  speak, that allow employees to share files.
4      Q.  Do various file shares have domain names,
5  such as Prilosec OTC/regulatory, as an example?
6      A.  Not to my knowledge.
7      Q.  How would an employee working on Prilosec
8  know where to find a file to share it with another
9  colleague?
10      A.  In that group of individuals, they would
11  know.  But I can't speculate as to what they might --
12  what that name might be.
13      Q.  Well, if one was going to go collect all of
14  the marketing documents on Prilosec OTC, where would
15  one go to find them in the P&G systems?
16      A.  In a case like that, the first step would be
17  to work with the employees and ask them where they
18  store their documents, identify it.  But until then, I
19  can't speculate.
20      Q.  All right.  So you'd have to ask the
21  employees assigned to that project first.  Is that
22  fair?
23      A.  Yes.
24      Q.  And how would you, as an e-discovery project
25  manager, know which employees to go visit with?

Page 37

1      A.  That would be at the direction of counsel.
2      Q.  How do you identify which employees in P&G
3  worked on Prilosec OTC?  How do you go about doing
4  that?
5      MR. SCHAEFER:  I'll object.  That's beyond
6  the scope and the witness' answers are not speaking for
7  the company.
8  BY MR. DENTON:
9      Q.  Go ahead and answer.
10      A.  Again, that would be at the direction of
11  counsel.
12      Q.  I didn't ask you -- I'm sorry.  Sorry I
13  interrupted.
14      A.  To clarify, P&G has over 100,000 employees,
15  and I would have to work with counsel to identify which
16  employees are involved with Prilosec, and then at the
17  direction of counsel, I would be instructed to
18  interview them.
19      Q.  Okay.  Have you done that in Prilosec OTC,
20  interviewed employees?
21      MR. SCHAEFER:  I'll object.  Instruct not to
22  answer.  Calls for information that's work product.
23  BY MR. DENTON:
24      Q.  How many employees currently at P&G have
25  involvement with Prilosec OTC, an approximate number,

10  (Pages 34 to 37)

Scott Van Nice

Page 38

1  please?
2          MR. SCHAEFER: I'll object. Beyond the
3  scope. The answer is not binding on the company.
4          MR. DENTON: Understood. But he can answer.
5      A.  I don't know.
6      Q.  You've been involved in that work, haven't
7  you?
8      A.  With what work?
9      Q.  As written in your paper, your job is to
10 collect, preserve, and maintain data for litigation.
11 Correct?
12     A.  Yes, that's right.
13     Q.  Has that been your role in the Prilosec OTC
14 litigation?
15     A.  That's one of my expected responsibilities
16 that I'm expected to carry out, yes.
17     Q.  And have you done so to date on the Prilosec
18 OTC litigation?
19         MR. SCHAEFER: Object. Instruct the witness
20 not to answer. Calls for information that's work
21 product regarding ongoing discovery in this litigation.
22 Outside the scope of the 30(b)(6).
23         MR. DENTON: I don't know how the heck it can
24 be privileged information when he's published a paper
25 in the public domain on this document.

Page 39

1          MR. SCHAEFER: Although I have a continuing
2  objection to the document you're referring to, that is
3  an item that is under, what, Guidance Software, and
4  it's some years old, and it's an article of general
5  interest, not specific to Procter & Gamble policies.
6  It's not a Procter & Gamble document.
7          MR. DENTON: It's actually a document that
8  this witness wrote.
9          MR. SCHAEFER: That's correct. But he's here
10 today as a 30(b)(6) witness.
11         MR. DENTON: Correct. And actually he wrote
12 in this article that his role as a 30(b)(6) witness is
13 to be able to testify on what steps were done to
14 collect, preserve, and maintain data in the litigation.
15 And my simple question here today is: Has he done that
16 in the Prilosec OTC litigation? That can't possibly be
17 privileged.
18         MR. SCHAEFER: My objection stands. Instruct
19 the witness not to answer about his participation in
20 the discovery process of this litigation.
21 BY MR. DENTON:
22     Q.  But for objections of your counsel, could you
23 tell us what steps you took to collect, preserve, and
24 maintain data in the Prilosec OTC litigation? Are you
25 capable of answering that question?

Page 40

1          MR. SCHAEFER: I'll object.
2      Q.  Go ahead.
3      A.  Yes.
4      Q.  And the reason you're not answering is based
5  upon instruction of counsel, correct?
6          MR. SCHAEFER: Object.
7      A.  That's right.
8      Q.  Let's go back to Exhibit 2, Number 6,
9  employee data storage.
10         What can you tell me about employee data
11 storage at P&G with respect to the Prilosec OTC
12 litigation?
13         MR. SCHAEFER: Object as vague.
14     A.  I can't speculate to what the employees may
15 have done to store data related to Prilosec. P&G
16 employees have the option themselves to make the -- at
17 their discretion, as I said before, as to how they want
18 to save their data.
19     Q.  So it's just up to an individual employee,
20 their personal discretion on how to store data related
21 to Prilosec OTC. Am I right about that?
22         MR. SCHAEFER: Object to form.
23     A.  Generally speaking, yes.
24     Q.  What are the options employees have to store
25 data?

Page 41

1      A.  The options are as, I mentioned before, by
2  saving data, they can save on a back-up device or USB
3  drive, they may save at box.net, OneDrive, SharePoint,
4  or they may save in another system identified in that
5  business or department. So -- and that may be
6  required, and we would have to interview the employee
7  themselves to find out where they saved their data.
8      Q.  Box.net, can you tell me what that is,
9  please.
10     A.  Yes. It's a cloud software, and it's where
11 you can upload documents to a file share repository
12 that you can access either from your computer or
13 another location, and you can save files for yourself
14 or you can set up a folder that is shared with other
15 people.
16     Q.  All right. And is it the employees'
17 discretion as to whether or not to create a share space
18 in box.net?
19     A.  Yes, it is.
20     Q.  Do the various departments have different
21 policies for employee data storage?
22     A.  The only restriction I'm aware of is that you
23 can't store highly restricted data in box.net.
24     Q.  And can you define what "highly restricted
25 data" is.

11 (Pages 38 to 41)

Scott Van Nice

Page 42

1      A.   That is a classification determined by the
2   business -- each business as to how they define "highly
3   restricted."
4      Q.   When you refer to the term "business," is
5   that a department or is that a product?  What do you
6   mean, "by the business"?
7      A.   "By the business" could mean a department or
8   group or an organization.
9      Q.   All right.  Do you know how many departments
10  or businesses are involved with Prilosec OTC?
11         MR. SCHAEFER:  Okay.  Beyond the scope.
12         You may answer.
13      A.   No, I don't.
14      Q.   Can you give me your best approximation?
15         MR. SCHAEFER:  Object.
16      A.   I couldn't speculate.
17      Q.   Is it accurate that the various businesses or
18  departments can have different policies concerning
19  employee data storage?
20         MR. SCHAEFER:  Object to form.
21      A.   Yes, that is possible.
22      Q.   And where would one go to find out a
23  particular data storage policy in a particular
24  department or business?
25      A.   You may go to an internal website called

Page 43

1   ITsolutions.PG.com, and they have a policy at a high
2   level, what are the options for storing documents.
3      Q.   Is that a policy that could be printed on
4   paper?
5      A.   I believe so.
6      Q.   All right.  And I take it you did not bring a
7   copy of IT Solutions with you to the deposition.  Is
8   that correct?
9         MR. SCHAEFER:  Object.
10      A.   No, I did not.
11      Q.   Did you bring any documents with you to the
12  deposition?
13      A.   No, I did not.
14      Q.   Did you review any documents or electronic
15  information to prepare for the deposition?
16      A.   Yes, I did.
17      Q.   What did you review?
18      A.   I reviewed this prior to the deposition
19  (indicating).
20      Q.   Exhibit 2?
21      A.   Yes.
22      Q.   Anything else?
23      A.   I reviewed notes based on these topics,
24  e-mails, voice mails, file shares.  I reviewed
25  policies, as I mentioned before, on ITsolutions.PG.com,

Page 44

1   recordsretention.PG.com and others that are related to
2   these topics.
3      Q.   All right.  So if I understood that
4   correctly, you reviewed certain documents to be able to
5   answer questions that are related to the topics in
6   Exhibit 2?
7         MR. SCHAEFER:  Object to form.
8      A.   Yes.  At the direction of counsel, yes, on
9   those topics.
10      Q.   But you have that information available to
11  you independent of counsel, correct?
12         MR. SCHAEFER:  Object.
13      A.   I'm not sure I understand.
14      Q.   Well, for example, ITsolutions.PG, you can
15  obtain that information without the assistance of
16  counsel, correct?
17      A.   Yes.
18      Q.   The recordretentionsystem.PG.com, you can
19  obtain and review that policy independent of counsel,
20  correct?
21      A.   Yes.
22      Q.   As far as all of the materials that you
23  review related to the topics in Exhibit 2, all of those
24  materials you could have access to independent of
25  counsel, correct?

Page 45

1         MR. SCHAEFER:  Object to the form of the
2   question.
3      A.   Not all of them, no.
4      Q.   Which ones would be -- which ones are you
5   excluding?
6         MR. SCHAEFER:  I'll object and just instruct
7   the witness to the extent that it calls for
8   attorney-client privileged or attorney-client
9   information, he isn't to answer.
10         THE WITNESS:  Am I supposed to answer?
11         MR. SCHAEFER:  If you can answer without
12  revealing attorney work product or our privileged
13  communications, you may respond.
14      A.   I don't believe I would be able to answer
15  that without disclosing attorney-client privilege or
16  work product.
17      Q.   Let's look at Number 9 on the second page.
18  That topic states, policies regarding departing
19  employees and their data.
20         Do you see where I'm referring to?
21      A.   Yes, I do.
22      Q.   Are there written policies regarding
23  departing employees and their data?
24      A.   Yes, there are.
25      Q.   Did you review those written policies in

12 (Pages 42 to 45)

Scott Van Nice

Page 46

1    preparation for your deposition?
2        A.  No, I did not.
3        Q.  Are you aware of the policies regarding
4    departing employees and their data?
5        A.  Yes, I am.
6        Q.  What is your source of knowledge concerning
7    the policies regarding departing employees and their
8    data?
9        A.  My source is a document and policy called the
10   exit interview form.
11       Q.  And is that a written document?
12       A.  It is.
13       Q.  Did you review that in preparation for your
14   deposition?
15       A.  No, I did not.
16       Q.  Do you have access to a copy of the exit
17   interview form?
18       A.  I do.
19       Q.  What is the policy regarding departing
20   employees and their data retention?
21       A.  The policy is that when an employee leaves,
22   before leaving, either human resources, HR, or the
23   employee's manager has to sit down with the employee
24   and go through the exit interview.  Some of that
25   includes collecting their computer, PC, requesting

Page 47

1    their account be -- their IT account to be deactivated
2    and so forth.  All standard pro forma as part of
3    closing out the employee.
4        Q.  Are departing employees, their e-mails,
5    retained in any way?
6        A.  If they're not under legal hold, then no.
7        Q.  So if there is no legal hold in place and an
8    employee leaves P&G, there is no retention of any data
9    on their computer?
10       A.  To the best of my knowledge, that's right.
11       Q.  And if there is a legal hold in place, what
12   is the policy for departing employees?
13       A.  If there is a legal hold in place for the
14   departing employee, one part on the checklist instructs
15   the manager and for HR to send a standard e-mail to a
16   specific account to ask if a person is under a legal
17   hold.  If the response is affirmative, then the
18   computer and other corporate-owned devices are sent to
19   that specific person for chain of custody.
20       Q.  So they're retained -- if there's a legal
21   hold, the information is retained?
22       A.  Yes, that's right.
23       Q.  All right.  Slightly different question.
24   Let's say an employee is working on Prilosec OTC and
25   then is -- doesn't leave the company but is reassigned

Page 48

1    to a different product.  What happens to their Prilosec
2    OTC data that was on their computer?
3        A.  I couldn't speculate as to what happens to
4    that data.
5        Q.  Let's go to Number 10 on the letter.  ARGUS
6    application for adverse event data.
7            I take it, first of all, the database that's
8    used for tracking data events is ARGUS.
9        A.  My understanding, yes.
10       Q.  Can you tell me when the ARGUS application
11   was first put in place at P&G.
12       A.  Unfortunately, I can't remember when it was
13   first implemented, other than it has been a while.
14   It's been there for some time.
15       Q.  Okay.  The question I'm really trying to get
16   at, do you know if there was a predecessor application
17   that tracked adverse event data at P&G?
18       A.  To the best of my knowledge, I don't know.  I
19   am familiar at a high level as to what ARGUS is, but
20   not if there was a predecessor of the system.
21       Q.  Number 11, ePADex, what is that?
22       A.  It's an interactive process for approving
23   artwork.
24       Q.  Is that unique to P&G or is that a commercial
25   software?

Page 49

1        A.  I don't know if it's commercial software, but
2    it is used at P&G.
3        Q.  And can you give me an example of what the
4    ePADex application is used for at P&G.
5        A.  At a high level, you can consider it a form
6    of approval, where people submit artwork that goes
7    through specific steps before it's finally approved for
8    use in the business.
9        Q.  So various departments would have access to
10   ePADex for their review?
11       A.  I believe so, yes.
12       Q.  Does that application allow the reviewer to
13   make electronic notes or comments on the artwork?
14       A.  Could you say that again, please?
15       Q.  Does the ePADex application allow for a
16   reviewer to make notes, comment, or edits in the
17   artwork?
18       A.  As part of the approval process, I would
19   imagine so, yes.
20       Q.  Are the notes, comments, and edits in ePADex
21   retained?
22       A.  My understanding is the final product is
23   retained.  I can't speculate to whether that includes
24   the notes or any comment.
25       Q.  You don't know for sure about ePADex --

13 (Pages 46 to 49)

Scott Van Nice

Page 50

1        A.   That's correct.
2        Q.   -- whether those notes are retained?
3        A.   That's right.
4        Q.   Number 12, claims managers.  Number 12.  What
5    is a claims manager, as referred to here?
6        A.   The claims manager is part of a process
7    similar to HCPA and STEAM, where that all is involved
8    with holding the final results of the promotional
9    materials.  EPADex, for example, as I mentioned, part
10   of the approval process, the final result, as I
11   understand it, falls into HCPA/STEAM.
12       Q.   Can you explain what those applications are,
13   HCPA and STEAM.
14       A.   HCPA and STEAM are almost the same.  The two
15   words are used interchangeably.
16       Q.   But what is the purpose of HCPA/STEAM?
17       A.   My understanding is it's to hold the final
18   output of what the promotional materials are and have
19   been approved for the business use.
20       Q.   Okay.  So it would be -- for example, in
21   Prilosec OTC, HCPA/STEAM would hold the final
22   promotional materials for Prilosec OTC, correct?
23           MR. SCHAEFER:  Object to form.
24       A.   I would imagine so, yes.
25       Q.   All right.  Is there any application or

Page 51

1    storage area for draft promotional materials?
2        A.   The only other application that I'm familiar
3    with for artwork is ePADex, and that's it.
4        Q.   All right.  Is there a file share or database
5    or some storage facility for regulatory documents
6    related to Prilosec OTC?
7        A.   Yes.
8        Q.   Where are those documents stored, regulatory
9    documents for Prilosec OTC?
10       A.   My understanding is that the template
11   policies and procedures are stored in box.net in a
12   folder.
13       Q.   All right.  What about the communications
14   with FDA concerning Prilosec OTC, where is that
15   information stored?
16       A.   I don't know where the communications are
17   stored that are handled by -- that's handled by an
18   outside vendor.
19       Q.   Let me see if I understood your answer.  The
20   regulatory communications with FDA concerning Prilosec
21   OTC are retained and stored with an outside vendor?
22       A.   Yes.
23       Q.   What is the name of the vendor?
24       A.   DXC.
25       Q.   How long has regulatory documents related to

Page 52

1    Prilosec OTC been stored with DXC?
2        A.   I don't know.
3        Q.   Do you have any approximation of that time
4    frame?
5        A.   I do not.
6        Q.   Was that -- did the DXC store the regulatory
7    documents on Prilosec OTC since you became the
8    e-discovery person in 2008?
9        A.   I don't know.
10       Q.   Who has access -- what employees at P&G have
11   access to the regulatory information that is housed by
12   DXC?
13       A.   I don't know who would have access to those
14   folders.
15       Q.   Is there a regulatory department or business
16   at P&G here in Cincinnati?
17       A.   There is.
18       Q.   Is there a person in charge of that document?
19       A.   I don't know who is in charge specifically of
20   that.
21       Q.   Who is your contact in the regulatory
22   department here in Cincinnati for P&G?
23       A.   One of my contacts would be Vicki Schofield,
24   if I have any questions.
25           MR. DENTON:  Could you have him spell her

Page 53

1    last name for the record?
2        A.   To the best of my ability.
3    S-C-H-O-F-I-E-L-D.
4        Q.   And who is your contact if you had any
5    questions concerning marketing materials for Prilosec
6    OTC?
7        A.   I'm sorry.  I can't remember.
8        Q.   Who is your contact concerning the ARGUS
9    application for adverse event data?
10       A.   My contact would be Michael.  I believe his
11   last time name is Steinbauch.  I may have -- I'm not
12   sure of the spelling.  S-T-E-I-N-B-A-U-C-H.
13       Q.   Who is your contact with ePADex application?
14       A.   I can't recall.
15       Q.   What about HCPA/STEAM, who is your contact
16   there for the promotional materials?
17       A.   The only person that I can remember by first
18   name is Rose, but I can't remember the last name.
19       Q.   Let's go to Paragraph 13.  Enovia and CSS
20   corporate systems of record.  Can you explain to me
21   what those systems are?
22       A.   Yes.  If I recall, to the best of my
23   ability -- I'm sorry.  I can't remember.  I don't want
24   to speculate and give you the wrong answer.
25       Q.   All right.  Did you review any materials

14  (Pages 50 to 53)

Page 54

1    concerning Enovia and CSS corporate system records in
2    preparation for the deposition?
3         A.   At the direction of counsel, I did.
4         Q.   And you didn't bring -- if you had those
5    documents in front of you, would that refresh your
6    recollection and allow you to testify about Enovia and
7    CSS corporate systems of record?
8              MR. SCHAEFER:  Object.  Mischaracterizes the
9    testimony.
10        A.   Yes.
11        Q.   Were you instructed not to bring any
12   documents to the deposition?
13             MR. SCHAEFER:  Object.  Instruct the witness
14   not to answer.  Calls for information that's
15   privileged, work product.
16        Q.   Let's go to Number 14, the Kardia application
17   and C3DB system for consumer relations data.  Can you
18   explain those systems to me.
19        A.   Yes.  Kardia is part of the ecosystem with
20   ARGUS, and so what it holds includes adverse data, as
21   well as other data.  And Kardia also feeds into ARGUS.
22        Q.   Okay.  As an example, if a customer calls in
23   and makes a complaint about a product, is that recorded
24   in Kardia?
25        A.   It is.

Page 55

1         Q.   Is that information retained?
2         A.   I don't know if it is retained, but it is
3    entered into Kardia.
4         Q.   Is Kardia a database?
5         A.   It is a database, yes.
6         Q.   And the input -- the data that's inputted
7    into Kardia, what is the retention policy, if you know?
8         A.   I don't know.
9         Q.   If you wanted to find an answer to that
10   question, who would you talk to?
11        A.   It would be either Michael Steinbauch related
12   to the adverse data and Kardia, and Rose, the last name
13   I don't know.
14        Q.   Okay.  Is C3DB system different from Kardia?
15        A.   Yes.  Well, I'm not familiar with C3DB.
16        Q.   Okay.  In the Kardia application, is there a
17   way to filter the data for the types of information the
18   consumer reports?
19        A.   I'm not familiar with how Kardia is set up
20   internally, so I can't speculate as to how the filter
21   may work.
22        Q.   Do you know if Kardia is searchable, the data
23   within it?
24        A.   As it is a database, it's fair to say that it
25   has some search capability.

Page 56

1         Q.   But you're not personally familiar, are you?
2         A.   That's correct.
3         Q.   Number 15, what is DRS?
4         A.   It's the same thing.  It's used
5    interchangeably with Salesforce, and it's used for
6    professional sales data.
7         Q.   And what do you mean by "professional sales
8    data"?
9         A.   My understanding is that it's a software, at
10   a high level, that keeps track of the sales made.
11        Q.   In the Prilosec OTC, we're talking about an
12   over-the-counter product.  Do you know what type of
13   sales data is tracked in DRS related to Prilosec OTC?
14        A.   No, I do not.
15        Q.   Who would be your contact concerning DRS?
16        A.   My contact was a person named Jeff Knapp,
17   K-N-A-P-P.
18        Q.   And do you think he would be able to answer
19   questions concerning the type of sales data tracked in
20   DRS related to Prilosec OTC?
21        A.   Yes.  He's my known contact for Salesforce.
22        Q.   Let's go back to Page 1, Number 8, business
23   use of mobile devices.  What can you tell me about the
24   policy at P&G concerning business use of mobile
25   devices?

Page 57

1         A.   Generally speaking, employees may have a
2    corporate-owned mobile phone or they may have -- they
3    may use their own mobile, called BYOM.
4         Q.   Is there any software available to collect
5    the voice messages on mobile devices?
6         A.   Generally speaking, there are some softwares
7    out there that can do that if you have the phone in
8    physical possession.
9         Q.   So if I would hand you my phone, is there
10   software available for you to retrieve my voice
11   messages?
12             MR. SCHAEFER:  I'll object.  It's beyond the
13   scope of the notice, and the witness' responses about
14   what you can buy to do that are not speaking for the
15   corporation.
16             MR. DENTON:  All right.  He can speak for
17   himself.
18   BY MR. DENTON:
19        Q.   Go ahead.
20        A.   There are commercial softwares out there that
21   could be able to do what you're asking.
22        Q.   Does P&G use any such software?
23        A.   We have a mobile forensic software for mobile
24   phones, and as to whether or not that software can
25   handle voice mail or messages, I can't be sure.

Scott Van Nice

Page 58

1    Q.  What is the forensic mobile software used for
2  at P&G?
3    A.  The forensic mobile software is Cellebrite,
4  C-E-L-L-E-B-R-I-T-E.
5    Q.  And what is it used for?
6    A.  It's used to take a forensic image of the
7  mobile phone and then do analysis on the different
8  artifacts that are found on the mobile phone.
9    Q.  Do the employees at P&G have any dedicated
10  file share space on a server that's unique to their
11  name?
12    A.  Yes.
13    Q.  Do all employees have that, if they work in
14  the office?
15    A.  Generally speaking, yes.
16    Q.  And where is that information retained on the
17  file share?  Is that at the server level?
18    A.  That would be retained in either box.net or
19  OneDrive, where each employee has their own designated
20  space.
21    Q.  All right.  So if I happen to work for P&G
22  and I was in the office, I would have a file share in
23  my name, correct?
24    A.  Yes.
25    Q.  And what types of documents can be stored in

Page 59

1  file share?
2    A.  Standard user-created documents.  For
3  example, Microsoft Word, PDFs, Excel, images and so
4  forth.
5    Q.  What about e-mails, can you store e-mails in
6  your file share?
7    A.  As an archive or individual e-mail message,
8  you could do that.
9    Q.  So if I have this correctly, an employee
10  could store data on their own hard drive, correct?
11    MR. SCHAEFER:  Object to form.
12    You may answer.
13    A.  An employee can save data on the local --
14  their local hard drive, yes.
15    Q.  What I refer to the C drive?
16    A.  Yes.
17    Q.  They could store data on removable devices,
18  like a USB?
19    A.  Yes.
20    Q.  They could store data in their file share?
21    A.  Yes.  If they have their own account, yes.
22    Q.  As a general rule, office employees have a
23  share file in their own name?
24    A.  As a general rule, yes.
25    Q.  If an employee is subject to a litigation

Page 60

1  hold, how are those storage options maintained?
2    A.  If they're subject to a hold, then they are
3  expected to preserve the data and to comply with the
4  instructions sent out in the legal hold.
5    Q.  So each employee is to follow what is
6  communicated to them on an individual basis?
7    A.  Yes, between them and counsel.
8    MR. DENTON:  I think it's time to take a
9  short break.
10    Maybe you want to take a quick lunch?
11    MR. SCHAEFER:  We can do lunch, sure.
12    MR. DENTON:  Is that okay?
13    MR. SCHAEFER:  Sure.
14    - - -
15    Thereupon, the luncheon recess
16    was taken at 11:55 a.m.
17    - - -
18
19
20
21
22
23
24
25

Page 61

1    January 31, 2018
2    Wednesday Afternoon Session
3    12:45 p.m.
4    - - -
5    THE WITNESS:  Before we begin, I want to take
6  a moment to make a point of clarification.  Before, I
7  was under the gun and couldn't remember what Enovia and
8  CSS were, and I do recall Kardia feeds into Enovia.
9  And so Enovia is the system of record, and Kardia feeds
10  into Enovia once a day.  And, if memory serves me, C3DB
11  is an older system that was replaced by Kardia.
12    Also, when we were talking about -- during my
13  testimony, point of clarification, we were talking
14  about the regulatory materials, and one of your
15  questions asked of me was how long had that electronic
16  filing been in place, and I said that I couldn't
17  remember.  And I do recall that it was -- started in
18  2008.  The contact person is the same.  Her name is
19  Vicki Schofield.
20    And the last point of clarification, DRS and
21  Salesforce, I mentioned -- previously I said that it's
22  sales data, but I wasn't sure if I was clear on that.
23  It is -- could be easily mistakenly interpreted.  And
24  so just to clarify, it's sales data, not the actual
25  number of sales, but the sales rep, for example, the

16 (Pages 58 to 61)

Scott Van Nice

Page 62

1  calls they make, the doctors.  Just at a very high
2  level, they're sales calls.
3       So hopefully that's helpful.
4       MR. DENTON:  Thank you.
5       THE WITNESS:  And that's it.
6       MR. DENTON:  All right.
7  BY MR. DENTON:
8       Q.  Let's follow up on the sales call
9  information.  Would that be where sales reps keep call
10  notes when they visit with a physician?
11       A.  I don't know.  The main contact would
12  continue to be Jeff Knapp.  He would know the answer to
13  that.
14       Q.  All right.  So if I understood your
15  clarification, the regulatory files in DXC, that vendor
16  started in about 2008?
17       A.  Yes, that's right.
18       Q.  And do you know where regulatory documents
19  are stored that were created before 2008 for Prilosec
20  OTC?
21       A.  As I recall, I believe that was handled
22  electronically, but as for the name of the repository
23  or tool solution, no, I don't recall.  I don't know.
24       Q.  All right.  Thank you.
25       Let me talk to you about your various work

Page 63

1  duties at P&G over time.  When did you first start for
2  P&G?
3       A.  I started approximately 2002.
4       Q.  And what title or role did you have at that
5  time?
6       A.  My title was systems analyst.
7       Q.  And generally, what type of work did you
8  perform?
9       A.  In the beginning, I was responsible for
10  infrastructure support and R&D.
11       Q.  All right.  When did your job duties or
12  responsibilities change after 2002?
13       A.  When I transferred to a new role in 2004, I
14  became more involved in programming and application
15  software support.  And that was when the role -- my
16  role started to change.
17       Q.  All right.  When -- what's the next role you
18  had after 2004?
19       A.  After 2004, my next role started in 2006,
20  2007, when I became involved in developing electronic
21  discovery service.
22       Q.  Okay.  When did you obtain your law degree?
23       A.  I graduated in the spring of 2008.
24       Q.  All right.  Any of the -- let me ask you
25  this:  Have you ever performed work as an in-house

Page 64

1  lawyer at P&G, or has your role been in the information
2  technology field?
3       A.  My role has been in the area of information
4  technology.
5       Q.  All right.  To be clear, you do not provide
6  legal advice to P&G employees, correct?
7       MR. SCHAEFER:  Object.
8       A.  Right.
9       Q.  Let's talk about your role when you started
10  the electronic discovery area.  What is it that you did
11  for P&G in that area?
12       A.  My role when I started to develop the
13  electronic discovery service was to allow the attorneys
14  to be compliant with the Federal Rules of Civil
15  Procedure.
16       Q.  Okay.  And how did you know about the Federal
17  Rules of Civil Procedure?  Was that part of your law
18  training?
19       A.  That was part of my law training, as well as
20  P&G training.
21       Q.  And take us through the various tasks that
22  you have done to develop the e-discovery system
23  in-house for P&G.
24       MR. SCHAEFER:  Object to form.
25       A.  At a high level, it was about making sure

Page 65

1  that we had the necessary tools and processes that
2  would allow us to, one, be -- to conform to the
3  framework established by the US Supreme Court, which is
4  to preserve and identify electronic data, as well as
5  whether or not we can demonstrate that we are following
6  the Electronic Discovery Reference Model, or the EDRM.
7       Q.  When did you start that again?
8       A.  That was approximately around 2006, 2007.
9  No.  If I recall, the US Supreme Court released the
10  amendment in 2008, so that must have been -- I started
11  working on that in 2008.  That would make sense.
12       Q.  All right.  And I'm trying to understand.
13  What reference to the United States Supreme Court are
14  you referring to?
15       A.  The Federal Rules of Civil Procedure.
16       Q.  So did it become a full-time job at P&G for
17  you to make sure the e-discovery in-house complied with
18  the Federal Rules of Civil Procedure in 2008?
19       A.  Yes, it did become a full-time job.
20       Q.  Is that still your job?
21       A.  It is still part of my job duties.
22       Q.  Okay.  So you've been doing this seven to
23  eight years, correct, this particular role?
24       A.  Approximately that, yes.
25       Q.  So as I understand it, one of your duties,

17 (Pages 62 to 65)

Scott Van Nice

Page 66

1  generally, has been to identify and collect and
2  preserve electronic discovery in-house for P&G for the
3  various litigations. True?
4      A. Yes.
5      Q. Has that been your role in the Prilosec OTC
6  litigation?
7      A. Yes, that is part of my job duty that I'm
8  expected to do at the direction of counsel.
9      Q. Okay. So just to be clear, in the Prilosec
10  OTC litigation, your job, in part, is to identify and
11  supervise and collect sources of electronic data that
12  could be relevant to this litigation, true?
13          THE WITNESS: Do you mind repeating the
14  question, please?
15          (Record read as requested.)
16      A. Yes.
17      Q. And have you done so?
18      A. No, I haven't.
19      Q. Why not?
20          MR. SCHAEFER: Object. I've let you question
21  him on this area a little bit so that we could give you
22  some information, but at this point, you're, again,
23  going into areas that involve Mr. Van Nice's interface
24  with outside counsel and legal department of P&G in the
25  ongoing conduct of discovery in this case.

Page 67

1          So to the extent that you're asking what he
2  has done in this litigation to date, I'm going to tell
3  him not to answer and you can proceed.
4          MR. DENTON: We respectfully disagree with
5  that. I'm not asking advice of counsel, what he was
6  told or not to do. I'm just asking for his actions.
7  I'm going to ask it a different way and see if we can
8  get an answer.
9  BY MR. DENTON:
10      Q. In the Prilosec OTC litigation, have you been
11  involved in the identification of sources of
12  electronically stored information?
13      A. No, I have not.
14      Q. Has some other employee in P&G been doing
15  that?
16      A. Yes, there is another employee.
17      Q. And what is that individual's name?
18      A. That person's name is Lisa Schaerer.
19      Q. Can we get a spelling?
20      A. S-C-H-A-R-E-R (sic). And that may be
21  misspelled.
22      Q. And what is Lisa Schaerer's title?
23      A. She now has been moved to a new role in
24  project management. So she is no longer with
25  electronic discovery service.

Page 68

1      Q. All right. When did that change take place?
2      A. Roughly around October or September of 2017.
3      Q. Is there currently an e-discovery manager
4  assigned to the Prilosec OTC at P&G?
5      A. Yes.
6      Q. What is that person's name?
7      A. That would be me.
8      Q. Okay. So the combination of Lisa and you
9  have served as the project director for the e-discovery
10  of the Prilosec OTC litigation, true?
11          MR. SCHAEFER: Object to form.
12      A. Yes, that's right.
13      Q. When did Lisa join P&G in the e-discovery
14  department?
15          MR. SCHAEFER: Object. That's beyond the
16  scope of the 30(b)(6) notice.
17          If the witness has knowledge, he can answer.
18      A. Lisa joined electronic discovery service
19  under my supervision in 2012.
20      Q. And did Lisa work in e-discovery under your
21  supervision until she left in September or October of
22  2017?
23          MR. SCHAEFER: Same objection. If I could
24  have a continuing objection with respect to questions
25  about employee titles and responsibilities in the

Page 69

1  e-discovery area. Can I have a continuing objection?
2          MR. DENTON: Sure, you can. Yeah.
3          MR. SCHAEFER: All right.
4          MR. DENTON: But he can answer the question
5  if he has knowledge?
6          MR. SCHAEFER: I haven't instructed him not
7  to.
8          MR. DENTON: Right.
9      A. Yes.
10  BY MR. DENTON:
11      Q. Is Lisa Schaerer still with P&G, still an
12  employee?
13      A. To the best of my knowledge, yes.
14      Q. Did anyone replace Lisa in your department
15  when she left?
16      A. No.
17      Q. Are you the only e-discovery employee
18  currently at Procter & Gamble?
19      A. Yes.
20      Q. I want to go back to Exhibit 2, and I want to
21  ask you if, in addition to databases and information
22  contained in the letter, are you aware of any other
23  databases that exist in the P&G system that would have
24  information relevant to the Prilosec OTC litigation?
25      A. No. Other than the topics listed here, no.

18 (Pages 66 to 69)

Page 70

1    Q. All right. With respect to the Prilosec OTC
2  litigation, did Lisa identify the sources of
3  information within the company that would be relevant
4  to this litigation?
5    A. To the best of my knowledge. She worked at
6  the direction of counsel, where counsel identified the
7  sources of information.
8    Q. How would outside counsel know the sources of
9  information?
10    MR. SCHAEFER: I'll object and instruct the
11  witness not to answer questions that are privileged or
12  work product. And I'll object to the form of that
13  question.
14    Q. Let's go to Exhibit 1. First of all, I want
15  to try to help you with the date. You previously told
16  me you thought this was published in 2012, but I want
17  to refer you to Page 7. And it has some P&G
18  e-discovery statistics, at least through the year 2014.
19    Does that refresh your recollection, perhaps,
20  as to when you published Exhibit 1?
21    MR. SCHAEFER: I'll just object since we're
22  after the break now with respect to questions about
23  Exhibit 1, the white paper, guidant, as I did before
24  the lunch break. This is a document that is beyond the
25  scope of the 30(b)(6). It's authored by Mr. Van Nice,

Page 71

1  but it is not a Procter & Gamble document, nor does it
2  speak for Procter & Gamble practices or official
3  policies. If I can have a continuing objection on that
4  basis, then I will --
5    MR. DENTON: You can have a continuing
6  objection, but I'd appreciate it if you'd quit
7  providing leading objections to the witness. I simply
8  asked him if that document refreshed his recollection
9  as to the date of this document. That was the only
10  question on the table.
11    A. And related to which question?
12  BY MR. DENTON:
13    Q. I'm sorry. I'm just trying to see if
14  referencing Page 7 would help you identify the date of
15  publication of Exhibit 1 since there is reference
16  therein to 2014 statistics at P&G.
17    MR. SCHAEFER: Object to form.
18    A. Well, because I have the year here, 2014, it
19  would stand to reason that this was produced at least
20  in 2014 or 2015.
21    Q. Okay. Fair enough.
22    In looking at Page 7 and the statistics, you
23  used the term custodians, and you have numbers in that
24  column. What do you mean in this article -- how do you
25  define the term "custodian"?

Page 72

1    A. Based on this, I seem to be explaining about
2  how EnCase is a good fit because we use that for key
3  custodians. And by "key custodians," those are those
4  who we're actively collecting data.
5    Q. Okay.
6    A. So by custodian, again, I must be referring
7  to key custodians.
8    Q. And a custodian would be an employee of
9  Procter & Gamble who would have relevant information
10  concerning the litigation?
11    MR. SCHAEFER: Object to form.
12    A. That's the typical definition of a custodian,
13  yes.
14    Q. Is that the definition you use when you talk
15  about custodians?
16    A. Yes.
17    Q. All right. Now, I want to go a little bit
18  further. You've identified an individual as a
19  custodian.
20    Do you have a definition of what a custodial
21  file would contain?
22    A. A what?
23    Q. Do you use the term -- if you're collecting
24  data from a custodian that's been identified, what
25  information is collected?

Page 73

1    A. If we identify a key custodian, collection
2  would include typical sources in the P&G environment,
3  and that includes, for example, the person's computer,
4  the person's e-mail from the Microsoft Exchange, which
5  we talked about previously, and it could very well
6  include box.net, OneDrive, SharePoint. Again, what we
7  had talked about before.
8    Q. Okay. What about external storage devices,
9  such as a USB stick?
10    A. If counsel identifies that as part of their
11  follow-up, then yes.
12    Q. Well, does your department interview the
13  employee to find out where they store relevant
14  information?
15    A. Sometimes our department will do an
16  interview, but it's at the direction of counsel.
17    Q. All right. What about if the employee has
18  paper documents that aren't in electronic form, do you
19  consider that part of the identification of relevant
20  information?
21    A. No, we don't, because we don't handle paper
22  documents as part of the electronic discovery service.
23  The emphasis is on electronic.
24    Q. Would you have access and information that
25  would identify which individuals P&G has identified as

19 (Pages 70 to 73)

Scott Van Nice

Page 74

1    custodians in the Prilosec OTC litigation?
2         MR. SCHAEFER:  Object.
3         MR. DENTON:  Just asking if he had access.
4         MR. SCHAEFER:  Could I have the court
5    reporter read that one back?
6         MR. DENTON:  Sure.
7         (Record read as requested.)
8    A.  Do you mind rephrasing that question?  I'm
9    not sure I follow.
10   BY MR. DENTON:
11   Q.  Okay.  You already told me that Lisa
12   identified custodians for the Prilosec OTC and
13   collected the information.  True?
14        MR. SCHAEFER:  Object.  Mischaracterizes
15   testimony.
16   A.  Lisa did not identify the custodians.  It was
17   counsel that identified the custodians.  Lisa worked at
18   their direction.
19   Q.  But Lisa was involved in the collection and
20   the preservation of the custodial files for this
21   litigation?
22   A.  Lisa was involved in the preservation of the
23   data.
24   Q.  So somewhere, Lisa had to have a list of
25   names to preserve data, custodial names, correct?

Page 75

1         MR. SCHAEFER:  Object.  Beyond the scope of
2    this deposition.  If the witness can answer, he's not
3    answering on behalf of the company.
4    A.  Do you mind repeating the question?
5    Q.  Lisa would have necessarily had a list of
6    custodians to collect and preserve their data, correct?
7    A.  Yes.
8    Q.  Do you currently have access to that same
9    list of custodians?
10   A.  Yes.
11   Q.  Do you have access to the list of databases
12   that have been preserved and collected for the OTC
13   litigation?
14   A.  No.
15   Q.  Do you know if anyone does have such a list?
16   A.  No.
17   Q.  Was Lisa involved in the preservation and
18   collection of database information with respect to the
19   Prilosec OTC litigation?
20        MR. SCHAEFER:  Object.  Beyond the scope of
21   the notice.  Same objection previously.
22   A.  For database, no, Lisa was not involved in
23   the preservation or collection.
24   Q.  Who was involved, if anyone, at P&G for the
25   collection and preservation of database information

Page 76

1    related to the Prilosec OTC litigation?
2    A.  To my knowledge, no one was involved in the
3    preservation or collection of databases.
4    Q.  In looking at Exhibit 1, your paper, Page 7,
5    I'm looking down at these P&G e-discovery statistics,
6    do you have an approximation of how many custodians
7    that P&G has identified in the Prilosec OTC litigation?
8         MR. SCHAEFER:  Object.  Instruct the witness
9    not to answer.  Once again, as in the case earlier,
10   this is calling for information regarding his interface
11   with the legal department and outside counsel about
12   discovery in this litigation that's ongoing and, in
13   many cases, is beginning.  So this is work product and
14   privileged information.
15        I instruct him not to answer of his ongoing
16   involvement with the collection of information and
17   direction of in-house or outside counsel.
18        Further, we're going to take a break at this
19   point.
20        MR. DENTON:  Why?  Who needs a break?
21        MR. SCHAEFER:  We do.
22        MR. DENTON:  For what?
23        MR. GREEN:  You're going far afield, Roger.
24   You really are.  You're digging in -- you're trying to
25   violate privilege.

Page 77

1         MR. DENTON:  I am not.  You can instruct him.
2    You can object.  I can make my question.  I'm not
3    trying to do anything except make a record.  You made
4    your record.  We'll let the Court figure it out.
5         MR. GREEN:  The questions about what's been
6    done specifically in terms of document collection and
7    custodians and all of that, in this -- with respect to
8    Prilosec OTC is all privileged information.
9         MR. DENTON:  I absolutely disagree with you.
10        MR. GREEN:  Well, we disagree on that point.
11        MR. DENTON:  So why do we need to take a
12   break?
13        MS. FRIENT:  We're taking a break.  Thank
14   you.
15        MR. DENTON:  Who are you?  Are you counsel of
16   record?
17        MR. SCHAEFER:  Roger, I'm counsel of record.
18   I said we're taking a break.  I said it and K.C. has
19   said it.  He's counsel of record.
20        MR. DENTON:  Okay.  But I don't know who that
21   is.
22        MR. SCHAEFER:  So that's what we're doing.
23        MR. DENTON:  I'm sorry you guys are so
24   sensitive to the reality here of you not providing
25   appropriate discovery.

Scott Van Nice

Page 78

1           We will be, by the way -- don't leave yet --
2    we are going to be filing a motion for sanctions to
3    come back.
4           Show that Counsel Schaefer shrugged his head
5    and didn't offer to respond.
6           MR. SCHAEFER: We're off the record.
7           (Recess taken.)
8           MR. SCHAEFER: Roger, I just want to put
9    something on the record; that we took a break for
10   counsel to confer. The witness was not present during
11   that conference, and the conference was directed into the
12   questioning in the deposition, trying to move us
13   forward.
14          And Mr. Van Nice is here as a 30(b)(6)
15   witness. He's not been provided based upon his
16   individual knowledge or his individual involvement in
17   the ongoing conduct of discovery in this litigation.
18          So to the extent you ask him questions that
19   are involved with his individual participation, his
20   past participation, or his current participation with
21   inside and outside counsel, we'll continue to object
22   and instruct the witness not to answer. If you can ask
23   him questions involving Procter & Gamble's practices
24   and policies and what has taken place to date
25   institutionally at Procter & Gamble, that doesn't

Page 79

1    implicate his personal testimony, then those questions
2    are not objectionable or privileged.
3           MR. DENTON: Well, I understand that things
4    may cross over between 30(b)(6) and personal knowledge,
5    and you can make that distinction, but this is a
6    discovery deposition. It's relevant information. The
7    gentleman clearly has a wealth of knowledge that he's
8    not being allowed to testify about based on these
9    objections that I would like to get on the record so we
10   have information.
11          I don't know what -- I don't believe that's a
12   proper objection, I guess, is what I'm getting at. I'm
13   not trying to and have not tried to invade the
14   attorney-client privilege, although I disagree with
15   some of your objections. I'm not asking him what
16   counsel directed him to do. I'm not asking him about
17   his communications with counsel. I'm asking about what
18   he does in his job as e-discovery expert internally at
19   P&G.
20          MR. SCHAEFER: Well, those questions, if
21   that's what you were asking, would not be
22   objectionable.
23          MR. DENTON: That's correct.
24          MR. SCHAEFER: If you're asking him what he's
25   doing working with counsel with this litigation, then

Page 80

1    that is work product and may or may not be privileged,
2    but it most certainly is work product. And that's
3    where we're drawing the line. If you ask him what he
4    is doing, that's a different question than asking what
5    P&G has done.
6           MR. DENTON: All right. I disagree, but
7    we'll try to go forward.
8    BY MR. DENTON:
9        Q. This Exhibit 1, this paper you wrote around
10   2014 and 2015, it has your name on here on the front,
11   doesn't it, Scott Van Nice, e-discovery manager at P&G,
12   right?
13       A. Yes.
14       Q. And what you were putting in this white paper
15   was a summary of what you did as an e-discovery manager
16   at Procter & Gamble, correct?
17       A. No. This is a best -- to an extent, yes.
18   This is a best practice, talking about how a person or
19   team of two can handle electronic discovery at a
20   Fortune 500 company.
21          The intent behind this white paper was to
22   demonstrate that e-discovery, the team doesn't have to
23   be large. With the right tools and processes, it can
24   be done.
25       Q. And the white paper is describing what you

Page 81

1    actually did and still do at Procter & Gamble as an
2    e-discovery manager, true?
3        A. Yes.
4        Q. And just to be clear, this white paper was
5    published on the internet for anyone to see if they
6    chose to go find it like I did. Correct?
7        A. My understanding is that it is now published
8    on the internet, yes.
9        Q. You didn't have any direction of legal
10   counsel on what to put in this document, did you?
11       A. This went through formal P&G communications,
12   received approval for publication.
13       Q. Oh. So this Exhibit 1 that you prepared was
14   approved by Procter & Gamble before it was published?
15       A. It was approved by P&G communications.
16       Q. And that was done before it was published on
17   the internet?
18       A. This was -- P&G communications approved of
19   this white paper, and that was the white paper itself.
20       Q. Have you published any other articles
21   concerning electronic discovery?
22       A. No, I have not.
23       Q. Let's go to Page 6 of the article. I want to
24   reference you to this area right here, the Electronic
25   Discovery Reference Model.

Scott Van Nice

## Page 82

1    Do you see that?
2    A.  Yes, I see that.
3    Q.  Generally, what part of that model does P&G
4 do in-house?
5    A.  Generally at the direction of counsel, the
6 e-discovery team will handle identification,
7 preservation, collection in-house.
8    Q.  And that is a role that you perform?
9    A.  That's right.
10    Q.  And you have performed that role since 2008?
11    A.  Yes, that's right.
12    Q.  And did you perform that role or did Lisa
13 perform that role in the Prilosec OTC?
14    A.  Lisa worked with counsel to identify the data
15 and then worked with them for the necessary
16 preservation.
17    Q.  And what about collection?
18    A.  To the best of my knowledge, collection has
19 not been done yet.  We have the preservation and the
20 legal hold in place.
21    Q.  Do you know when the legal hold was put in
22 place for the Prilosec OTC litigation?
23    MR. SCHAEFER:  I'll object.
24    Q.  Go ahead.
25    A.  I can't recall.

## Page 83

1    Q.  Would you have that information in your
2 office?
3    A.  Yes.
4    Q.  Do you have any knowledge of where data
5 concerning Prilosec OTC would be stored prior to 2009?
6    A.  I don't believe so, no.
7    Q.  Who -- if you were asked to answer that
8 question, who would you go interview to try to find out
9 where old data prior to your tenure would exist for
10 Prilosec OTC?
11    MR. SCHAEFER:  I'll just object as vague.
12    A.  To determine if I remember where any old data
13 is beforehand, the practice would be to approach a
14 current employee that owns the current system and ask
15 questions to see how far back it goes.
16    Q.  So, for example, on ARGUS, if there was a
17 predecessor system, you would go ask the person who
18 runs ARGUS now to see if they have that information?
19    A.  That would be one strategy, yes.
20    Q.  You mentioned earlier you had provided one
21 30(b)(6) deposition in another litigation.
22    What litigation was that?
23    A.  That was for Fixodent.  The Fixodent
24 litigation.
25    Q.  And do you recall approximately what time or

## Page 84

1 date you gave that deposition?
2    A.  That would have been in the spring of 2008.
3 Wait.  Yes, spring of 2008.
4    Q.  And today is your second deposition?
5    A.  That's right.
6    MR. DENTON:  Let's mark this as Exhibit 3.
7    - - -
8    (Exhibit 3 marked.)
9    - - -
10 BY MR. DENTON:
11    Q.  I'm handing you Exhibit 3, which is the
12 notice for the deposition.
13    Have you ever seen Exhibit 3 before today --
14 before I just handed it to you?
15    MR. SCHAEFER:  We'll object to that as notice
16 of this deposition.  This is something that was
17 received --
18    MR. GREEN:  This --
19    MR. DENTON:  Wait, wait.  I just -- the
20 question was has he ever seen it.  You don't need a
21 speaking, coaching information from counsel.
22    MR. SCHAEFER:  You said this was notice of
23 the deposition.  This is not the notice of deposition.
24    MR. DENTON:  I disagree.
25    MR. GREEN:  This was just sent last night by

## Page 85

1 e-mail.  It's brand new.
2    MR. DENTON:  Anything else you want to tell
3 your witness before he answers the question, Counsel?
4    MR. GREEN:  I'm not telling the witness.
5 We're telling the Court.  This was sent at the eleventh
6 hour.  This is not the notice for this deposition.
7 BY MR. DENTON:
8    Q.  Have you ever seen Exhibit 3?
9    A.  No, I have not.
10    Q.  Have you ever seen the prior draft of the
11 deposition notice?
12    A.  Several months ago, I saw a deposition
13 notice.
14    Q.  Let's go to Page 10 of Exhibit 3.  Let's look
15 at Paragraph 1.  Please read it to yourself and then
16 I'll ask you a question about it.
17    A.  The first paragraph?
18    Q.  Paragraph Number 1 under Deposition Topics.
19    A.  Okay.
20    Q.  Are you capable of testifying about the
21 topics listed in Paragraph 1 on Page 10?
22    MR. SCHAEFER:  Object.
23    A.  Yes, to the best of my ability.
24    Q.  Let's look at Paragraph 2 on Page 10.  Please
25 read it to yourself and then I'll ask you a question

Scott Van Nice

Page 86

1    about it.
2         A.   What was your question?
3         Q.   My question is:  Would you have access to the
4    information to answer the Question Number 2 on Page 10
5    of this deposition notice?
6         MR. SCHAEFER:  I'll object and state that the
7    response is not speaking on behalf of the corporation.
8    This is a 30(b)(6) witness.  His personal opinion about
9    what he's capable of testifying to doesn't reflect the
10   notice to the company, and this is not an operative
11   notice for this deposition.
12        MR. DENTON:  It is the operative notice.
13        MR. SCHAEFER:  If I could have a continuing
14   objection, then I won't have to object to every
15   question.
16        MR. DENTON:  You can have a continuing
17   objection to anything you can fathom.  How about that?
18   Because I'm going to raise all of this with the Court.
19   BY MR. DENTON:
20        Q.   Now, the question is:  Would you be able, as
21   an employee of Procter & Gamble, to answer the
22   information in Paragraph 2 on Page 10?
23        A.   To the best of my ability, yes.
24        Q.   Let's go to the next page.  Let's look at
25   Number 3.  Please read it to yourself and then I will

Page 87

1    ask a question.
2         A.   Okay.
3         Q.   Would you have the ability to obtain the
4    information necessary to answer Paragraph 3?
5         A.   To the best of my ability, yes.
6         Q.   Please read Paragraph 4 and I'm going to ask
7    you the same question.
8         A.   Okay.
9         Q.   Are you able --
10        A.   Yes.  The same as the previous responses.  To
11   the best of ability, yes.
12        Q.   All right.  Let's look at Paragraph 5.
13   Please read it and I'm going to ask you the same
14   question.
15        A.   Okay.
16        Q.   What's your answer, please?
17        A.   The same as before.  Yes, to the best of my
18   ability.
19        Q.   All right.  Next page, let's look at
20   Number 6, please.
21        A.   Okay.
22        Q.   Do you have information that's responsive to
23   Number 6?  Could you answer that question if allowed
24   to?
25        A.   To the best of my ability, yes.

Page 88

1         Q.   Number 7, please read that.  Same question:
2    Would you be able to answer that question if allowed by
3    counsel?
4         A.   Same answer as before.
5         Q.   All right.  Number 8, please.
6         A.   Okay.
7         Q.   Same question.
8         A.   Same as before.  To the best of my ability,
9    yes.
10        Q.   Let's look at Number 9.
11        A.   Yes, the same as before.
12        Q.   So you could answer Number 9 if allowed to?
13        A.   If allowed, yes.
14        Q.   Number 10, please read it.  Same question.
15        A.   Same answer as before.  To the best of my
16   ability.
17        Q.   All right.  Let's go back to Number 1 on Page
18   10.
19        A.   In Exhibit 3?
20        Q.   Yes.  I'm sorry.  Yes, Page 10, Number 1.
21        A.   Okay.
22        Q.   Please explain to me all of the practices and
23   protocols and procedures followed by P&G to identify
24   and preserve electronic and paper data and other
25   documents potentially relevant to the claims or

Page 89

1    defenses in this litigation.
2         A.   The standard practice and policy is the
3    e-discovery team works with counsel.  Counsel will
4    identify custodians, and then counsel will release a
5    list to send out -- of people to send out a legal hold.
6    And in this legal hold notice, it asks the employees to
7    confirm their duties to preserve data, as well as
8    acknowledge their duties to preserve the data, as well
9    as make sure that they maintain and store and do not
10   modify or delete any data in their possession related
11   to the claim or defense matter.
12        Q.   All right.
13        A.   After that, counsel will work with the
14   electronic discovery team and issue an e-mail hold.
15   And from there, once we -- counsel and the e-discovery
16   team has preserved the e-mails, as well as made sure
17   the necessary legal holds are in place for specific
18   application or systems, then we're ready, if necessary,
19   to -- subject to the Court, to start the collection
20   process.
21        Q.   Okay.  How is it that your department goes
22   about preserving e-mails of custodians that have been
23   identified?
24        A.   Once we have the names of the employees and
25   once we've confirmed that they've received a legal

Golkow Litigation Services - 877.370.DEPS

Scott Van Nice

Page 90

 1  hold, then we work with the e-mail team, which
 2  typically is a vendor, and we release a request for
 3  them to put on an e-mail hold.  And we preserve the
 4  data in their mailbox.
 5      Q.   How do you go about preserving the e-mails on
 6  each computer?
 7      A.   Every employee has an account that is synced
 8  with Microsoft Exchange server, and so we preserve the
 9  data on the Microsoft Exchange server.
10      Q.   All right.
11      A.   And that includes only the e-mails that the
12  employee has synced with Microsoft Exchange server.
13      Q.   And what do you mean by "synced"?
14      A.   By "synced," I mean that if the sent and
15  received or saved drafts, so forth, have communicated
16  with the Microsoft Exchange server, that we would
17  preserve that.
18      Q.   Let me give you a hypothetical.  An employee
19  sends an e-mail to another employee.  Is that retained
20  at the Microsoft e-mail server?
21      A.   If that person is under e-mail hold, then
22  under that hypothetical, yes.
23      Q.   But are e-mails retained at the server
24  outside of litigation to standard practice for some
25  period of time?

Page 91

 1      A.   I'm not sure I follow.
 2      Q.   Let's assume there's no legal hold and an
 3  e-mail is sent by one employee to another employee.
 4  Let's say they're talking about the Cincinnati Reds.
 5          Is that e-mail preserved on the server for
 6  some number of days in the ordinary course of business?
 7      A.   So if I understand you correctly, you're
 8  asking me if an employee not under legal hold sends an
 9  e-mail, theoretically, yes, the e-mail should still be
10  available on the server.  But it may be subject to
11  routine deletion rules.
12      Q.   That's really what I was trying to ask, what
13  is the routine deletion rules outside of the legal
14  hold?
15      A.   My understanding is that if a person deletes
16  an e-mail, then it becomes removed from the Microsoft
17  Exchange server within seven days.  But beyond that, to
18  the best of my knowledge, that's the only routine rule
19  that's uniformly identified.
20      Q.   And as I understood your prior answer, if an
21  employee is subject to a legal hold, all of their
22  e-mails are then saved at the server level.
23          MR. SCHAEFER:  Object to form.
24      A.   Yes.
25      Q.   And that process of holding the e-mails at

Page 92

 1  the server, or preserving them at the server, is that
 2  done in-house by P&G employees, or is that a vendor?
 3      A.   It's done by a vendor.
 4      Q.   And does that vendor have to come on-site to
 5  do that or can they remotely access the server?
 6      A.   It's handled remotely.
 7      Q.   So is it fair to say that the remote vendor,
 8  on e-mails, would have to receive a list of employees
 9  that they needed to preserve at the server level?
10      A.   Yes.
11      Q.   Do you have a list in your possession of the
12  employees that have been put on a legal hold for the
13  Prilosec litigation?
14      A.   Yes.
15      Q.   Do you know when the legal hold was
16  implemented?
17      A.   I can't recall.
18      Q.   You would have that information back at the
19  office, true?
20      A.   Yes.
21          MR. DENTON:  Let's take a short break.  We
22  may be close.
23          MR. SCHAEFER:  Okay, good.
24          (Recess taken.)
25          MR. DENTON:  I don't have any more questions

Page 93

 1  today, although I am putting on the record that I don't
 2  believe this deposition is complete.  I think he's been
 3  improperly instructed not to answer certain questions.
 4  I also believe there are time frames and other
 5  information that he doesn't have information that he
 6  can answer.  And so that's not his fault, but Procter &
 7  Gamble's going to have to fill in those gaps with some
 8  other witness.
 9          We are going to be asking for costs and
10  expenses for what we believe is an improper
11  stonewalling of information that this witness could
12  have provided.  I don't want to debate it on the
13  record.  I just want to make the record.  We'll take it
14  up with the judge at the next status conference.
15          MR. GREEN:  I would just add that to the
16  extent -- first of all, I do think it is improper.
17  Beyond that, some of the questions you're referring to
18  were outside of what we agreed would be the topic
19  areas.
20          MR. DENTON:  Well, the topic areas we want
21  covered by some witness to everything in the
22  notice.  I understand you sent me a letter, which we
23  did mark as Exhibit 2, of what you said this witness
24  could testify about.  But that is in no way waiving our
25  position that these other topics are appropriate or

Scott Van Nice

Page 94

1    relevant.  Procter & Gamble needs to provide such a
2    witness.  And actually going through the notice, it is
3    pretty clear this is the gentleman who could have
4    answered all of those questions.
5          So with that, I'm closing the record.
6          MR. GREEN:  That's a new notice.  It's not
7    the notice you sent us originally.
8          MR. DENTON:  It's almost verbatim.
9          MR. GREEN:  No.
10         MR. DENTON:  The point is, this witness could
11   have answered and has the ability to answer all of
12   those topics, so I assume we're coming back.
13         MR. SCHAEFER:  The only thing I'll add, then,
14   is that the notice we provided -- excuse me, the
15   correspondence we provided January 24, 2018 was in
16   response to a request from plaintiffs' counsel to
17   provide a list of topics the witness would be prepared
18   to testify about.  And that's what we've done today.
19   We provided that list back on the 24th of January, and
20   that was operative and what we prepared the witness for
21   today, and that was at the invitation of opposing
22   counsel.
23         MR. DENTON:  The truth of the matter is,
24   we've always wanted the witness to respond to
25   everything in the notice.  You have said that both

Page 95

1    sides are preserving that.  You've objected to certain
2    things.  You've not filed formal objections.  We traded
3    red lines.  We all said, everybody's preserving
4    everything.  That's all I'm saying, is I'm preserving
5    all of the topics in the notice that I have served.
6    And you can file your objections.  You can do whatever
7    you think is appropriate.  But we're going to get
8    answers to those questions or you're going to have to
9    get an objection sustained by the Court to them at some
10   point.
11         MR. SCHAEFER:  Sure.
12         MR. GREEN:  We didn't trade red lines.  We
13   offered red lines, and you all refused to further red
14   line and asked us to do what we did instead, which was
15   to provide a list of topics that he would cover.
16         I understand we agreed we could argue later
17   about whether the scope -- about the scope of the
18   notice and so forth.  And we can push that down the
19   road.  So I'm not saying you waived stuff that you
20   asked originally in the notice, but we presented him
21   today to address those topics in that letter, which was
22   done at your directive.  We tried to red line it, and
23   you guys didn't want to go that route.  So we went your
24   route, and that's what -- this was the result.
25         MR. DENTON:  We didn't go anybody's route.

Page 96

1    You sent us red lines.  That's -- we didn't accept
2    those red lines.  We told you the notice is what the
3    notice is.  You've not filed objections to it.  You
4    sent red lines to it.  You provided this letter, and
5    this witness testified about the topics in that letter
6    to some extent.  He didn't have the documents that were
7    to be produced.  And we still have a notice out there
8    that we're going to need a witness for.
9          All I'm saying is, this witness clearly
10   testified today he could answer all of those questions,
11   and so we expect to be back to ask him those questions
12   at some point on --
13         MR. GREEN:  Except you didn't take him
14   through the definitions and the instructions and all of
15   the stuff that takes us way back to time frames that
16   we -- he made clear, and you heard it in his testimony,
17   he can't necessarily address.
18         MR. DENTON:  We can agree to disagree.  I
19   think we've made a record.
20         Unless you want to add something,
21   Mr. Schaefer.
22         MR. SCHAEFER:  Not at this point.
23         MR. DENTON:  Okay.  I think we can close the
24   deposition.
25         (Signature not waived.)

Page 97

1                        ---
2            Thereupon, the deposition was concluded
3    at approximately 2:10 p.m.
4                        ---
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

25 (Pages 94 to 97)

Scott Van Nice

Page 98

1   STATE OF OHIO:
      SS:
2   COUNTY OF _____:
3       I, SCOTT VAN NICE, do hereby certify that I
4   have read the foregoing transcript of my deposition
5   given on January 31, 2018; that together with the
6   correction page attached hereto noting changes to form
7   or substance, if any, it is true and correct.
8

      _____
9         SCOTT VAN NICE
10       I do hereby certify that the foregoing
11   transcript of the deposition of SCOTT VAN NICE was
12   submitted to the witness for reading and signing; that
13   after he had stated to the undersigned Notary Public
14   that he had read and examined his deposition, he signed
15   the same in my presence on this _____ day of
16   _____, 2018.
17

      _____
19       NOTARY PUBLIC, STATE OF OHIO
20   My commission expires: _____
21         ---
22
23
24
25

Page 100

1         - - - - - -
2         E R R A T A
        - - - - - -
3
4   PAGE  LINE  CHANGE
5   ____  ____  _____
6     REASON: _____
7   ____  ____  _____
8     REASON: _____
9   ____  ____  _____
10     REASON: _____
11   ____  ____  _____
12     REASON: _____
13   ____  ____  _____
14     REASON: _____
15   ____  ____  _____
16     REASON: _____
17   ____  ____  _____
18     REASON: _____
19   ____  ____  _____
20     REASON: _____
21   ____  ____  _____
22     REASON: _____
23   ____  ____  _____
24     REASON: _____
25

Page 99

1         CERTIFICATE
2   THE STATE OF OHIO:
      SS:
3   COUNTY OF DELAWARE:
4       I, Sara S. Clark, RPR/RMR/CRR/CRC, a Notary
5   Public in and for the State of Ohio, duly commissioned
6   and qualified, certify that the within named SCOTT VAN
7   NICE was by me duly sworn to testify to the whole truth
8   in the cause aforesaid; that the testimony was taken
9   down by me in stenotypy in the presence of said
10   witness, afterwards transcribed upon a computer; that
11   the foregoing is a true and correct transcript of the
12   testimony given by said witness taken at the time and
13   place in the foregoing caption specified.
14       I certify that I am not a relative, employee,
15   or attorney of any of the parties hereto, or of any
16   attorney employed by the parties, or financially
17   interested in the action.
18       IN WITNESS WHEREOF, I have set my hand and
19   affixed my seal of office at Delaware, Ohio, on this
20   14th day of February, 2018.
21

      _____
22       Sara S. Clark, RPR/RMR/CRR/CRC
      Notary Public, State of Ohio
23
24   My commission expires: March 10, 2018.
25

26 (Pages 98 to 100)

**A**

**a.m** 1:14 60:16
**ability** 24:11
  25:25 33:7
  53:2,23 85:23
  86:23 87:3,5
  87:11,18,25
  88:8,16 94:11
**able** 13:15 16:2
  16:16,23 24:1
  31:4 33:7,25
  39:13 44:4
  45:14 56:18
  57:21 86:20
  87:9 88:2
**absolutely** 12:15
  20:4 77:9
**accept** 96:1
**access** 26:12
  29:4 31:25
  34:9,11 41:12
  44:24 46:16
  49:9 52:10,11
  52:13 73:24
  74:3 75:8,11
  86:3 92:5
**account** 27:16
  27:17 47:1,1
  47:16 59:21
  90:7
**accurate** 7:25
  8:1,19 11:17
  11:24 29:16,17
  42:17
**accurately** 15:10
  16:7
**acknowledge**
  89:8
**action** 17:15
  99:17
**actions** 1:7 67:6
**actively** 72:4
**actual** 61:24
**add** 93:15 94:13
  96:20
**addition** 17:21

69:21
**additional** 12:7
**address** 23:7,14
  32:7 95:21
  96:17
**ads** 29:25 30:2
**advanced** 7:19
**adverse** 48:6,17
  53:9 54:20
  55:12
**advice** 64:6 67:5
**affirmative**
  47:17
**affixed** 99:19
**afield** 76:23
**aforesaid** 99:8
**Afternoon** 61:2
**ago** 10:11 85:12
**agree** 12:8 96:18
**agreed** 93:18
  95:16
**ahead** 20:19
  37:9 40:2
  57:19 82:24
**allow** 26:3 36:3
  49:12,15 54:6
  64:13 65:2
**allowed** 12:13
  23:17 27:5
  30:16,18 79:8
  87:23 88:2,12
  88:13
**allows** 31:15
  35:25
**amendment**
  65:10
**analysis** 58:7
**analyst** 6:18
  63:6
**ANAPOL** 2:14
**answer** 10:16,22
  11:1 12:13
  13:5,14 14:5
  15:22 16:23
  17:6 18:2,7,8
  18:10,17 19:2

19:13,16 20:14
  21:3,6,16 23:4
  27:1 31:4 32:3
  33:4,8 37:9,22
  38:3,4,20
  39:19 42:12
  44:5 45:9,10
  45:11,14 51:19
  53:24 54:14
  55:9 56:18
  59:12 62:12
  67:3,8 68:17
  69:4 70:11
  75:2 76:9,15
  78:22 83:7
  86:4,21 87:4
  87:16,23 88:2
  88:4,12,15
  91:20 93:3,6
  94:11 96:10
**answered** 94:4
  94:11
**answering** 39:25
  40:4 75:3
**answers** 37:6
  85:3 95:8
**anybody's** 95:25
**apart** 10:19,25
  11:2 18:11
**appears** 7:23
**application** 48:6
  48:10,16 49:4
  49:12,15 50:25
  51:2 53:9,13
  54:16 55:16
  63:14 89:18
**applications**
  50:12
**appreciate** 71:6
**approach** 83:13
**appropriate**
  14:14 33:18
  77:25 93:25
  95:7
**approval** 49:6
  49:18 50:10

81:12
**approved** 49:7
  50:19 81:14,15
  81:18
**approving** 48:22
**approximate** 8:5
  20:11 37:25
**approximately**
  7:4 9:9 22:13
  22:15 24:17
  25:7 63:3 65:8
  65:24 83:25
  97:3
**approximation**
  42:14 52:3
  76:6
**archive** 59:7
**area** 8:23 51:1
  64:3,10,11
  66:21 69:1
  81:24
**areas** 66:23
  93:19,20
**argue** 95:16
**ARGUS** 48:5,8
  48:10,19 53:8
  54:20,21 83:16
  83:18
**arrived** 25:11
**article** 12:3,5
  39:4,12 71:24
  81:23
**articles** 81:20
**artifacts** 58:8
**artwork** 48:23
  49:6,13,17
  51:3
**asked** 14:8
  61:15 71:8
  83:7 95:14,20
**asking** 10:24
  12:5 13:17
  14:12 18:4,10
  20:20 57:21
  67:1,5,6 74:3
  79:15,16,17,21

79:24 80:4
  91:8 93:9
**asks** 89:6
**assigned** 36:21
  68:4
**assistance** 44:15
**assume** 14:4
  28:21 35:7
  91:2 94:12
**attached** 98:6
**attachment** 26:4
**attention** 15:15
**attorney** 45:12
  99:15,16
**attorney-client**
  45:8,8,15
  79:14
**attorneys** 64:13
**authenticity**
  16:4
**authored** 70:25
**available** 11:16
  25:2 29:5,6
  35:8 44:10
  57:4,10 91:10
**aware** 10:9,11
  15:1,4 17:20
  19:20 23:10
  27:25 41:22
  46:3 69:22

**B**

**bachelor's** 7:9
**back** 12:23
  14:17 19:6
  23:25 32:8
  40:8 56:22
  69:20 74:5
  78:3 83:15
  88:17 92:18
  94:12,19 96:11
  96:15
**back-up** 41:2
**background**
  6:24
**BACON** 2:19

Scott Van Nice

**based** 8:12
25:10 31:17
34:3 40:4
43:23 72:1
78:15 79:8
**basis** 21:2 60:6
71:4
**beginning** 63:9
76:13
**behalf** 2:5,11,17
2:22 3:6,12
8:11 75:3 86:7
**believe** 19:7
28:2 29:14
43:5 45:14
49:11 53:10
62:21 79:11
83:6 93:2,4,10
**BERNE** 1:15
2:8
**best** 11:20 24:17
25:10 26:10
30:24 33:7
35:4 42:14
47:10 48:18
53:2,22 69:13
70:5 80:17,18
82:18 85:23
86:23 87:5,11
87:17,25 88:8
88:15 91:18
**beyond** 18:12
37:5 38:2
42:11 57:12
68:15 70:24
75:1,20 91:17
93:17
**binding** 38:3
**bit** 66:21 72:17
**BOCKIUS** 3:9
**BOGARD** 2:2
**Boston** 3:4
**Boulevard** 2:19
**box.net** 30:19
36:1 41:3,8,18
41:23 51:11

58:18 73:6
**Boylston** 3:4
**brand** 85:1
**break** 33:9,23
60:9 70:22,24
76:18,20 77:12
77:13,18 78:9
92:21
**bring** 31:23 43:6
43:11 54:4,11
**brought** 23:1
32:21
**Bryant** 3:16
**BS** 7:16,20
**business** 27:16
27:17 41:5
42:2,2,4,6,7,24
49:8 50:19
52:15 56:22,24
91:6
**businesses** 42:10
42:17
**buy** 57:14
**BYOM** 57:3

**C**
**C** 1:5 2:1,2 3:1
6:2 59:15
**C-E-L-L-E-B-...**
58:4
**C3DB** 54:17
55:14,15 61:10
**call** 62:8,9
**called** 4:6 8:25
24:15,23 25:6
28:14 31:13
42:25 46:9
57:3
**calling** 76:10
**calls** 10:16 37:22
38:20 45:7
54:14,22 62:1
62:2
**capability** 55:25
**capable** 16:13
39:25 85:20

86:9
**capacity** 10:18
**caption** 99:13
**carry** 38:16
**case** 1:4 16:10
36:16 66:25
76:9
**cases** 13:25
76:13
**categories** 31:17
32:25 33:2
**cause** 99:8
**CCC** 1:5
**Cecchi** 1:5
**Cellebrite** 58:3
**central** 34:11
**certain** 30:7
44:4 93:3 95:1
**certainly** 13:12
13:15 80:2
**CERTIFICA...**
99:1
**certification**
8:17,21 19:22
**certified** 5:14,15
6:5
**certify** 18:18
19:5 98:3,10
99:6,14
**certifying** 20:2
**chain** 16:5 47:19
**change** 63:12,16
68:1 100:4
**changes** 98:6
**character** 4:11
**charge** 7:24
52:18,19
**checklist** 47:14
**chose** 81:6
**Cincinnati** 1:16
2:9 52:16,22
91:4
**City** 2:20
**Civil** 64:14,17
65:15,18
**claim** 89:11

**claims** 50:4,5,6
88:25
**Claire** 1:5
**clarification**
33:16 61:6,13
61:20 62:15
**clarify** 28:8
37:14 61:24
**Clark** 1:22 99:4
99:22
**classification**
42:1
**clear** 25:16
61:22 64:5
66:9 81:4 94:3
96:16
**clearly** 79:7 96:9
**click** 33:24
**close** 92:22
96:23
**closing** 47:3
94:5
**cloud** 41:10
**coaching** 84:21
**collaboration**
11:15
**colleague** 36:9
**collect** 16:3,17
16:20 17:9,16
17:20 36:13
38:10 39:14,23
57:4 66:1,11
75:6
**collected** 21:14
72:25 74:13
75:12
**collecting** 15:11
46:25 72:4,23
**collection** 17:24
73:1 74:19
75:18,23,25
76:3,16 77:6
82:7,17,18
89:19
**college** 7:7
**column** 71:24

**combination**
68:8
**come** 14:17 78:3
92:4
**coming** 19:6
94:12
**comment** 49:16
49:24
**comments** 49:13
49:20
**commercial**
48:24 49:1
57:20
**commission**
98:20 99:24
**commissioned**
99:5
**common** 36:2
**communicated**
60:6 90:15
**communicatio...**
45:13 51:13,16
51:20 79:17
81:11,15,18
**company** 3:12
16:2,14 29:14
34:7 37:7 38:3
47:25 70:3
75:3 80:20
86:10
**complaint** 54:23
**complete** 17:1
93:2
**compliant** 64:14
**complied** 65:17
**comply** 32:11
60:3
**computer** 8:18
23:18 30:15
41:12 46:25
47:9,18 48:2
73:3 90:6
99:10
**computers**
23:17 27:4
34:7

concept 8:8
concerning 28:6
  42:18 46:6
  51:14,20 53:5
  53:8 54:1
  56:15,19,24
  72:10 81:21
  83:5
concluded 97:2
conduct 18:11
  20:23 66:25
  78:17
conducting 21:4
confer 78:10
conference
  78:11,11 93:14
confirm 89:7
confirmed 89:25
conform 65:2
confused 7:14
consider 49:5
  73:19
consumer 3:7
  54:17 55:18
contact 52:21
  53:4,8,10,13
  53:15 56:15,16
  56:21 61:18
  62:11
contacts 52:23
contain 72:21
contained 69:22
contents 15:9
continue 14:4
  62:12 78:21
continuing 12:1
  12:9,10 19:22
  21:4 39:1
  68:24 69:1
  71:3,5 86:13
  86:16
copy 31:23,25
  33:3 43:7
  46:16
corporate 27:7
  53:20 54:1,7

corporate-ow-
  47:18 57:2
corporation
  57:15 86:7
correct 8:4
  16:11 19:24
  25:24 26:20
  34:5 38:11
  39:9,11 40:5
  43:8 44:11,16
  44:20,25 50:1
  50:22 56:2
  58:23 59:10
  64:6 65:23
  74:25 75:6
  79:23 80:16
  81:6 98:7
  99:11
correction 98:6
correctly 44:4
  59:9 91:7
correspondence
  94:15
costs 93:9
counsel 4:4
  12:25 14:7
  16:6 17:13
  18:16,23 19:18
  20:22 35:18
  37:1,11,15,17
  39:22 40:5
  44:8,11,16,19
  44:25 54:3
  60:7 66:8,24
  67:5 70:6,6,8
  73:10,16 74:17
  76:11,17 77:15
  77:17,19 78:4
  78:10,21 79:16
  79:17,25 81:10
  82:5,14 84:21
  85:3 88:3 89:3
  89:3,4,13,15
  94:16,22
country 31:19
COUNTY 98:2

99:3
course 91:6
court 1:1 14:17
  65:3,9,13 74:4
  77:4 85:5
  86:18 89:19
  95:9
cover 95:15
covered 93:21
Cowing 2:18
create 23:17
  29:8 32:16
  34:14 41:17
created 34:24
  62:19
creating 30:1
cross 79:4
CSS 53:19 54:1
  54:7 61:8
current 9:19,23
  22:11,12,17
  24:14 26:5
  78:20 83:14,14
currently 9:12
  10:3 15:5 22:7
  31:10 37:24
  68:3 69:18
  75:8
custodial 72:20
  74:20,25
custodian 71:25
  72:6,8,12,19
  72:24 73:1
custodians
  10:12 11:23
  13:2,12,19
  14:5,9,13,21
  15:2,11 21:17
  21:20 71:23
  72:3,3,7,15
  74:1,12,16,17
  75:6,9 76:6
  77:7 89:4,22
custody 16:5
  47:19
customer 54:22

cycles 9:10
——————
D
D 5:1 6:2
data 13:20,21
  14:11,12 16:3
  16:4,14,17,20
  17:10,16,21,24
  31:17 32:4,23
  38:10 39:14,24
  40:9,10,15,18
  40:20,25 41:2
  41:7,21,23,25
  42:19,23 45:19
  45:23 46:4,8
  46:20 47:8
  48:2,4,6,8,17
  53:9 54:17,20
  54:21 55:6,12
  55:17,22 56:6
  56:8,13,19
  59:10,13,17,20
  60:3 61:22,24
  65:4 66:11
  72:4,24 74:23
  74:25 75:6
  82:14 83:4,9
  83:12 88:24
  89:7,8,10 90:4
  90:9
database 48:7
  51:4 55:4,5,24
  75:18,22,25
databases 69:21
  69:23 75:11
  76:3
date 17:10 38:17
  67:2 70:15
  71:9,14 78:24
  84:1
day 61:10 98:15
  99:20
days 24:3,4 91:6
  91:17
deactivated 47:1
debate 93:12

dedicated 23:7
  23:14 29:15
  31:1 58:9
defendant 2:11
  3:6,12 10:9
Defendants 2:22
defendants'
  19:6
defense 89:11
defenses 89:1
deficiency 20:25
define 41:24
  42:2 71:25
definition 72:12
  72:14,20
definitions
  96:14
degree 7:17,21
  63:22
degrees 7:7,19
Delaware 99:3
  99:19
delete 26:20
  32:10 89:10
deleted 24:1,3,5
deletes 23:20,23
  26:22 91:15
deletion 91:11
  91:13
Dell 27:8
demonstrate
  65:5 80:22
Denton 2:2,2 5:5
  5:9 6:8,11 7:14
  7:15 10:21
  11:4,7,12
  12:10,13,16,17
  12:23 13:8
  14:3,16,19
  15:25 17:2,5
  18:6,18,20
  19:4,8,21 20:1
  20:6,7,15,18
  21:8,12,18
  22:5,9 32:19
  33:9,11 35:12

35:16 37:8,23
38:4,23 39:7
39:11,21 52:25
57:16,18 60:8
60:12 62:4,6,7
67:4,9 69:2,4,8
69:10 71:5,12
74:3,6,10
76:20,22 77:1
77:9,11,15,20
77:23 79:3,23
80:6,8 84:6,10
84:19,24 85:2
85:7 86:12,16
86:19 92:21,25
93:20 94:8,10
94:23 95:25
96:18,23
**departing** 45:18
45:23 46:4,7
46:19 47:4,12
47:14
**department**
13:25 17:19
19:18 20:21
41:5 42:5,7,24
52:15,22 66:24
68:14 69:14
73:12,15 76:11
89:21
**departments**
41:20 42:9,18
49:9
**depend** 29:22
**depending**
31:18
**deposition** 1:11
4:5 5:11 8:6
10:20,25 12:3
12:4 18:5
19:14 20:24
21:23,24 43:7
43:12,15,18
46:1,14 54:2
54:12 75:2
78:12 79:6

83:21 84:1,4
84:12,16,23,23
85:6,11,12,18
86:5,11 93:2
96:24 97:2
98:4,11,14
**depositions** 8:3
**deps@golkow...**
1:24
**describe** 15:10
17:23
**describing** 80:25
**DESCRIPTI...**
5:7
**designated** 8:9
58:19
**desk** 27:5
**desktop** 27:9
**determination**
29:12
**determine** 34:16
83:12
**determined** 42:1
**develop** 64:12
64:22
**developed** 22:24
**developing**
63:20
**device** 27:12,13
27:15,21 30:17
41:2
**devices** 27:4
47:18 56:23,25
57:5 59:17
73:8
**different** 10:2
14:12 22:16
28:13 32:25
41:20 42:18
47:23 48:1
55:14 58:7
67:7 80:4
**differently** 17:8
**digging** 76:24
**digital** 9:4
**directed** 78:11

79:16
**direction** 12:25
17:13 18:23
37:1,10,17
44:8 54:3 66:8
70:6 73:16
74:18 76:17
81:9 82:5
**directive** 95:22
**director** 68:9
**disagree** 11:4
14:3,16 17:2
18:6 19:21
67:4 77:9,10
79:14 80:6
84:24 96:18
**disclosed** 21:17
**disclosing** 45:15
**disclosure** 10:17
10:19
**discovery** 8:17
8:22,24 9:4,7
9:14,20 10:5
13:7 14:1 18:5
18:11,14,14
20:23,24,24
21:4 38:21
39:20 63:21
64:10,13 65:6
66:2,25 67:25
68:18 73:22
76:12 77:25
78:17 79:6
80:19 81:21,25
89:14
**discovery's**
16:24
**discretion** 32:9
40:17,20 41:17
**distinction** 79:5
**DISTRICT** 1:1
1:1
**DIVISION** 1:2
**doctors** 62:1
**document** 1:6
26:4 27:24,24

28:1,6,9,12,20
29:9,13 30:1
31:7,15,16,20
31:25 32:10
33:13,17,20
34:1,3,14,16
34:18,20 38:25
39:2,6,7 46:9
46:11 52:18
70:24 71:1,8,9
77:6 81:10
**documents**
29:15,22 30:8
30:10,12,15,16
30:18,23,25
32:16 33:19
36:14,18,411
43:2,11,14
44:4 51:5,8,9
51:25 52:7
54:5,12 58:25
59:2 62:18
73:18,22 88:25
96:6
**DocumentUp**
28:14
**doggone** 32:20
**doing** 37:3 65:22
67:14 77:22
79:25 80:4
**domain** 36:4
38:25
**draft** 51:1 85:10
**drafting** 33:13
**drafts** 90:15
**draw** 15:15
**drawing** 80:3
**drive** 30:3,15,16
30:17 31:1
41:3 59:10,14
59:15
**DRS** 56:3,13,15
56:20 61:20
**duly** 6:5 99:5,7
**duties** 63:1,11
65:21,25 89:7

89:8
**duty** 66:7
**DXC** 51:24 52:1
52:6,12 62:15

**E**
**E** 2:1,1 3:1,1 5:1
6:2,2 100:1
**e-discovery** 6:25
7:3,24 10:25
36:24 52:8
64:22 65:17
68:3,9,13,20
69:1,17 70:18
76:5 79:18
80:11,15,22
81:2 82:6 89:3
89:15
**e-mail** 17:14,21
18:21,24 19:10
20:9 22:6,11
22:12,17,20,23
23:2,7,14,18
23:21,22,23,24
24:1,5,5 27:20
27:21 32:7
47:15 59:7
73:4 85:1
89:14 90:1,3
90:19,20,21
91:3,5,9,9,16
**e-mails** 17:25
21:9,11,13
23:1 24:3
27:16,17 43:24
47:4 59:5,5
89:16,22 90:5
90:11,23 91:22
91:25 92:8
**earlier** 76:9
83:20
**easily** 61:23
**ecosystem** 54:19
**edits** 49:16,20
**EDRM** 65:6
**effect** 22:14 24:8

24:16,24
eight 65:23
either 27:8
  41:12 46:22
  55:11 58:18
electronic 8:17
  8:22,24 9:3,7
  9:13,20 10:5
  43:14 49:13
  61:15 63:20
  64:10,13 65:4
  65:6 66:2,11
  67:25 68:18
  73:18,22,23
  80:19 81:21,24
  88:24 89:14
electronically
  62:22 67:12
eleventh 85:5
emphasis 73:23
employed 99:16
employee 23:6
  23:20,23 26:17
  26:19,22 27:15
  27:20 30:1,2,4
  31:15 32:10,11
  32:13 33:18,24
  34:3,9,14 36:7
  40:9,10,19
  41:6,21 42:19
  46:21,23 47:3
  47:8,14,24
  58:19 59:9,13
  59:25 60:5
  67:14,16 68:25
  69:12,17 72:8
  73:13,17 83:14
  86:21 90:7,12
  90:18,19 91:3
  91:3,8,21
  99:14
employee's
  46:23
employees 19:10
  20:8,12,16
  23:11,13,16

24:10 25:2,8
25:25 26:12
27:5,11,13
28:21 29:4,7,8
29:11 30:7,10
30:14 32:15
35:8,25 36:3
36:17,21,25
37:2,14,16,20
37:24 40:14,16
40:24 45:19,23
46:4,7,20 47:4
47:12 52:10
57:1 58:9,13
59:22 64:6
89:6,24 92:2,8
92:12
employees'
  21:13 41:16
EnCase 8:25
  72:2
Enovia 53:19
  54:1,6 61:7,8,9
  61:10
entered 55:3
enterprise-wide
  28:20
entitled 21:1
environment
  34:12 73:2
ePADex 48:21
  49:4,10,15,20
  49:25 50:9
  51:3 53:13
Esquire 2:2,7,7
  2:13,18 3:2,8
established 65:3
event 48:6,17
  53:9
events 48:8
everybody's
  95:3
evidence 20:25
exactly 21:22
Examination
  5:5 6:7

examined 98:14
example 23:12
  29:9,19 30:17
  31:17 32:7,15
  32:16 36:5
  44:14 49:3
  50:9,20 54:22
  59:3 61:25
  73:3 83:16
Excel 29:1 59:3
exception 23:11
exceptions 23:9
Exchange 73:4
  90:8,9,12,16
  91:17
excluding 45:5
excuse 12:2
  94:14
Exhibit 5:7 11:8
  11:10,13,19
  15:7,9,14
  35:12,14,17
  40:8 43:20
  44:6,23 69:20
  70:14,20,23
  71:15 76:4
  80:9 81:13
  84:6,8,11,13
  85:8,14 88:19
  93:23
exist 69:23 83:9
exit 46:10,16,24
expect 96:11
expected 32:11
  32:12 34:19
  38:15,16 60:3
  66:8
expenses 93:10
expert 12:6
  79:18
expires 98:20
  99:24
explain 8:21
  23:20 50:12
  53:20 54:18
  88:22

explaining 72:1
extent 10:16,23
  16:23 18:8
  19:17 45:7
  67:1 78:18
  80:17 93:16
  96:6
external 30:16
  73:8
extremely 33:1

**F**

facility 51:5
fair 14:1 27:2,3
  36:22 55:24
  71:21 92:7
fall 7:6
falls 50:11
familiar 8:8
  34:19 35:20
  48:19 51:2
  55:15,19 56:1
far 23:25 44:22
  76:23 83:15
fathom 86:17
fault 93:6
fax 1:23
FDA 51:14,20
February 99:20
Federal 64:14
  64:16 65:15,18
feeds 54:21 61:8
  61:9
field 7:2,11 64:2
fight 11:5 21:20
figure 77:4
file 30:3 35:22
  35:25 36:4,8
  41:11 43:24
  51:4 58:10,17
  58:22 59:1,6
  59:20,23 72:21
  95:6
filed 95:2 96:3
files 36:3 41:13
  62:15 74:20

filing 61:16 78:2
fill 93:7
filter 55:17,20
final 49:22 50:8
  50:10,17,21
finally 49:7
finance 33:1
financially
  99:16
find 9:19 13:10
  28:17 29:18
  36:8,15 41:7
  42:22 55:9
  73:13 81:6
  83:8
fine 13:22 20:4
Finken 2:13
  5:10
first 6:5 10:8
  18:24 36:16,21
  48:7,11,13
  53:17 63:1
  70:14 85:17
  93:16
fit 72:2
Fixodent 83:23
  83:23
folder 41:14
  51:12
folders 23:17
  52:14
follow 32:12
  60:5 62:8 74:9
  91:1
follow-up 73:11
followed 88:23
following 65:5
follows 6:6
foregoing 98:4
  98:10 99:11,13
forensic 6:18
  57:23 58:1,3,6
forensics 8:18
  9:4
form 8:14 15:21
  16:8 25:8 28:7

Scott Van Nice

33:21 34:17
35:9 40:22
42:20 44:7
45:1 46:10,17
49:5 50:23
59:11 64:24
68:11 70:12
71:17 72:11
73:18 91:23
98:6
**forma** 47:2
**formal** 81:11
95:2
**formats** 32:23
**forth** 28:15 33:1
47:2 59:4
90:15 95:18
**Fortune** 80:20
**forward** 17:4
23:1 78:13
80:7
**found** 58:8
**frame** 52:4
**frames** 93:4
96:15
**framework** 65:3
**Frient** 3:16
77:13
**front** 2:3 21:21
32:20 54:5
80:10
**full-time** 65:16
65:19
**further** 72:18
76:18 95:13

———————
**G**
**G** 6:2
**Gamble** 2:12
3:16 13:24
14:9,21 15:6
18:16 19:10,19
20:22 22:3,6
23:6 39:5,6
69:18 71:1,2
72:9 78:25

80:16 81:1,14
86:21 94:1
**Gamble's** 27:19
78:23 93:7
**game** 14:2
**gaps** 93:7
**general** 39:4
59:22,24
**generally** 10:6
22:21 23:8,15
24:7 26:14
29:5 30:12
40:23 57:1,6
58:15 63:7
66:1 82:3,5
**Genet** 3:17
**gentleman** 13:12
79:7 94:3
**getting** 12:21
79:12
**give** 12:9,10
20:11 42:14
49:3 53:24
66:21 90:18
**given** 8:3,6 98:5
99:12
**go** 10:21 15:14
19:9 20:19
22:13 32:8
34:15 36:13,15
36:25 37:3,9
40:2,8 42:22
42:25 46:24
48:5 53:19
54:16 56:22
57:19 69:20
70:14 72:17
80:7 81:6,23
82:24 83:8,17
85:14 86:24
88:17 90:5
95:23,25
**goes** 24:4 33:24
49:6 83:15
89:21
**going** 13:5,14

14:4,17 17:4
18:1,3,14 19:6
19:12,24 21:6
36:13 66:23
67:2,7 76:18
76:23 78:2
86:18 87:6,13
93:7,9 94:2
95:7,8 96:8
**Golkow** 1:23
**good** 6:9,10 22:8
72:2 92:23
**graduated** 63:23
**Grand** 2:19
**GRAY** 3:3
**Green** 2:7 5:10
20:17 22:8
76:23 77:5,10
84:18,25 85:4
93:15 94:6,9
95:12 96:13
**group** 36:10
42:8
**GSK** 3:7
**guess** 13:13
79:12
**Guidance** 8:25
9:1,2 11:15
39:3
**guidant** 70:23
**guidelines** 27:19
30:6,9
**guides** 33:17
**gun** 61:7
**guys** 77:23
95:23

———————
**H**
**hand** 57:9 99:18
**handed** 35:17
84:14
**handing** 84:11
**handle** 57:25
73:21 80:19
82:6
**handled** 13:21

51:17,17 62:21
92:6
**happen** 58:21
**happens** 48:1,3
**hard** 30:3,15,16
59:10,14
**HARDY** 2:19
**Harrison** 3:2
**HCPA** 50:7,13
50:14
**HCPA/STEAM**
50:11,16,21
53:15
**head** 35:23 78:4
**Health** 3:7
**heard** 21:10
96:16
**heck** 38:23
**help** 28:8 35:21
70:15 71:14
**helpful** 62:3
**hereinafter** 6:5
**hereto** 98:6
99:15
**high** 15:13 17:12
30:20 31:9
43:1 48:19
49:5 56:10
62:1 64:25
**highly** 41:23,24
42:2
**hold** 18:24 19:11
20:9,12 47:6,7
47:11,13,17,21
50:17,21 60:1
60:2,4 82:20
82:21 89:5,6
89:14 90:1,3
90:21 91:2,8
91:14,21 92:12
92:15
**holding** 50:8
91:25
**holds** 17:14,21
18:21 54:20
89:17

**hopefully** 62:3
**hour** 85:6
**housed** 52:11
**HP** 27:8
**HR** 46:22 47:15
**human** 46:22
**Hunter** 3:16
**hypothetical**
90:18,22

———————
**I**
**IBM** 22:24
**identifiable** 32:5
**identification**
67:11 73:19
82:6
**identified** 14:13
14:21 15:2
21:24 41:4
70:6 72:18,24
73:25 74:12,17
76:7 89:23
91:19
**identifies** 16:3
16:14 73:10
**identify** 11:13
11:23 13:2
14:9 31:16
33:25 36:18
37:2,15 65:4
66:1,10 70:2
71:14 73:1,25
74:16 82:14
88:23 89:4
**identifying**
10:12 13:11,19
14:15 15:11
19:9
**II** 1:5
**image** 58:6
**images** 59:3
**imagine** 49:19
50:24
**implemented**
48:13 92:16
**implicate** 18:15

Scott Van Nice

79:1
implicates 19:17
improper 93:10
  93:16
improperly 93:3
in-house 63:25
  64:23 65:17
  66:2 76:17
  82:4,7 92:2
incident 9:4
include 73:2,6
includes 46:25
  49:23 54:20
  73:3 90:11
including 27:24
independent
  44:11,19,24
indicates 8:16
  11:22
indicating 43:19
individual 12:6
  40:19 59:7
  60:6 72:18
  78:16,16,19
individual's
  67:17
individuals
  36:10 73:25
information
  7:18,20 10:13
  10:18 11:24
  13:3,7,10,11
  14:22 15:2,12
  22:19 32:6
  37:22 38:20,24
  43:15 44:10,15
  45:9 47:21
  51:15 52:11
  54:14 55:1,17
  58:16 62:9
  64:1,3 66:22
  67:12 69:21,24
  70:3,7,9 72:9
  72:25 73:14,20
  73:24 74:13
  75:18,25 76:10

76:14,16 77:8
  79:6,10 83:1
  83:18 84:21
  86:4,22 87:4
  87:22 92:18
  93:5,5,11
infrastructure
  13:21 21:25
  22:2 63:10
INHIBITOR
  1:4
input 55:6
inputted 55:6
inquire 21:1
inside 78:21
installed 34:6
instant 24:11,14
  24:19 25:1,8
  25:14,22 26:1
  26:3,8
Institute 7:10
institutionally
  78:25
instruct 10:15
  10:22 11:1
  13:4 14:5 18:2
  19:2,13,16
  20:13 21:2
  37:21 38:19
  39:18 45:6
  54:13 70:10
  76:8,15 77:1
  78:22
instructed 37:17
  54:11 69:6
  93:3
instructing
  18:10,16 21:15
instruction 18:7
  40:5
instructions
  60:4 96:14
instructs 34:2
  47:14
intent 80:21
interactive

31:14 33:16,22
  34:2,6,9,15
  48:22
interchangeably
  50:15 56:5
interest 39:5
interested 99:17
interface 66:23
  76:10
interfaces 13:24
internal 42:25
internally 34:11
  55:20 79:18
internet 11:17
  81:5,8,17
interpretations
  28:13
interpreted
  61:23
interpreter 3:16
  3:17 7:12,13
interrupt 12:3,7
interrupted
  37:13
interview 37:18
  41:6 46:10,17
  46:24 73:12,16
  83:8
interviewed
  37:20
invade 79:13
invitation 94:21
involve 66:23
involved 9:5,13
  10:1,12 14:11
  17:9,13,15
  18:22 22:1
  37:16 38:6
  42:10 50:7
  63:14,20 67:11
  74:19,22 75:17
  75:22,24 76:2
  78:19
involvement
  14:15 33:13
  37:25 76:16

78:16
involves 9:24
  18:9
involving 9:13
  10:2 78:23
iPads 27:12
issue 89:14
issues 18:14
item 39:3
ITsolutions.PG
  44:14
ITsolutions.P...
  43:1,25
_____

**J**

January 1:14
  61:1 94:15,19
  98:5
Jeff 56:16 62:12
Jeffrey 2:7
JERSEY 1:1
job 6:17 38:9
  63:11 65:16,19
  65:20,21 66:7
  66:10 79:18
join 68:13
joined 68:18
jschaefer@ul...
  2:10
judge 1:5 93:14
judgment 29:12
_____

**K**

K 3:2
K-N-A-P-P
  56:17
K.C 2:7 20:18
  22:9 77:18
Kansas 2:20
Kardia 54:16,19
  54:21,24 55:3
  55:4,7,12,14
  55:16,19,22
  61:8,9,11
kcgreen@ulm...
  2:10

keep 31:16
  32:16 34:1,3
  34:19 62:9
keeps 56:10
kept 13:10
key 72:2,3,7
  73:1
kind 32:23
kinds 30:22
Knapp 56:16
  62:12
know 7:16 14:20
  21:16 22:19,25
  23:4,5,25 25:7
  25:13,18 27:1
  31:3,4,9 32:22
  36:8,11,25
  38:5,23 42:9
  48:16,18 49:1
  49:25 51:16
  52:2,9,13,19
  55:2,7,8,13,22
  56:12 62:11,12
  62:18,23 64:16
  70:8 75:15
  77:20 79:11
  82:21 92:15
knowledge
  11:20 13:20
  24:17 25:10
  28:19 30:24
  36:6 46:6
  47:10 48:18
  68:17 69:5,13
  70:5 76:2
  78:16 79:4,7
  82:18 83:4
  91:18
known 56:21
_____

**L**

L 3:8
L-Y-N-C 24:23
Language 3:16
  3:17
laptop 27:10

**laptops** 27:6
**large** 29:14
  80:23
**law** 6:21 7:8,20
  31:19 63:22
  64:17,19
**lawsuit** 10:10
**lawyer** 6:19 64:1
**lawyers** 8:12
**leading** 17:3
  71:7
**leave** 47:25 78:1
**leaves** 46:21
  47:8
**leaving** 46:22
**left** 68:21 69:15
**legal** 13:25
  18:15 19:18
  20:21 21:25
  47:6,7,11,13
  47:16,20 60:4
  64:6 66:24
  76:11 81:9
  82:20,21 89:5
  89:6,17,25
  91:2,8,13,21
  92:12,15
**let's** 16:19 18:21
  26:11 29:24
  30:22 32:8
  33:9 35:12
  40:8 45:17
  47:24 48:5
  53:19 54:16
  56:22 62:8
  64:9 70:14
  81:23 84:6
  85:14,14,24
  86:24,24 87:12
  87:19 88:10,17
  91:2,4 92:21
**letter** 5:9 8:13
  21:9 27:23
  35:18,19 48:5
  69:22 93:22
  95:21 96:4,5

**level** 15:13
  17:12 26:9
  30:21 31:9
  43:2 48:19
  49:5 56:10
  58:17 62:2
  64:25 91:22
  92:9
**LEWIS** 3:9
**LIABILITY** 1:4
**license** 6:21
**limit** 33:19
**line** 80:3 95:14
  95:22 100:4
**lines** 95:3,12,13
  96:1,2,4
**LinkedIn** 7:23
  8:2,16
**Lisa** 67:18,22
  68:8,13,18,20
  69:11,14 70:2
  74:11,16,17,19
  74:22,24 75:5
  75:17,22 82:12
  82:14
**list** 20:8 74:24
  75:5,9,11,15
  89:5 92:8,11
  94:17,19 95:15
**listed** 27:23
  69:25 85:21
**lists** 32:25
**litigation** 1:4,23
  9:7,22,23
  10:14,14,19,24
  11:2,24 13:2,3
  13:18 14:7,10
  14:14,22 15:3
  15:20 16:17,21
  16:24 17:11,17
  18:3,25 19:11
  20:23 22:1
  28:18 38:10,14
  38:18,21 39:14
  39:16,20,24
  40:12 59:25

  66:6,10,12
  67:2,10 68:10
  69:24 70:2,4
  72:10 74:1,21
  75:13,19 76:1
  76:7,12 78:17
  79:25 82:22
  83:21,22,24
  89:1 90:24
  92:13
**litigations** 9:12
  9:20 10:2,6
  66:3
**little** 66:21
  72:17
**LLP** 1:15 2:2,8
  2:19 3:3,9
**local** 31:19
  59:13,14
**location** 41:13
**Logan** 2:14
**long** 7:2 24:16
  24:24 31:16
  32:15 33:25
  34:3,16,19
  51:25 61:15
**longer** 67:24
**look** 29:21 45:17
  85:14,24 86:24
  87:12,19 88:10
**looking** 7:23
  29:23 71:22
  76:4,5
**looks** 35:20
**Lotus** 22:24,25
**Louis** 2:3
**lunch** 60:10,11
  70:24
**luncheon** 60:15
**Lync** 24:23,24
  25:1,3

---

**M**

**MA** 3:4
**Magnotta** 2:13
**mail** 26:11,12,15

  26:17,22,23
  57:25
**mailbox** 90:4
**mails** 43:24
**main** 62:11
**maintain** 16:4,5
  25:22 38:10
  39:14,24 89:9
**maintained**
  30:23 60:1
**major** 7:11,16
**making** 64:25
**management**
  27:24 28:6,9
  28:12,20 67:24
**manager** 36:25
  46:23 47:15
  50:5,6 68:3
  80:11,15 81:2
**managers** 50:4
**March** 99:24
**mark** 2:18 11:7
  35:12 84:6
  93:23
**marked** 11:10
  35:14 84:8
**Market** 3:9
**marketing** 29:19
  29:22,24 36:14
  53:5
**Martha** 3:2
**martha.harris...**
  3:5
**material** 11:16
**materials** 14:6
  28:18 29:19
  44:22,24 50:9
  50:18,22 51:1
  53:5,16,25
  61:14
**matter** 18:12
  89:11 94:23
**matters** 21:1
**mcowing@sh...**
  2:21
**MDL** 1:4

**mean** 9:22 28:9
  28:12 42:6,7
  56:7 71:24
  90:13,14
**means** 8:23
**Megan** 3:16
**memory** 25:5
  35:4 61:10
**mentioned** 32:3
  33:16 36:1
  41:1 43:25
  50:9 61:21
  83:20
**Merck** 3:12
**message** 26:1,18
  26:19 59:7
**messages** 25:14
  25:23 26:9,15
  57:5,11,25
**messaging** 24:11
  24:14,19 25:1
  25:9 26:3,8
**MF** 1:5
**Michael** 53:10
  55:11
**Microsoft** 22:12
  22:15 23:1
  24:8 28:15,22
  29:3,6 30:19
  59:3 73:4 90:8
  90:9,12,16,20
  91:16
**mind** 9:17 12:20
  14:23 17:7
  28:1 66:13
  74:8 75:4
**Mischaracteri...**
  54:8 74:14
**misspelled** 67:21
**mistakenly**
  61:23
**MO** 2:3,20
**mobile** 27:11,13
  27:15,18,21
  56:23,24 57:2
  57:3,5,23,23

58:1,3,7,8
**model** 27:7 65:6
81:25 82:3
**models** 27:5
**modify** 89:10
**moment** 61:6
**months** 10:11
85:12
**MORGAN** 3:9
**morning** 6:9,10
**motion** 78:2
**move** 78:12
**moved** 67:23

────────────
**N**

**N** 2:1 3:1 5:1 6:2
**name** 6:11,13
24:13 35:1,3,4
36:12 51:23
53:1,11,18,18
55:12 58:11,23
59:23 61:18
62:22 67:17,18
68:6 80:10
**named** 56:16
99:6
**names** 14:5 36:4
74:25,25 89:24
**nature** 22:3
**necessarily** 75:5
96:17
**necessary** 65:1
82:15 87:4
89:17,18
**need** 34:15
77:11 84:20
96:8
**needed** 92:9
**needs** 76:20 94:1
**new** 1:1 63:13
67:23 85:1
94:6
**NEWARK** 1:2
**Nice** 1:11 4:6 5:4
5:8 6:4,13
18:13 22:1

70:25 78:14
80:11 98:3,9
98:11 99:7
**Nice's** 13:23
66:23
**night** 84:25
**Nods** 35:23
**North** 2:14
**Notary** 4:8,11
98:13,19 99:4
99:22
**notes** 4:9 22:24
23:1 43:23
49:13,16,20,24
50:2 62:10
**notice** 5:11
57:13 68:16
75:21 84:12,15
84:22,23 85:6
85:11,13 86:5
86:10,11,12
89:6 93:22
94:2,6,7,14,25
95:5,18,20
96:2,3,7
**noting** 98:6
**number** 20:11
20:16 21:9,14
28:2 32:6
35:22 37:25
40:8 45:17
48:5,21 50:4,4
54:16 56:3,22
61:25 85:18
86:4,25 87:20
87:23 88:1,5
88:10,12,14,17
88:20 91:6
**numbered** 15:15
**numbers** 71:23
**numerous** 33:1

────────────
**O**

**O** 6:2
**object** 8:14
10:15 11:1

13:4 14:2
15:21 16:8,22
18:1 19:1,12
19:25 20:13
22:4 28:7
32:18 33:6
34:17 35:9
37:5,21 38:2
38:19 40:1,6
40:13,22 42:15
42:20 43:9
44:7,12 45:1,6
50:23 54:8,13
57:12 59:11
64:7,24 66:20
68:11,15 70:10
70:12,21 71:17
72:11 74:2,14
75:1,20 76:8
77:2 78:21
82:23 83:11
84:15 85:22
86:6,14 91:23
**objected** 95:1
**objecting** 13:16
**objection** 12:1,9
12:11 21:5
25:20 39:2,18
68:23,24 69:1
71:3,6 75:21
79:12 86:14,17
95:9
**objectionable**
17:1 79:2,22
**objections** 12:7
17:4 39:22
71:7 79:9,15
95:2,6 96:3
**obtain** 44:15,19
63:22 87:3
**October** 68:2,21
**offer** 78:5
**offered** 95:13
**office** 23:13,16
24:8,10 29:6
58:14,22 59:22

83:2 92:19
99:19
**offices** 26:13
**official** 4:10
71:2
**Oh** 2:9 81:13
**Ohio** 1:16 6:22
98:1,19 99:2,5
99:19,22
**okay** 9:12 10:1,8
12:16 13:1
18:24 23:13,16
23:25 24:4
25:13 27:11
30:13,14 32:8
34:21 35:7,21
35:22 37:19
42:11 48:15
50:20 54:22
55:14,16 60:12
63:22 64:16
65:22 66:9
68:8 71:21
72:5 73:8
74:11 77:20
85:19 87:2,8
87:15,21 88:6
88:21 89:21
92:23 96:23
**old** 12:21 39:4
83:9,12
**older** 61:11
**on-site** 92:4
**once** 24:4 61:10
76:9 89:15,24
89:25
**OneDrive** 30:19
36:1 41:3
58:19 73:6
**ones** 45:4,4
**ongoing** 16:24
16:25 18:3,11
18:15 19:17
20:21 38:21
66:25 76:12,15
78:17

**operate** 22:3
**operative** 86:10
86:12 94:20
**opinion** 86:8
**opposing** 94:21
**opt** 30:14
**option** 26:20
29:11 40:16
**options** 40:24
41:1 43:2 60:1
**opts** 26:17
**ordinary** 91:6
**organization**
42:8
**oriented** 35:21
**originally** 94:7
95:20
**OTC** 9:24 13:1,3
14:22 15:3,20
16:20 17:10,17
18:25 19:11
28:18 29:19,24
30:8 31:2
32:17 36:14
37:3,19,25
38:13,18 39:16
39:24 40:11,21
42:10 47:24
48:2 50:21,22
51:6,9,14,21
52:1,7 53:6
56:11,13,20
62:20 66:5,10
67:10 68:4,10
69:24 70:1
74:1,12 75:12
75:19 76:1,7
77:8 82:13,22
83:5,10
**OTC/regulato...**
36:5
**Outlook** 22:15
22:20,23 23:17
**output** 50:18
**outside** 18:16
19:18 20:17,22

21:23 38:22
51:18,21 66:24
70:8 76:11,17
78:21 90:24
91:13 93:18
**over-the-coun...**
56:12
**owned** 22:24
**owner** 34:18
**owns** 83:14

**P**

**P** 2:1,1 3:1,1 6:2
**P&G** 6:15 7:5
7:24 8:12 9:6
9:16,21 10:2,9
11:23 13:13,22
15:1,10,20
16:19 17:16
20:9 22:11,20
24:1,10 25:2,8
25:11,14 28:6
29:15 30:7,11
31:7 34:12,24
35:8,24 36:15
37:2,14,24
40:11,15 47:8
48:11,17,24
49:2,4 52:10
52:16,22 56:24
57:22 58:2,9
58:21 63:1,2
64:1,6,11,20
64:23 65:16
66:2,24 67:14
68:4,13 69:11
69:23 70:17
71:16 73:2,25
75:24 76:5,7
79:19 80:5,11
81:11,15,18
82:3 88:23
92:2
**P&J** 9:13,15
**p.m** 61:3 97:3
**PA** 2:15 3:10

**page** 5:3,7,14,15
7:23 8:2,16
15:14 16:1
45:17 56:22
70:17 71:14,22
76:4 81:23
85:14,21,24
86:4,22,24
87:19 88:17,20
98:6 100:4
**Paige** 3:17
**paper** 5:8 11:14
11:19,22 12:8
15:6,9 33:20
38:9,24 43:4
70:23 73:18,21
76:4 80:9,14
80:21,25 81:4
81:19,19 88:24
**paragraph**
15:15 16:1
53:19 85:15,17
85:18,21,24
86:22 87:4,6
87:12
**part** 21:19 28:10
30:19 47:2,14
49:18 50:6,9
54:19 64:17,19
65:21 66:7,10
73:10,19,22
82:3
**participation**
39:19 78:19,20
78:20
**particular** 7:11
10:13 29:20
35:1 42:23,23
65:23
**parties** 4:5
99:15,16
**party** 10:9
**PC** 27:8 46:25
**PDFs** 59:3
**people** 14:15
41:15 49:6

89:5
**perform** 63:8
82:8,12,13
**performed**
63:25 82:10
**period** 90:25
**person** 16:10
47:16,19 52:8
52:18 53:17
56:16 61:18
80:18 83:17
90:21 91:15
**person's** 67:18
68:6 73:3,4
**personal** 40:20
79:1,4 86:8
**personally** 32:5
56:1
**persons** 14:11
**ph** 1:23
**Philadelphia**
2:15 3:10
**phone** 26:20
27:18 57:2,7,9
58:7,8
**phones** 26:13
27:12 57:24
**phrased** 25:19
**physical** 57:8
**physician** 62:10
**PII** 31:17 32:3,5
33:1
**place** 18:25
25:14 47:7,11
47:13 48:11
61:16 68:1
78:24 82:20,22
89:17 99:13
**Plaintiffs** 2:5,17
4:6
**plaintiffs'** 94:16
**plant** 23:11
**please** 7:13,17
11:8,13 12:20
12:23 15:15
22:22 30:13

31:12 38:1
41:9 49:14
66:14 85:15,24
86:25 87:6,13
87:16,20 88:1
88:5,14,22
**point** 33:15 61:6
61:13,20 66:22
76:19 77:10
94:10 95:10
96:12,22
**pointing** 15:17
**policies** 30:6,9
39:5 41:21
42:18 43:25
45:18,22,25
46:3,7 51:11
71:3 78:24
**policy** 27:19
31:7,10,13,21
32:1,9,12,20
33:3,12 34:4
42:23 43:1,3
44:19 46:9,19
46:21 47:12
55:7 56:24
89:2
**position** 21:16
93:25
**possess** 14:21
**possession** 57:8
89:10 92:11
**possible** 23:24
26:18 42:21
**possibly** 20:15
39:16
**potentially**
88:25
**PowerPoint**
28:24
**PPI** 10:9
**practice** 6:21
80:18 83:13
89:2 90:24
**practices** 71:2
78:23 88:22

**predecessor**
48:16,20 83:17
**prefer** 17:3
**preparation**
46:1,13 54:2
**prepare** 11:19
43:15
**prepared** 15:6
19:15 28:5
81:13 94:17,20
**presence** 4:9
98:15 99:9
**present** 3:15
78:10
**presented** 18:13
95:20
**preservation**
17:24 74:20,22
75:17,23,25
76:3 82:7,16
82:19
**preserve** 16:4,17
16:20 17:10,16
17:21 38:10
39:14,23 60:3
65:4 66:2
74:25 75:6
88:24 89:7,8
90:3,8,17 92:9
**preserved** 75:12
89:16 91:5
**preserving**
89:22 90:5
92:1 95:1,3,4
**pretty** 94:3
**previous** 9:7
32:3 87:10
**previously** 36:1
61:21 70:15
73:5 75:21
**Prilosec** 9:24
10:10,14 13:1
13:3 14:22
15:3,20 16:20
17:10,17 18:25
19:11 28:18

29:19,24 30:8
30:10 31:2
32:17,23 36:5
36:7,14 37:3
37:16,19,25
38:13,17 39:16
39:24 40:11,15
40:21 42:10
47:24 48:1
50:21,22 51:6
51:9,14,20
52:1,7 53:5
56:11,13,20
62:19 66:5,9
67:10 68:4,10
69:24 70:1
74:1,12 75:19
76:1,7 77:8
82:13,22 83:5
83:10 92:13
**primary** 13:9
**print** 25:25
**printed** 33:20
43:3
**prior** 22:23
24:20 25:1,3
33:23 43:18
83:5,9 85:10
91:20
**privilege** 45:15
76:25 79:14
**privileged** 10:17
18:9 20:16
38:24 39:17
45:8,12 54:15
70:11 76:14
77:8 79:2 80:1
**pro** 47:2
**probably** 12:18
25:16
**problem** 21:19
28:10
**Procedure** 64:15
64:17 65:15,18
**procedures**
51:11 88:23

**proceed** 67:3
**process** 15:10
17:1 31:14
39:20 48:22
49:18 50:6,10
89:20 91:25
**processes** 65:1
80:23
**Procter** 2:12
3:16 13:24
14:9,20 15:5
18:15 19:10,18
20:22 22:3,6
23:6 27:19
39:5,6 69:18
71:1,2 72:9
78:23,25 80:16
81:1,14 86:21
93:6 94:1
**produced** 21:20
71:19 96:7
**product** 10:17
11:2 13:7 18:3
18:9,15 19:3
19:14,17,23
21:2,5 29:16
37:22 38:21
42:5 45:12,16
48:1 49:22
54:15,23 56:12
70:12 76:13
80:1,2
**products** 1:4 9:3
10:2 29:3
**professional**
56:6,7
**proficient** 8:23
**program** 31:20
**programming**
63:14
**project** 36:21,24
67:24 68:9
**promotional**
50:8,18,22
51:1 53:16
**proof** 4:10

**proper** 79:12
**protocols** 88:23
**PROTON-PU...**
1:4
**provide** 64:5
94:1,17 95:15
**provided** 9:6
16:5 27:11
78:15 83:20
93:12 94:14,15
94:19 96:4
**provides** 9:3
**providing** 71:7
77:24
**Prudential** 3:3
**public** 38:25
98:13,19 99:5
99:22
**publication**
71:15 81:12
**published** 38:24
70:16,20 81:5
81:7,14,16,20
**purpose** 18:5
19:14 21:23
50:16
**Pursuant** 8:16
**push** 95:18
**put** 11:14 18:25
48:11 78:8
81:10 82:21
90:3 92:12
**putting** 80:14
93:1

## Q

**qualifications**
4:11
**qualified** 99:6
**question** 5:14,15
7:12 9:17
12:18,20 14:23
16:19,22 17:3
17:6,7 18:19
19:5 20:3
21:10 22:8,10

31:5 39:15,25
45:2 47:23
48:15 55:10
66:14,20 69:4
70:13 71:10,11
74:8 75:4 77:2
80:4 83:8
84:20 85:3,16
85:25 86:2,3,4
86:15,20 87:1
87:7,14,23
88:1,2,7,14
**questioning**
78:12
**questions** 6:12
12:2,5,14 13:6
13:14,16,17,17
13:19,22 14:1
14:10 18:4,10
19:25 20:20
21:3 22:3
25:16,18 33:4
44:5 52:24
53:5 56:19
61:15 68:24
70:11,22 77:5
78:18,23 79:1
79:20 83:15
92:25 93:3,17
94:4 95:8
96:10,11
**quick** 60:10
**quit** 71:6
**quote** 16:1

## R

**R** 2:1,7 3:1 6:2
100:1,1
**R&D** 63:10
**raise** 86:18
**rdenton@usel...**
2:4
**read** 12:23,24
16:7 66:15
74:5,7 85:15
85:25 86:25

87:6,13 88:1
88:14 98:4,14
**reading** 98:12
**ready** 89:18
**reality** 77:24
**really** 12:4
48:15 76:24
91:12
**reason** 13:9
23:21 40:4
71:19 100:6,8
100:10,12,14
100:16,18,20
100:22,24
**reasonable**
19:16
**reassigned**
47:25
**recall** 31:6 53:14
53:22 61:8,17
62:21,23 65:9
82:25 83:25
92:17
**receive** 27:16
92:8
**received** 81:12
84:17 89:25
90:15
**receives** 26:19
27:20
**recess** 33:10
60:15 78:7
92:24
**recollection**
26:10 54:6
70:19 71:8
**recommended**
27:7
**recommends**
30:11
**record** 12:24
32:8 33:12
53:1,20 54:7
61:9 66:15
74:7 77:3,4,16
77:17,19 78:6

Scott Van Nice

| | | | | |
|---|---|---|---|---|
| 78:9 79:9 93:1 | 29:15,24 30:2 | 90:2 94:16 | 58:18 90:19,23 | **Roger** 2:2 6:11 |
| 93:13,13 94:5 | 30:8,10 32:17 | **requested** 12:24 | **retention** 27:24 | 11:25 76:23 |
| 96:19 | 40:15,20 44:1 | 32:21 66:15 | 31:7,13,20 | 77:17 78:8 |
| **recorded** 54:23 | 44:5,23 51:6 | 74:7 | 32:1,9,12,13 | **role** 9:13 10:24 |
| **recordretentio...** | 51:25 55:11 | **requesting** | 33:12,18 46:20 | 11:2 13:6 15:5 |
| 44:18 | 56:13,20 71:11 | 46:25 | 47:8 55:7 | 38:13 39:12 |
| **records** 31:13 | 76:1 89:10 | **required** 41:6 | **retrievable** 24:5 | 63:4,13,15,16 |
| 32:12 54:1 | **Relates** 1:6 | **resources** 46:22 | **retrieve** 24:1 | 63:17,19 64:1 |
| **recordsretenti...** | **relations** 54:17 | **respect** 13:19 | 26:23 57:10 | 64:3,9,12 |
| 35:6 44:1 | **relative** 99:14 | 17:24 40:11 | **retrieved** 23:22 | 65:23 66:5 |
| **recordsretenti...** | **release** 89:4 | 68:24 70:1,22 | **revealing** 45:12 | 67:23 82:8,10 |
| 35:5 | 90:2 | 75:18 77:7 | **review** 16:6 | 82:12,13 |
| **recover** 23:24 | **released** 65:9 | **respectfully** | 43:14,17 44:19 | **roles** 11:22 |
| 24:3 | **relevant** 10:13 | 11:4 67:4 | 44:23 45:25 | **ROPES** 3:3 |
| **red** 95:3,12,13 | 13:3,11,12 | **respective** 4:5 | 46:13 49:10 | **Rose** 53:18 |
| 95:13,22 96:1 | 14:6,21 15:2 | **respond** 45:13 | 53:25 | 55:12 |
| 96:2,4 | 28:18 66:12 | 78:5 94:24 | **reviewed** 43:18 | **Roughly** 68:2 |
| **Reds** 91:4 | 69:24 70:3 | **responding** 18:4 | 43:23,24 44:4 | **route** 95:23,24 |
| **reduced** 4:8 | 72:9 73:13,19 | **response** 9:4 | **reviewer** 49:12 | 95:25 |
| **refer** 42:4 59:15 | 79:6 88:25 | 19:7 47:17 | 49:16 | **routine** 91:11,13 |
| 70:17 | 94:1 | 86:7 94:16 | **right** 6:14,16,20 | 91:18 |
| **reference** 34:21 | **remember** 12:18 | **responses** 57:13 | 15:14 18:18 | **RPR/RMR/C...** |
| 65:6,13 71:15 | 25:5 48:12 | 87:10 | 20:6 33:9 | 99:4,22 |
| 81:24,25 | 53:7,17,18,23 | **responsibilities** | 34:13 35:11 | **RRS** 31:14 32:8 |
| **referencing** | 61:7,17 83:12 | 13:24 38:15 | 36:20 38:12 | 32:13,24,24 |
| 71:14 | **remote** 92:7 | 63:12 68:25 | 40:7,21 41:16 | 33:3,16,20 |
| **referred** 50:5 | **remotely** 92:5,6 | **responsibility** | 42:9 43:6 44:3 | **rule** 8:3,8 24:7 |
| **referring** 39:2 | **removable** | 6:17 | 47:10,22,23 | 59:22,24 91:18 |
| 45:20 65:14 | 59:17 | **responsible** | 50:3,25 51:4 | **rules** 64:14,17 |
| 72:6 93:17 | **removed** 91:16 | 32:14 63:9 | 51:13 53:25 | 65:15,18 91:11 |
| **reflect** 86:9 | **rep** 61:25 | **responsive** | 57:16 58:21 | 91:13 |
| **refresh** 54:5 | **repeat** 7:12 | 87:22 | 62:6,14,17,24 | **ruling** 13:9 |
| 70:19 | **repeating** 9:17 | **restricted** 41:23 | 63:11,17,24 | 14:18 |
| **refreshed** 71:8 | 12:20 14:23 | 41:24 42:3 | 64:5,8 65:12 | **runs** 83:18 |
| **refused** 95:13 | 17:7 66:13 | **restriction** 41:22 | 68:1,12 69:3,8 | |
| **regard** 12:8 | 75:4 | **result** 50:10 | 70:1 72:17 | **S** |
| **regarding** 12:1 | **rephrasing** 74:8 | 95:24 | 73:17 80:6,12 | **S** 1:22 2:1,3 3:1 |
| 12:2 38:21 | **replace** 69:14 | **results** 50:8 | 80:23 81:24 | 6:2 99:4,22 |
| 45:18,22 46:3 | **replaced** 61:11 | **retain** 25:14 | 82:9,11 84:5 | **S-C-H-A-R-E-R** |
| 46:7,19 76:10 | **Reported** 1:22 | 26:9 32:10 | 87:12,19 88:5 | 67:20 |
| **regulatory** 51:5 | **reporter** 74:5 | 34:16 | 88:17 89:12 | **S-C-H-O-F-I-...** |
| 51:8,20,25 | **reports** 55:18 | **retained** 26:15 | 90:10 | 53:3 |
| 52:6,11,15,21 | **repository** 30:18 | 27:21 47:5,20 | **RMR/CRR/C...** | **S-T-E-I-N-B-...** |
| 61:14 62:15,18 | 41:11 62:22 | 47:21 49:21,23 | 1:22 | 53:12 |
| **relate** 93:21 | **reps** 62:9 | 50:2 51:21 | **road** 95:19 | **sales** 56:6,7,10 |
| **related** 17:14,16 | **request** 27:13 | 55:1,2 58:16 | **Rochester** 7:10 | 56:13,19 61:22 |

61:24,25,25
62:2,8,9
**Salesforce** 56:5
56:21 61:21
**Sametime** 25:6
**sanctions** 78:2
**Sara** 1:22 99:4
99:22
**save** 29:13 30:7
30:10,11,14,16
30:18 40:18
41:2,3,4,13
59:13
**saved** 29:9,10
41:7 90:15
91:22
**saving** 30:2,3,5
41:2
**saw** 85:12
**saying** 95:4,19
96:9
**says** 6:6
**Scarafile** 3:8
**Schaefer** 2:7
8:14 10:15,23
11:6,25 12:12
12:15 13:4,15
14:8 15:21,23
16:8,22 18:1,8
19:1,12,24
20:4,13,20
21:10,15,22
25:20 28:7
32:18 33:6
34:17 35:9
37:5,21 38:2
38:19 39:1,9
39:18 40:1,6
40:13,22 42:11
42:15,20 43:9
44:7,12 45:1,6
45:11 50:23
54:8,13 57:12
59:11 60:11,13
64:7,24 66:20
68:11,15,23

69:3,6 70:10
70:21 71:17
72:11 74:2,4
74:14 75:1,20
76:8,21 77:17
77:22 78:4,6,8
79:20,24 82:23
83:11 84:15,22
85:22 86:6,13
91:23 92:23
94:13 95:11
96:21,22
**Schaerer** 67:18
69:11
**Schaerer's**
67:22
**schedule** 31:14
32:13
**SCHLICHTER**
2:2
**Schofield** 52:23
61:19
**science** 7:9
**scope** 20:17 37:6
38:3,22 42:11
57:13 68:16
70:25 75:1,20
95:17,17
**Scott** 1:11 4:5
5:4 6:4,13
80:11 98:3,9
98:11 99:6
**se** 33:17
**seal** 99:19
**search** 55:25
**searchable**
55:22
**second** 8:7 26:11
45:17 84:4
**Security** 32:6
**see** 14:17 15:17
45:20 51:19
67:7 71:13
81:5 82:1,2
83:15,18
**seeking** 28:16

**seen** 35:19 84:13
84:20 85:8,10
**send** 27:16
47:15 89:5,5
**sends** 27:20
90:19 91:8
**sense** 65:11
**sensitive** 77:24
**sent** 8:12 47:18
60:4 84:25
85:5 90:14
91:3 93:22
94:7 96:1,4
**September** 68:2
68:21
**served** 68:9 95:5
**server** 23:22,24
24:3 26:9,16
26:24 27:21
29:20 58:10,17
90:8,9,12,16
90:20,23 91:5
91:10,17,22
92:1,1,5,9
**serves** 25:5
61:10
**service** 63:21
64:13 67:25
68:18 73:22
**services** 1:23 9:6
**Session** 61:2
**set** 26:8 27:18
41:14 55:19
99:18
**seven** 65:22
91:17
**share** 22:22 30:4
31:1 36:3,8
41:11,17 51:4
58:10,17,22
59:1,6,20,23
**shared** 41:14
**SharePoint**
30:20,22,23
36:2 41:3 73:6
**shares** 36:4

43:24
**sharing** 35:22
35:25
**Shevon** 3:8
**shevon.scarafi...**
3:11
**SHOOK** 2:19
**short** 60:9 92:21
**Show** 78:4
**showing** 28:1
**shrugged** 78:4
**sic** 67:20
**sides** 95:1
**Sign** 3:16,17
**Signature** 96:25
**signed** 98:14
**signing** 98:12
**similar** 50:7
**simple** 39:15
**simply** 21:5 71:7
**sir** 6:9 11:13
13:9 14:20
15:1 17:6 20:8
20:19 32:24
33:5,12 35:17
**sit** 46:23
**Skype** 24:15,16
24:20 26:6
**Slightly** 47:23
**Social** 32:6
**software** 8:25
9:1,2,2 11:15
24:11,13,14,22
28:14,22 29:3
34:2,10 35:24
39:3 41:10
48:25 49:1
56:9 57:4,10
57:22,23,24
58:1,3 63:15
**softwares** 57:6
57:20
**solution** 30:4
62:23
**Solutions** 43:7
**sorry** 7:14 9:16

25:18 37:12,12
53:7,23 71:13
77:23 88:20
**sorts** 32:25
**source** 29:10,20
46:6,9
**sources** 10:13
11:23 13:2,10
14:6 15:11
28:17 66:11
67:11 70:2,7,8
73:2
**space** 29:15
41:17 58:10,20
**spaces** 31:1
**speak** 8:11 30:9
30:11,13,20
36:3 57:16
71:2
**speaking** 17:3
22:21 23:8
26:14 37:6
40:23 57:1,6
57:14 58:15
84:21 86:7
**specific** 14:11
34:1,20 39:5
47:16,19 49:7
89:17
**specifically** 8:24
15:4 52:19
77:6
**specified** 99:13
**speculate** 9:10
24:25 26:25
30:4 32:22
36:11,19 40:14
42:16 48:3
49:23 53:24
55:20
**spell** 52:25
**spelling** 53:12
67:19
**spring** 63:23
84:2,3
**Square** 2:14

Scott Van Nice

**SS** 98:1 99:2
**St** 2:3
**stand** 71:19
**standard** 47:2
  47:15 59:2
  89:2 90:24
**stands** 32:5
  39:18
**start** 7:5 16:19
  29:25 30:22
  63:1 65:7
  89:19
**started** 22:15
  61:17 62:16
  63:3,16,19
  64:9,12 65:10
**state** 6:22 16:1
  86:6 98:1,19
  99:2,5,22
**stated** 98:13
**states** 1:1 45:18
  65:13
**statistics** 70:18
  71:16,22 76:5
**status** 93:14
**statute** 4:7
**stay** 35:21
**STEAM** 50:7,13
  50:14
**Steinbauch**
  53:11 55:11
**stenotypy** 4:8
  99:9
**step** 36:16
**steps** 16:3,16
  17:9,12,20
  39:13,23 49:7
**stick** 73:9
**stipulated** 4:4
**STIPULATI...**
  4:2
**stonewalling**
  93:11
**storage** 29:15
  40:9,11 41:21
  42:19,23 51:1

51:5 60:1 73:8
**store** 36:18
  40:15,20,24
  41:23 52:6
  59:5,10,17,20
  73:13 89:9
**stored** 51:8,11
  51:15,17,21
  52:1 58:25
  62:19 67:12
  83:5
**storing** 43:2
**strategy** 83:19
**Street** 1:15 2:3,8
  2:14 3:4,9
**strike** 9:5 27:14
  28:11
**strongly** 14:16
**stuff** 95:19
  96:15
**subject** 18:12
  20:9,12 31:18
  32:24 59:25
  60:2 89:19
  91:10,21
**submit** 49:6
**submitted** 98:12
**substance** 98:7
**suite** 1:15 2:3,8
  29:6
**summary** 80:15
**supervise** 66:11
**supervision**
  68:19,21
**support** 63:10
  63:15
**supposed** 32:16
  45:10
**Supreme** 65:3,9
  65:13
**sure** 9:18 14:24
  14:25 28:2
  44:13 49:25
  53:12 57:25
  60:11,13 61:22
  64:25 65:17

69:2 74:6,9
  89:9,16 91:1
  95:11
**sustained** 95:9
**sworn** 6:5 99:7
**synced** 90:7,12
  90:13,14
**system** 22:6,11
  22:12,14,18,20
  22:23 23:2
  24:19 26:3
  28:9,20 33:12
  41:4 48:20
  54:1,17 55:14
  61:9,11 64:22
  69:23 83:14,17
**systems** 13:20
  14:11,12 21:25
  22:2 25:13
  26:8 35:24
  36:15 53:20,21
  54:7,18 63:6
  89:18

**T**

**T** 100:1
**table** 71:10
**take** 33:9 43:6
  48:7 58:6 60:8
  60:10 61:5
  64:21 68:1
  76:18 77:11
  92:21 93:13
  96:13
**Takeda** 2:22
**taken** 4:7 16:3
  16:17 17:20
  33:10 60:16
  78:7,24 92:24
  99:8,12
**takes** 96:15
**talk** 18:21 21:8
  26:11 35:22
  55:10 62:25
  64:9 72:14
**talked** 73:5,7

**talking** 21:12
  28:15 56:11
  61:12,13 80:18
  91:4
**tasks** 64:21
**tax** 32:25
**team** 80:19,22
  82:6 89:3,14
  89:16 90:1
**technology** 7:10
  7:18,20 64:2,4
**TELEPHONE**
  2:13,18 3:2,8
**tell** 10:8 13:23
  28:5 31:12
  39:23 40:10
  41:8 48:10
  56:23 67:2
  85:2
**telling** 85:4,5
**template** 51:10
**tense** 16:25
**tenure** 83:9
**term** 42:4 71:23
  71:25 72:23
**terms** 14:1 31:18
  33:2 77:6
**testified** 96:5,10
**testifies** 6:6
**testify** 16:2,13
  16:16 28:6
  39:13 54:6
  79:8 93:24
  94:18 99:7
**testifying** 85:20
  86:9
**testimony** 12:1
  54:9 61:13
  74:15 79:1
  96:16 99:8,12
**text** 31:16
**tfinken@anap...**
  2:16
**Thank** 12:12
  22:9 28:4 62:4
  62:24 77:13

**theoretically**
  91:9
**thing** 25:21,22
  56:4 94:13
**things** 25:17
  79:3 95:2
**think** 19:15
  56:18 60:8
  93:2,16 95:7
  96:19,23
**thought** 21:8
  70:16
**three** 36:2
**time** 4:7 8:7
  14:14 20:2,18
  23:25 48:14
  52:3 53:11
  60:8 63:1,5
  83:25 90:25
  93:4 96:15
  99:12
**times** 8:5 9:9
**title** 6:17,18 63:4
  63:6 67:22
**titled** 15:16
**titles** 68:25
**today** 6:12 10:20
  10:25 11:5
  14:18 15:20
  16:13,16 18:13
  33:4 39:10,15
  84:4,13 93:1
  94:18,21 95:21
  96:10
**told** 67:6 70:15
  74:11 96:2
**tool** 8:24 33:16
  33:17,22 34:6
  62:23
**tools** 8:24 65:1
  80:23
**topic** 19:15
  45:18 93:18,20
**topics** 8:12
  18:12 21:24
  27:23 43:23

44:2,5,9,23
69:25 85:18,21
93:25 94:12,17
95:5,15,21
96:5
**total** 25:7
**Tower** 3:3
**track** 56:10
**tracked** 48:17
56:13,19
**tracking** 48:8
**Tracy** 2:13
**trade** 95:12
**traded** 95:2
**training** 6:24
64:18,19,20
**transcribed** 4:9
99:10
**transcript** 98:4
98:11 99:11
**transferred**
63:13
**tried** 79:13
95:22
**true** 66:3,12
68:10 74:13
81:2 92:19
98:7 99:11
**truth** 94:23 99:7
**try** 70:15 80:7
83:8
**trying** 9:19
21:19 28:17
48:15 65:12
71:13 76:24
77:3 78:12
79:13 91:12
**TV** 29:25 30:2
**two** 50:14 80:19
**type** 27:4 34:1
34:20 56:12,19
63:7
**types** 30:7 55:17
58:25
**typical** 72:12
73:2

**typically** 27:8
90:2

_____ **U** _____
**ULMER** 1:15
2:8
**undersigned**
98:13
**understand** 6:13
6:19 8:2,11
9:23 15:19
18:22 20:1
21:19 28:16
34:13 44:13
50:11 65:12,25
79:3 91:7
93:22 95:16
**understanding**
11:18 14:7
24:2,6 26:21
48:9 49:22
50:17 51:10
56:9 81:7
91:15
**understood** 11:6
14:24 38:4
44:3 51:19
62:14 91:20
**Unfortunately**
48:12
**uniformly** 91:19
**unique** 48:24
58:10
**unit** 27:9
**United** 1:1 65:13
**upgrades** 22:16
**upload** 41:11
**USB** 30:17 41:2
59:18 73:9
**use** 22:6 24:11
27:5 28:21
49:8 50:19
56:23,24 57:3
57:22 72:2,14
72:23
**user-created**

30:25 59:2

_____ **V** _____
**vague** 32:18,19
40:13 83:11
**Van** 1:11 4:6 5:4
5:8 6:4,13
13:23 18:13
22:1 66:23
70:25 78:14
80:11 98:3,9
98:11 99:6
**variety** 9:3
**various** 36:4
41:20 42:17
49:9 62:25
64:21 66:3
**vehicles** 36:2
**vendor** 9:2
51:18,21,23
62:15 90:2
92:2,3,4,7
**verbatim** 94:8
**Vicki** 52:23
61:19
**Vine** 1:15 2:8
**violate** 76:25
**visit** 36:25 62:10
**voice** 26:11,12
26:15,17,19,22
26:23 43:24
57:5,10,25

_____ **W** _____
**W** 2:18
**wait** 84:3,19,19
**waived** 4:11
95:19 96:25
**waiving** 93:24
**want** 14:10,23
20:2 21:14
29:13 35:21
40:17 53:23
60:10 61:5
69:20,20 70:14
70:16 72:17

78:8 81:23
85:2 93:12,13
93:20 95:23
96:20
**wanted** 29:18
55:9 94:24
**wasn't** 61:22
**way** 22:2 26:23
47:5 55:17
67:7 78:1
93:24 96:15
**ways** 13:21
**we'll** 14:18 77:4
78:21 80:7
84:15 93:13
**we're** 14:17 18:4
19:6 56:11
70:21 72:4
76:18 77:13,18
77:22 78:6
80:3 85:5
89:18 94:12
95:7 96:8
**we've** 21:24
89:25 94:18,24
96:19
**wealth** 79:7
**website** 33:23,24
34:11,15,21,24
35:1,7 42:25
**Wednesday** 61:2
**WEISS** 2:14
**went** 24:8 81:11
95:23
**WHEREOF**
99:18
**white** 5:8 11:14
70:23 80:14,21
80:25 81:4,19
81:19
**Windows** 27:8
**witness** 4:6,10
5:3 8:9 10:4,16
12:5,6 13:5
15:16,20,22
16:23 18:2

19:2,13 21:3,6
38:19 39:8,10
39:12,19 45:7
45:10 54:13
61:5 62:5
66:13 68:17
70:11 71:7
75:2 76:8
78:10,15,22
85:3,4 86:8
93:8,11,21,23
94:2,10,17,20
94:24 96:5,8,9
98:12 99:10,12
99:18
**witness'** 37:6
57:13
**Word** 28:15,21
28:22 29:8
59:3
**words** 50:15
**work** 6:15 10:17
11:2 13:7,15
13:18 17:13
18:3,9,15,15
19:2,13,17,17
19:23 20:21
21:2,5,25
36:17 37:15,22
38:6,8,20
45:12,16 54:15
55:21 58:13,21
62:25 63:7,25
68:20 70:12
76:13 80:1,2
89:13 90:1
**worked** 7:2 37:3
70:5 74:17
82:14,15
**working** 9:20
10:5,18,24
13:6 14:8 36:7
47:24 65:11
79:25
**works** 13:25
89:3

**writing** 4:8
31:21
**written** 5:8
31:21 38:9
45:22,25 46:11
**wrong** 53:24
**wrote** 12:5 39:8
39:11 80:9

### X

**X** 5:1

### Y

**Yeah** 69:2
**year** 9:11 24:18
70:18 71:18
**years** 24:25 25:8
39:4 65:23

### Z

### 0

**02199-3600** 3:4

### 1

**1** 5:8 11:8,10,13
11:19 15:7,9
15:14,16 16:1
21:9 56:22
70:14,20,23
71:15 76:4
80:9 81:13
85:15,18,21
88:17,20
**1/24/18** 5:9
**10** 48:5 85:14,21
85:24 86:4,22
88:14,18,20
99:24
**10:05** 1:14
**100** 2:3
**100,000** 37:14
**11** 5:8 48:21
**11:55** 60:16
**12** 50:4,4
**12:45** 61:3
**1200** 2:3

**13** 53:19
**130** 2:14
**14** 54:16
**14th** 99:20
**15** 56:3
**17** 5:14
**1701** 3:9
**18** 5:15
**18th** 2:14
**19103** 2:15
**19103-2921** 3:10

### 2

**2** 5:9 35:12,14
35:17 40:8
43:20 44:6,23
69:20 85:24
86:4,22 93:23
**2:10** 97:3
**2:17-MD-2780**
1:5
**2002** 7:6 25:11
25:12 63:3,12
**2004** 63:13,18
63:19
**2005** 22:16,20
**2006** 63:19 65:8
**2007** 63:20 65:8
**2008** 7:4 52:8
61:18 62:16,19
63:23 65:10,11
65:18 82:10
84:2,3
**2009** 83:5
**2012** 11:21 15:7
68:19 70:16
**2014** 70:18
71:16,18,20
80:10
**2015** 71:20
80:10
**2017** 68:2,22
**2018** 1:14 61:1
94:15 98:5,16
99:20,24
**215.735.1130**

2:15
**215.963.5250**
3:10
**24** 94:15
**24th** 94:19
**2555** 2:19
**2789** 1:4
**28** 24:2,4
**2800** 1:15 2:8

### 3

**3** 5:11 84:6,8,11
84:13 85:8,14
86:25 87:4
88:19
**30** 24:3,4
**30(b)(6)** 5:11 8:3
8:9 10:4 12:4
15:16,19 38:22
39:10,12 68:16
70:25 78:14
79:4 83:21
86:8
**31** 1:14 61:1
98:5
**35** 5:9
**365** 22:12,17

### 4

**4** 28:2 87:6
**45202** 1:16 2:9

### 5

**5** 15:14 16:1
35:22 87:12
**500** 80:20
**513.689.5000**
2:9

### 6

**6** 5:5 40:8 81:23
87:20,23
**600** 1:15 2:8
**617.951.7967**
3:5
**63102** 2:3
**64108** 2:20

### 7

**7** 70:17 71:14,22
76:4 88:1

### 8

**8** 56:22 88:5
**800** 3:4
**800.873.5297**
2:4
**816.474.6550**
2:20
**84** 5:11
**877.370.3377**
1:23

### 9

**9** 45:17 88:10,12
**917.591.5672**
1:23