IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT ACOSTA, Individually, | § | |
| HECTOR ALANIZ, Individually and as | § | CIVIL ACTION NO. _____ |
| the Representative of the Estate of | § | |
| ZULEMA ALANIZ, Deceased, DENNIE | § | |
| ALBRITTON, Individually, ROSEMARY | § | |
| ALLENDE, Individually and as the | § | JURY TRIAL DEMANDED |
| Representative of the Estate of | § | |
| REYNALDO ALLENDE, Deceased, | § | |
| PEGGY ALLRED, Individually, WENDY | § | |
| ANDERSON, Individually and as the | § | |
| Representative of the Estate of RUTH | § | |
| DUGGER, Deceased, MISSY | § | |
| ARRIZOLA, Individually and as the | § | |
| Representative of the Estate of RODOLFO | § | |
| ARRIZOLA, Deceased, TIMOTHY | § | |
| AUSTIN, Individually, RONALD | § | |
| BARFIELD, Individually, BELINDA | § | |
| BECK, Individually and as the | § | |
| Representative of the Estate of WILLIE | § | |
| TAYLOR, Deceased, WILMA BIBBS, | § | |
| Individually, GEORGE BILOTTA, | § | |
| Individually, STEVEN BISHOP, | § | |
| Individually, RUBY BOWERS, | § | |
| Individually, CAREY BOWIE, | § | |
| Individually and as the Representative of | § | |
| the Estate of HENRY BOWIE, Deceased, | § | |
| MARTHA BRUTON, Individually, | § | |
| RAFAEL BURGUENO, Individually, | § | |
| ERICA BURRELL, Individually and as the | § | |
| Representative of the Estate of ERIC | § | |
| BURRELL, Deceased, DANIEL | § | |
| CABRERA, Individually and as the | § | |
| Representative of the Estate of JANIE | § | |
| PLACENCIA, Deceased, JOANN | § | |
| CAHEE, Individually and as the | § | |
| Representative of the Estate of ITHEAR | § | |
| CAHEE, Deceased, JOANN CAHEE, | § | |
| Individually and as the Representative of | § | |
| the Estate of RONNIE CAHEE, Deceased, | § | |
| SANDRA CALLICOATTEE, Individually, | § | |
| CAROLYN CANNATA, Individually, | § | |
| JUAN CANTU, Individually and as the | § | |

Representative of the Estate of §
MARGARITA CANTU, Deceased, §
MARGARET CHAPPEL, Individually and §
as the Representative of the Estate of §
ADRIAN SMITH, Deceased, JOANN §
CHASTAIN, Individually, PHILLIP §
COTTLE, Individually, JERRY CURD, §
Individually, ALEX DANTONE, §
Individually and as the Representative of §
the Estate of LYDIA BENAVIDES, §
Deceased, RHONDA DAVIS, Individually §
and as the Representative of the Estate of §
ALLEN WILSON, Deceased, TONY §
DAVIS, Individually, ALICIA DE LA §
ROSA, Individually, REYNALDO §
DELEON, Individually, LINDA §
DEVORA, Individually, ELIZABETH §
DOGGETT, Individually and as the §
Representative of the Estate of ADDIE §
FISHER, Deceased, MARLENE DURST, §
Individually, JACOB EDDIN, Individually §
and as the Representative of the Estate of §
EMMA FRANCES, Deceased, MARIA §
EDWARDS, Individually and as the §
Representative of the Estate of §
FRANCISCA CAMACHO, Deceased, §
EBONI EVANS, Individually, §
GEORGETTE FITZGERALD, §
Individually, JUANITA FLORES, §
Individually, SAN JUANITA, Flores, §
Individually and as the Representative of §
the Estate of MIGUEL FLORES, §
Deceased, RICKY FRITSCHE, §
Individually and as the Representative of §
the Estate of MARVIN FRITSCHE, §
Deceased, KAREN GAINES, Individually, §
EMMA GARCIA, Individually, §
CHARLOTTE GARNER, Individually and §
as the Representative of the Estate of §
ALINE BRUTON, Deceased, ESTHER §
GARZA, Individually and as the §
Representative of the Estate of JORGE §
GARZA, Deceased, JEWEL GIBSON, §
Individually, MARY GOMEZ, §
Individually, GEORGE GOODJOINT, §
Individually and as the Representative of §

the Estate of FRANCES GOODJOINT, §
Deceased, MARIA GOVEA, Individually §
and as the Representative of the Estate of §
MARTIN GOVEA, Deceased, GLADYS §
GREEN, Individually, DEBBIE §
GREGORY, Individually, ERMA §
GUIDRY, Individually and as the §
Representative of the Estate of NORRIS §
GUIDRY, Deceased, LARRY §
GUILLORY, Individually and as the §
Representative of the Estate of DAVID §
GUILLORY, Deceased, ROBERT §
GUNTHRIE, Individually, JUDITH §
HAESSLY, Individually, GLENDA §
HALL, Individually and as the §
Representative of the Estate of RYDALE §
DUNN, Deceased, PAUL HARRINGTON, §
Individually, CLEVIE HARTIS, §
Individually, SUSAN HATHCOAT, §
Individually, LOLA HAYDEN, §
Individually, TERRY HAYS-BOOKER, §
Individually, GLORIA HERNANDEZ, §
Individually, VERONICA HILL, §
Individually, ELIZABETH HOOVER, §
Individually and as the Representative of §
the Estate of KATHARINA HOOVER, §
Deceased, DEBORAH HYPOLITE, §
Individually and as the Representative of §
the Estate of DELCOLM HYPOLITE, §
Deceased, MARY JAMISON, §
Individually, IMOGENE JOHNSON, §
Individually, LINDA JOHNSON, §
Individually, MARY JOHNSON, §
Individually, THERESSA JOHNSON, §
Individually, ONEAL JOHNSON, §
Individually and as the Representative of §
the Estate of PAULA JOHNSON, §
Deceased, MARGARET JOHNSTON, §
Individually, DOROTHY JONES, §
Individually, GALE JONES, Individually, §
DELMUS KELLEY, Individually and as §
the Representative of the Estate of §
MARILYN KELLEY, Deceased, LISA §
KINNEY, Individually and as the §
Representative of the Estate of CAROL §
KINNEY, Deceased, MARTHA LEE, §

Individually, LORENZO LIMON,                    §
Individually, CHARLIE LONG,                      §
Individually and as the Representative of        §
the Estate of IRINE LONG, Deceased,              §
VICTORIA LONG, Individually and as the           §
Representative of the Estate of RONALD           §
LONG, Deceased, FIDENCIO LOPEZ,                  §
Individually, NADINE LUJAN,                      §
Individually, GWENDOLYN MACK,                    §
Individually, JOYCE MAGEE,                       §
Individually and as the Representative of        §
the Estate of CRAIG MAGEE, Deceased,             §
ANDRES MALDONADO, Individually,                  §
GEORGE MARINES, Individually and as              §
the Representative of the Estate of PETRA        §
MARINES, Deceased, EULETA                        §
MARTIN, Individually and as the                  §
Representative of the Estate of LARRY            §
MARTIN, Deceased, JERRY MARTINEZ,                §
Individually, SHARON MAYFIELD,                   §
Individually, NIKKI MCADAMS,                     §
Individually, CAROLYN MCCLURE,                   §
Individually and as the Representative of        §
the Estate of DONALD MCCLURE,                    §
Deceased, RICKEY MCCONIC,                        §
Individually and as the Representative of        §
the Estate of REGINA MCCONIC,                    §
Deceased, POTISHA MCDONALD,                      §
Individually and as the Representative of        §
the Estate of NARA WILSON, Deceased,             §
WALTER MCDONALD, Individually and                §
as the Representative of the Estate of           §
ZACHARY MCDONALD, Deceased,                      §
VEDA MCDONALD-RHODES,                            §
Individually and as the Representative of        §
the Estate of ANDRE MCDONALD,                    §
Deceased, STANLEY MCKINNEY,                      §
Individually, JESSICA MCKNIGHT,                  §
Individually, JOYCE MCLEAN,                      §
Individually, STEPHANIE MELTON,                  §
Individually and as the Representative of        §
the Estate of EDWARD MELTON,                     §
Deceased, RITA MILLER, Individually,             §
GEORGE MONTGOMERY, Individually,                 §
DELAINE MOORE, Individually,                     §
SHELLY MOSLEY, Individually, GAIL                §

MUSGRAVE, Individually, ANGELA    §
NELSON, Individually, MALCOLM    §
NEW, Individually, MELISSA    §
NEWMAN, Individually, DOROTHY    §
NORMAN, Individually, MELISSA    §
OLSON, Individually, BOBBY OWENS,    §
Individually and as the Representative of    §
the Estate of LOVELL ALLISON,    §
Deceased, MARILYN PADGETT,    §
Individually and as the Representative of    §
the Estate of NOVALYN COLLINS,    §
Deceased, MELVIN PANNELL,    §
Individually, SANDRA PANNELL,    §
Individually, TODD PARIS, Individually    §
and as the Representative of the Estate of    §
CARLA FORD, Deceased, TESSIE    §
PARISH, Individually, DIANE PEREZ,    §
Individually, DONNA PIERCE,    §
Individually, PABLO PONCE,    §
Individually, GLENNA POOL,    §
Individually, RICHARD PRATER,    §
Individually, WAYNE PRICE,    §
Individually, DEBRA PRIMROSE,    §
Individually, ELISA PUENTES,    §
Individually and as the Representative of    §
the Estate of LUCY HERNANDEZ,    §
Deceased, CLIFFORD PULSE,    §
Individually, BRENDA RANDLE,    §
Individually and as the Representative of    §
the Estate of JIMMIE RANDLE,    §
Deceased, ESTHER RANGEL,    §
Individually and as the Representative of    §
the Estate of ARMANDO RANGEL,    §
Deceased, VERGIE REESE, Individually    §
and as the Representative of the Estate of    §
LONNIE HUFF, Deceased, BOBBIE    §
ROBERTS, Individually, DAVID    §
RODEGHIER, Individually, RONALD    §
ROLLINS, Individually, GWENDOLYN    §
RUSHER, Individually and as the    §
Representative of the Estate of VERNON    §
RUSHER, Deceased, KIUMARS    §
SARRAFHA, Individually, ALBERT    §
SAULS, Individually, JANET    §
SCHALLER, Individually, MICHAEL    §
SCHENK, Individually and as the    §

Representative of the Estate of MARIA §
SCHENK, Deceased, ANGELA SCOTT, §
Individually, CHARLOTTE SIMMS, §
Individually, LINDA SKINNER, §
Individually, FRANCES SMITH, §
Individually and as the Representative of §
the Estate of WILLIAM SMITH, §
Deceased, JULIA SMITH, Individually, §
SUSIE SMITH, Individually and as the §
Representative of the Estate of LINNIE §
SMITH, Deceased, MARIA SOLIS, §
Individually and as the Representative of §
the Estate of JESSIE MEDINA, Deceased, §
MARTA SOTO, Individually, IDA §
STRADIT, Individually and as the §
Representative of the Estate of CHARLES §
STRADIT, Deceased, JOYCE SYPHO, §
Individually and as the Representative of §
the Estate of EARLINE WHITAKER, §
Deceased, NANCY TAGUE, Individually, §
ALFRED THOMPSON, Individually, §
MARY TREVINO, Individually and as the §
Representative of the Estate of PEDRO §
TREVINO, Deceased, NATHAN TYLER, §
Individually, VICTOR VALDEZ, §
Individually and as the Representative of §
the Estate of RAMONA PAREDES, §
Deceased, DARWIN VALENTINE, §
Individually, ROSA VEGA, Individually, §
DALIA VELA, Individually and as the §
Representative of the Estate of MARIA §
VELA, Deceased, ADRIAN §
VILLAGOMEZ, Individually and as the §
Representative of the Estate of SABINA §
VILLAGOMEZ, Deceased, LOUISA §
VILLASENOR, Individually, CARL §
WARNER, Individually, TERESA §
WEDEMYER, Individually, LAVOYCE §
WHITE, Individually, DEBRA WHITE- §
COLE, Individually, BILLIE §
WHITEHEAD, Individually and as the §
Representative of the Estate of ARTIS §
WHITEHEAD, Deceased, CHARLES §
WILEY, Individually, EVANGELINE §
WILLIAMS, Individually, ALVIN §
WILLIAMSON, Individually, SANDRA §

WILSON, Individually and as the §
Representative of the Estate of BYRON §
WILSON, Deceased, SCOTT WRIGHT, §
Individually, BRENDA WYATT, §
Individually, PETREAT YARBROUGH, §
Individually, and DIANA ZAMORA, §
Individually, §
§
    *Plaintiffs*, §
§
v. §
§
ABBOTT LABORATORIES, §
ASTRAZENECA PHARMACEUTICALS §
LP, ASTRAZENECA PLC, §
ASTRAZENECA AB, ZENECA INC., §
ASTRA US HOLDING CORPORATION, §
ASTRA USA LLC, ASTRAZENECA LP, §
KBI SUB, INC., EISAI, CO., LTD., §
GLAXOSMITHKLINE CONSUMER §
HEALTHCARE HOLDINGS (US) LLC, §
GLAXOSMITHKLINE CONSUMER §
HEALTHCARE LP, §
GLAXOSMITHKLINE CONSUMER §
HEALTHCARE HOLDINGS (US) IP §
LLC, MERCK & CO. INC. D/B/A §
MERCK, SHARP & DOHME §
CORPORATION, NOVARTIS §
CORPORATION, NOVARTIS §
PHARMACEUTICAL CORPORATION, §
NOVARTIS VACCINES AND §
DIAGNOSTICS, INC., NOVARTIS §
INSTITUTES FOR BIOMEDICAL §
RESEARCH, INC., NOVARTIS §
CONSUMER HEALTH, INC., PFIZER, §
INC., THE PROCTER & GAMBLE §
COMPANY, PROCTER & GAMBLE §
MANUFACTURING COMPANY, §
TAKEDA PHARMACEUTICALS USA, §
INC., TAKEDA PHARMACEUTICALS §
AMERICA, INC., TAKEDA §
PHARMACEUTICALS LLC, TAKEDA §
PHARMACEUTICALS §
INTERNATIONAL, INC., TAKEDA §
CALIFORNIA, INC., TAKEDA §
DEVELOPMENT CENTER AMERICAS, §

| INC. F/K/A TAKEDA GLOBAL | § |
| RESEARCH & DEVELOPMENT | § |
| CENTER, INC. TAKEDA | § |
| PHARMACEUTICAL COMPANY | § |
| LIMITED, TAP PHARMACEUTICAL | § |
| PRODUCTS, INC. F/K/A TAP | § |
| HOLDINGS INC., WYETH | § |
| PHARMACEUTICALS, INC., WYETH- | § |
| AYERST LABORATORIES, and | § |
| WYETH LLC, | § |
| | § |
| *Defendants.* | § |

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

The above-captioned Plaintiffs ("Plaintiffs") file this, their Original Complaint, against the following currently named Defendants: Abbott Laboratories, AstraZeneca Pharmaceuticals LP, AstraZeneca PLC, AstraZeneca AB, Zeneca Inc., Astra US Holding Corporation, Astra USA LLC, AstraZeneca LP, KBI Sub, Inc., EISAI, Co., Ltd., GlaxoSmithKline Consumer Healthcare Holdings (US) LLC, GlaxoSmithKline Consumer Healthcare LP, GlaxoSmithKline Consumer Healthcare Holdings (US) IP LLC, Merck & Co. Inc. d/b/a Merck, Sharp & Dohme Corporation, Novartis Corporation, Novartis Pharmaceutical Corporation, Novartis Vaccines and Diagnostics, Inc., Novartis Institutes for Biomedical Research, Inc., Novartis Consumer Health, Inc., Pfizer, Inc., The Procter & Gamble Company, Procter & Gamble Manufacturing Company, Takeda Pharmaceuticals USA, Inc., Takeda Pharmaceuticals America, Inc., Takeda Pharmaceuticals LLC, Takeda Pharmaceuticals International, Inc., Takeda California, Inc., Takeda Development Center Americas, Inc. f/k/a Takeda Global Research & Development Center, Inc. Takeda Pharmaceutical Company Limited, TAP Pharmaceutical Products, Inc. f/k/a TAP Holdings Inc., Wyeth Pharmaceuticals, Inc., Wyeth- Ayerst Laboratories, and Wyeth LLC (collectively referred to as "Defendants").

This Complaint sets forth questions of fact and law common to those claims subsumed within the context of Defendants' prescription and over-the-counter Proton-Pump Inhibitor products (hereinafter together or individually, "the PPI Products" or "PPIs"). Plaintiffs seek compensatory and punitive damages, monetary restitution and all other available remedies as a result of injuries caused by Defendants' defective PPI Products. Plaintiffs make the following allegations based upon their personal knowledge and upon information and belief, as well as upon their attorneys' investigative efforts, regarding Defendants' PPI Products. Plaintiffs reserve the right to amend this Original Complaint and/or to file individualized complaints asserting individual claims (reasserting original claims or asserting new ones) as discovery proceeds and facts and other circumstances may warrant.

As more particularly set forth herein, each Plaintiff maintains that the PPI Products are defective in design, dangerous to human health, unfit and unsuitable to be advertised, marketed and sold in the United States, and lack proper warnings associated with their use.

## INTRODUCTION

1.    These are personal injury actions against Defendants and their affiliates, subsidiaries, alter-egos, and/or joint-venturers who were responsible for designing, researching, developing, testing, manufacturing, packaging, labeling, marketing, promoting, distributing, and/or selling the PPI Products including, but not limited to AcipHex, Dexilant, Nexium, Nexium 24HR, Prevacid, Prevacid 24HR, Prilosec, Prilosec OTC, and Protonix.

2.    PPI Products are used to suppress the production of acid in order to reduce the risk of duodenal ulcer recurrence and NSAID-associated gastric ulcers as well as to treat gastroesophageal reflux disease ("GERD") and certain pathological hypersecretory conditions including Zollinger-Ellison syndrome.

## PARTIES

3.     The above-captioned Plaintiffs are citizens and residents of Texas.

4.     Plaintiffs have suffered and were diagnosed with various forms of kidney injury, which were directly and proximately caused by their regular and prolonged use of the PPI Products. These kidney injuries include, but are not limited to, Acute Interstitial Nephritis ("AIN"), Acute Kidney Injury ("AKI"), Chronic Kidney Disease ("CKD"), and End-Stage Renal Disease ("ERSD") (collectively, "kidney injuries"), as well as other injuries.

5.     Defendant Abbott Laboratories ("Defendant Abbott") is and, at all times relevant to this action, has been an Illinois Corporation having a principal place of business at 100 Abbott Park Rd., Abbott Park, IL 60064.

6.     In and around 1977, Defendant Abbott and Defendant Takeda Pharmaceutical Company Limited entered into a joint venture resulting in the creation of TAP Holdings, Inc.

7.     As a part of their business and at all relevant times, Defendant Abbott has been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of prescription Prevacid (lansoprazole) products.

8.     Defendant Abbott manufactures and markets Prevacid in the United States.

9.     Defendant Abbott has transacted and conducted business related to Prevacid in each of the States and Territories of the United States.

10.     Defendant Abbott has derived substantial revenue from Prevacid in each of the States and Territories of the United States.

11.     Defendant Abbott has expected or should have expected its acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related

10

to Prevacid.

12.  Defendant AstraZeneca Pharmaceuticals LP is and, at all times relevant to this action, has been a Delaware limited partnership having a principal place of business at 1800 Concord Pike, Wilmington, DE 19850.

13.  Defendant AstraZeneca PLC is and, at all times relevant to this action, has been a Delaware Corporation with its principal place of business at 1800 Concord Pike, Wilmington, DE 19850.

14.  Defendant AstraZeneca Pharmaceuticals LP is and, at all times relevant to this action, has been a wholly owned subsidiary of Defendant AstraZeneca PLC and is comprised of four partners, Defendant AstraZeneca AB, Defendant Zeneca Inc., Defendant Astra US Holdings Corporation and Astra USA LLC.

15.  Defendant AstraZeneca AB, the general partner comprising Defendant AstraZeneca Pharmaceuticals LP, is a Swedish corporation having a principal place of business at SE-151 36 Sodentalje, Sweden.

16.  Defendant Zeneca Inc., one of the three limited partners comprising Defendant AstraZeneca Pharmaceuticals LP, is and, at all times relevant to this action, has been a Delaware Corporation having its principal place of business at 1800 Concord Pike, Wilmington, DE 19850.

17.  Defendant Astra US Holding Corporation, one of the three limited partners comprising Defendant AstraZeneca Pharmaceuticals LP, is and, at all times relevant to this action, has been a Delaware Corporation having its principal place at 1800 Concord Pike, Wilmington, DE 19850.

18.  Defendant Astra U.S.A. LLC, one of the three limited partners comprising Defendant AstraZeneca Pharmaceuticals LP, is and, at all times relevant to this action, has been a

New York Corporation having its principal place of business at 1800 Concord Pike, Wilmington, DE 19850.

19.     Defendant AstraZeneca LP is and, at all times relevant to this action, has been a Delaware limited partnership having a principal place of business at 1800 Concord Pike, Wilmington, DE 19850. Defendant AstraZeneca LP is and, at all times relevant to this action, has been a wholly owned subsidiary of AstraZeneca PLC.

20.     Defendant AstraZeneca LP is comprised of two partners. Defendant AstraZeneca Pharmaceuticals LP is the general partner and Defendant KBI Sub, Inc. is the limited partner.

21.     Defendant KBI Sub, Inc. is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business at 1 Merck Drive, White House Station, NJ 08889.

22.     Defendant AstraZeneca Pharmaceuticals LP, Defendant AstraZeneca PLC, Defendant AstraZeneca AB, Defendant Zeneca Inc., Defendant Astra US Holding Corporation, Defendant Astra U.S.A. LLC, Defendant AstraZeneca LP and Defendant KBI Sub, Inc. are referred to collectively herein as the "AstraZeneca Defendants."

23.     Each of the AstraZeneca Defendants was the agent and employee of the other AstraZeneca Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other AstraZeneca Defendants' actual and implied permission, consent, authorization, and approval.

24.     The AstraZeneca Defendants, in collaboration amongst themselves, designed, tested, researched and developed the prescription and non-prescription over-the-counter Prilosec (omeprazole) and Nexium (esomeprazole) products.

25.     As a part of their business and at all relevant times, the AstraZeneca Defendants

have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of both prescription and over-the-counter Prilosec and Nexium products.

26. In 1982, the AstraZeneca Defendants entered into a joint venture with Defendant Merck to design and develop the first proton pump inhibitor.

27. The result of this joint venture was the development of omeprazole, which was ultimately marketed and sold under the brand name Prilosec.

28. In September 1989, the FDA approved Prilosec for healing of erosive esophagitis, maintenance of healing erosive esophagitis and treatment of GERD.

29. The AstraZeneca Defendants hold and have held the patent for the drug Prilosec, which, by the year 2000, was the most widely prescribed drug in the world.

30. In an agreement reached in 1997, the AstraZeneca Defendants licensed to the Procter & Gamble Defendants the exclusive rights to market the over-the-counter version of Prilosec, known as Prilosec OTC, which was launched in September 2003.

31. According to the agreement between the Procter & Gamble Defendants and the AstraZeneca Defendants, the AstraZeneca Defendants supply Prilosec OTC and the Procter & Gamble Defendants market and sell Prilosec OTC.

32. In 2006, the FDA approved New Drug Application ("NDA") 22056 to allow the AstraZeneca Defendants the right to market and sell prescription Prilosec to children aged two and younger for the treatment of GERD.

33. Defendant AstraZeneca Pharmaceuticals LP is the holder of approved NDA 019810 for Prilosec Delayed-Release Capsule Pellets and 022056 for Prilosec Delayed-Release Oral Suspension.

34.     Defendant AstraZeneca LP is the holder of NDAs 019810/S-1-S-102 for Prilosec Delayed Release Capsules, 022056/S-1-S-019 for Prilosec delayed release oral suspension and 021229/S-1-S-029 for Prilosec OTC delayed release tablets.

35.     The AstraZeneca Defendants manufacture and market each of these Prilosec formulations in the United States.

36.     In anticipation of the expiration of the patent for prescription Prilosec, the AstraZeneca Defendants launched an internal program called Operation Shark Fin for the purpose of developing a second PPI Product in order to capitalize on the market for PPI Products. The result of Operation Shark Fin was the development of Nexium (esomeprazole).

37.     In December 1999, Defendant AstraZeneca Pharmaceutical LP submitted its first NDA for a Nexium product, NDA 021153, to the FDA for approval to market Nexium in the United States.

38.     In December 2000, the FDA simultaneously approved Nexium, NDA 021153, and Nexium Delayed Release, NDA 021154, for healing of erosive esophagitis, maintenance of healing erosive esophagitis, treatment of symptomatic GERD and *H. pylori* eradication to reduce the risk of duodenal ulcer recurrence (as part of a triple therapy with amoxicillin and clarithromycin).

39.     Defendant AstraZeneca Pharmaceuticals LP is also the holder of approved NDAs 021957 and 022010 for Nexium Delayed-Release Oral Suspension and NDAs 022101 and 021689 for Nexium Injection Solution.

40.     The AstraZeneca Defendants manufacture and market each of the aforementioned Nexium formulations in the United States.

41.     In 2003, the AstraZeneca Defendants spent $260 million alone in promoting and marketing Nexium products to American consumers, the largest amount spent on marketing a

single brand of pharmaceutical to that date.

42.     In an agreement reached in 2012, the AstraZeneca Defendants licensed to the Pfizer Defendants the exclusive right to market an over-the-counter version of Nexium, known as Nexium 24HR, which was launched in 2014.

43.     According to the agreement between the Pfizer Defendants and the AstraZeneca Defendants, the AstraZeneca Defendants receive royalty payments from the Pfizer Defendants on product launches and sales.

44.     The AstraZeneca Defendants have transacted and conducted business related to PPI Products in each of the States and Territories of the United States.

45.     The AstraZeneca Defendants have derived substantial revenue from PPI Products used in each of the States and Territories of the United States. For example, in 2003 alone, sales of Nexium in the United States was $2.7 billion and world-wide was $3.9 billion.

46.     The AstraZeneca Defendants have expected or should have expected their acts to have consequences within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to PPIs.

47.     Defendant EISAI, Co., Ltd. is and, at all relevant times to this action, has been a Japanese company having a principal place of business at 4-6-10, Koishikawa Bunkyo-ku, Tokyo, Japan 112-8088.

48.     Defendant EISAI, Co., Ltd. has had, and will continue to have, a contractual, ownership, and financial interest in AcipHex, NDA 020973, which was approved by the FDA in August 1999.

49.     Defendant EISAI, Co., Ltd. designed and developed AcipHex.

50. As a part of its business and at all relevant times, Defendant EISAI, Co., Ltd. has been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale, and distribution of AcipHex.

51. Defendant EISAI, Co., Ltd., manufactures AcipHex in Japan.

52. Defendant EISAI, Co., Ltd., has derived substantial revenue from AcipHex in each of the States and Territories of the United States.

53. Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) LLC is and, at all times relevant to this action, has been a Delaware limited liability corporation having a principal place of business at 184 Liberty Corner Road, Warren, NJ 07059.

54. Defendant GlaxoSmithKline Consumer Healthcare LP is and, at all times relevant to this action, has been a Delaware limited liability corporation having a principal place of business at 184 Liberty Corner Road, Warren, NJ 07059.

55. Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) IP LLC is and, at all times relevant to this action, has been a Delaware limited liability corporation having a principal place of business at 5 Crescent Drive, Philadelphia, PA 19112.

56. Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) LLC, Defendant GlaxoSmithKline Consumer Healthcare LP and Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) IP LLC are referred to collectively herein as the "GlaxoSmithKline Defendants."

57. Each of the GlaxoSmithKline Defendants was the agent and employee of the other GlaxoSmithKline Defendants and in doing the things alleged, was acting within the course and scope of such agency and employment and with the other GlaxoSmithKline Defendants' actual and implied permission, consent, authorization, and approval.

58.     The GlaxoSmithKline Defendants, pursuant to an agreement with the Novartis Defendants, obtained the rights to market and sell the over-the-counter medication Prevacid 24Hr.

59.     The GlaxoSmithKline Defendants, in collaboration and amongst themselves, designed and developed Prevacid 24HR.

60.     As a part of their business and at all relevant times, the GlaxoSmithKline Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale, and distribution of Prevacid 24HR products.

61.     Defendant GlaxoSmithKline Consumer Healthcare (US) IP LLC is the holder of approved NDA 022327 for Prevacid 24HR.

62.     The GlaxoSmithKline Defendants manufacture and market Prevacid 24HR in the United States.

63.     The GlaxoSmithKline Defendants have transacted and conducted business related to Prevacid 24HR in each of the States and Territories of the United States.

64.     The GlaxoSmithKline Defendants have derived substantial revenue from Prevacid 24HR in each of the States and Territories of the United States.

65.     The GlaxoSmithKline Defendants have expected or should have expected their acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Prevacid 24HR.

66.     Defendant Merck & Co. Inc. d/b/a Merck, Sharp & Dohme Corporation (hereinafter "Defendant Merck") is and, all times relevant to this action, has been a New Jersey corporation having a principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889.

67.     In 1982, Defendant Merck entered into an agreement with the AstraZeneca

Defendants, under the terms of which Defendant Merck developed and marketed the AstraZeneca Defendants' products, including Nexium and Prilosec products, under a royalty-bearing license.

68. In 1993, Merck's total sales of the AstraZeneca Defendants' products reached a level that triggered the first step in the establishment of a joint venture business (the "Joint Venture") in which Defendant Merck and the AstraZeneca Defendants each owned a 50% share. This Joint Venture, formed in 1994, was called Astra Merck Inc. and was responsible for the sale of Prilosec and other of the AstraZeneca Defendants' products.

69. In 1997, the Procter & Gamble Defendants formed a strategic alliance with the Joint Venture to develop and market Prilosec OTC.

70. Until 2014, Defendant Merck had a contractual and ownership interest in the Joint Venture. Through these interests, between 2009 and 2014, Defendant Merck earned at least $7 billion, based on the sales of prescription and over-the-counter formulations of Nexium and Prilosec.

71. Defendant Merck currently has, and will continue to have until 2018, a financial interest in prescription and over-the-counter formulations of Nexium and Prilosec.

72. As a part of their business and at all relevant times, Defendant Merck has been and is involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of prescription and over-the-counter formulations of Prilosec and Nexium.

73. In 1989, Defendant Merck sponsored the first NDA for a Prilosec product, NDA 019810, which it submitted to the FDA for approval to market Prilosec. Under this NDA the following forms of Prilosec have been approved: Delayed-Release Capsule Pellets (20mg), approved on September 14, 1989; Delayed-Release Capsule Pellets (10mg), approved on October 5, 1995; and Delayed-Release Capsule Pellets (40mg), approved on January 15, 1998.

74.     Defendant Merck has also had a contractual, ownership, and financial interest in Prilosec Delayed-Release Oral Suspension, NDA 022056.

75.     Defendant Merck, through the Joint Venture, also designed, researched, manufactured, tested, advertised, marketed, sold and distributed Nexium.

76.     Defendant Merck has had a contractual, ownership and financial interest in the following FDA approved forms of Nexium: Delayed-Release Capsule Pellets, NDA 021153; Delayed-Release Oral Suspension, NDAs 02195 and 022010; and Intravenous Injectable Solution, NDA 021689.

77.     Defendant Merck manufactures and markets Nexium products in the United States.

78.     Defendant Merck manufactures and markets Prilosec products in the United States.

79.     Defendant Merck has transacted and conducted business related to PPI Products in each of the States and Territories of the United States.

80.     Defendant Merck has derived substantial revenue from PPI Products in each of the States and Territories of the United States.

81.     Defendant Merck has expected or should have expected its acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to PPI Products.

82.     Defendant Novartis Corporation is and, at all times relevant to this action, has been a Swiss corporation having a principal place of business at Lichtstrasse 35, CH-4056 Basel, Switzerland.

83.     Defendant Novartis Pharmaceutical Corporation is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business at One Health Plaza,

East Hanover, NJ 07936.

84.     Defendant Novartis Vaccines and Diagnostics, Inc. is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business at 4560 Horton Street, Emeryville, CA 94608.

85.     Defendant Novartis Institutes for Biomedical Research, Inc. is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business at 250 Massachusetts Avenue, Cambridge, MA 02139.

86.     Defendant Novartis Consumer Health, Inc. is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business at 200 Kimball Drive, Parsippany, NJ 07054.

87.     Defendant Novartis Corporation is the parent/holding company of Defendant Novartis Pharmaceutical Corporation, Defendant Novartis Vaccines and Diagnostics, Inc., Defendant Novartis Institutes for Biomedical Research, Inc. and Defendant Novartis Consumer Health, Inc.

88.     At all relevant times, Defendant Novartis Corporation has exercised and exercises dominion and control over Defendant Novartis Pharmaceutical Corporation, Defendant Novartis Vaccines and Diagnostics, Inc., Defendant Novartis Institutes for Biomedical Research, Inc. and Defendant Novartis Consumer Health, Inc.

89.     Defendant Novartis Corporation, Defendant Novartis Pharmaceutical Corporation, Defendant Novartis Vaccines and Diagnostics, Inc., Defendant Novartis Institutes for Biomedical Research, Inc. and Defendant Novartis Consumer Health, Inc. are referred to collectively herein as the "Novartis Defendants."

90.     Each of the Novartis Defendants was the agent and employee of the other Novartis

Defendants, and in doing the things alleged were acting within the course and scope of such agency and employment and with the other Novartis Defendants' actual and implied permission, consent, authorization and approval.

91.     In 2005, the Novartis Defendants obtained the rights to market the over-the-counter version of Prevacid, Prevacid 24HR, from Defendant TAP.

92.     As a part of their business and at all relevant times, the Novartis Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale, and distribution of Prevacid 24 HR.

93.     The Novartis Defendants, in collaboration amongst themselves, designed and developed the Prevacid 24 HR.

94.     Defendant Novartis Pharmaceuticals Corporation has been the holder of approved NDA 022327 for Prevacid 24HR.

95.     The Novartis Defendants manufacture and market Prevacid 24HR in the United States.

96.     The Novartis Defendants have transacted and conducted business related to Prevacid 24HR in each of the States and Territories of the United States.

97.     The Novartis Defendants have derived substantial revenue from Prevacid 24HR in each of the States and Territories of the United States.

98.     The Novartis Defendants have expected or should have expected their acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Prevacid 24HR.

99.     Defendant Pfizer Inc. is and, all times relevant to this action, has been a Delaware

corporation having a principal place of business at 235 East 42nd Street, New York, NY 10017.

100.     On October 15, 2009, Defendant Pfizer Inc. acquired Defendant Wyeth Pharmaceuticals, Inc. and, since that time, has been the parent/holding company of the Wyeth Defendants.

101.     As a part of their business and at all relevant times, Defendant Pfizer Inc. has been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale, and distribution of the drugs Protonix (pantoprazole) and Nexium 24HR.

102.     In or about 2012, Defendant Pfizer Inc. entered into a marketing agreement with the AstraZeneca Defendants whereby Defendant Pfizer Inc. acquired the rights to market Nexium 24HR products.

103.     On or about March 28, 2014, Defendant Pfizer Inc., in collaboration with and pursuant to its marketing agreement with the AstraZeneca Defendants, was granted FDA approval to market Nexium 24HR products.

104.     Defendant Pfizer Inc. makes Nexium 24HR available for purchase in the United States in and around 2014 and continues to manufacture and market Nexium 24HR in the United States.

105.     Defendant Pfizer Inc. manufactures and markets Protonix in the United States.

106.     Defendant Pfizer Inc. has transacted and conducted business related to PPI Products in each of the States and Territories of the United States.

107.     Defendant Pfizer Inc. has derived substantial revenue from PPI Products in each of the States and Territories of the United States.

108.     Defendant Pfizer Inc. has expected or should have expected its acts to have consequence within each of the States and Territories of the United States, and derived substantial

revenue from interstate commerce in each of the States and Territories of the United States related to PPI Products.

109.    Defendant The Procter & Gamble Company is and, all times relevant to this action, has been an Ohio corporation with its principal place of business at 1 Procter & Gamble Plaza, Cincinnati, OH 45202.

110.    Defendant Procter & Gamble Manufacturing Company is and, all times relevant to this action, has been an Ohio corporation with its principal place of business at 3875 Reservoir Road, Lima, OH 45801.

111.    At all times relevant to this action Defendant The Procter & Gamble Company has been the direct or indirect owner of substantially all of the stock or other ownership interests of Defendant Procter & Gamble Manufacturing Company.

112.    Defendant The Procter & Gamble Company and Defendant Procter & Gamble Manufacturing Company are referred to collectively herein as the "Procter & Gamble Defendants."

113.    Each of the Procter & Gamble Defendants was the agent and employee of the other Procter & Gamble Defendant, and in doing the things alleged were acting within the course and scope of such agency and employment and with the other Procter & Gamble Defendant's actual and implied permission, consent, authorization and approval.

114.    The Procter & Gamble Defendants, in collaboration amongst themselves and the AstraZeneca Defendants, designed and developed Prilosec OTC.

115.    As a part of their business and at all relevant times, the Procter & Gamble Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of Prilosec OTC.

116.    In or about 1997, Defendant The Procter & Gamble Company entered into a

marketing agreement with Defendant AstraZeneca LP whereby the Procter & Gamble Defendants acquired the rights to market Prilosec OTC products.

117.    On or about January 27, 2000, Defendant The Procter & Gamble Company, in collaboration with and pursuant to its marketing agreement with Defendant AstraZeneca LP, submitted NDA 021229 for Prilosec OTC delayed release tablets.

118.    On or about June 20, 2003, Defendant The Procter & Gamble Company, in collaboration with and pursuant to its marketing agreement with Defendant AstraZeneca LP, was granted approval for NDA 021229, Prilosec OTC.

119.    The Procter & Gamble Defendants made Prilosec OTC available for purchase in the United States on or about October 2003 and continue to manufacture and market each formulation of Prilosec OTC in the United States.

120.    The Procter & Gamble Defendants have transacted and conducted business related to Prilosec OTC in each of the States and Territories of the United States.

121. The Procter & Gamble Defendants have derived substantial revenue from Prilosec OTC in each of the States and Territories of the United States.

122.    The Procter & Gamble Defendants have expected or should have expected their acts to have consequences within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Prilosec OTC.

123.    Defendant Takeda Pharmaceuticals USA, Inc. is and, at all times relevant to this action, has been an Illinois corporation having a principal place of business at One Takeda Parkway, Deerfield, Ill 60015.

124.    Defendant Takeda Pharmaceuticals America, Inc. is and, at all times relevant to this

action, has been an Illinois corporation having a principal place of business at One Takeda Parkway, Deerfield, Ill 60015.

125.    Defendant Takeda Pharmaceuticals LLC is and, at all times relevant to this action, has been an Illinois limited liability company having a principal place of business at One Takeda Parkway, Deerfield, Ill 60015.

126.    Defendant Takeda Pharmaceuticals, LLC, at all times relevant to this action, has been wholly owned by Defendant Takeda Pharmaceuticals America, Inc. and Defendant Takeda Pharmaceuticals USA, Inc.

127.    Defendant Takeda Pharmaceuticals International, Inc. is and, at all times relevant to this action, has been an Illinois corporation having a principal place of business at One Takeda Parkway, Deerfield, IL 60015.

128.    Defendant Takeda California, Inc. is and, at all times relevant to this action, has been a Delaware Corporation having a principal place of business at 10410 Science Center Drive, San Diego, CA 92121.

129.    Defendant Takeda Development Center Americas, Inc. f/k/a Takeda Global Research & Development Center, Inc. is and, at all times relevant to this action, has been an Illinois corporation having a principal place of business at One Takeda Parkway, Deerfield, IL 60015.

130.    Defendant Takeda Pharmaceutical Company Limited is and, at all times relevant to this action, has been a Japanese corporation having a principal place of business at 1-1, Doshomachi 4-chome, Chuoku, Osaka, Japan.

131.    Defendant Takeda Pharmaceutical Company Limited is and, at all times relevant to this action, has been the parent/holding company of Defendant Takeda Pharmaceuticals USA, Inc., Defendant Takeda Pharmaceuticals LLC, Defendant Takeda Pharmaceuticals International Inc.,

Defendant Takeda California Inc. and Defendant Takeda Development Center Americas, Inc. f/k/a Takeda Global Research & Development Center Inc.

132.     Defendant Takeda Pharmaceutical Company Limited, at all times relevant to this action, has exercised and exercises dominion and control over Defendant Takeda Pharmaceuticals USA, Inc., Defendant Takeda Pharmaceuticals LLC, Defendant Takeda Pharmaceuticals International Inc., Defendant Takeda California Inc. and Defendant Takeda Development Center Americas, Inc. f/k/a Takeda Global Research & Development Center Inc.

133.     Defendant Takeda Pharmaceuticals USA, Inc., Defendant Takeda Pharmaceuticals America, Inc., Defendant Takeda Pharmaceuticals LLC, Defendant Takeda Pharmaceuticals International, Inc., Defendant Takeda California, Inc., Defendant Takeda Development Center Americas, Inc. f/k/a Takeda Global Research & Development Center, Inc. and Defendant Takeda Pharmaceutical Company Limited are referred to collectively herein as the "Takeda Defendants."

134.     Each of the Takeda Defendants was the agent and employee of the other Takeda Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other Takeda Defendants' actual and implied permission, consent, authorization and approval.

135.     As a part of their business and at all relevant times, the Takeda Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of Dexilant (dexlansoprazole), Prevacid, Prevacid 24HR and Protonix products.

136.     The Takeda Defendants, in collaboration amongst themselves, designed and developed the Dexilant, Prevacid, Prevacid 24HR and Protonix products.

137.     Defendant Takeda Pharmaceuticals USA, Inc. is the holder of approved NDAs

022287 and 208056 for Dexilant, and NDAs 020406, 021428 and 021281 for Prevacid.

138.     The Takeda Defendants manufacture and market each of these prescription Prevacid formulations in the United States.

139.     The Takeda Defendants manufacture and market each of these Prevacid 24HR formulations in the United States.

140.     The Takeda Defendants manufacture and market each of these Dexilant formulations in the United States.

141.     The Takeda Defendants manufacture and market each of these Protonix formulations in the United States.

142.     The Takeda Defendants have transacted and conducted business related to PPI Products in each of the States and Territories of the United States.

143.     The Takeda Defendants have derived substantial revenue from PPI Products in each of the States and Territories of the United States.

144.     The Takeda Defendants have expected or should have expected their acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to PPI Products.

145.     Defendant TAP Pharmaceutical Products, Inc. f/k/a TAP Holdings, Inc. (hereinafter "Defendant TAP") is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business in Lake Forest, Ill.

146.     Defendant TAP was a joint venture created by and between Defendant Abbott and the Takeda Defendants in and around 1977.

147.     Defendant TAP filed the Investigational New Drug Application for prescription

Prevacid in 1987, and filed an NDA for prescription Prevacid in 1993

148.    Defendant TAP Holdings, Inc. was the holder of NDA 020406 for prescription Prevacid, which was approved for sale in the United States in 1995.

149.    In 2005, Defendant TAP sold the rights to market an over-the-counter version of Prevacid, Prevacid 24HR, to Defendant Novartis Consumer Healthcare.

150.    Defendant TAP dissolved in 2008 and, at that time, the Takeda Defendants received the rights to Dexilant, Prevacid and Prevacid 24HR products in the United States.

151.    Defendant TAP manufactured and marketed Prevacid in the United States.

152.    Defendant TAP has transacted and conducted business related to Prevacid in each of the States and Territories of the United States.

153.    Defendant TAP has derived substantial revenue from Prevacid in each of the States and Territories of the United States.

154.    Defendant TAP has expected or should have expected its acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Prevacid.

155.    Defendant Wyeth Pharmaceuticals Inc. is and, all times relevant to this action, has been a Delaware corporation having a principal place of business at 500 Arcola Rd. Collegeville, PA.

156.    Defendant Wyeth-Ayerst Laboratories is and, all times relevant to this action, has been a Delaware corporation having a principal place of business at 500 Arcola Rd. Collegeville, PA.

157.    Defendant Wyeth-Ayerst Laboratories is a wholly-owned subsidiary of Defendant Wyeth Pharmaceuticals, Inc.

158. In 2009 Defendant Pfizer Inc. acquired Defendant Wyeth Pharmaceuticals Inc. and, since that time, Defendant Wyeth Pharmaceuticals, Inc. has been a wholly owned subsidiary of Defendant Pfizer, Inc.

159. On November 9, 2009, Defendant Wyeth Pharmaceuticals, Inc. converted into a Delaware limited liability company, Wyeth LLC.

160. Defendant Wyeth LLC is and, all times relevant to this action, has been a Delaware corporation having a principal place of business at 500 Arcola Rd. Collegeville, PA, and is a wholly-owned subsidiary of Defendant Pfizer Inc.

161. Defendant Wyeth Pharmaceuticals, Inc., Defendant Wyeth-Ayerst Laboratories and Defendant Wyeth LLC are referred to collectively herein as the "Wyeth Defendants."

162. At all relevant times, Defendant Pfizer Inc. exercised and exercises dominion and control over the Wyeth Defendants.

163. Each of the Wyeth Defendants was the agent and employee of the other Wyeth Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other Wyeth Defendants' actual and implied permission, consent, authorization and approval.

164. As a part of their business and at all relevant times, the Wyeth Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale, and distribution of prescription Protonix products.

165. The Wyeth Defendants, in collaboration amongst themselves, designed and developed the prescription Protonix products.

166. Defendant Wyeth-Ayerst Laboratories is the holder of approved NDAs 020987 and 020988 for Protonix.

167.     Defendant Wyeth Pharmaceuticals, Inc. is the holder of approved NDA 022020 for Protonix.

168.     The Wyeth Defendants manufacture and market Protonix in the United States.

169.     The Wyeth Defendants have transacted and conducted business related to Protonix in each of the States and Territories of the United States.

170.     The Wyeth Defendants have derived substantial revenue from Protonix in each of the States and Territories of the United States.

171.     The Wyeth Defendants have expected or should have expected their acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Protonix.

172.     Defendants John Does/Jane Does 1-30 are those persons, agents, employees, and/or representatives of the Defendants whose conduct as described herein caused or contributed to the damages of Plaintiffs, all of whose names and legal identities are unknown to Plaintiffs at this time, but will be substituted by amendment when ascertained, individually and jointly.

173.     Defendants Unknown Businesses and/or Corporations A-Z are unknown entities whose conduct as described herein caused or contributed to the damages of Plaintiffs, all of whose names and legal identities are unknown to Plaintiffs at this time, but will be substituted by amendment when ascertained, individually and jointly.

### JURISDICTION AND VENUE

174.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) because complete diversity exists between Plaintiffs and Defendants.

175.     The amount in controversy alleged by each of the respective individual Plaintiffs

will exceed the sum or value of $75,000.

176. Defendants have significant contacts with this federal judicial district such that they are subject to the personal jurisdiction of this court, and Plaintiffs are residents and citizens of Texas.

177. Defendants are each multinational Fortune 500 companies that have significant contacts in each of the States and Territories of the United States, such that personal jurisdiction would be proper in any of them. Defendants have derived revenue from the sale of their respective PPI Product(s) in each of the States and Territories of the United States.

178. A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in Texas, including this district. Pursuant to 28 U.S.C. § 1391(a), venue is proper in said district.

## FACTUAL ALLEGATIONS

### A. General Background: Proton Pump Inhibitors

179. PPI Products are indicated for the treatment of the following conditions: GERD; dyspepsia; acid peptic disease; Zollinger-Ellison syndrome; acid reflux; and peptic or stomach ulcers.

180. PPI Products work by inhibiting the secretion of stomach acid. They shut down acid production of the active acid pumps in the stomach, thereby reducing hydrochloric acid in the stomach. The drug binds with the proton pump which inhibits the ability of the gastric parietal cell to secrete gastric acid.

181. PPI Products are one of the most commercially successful groups of medication in the history of pharmaceutical sales in the United States. Upon information and belief, from 2003 to the present, PPIs have been one of the top ten best-selling and most dispensed forms of

prescription medication in the United States each year.

182.     As of 2009, approximately 21 million Americans used one or more prescription PPI Products, accounting for nearly 20% of the drugs' global sales and earning an estimated $11 billion annually.

183.     Between the period of 2008 and 2013, prescription PPI Products had sales of over $50 billion with approximately 240 million units dispensed.

184.     According to the 2011–2012 National Health and Nutritional Examination Survey, 7.8% of US adults had used prescription PPI Products within the last 30 days.

**B.     PPI Products Cause Severe Kidney Injuries**

185.     As early as October of 1992, researchers from the University of Arizona Health Sciences Center led by Stephen Ruffenach published the first article reporting PPI usage associated with kidney injury in The American Journal of Medicine.

186.     Since 1992, there have been numerous adverse case reports and scientific studies published in medical journals and reported by physicians and scientists, as well as adverse reports from national adverse drug registries, which document an association between use of PPI Products and the occurrence of kidney injuries such as AIN, AKI"), CKD and ESRD.

**i.     PPI-Induced Acute Interstitial Nephritis ("AIN")**

187.     Since 1992, numerous case reports have been published in the medical literature documenting an association between the use of PPI Products and the development of AIN amongst patients.

188.     In 2006, researchers at the Yale School of Medicine conducted a case series published in the *International Society of Nephrology's Kidney International* finding that PPI Product use, by way of AIN, left most patients "with some level of chronic kidney disease."

189.    In 2007, F. Sierra et al. published an article in the *Journal of Alimentary\ Pharmacology and Therapeutics*, titled, "Systematic review: proton pump inhibitor-associated acute interstitial nephritis." The researchers concluded that long-term use of proton pump inhibitors is associated with interstitial nephritis.

190.    In February 2007, Harmark et al. published their findings in the *British Journal of Clinical Pharmacology* that AIN could be induced by a variety of available PPI Products and was indicative of a class-effect and that this finding was further supported by adverse event data from the World Health Organization Collaborating Centre for International Drug Monitoring, "where PPI-induced AIN is disproportionately present in the database." Harmark et al., *Proton-pump inhibitor-induced acute interstitial nephritis*, BJ Clin. Pharm. (2007).

191.    On August 23, 2011, Public Citizen, a consumer advocacy group, filed a Citizen's Petition with the FDA seeking the addition of safety information concerning several risks associated with PPI Product usage, including, among others, PPI-induced AIN.

192.    According to the Public Citizen petition, at the time of the filing there was "no detailed risk information on any PPI for this adverse effect."

193.    On October 31, 2014, more than three years after Public Citizen's petition, the FDA responded by requiring consistent labeling regarding the risk of AIN on all prescription PPI Products.

194.    The FDA found that there was "reasonable evidence of a causal association" and therefore, concluded "that the prescription PPI labeling should be consistent with regard to this risk[.]"

195.    In December of 2014, all labels for prescription PPI Products were required to include the following information:

> *Acute interstitial nephritis has been observed in patients taking PPIs including [Brand]. Acute interstitial nephritis may occur at any point during PPI therapy and is generally attributed to an idiopathic hypersensitivity reaction. Discontinue [PPI] if acute interstitial nephritis develops.*

196.    To this date, Defendants' over-the-counter PPI Products do not include a warning or any risk information about AIN.

197.    The current warning contained on prescription PPI Products regarding the risk of AIN is far from adequate, lacking the necessary force and specificity to give patients and their healthcare providers the proper information needed to make an informed decision about whether to start or continue a drug regimen with the potential for such dire consequences. If left untreated, AIN can lead to Chronic Kidney Disease, Renal Failure, Dialysis, Kidney Transplant and/or death.

198.    Defendants have also failed to adequately inform physicians, and other healthcare providers such as pharmacists, and consumers regarding the risk of AIN and the use of over-the counter

### PPI Products

199.    PPI Products and/or their metabolites – substances formed via metabolism – have been found to deposit within the spaces between the tubules of the kidney and act in such a way to mediate AIN, a sudden kidney inflammation that can result in mild to severe problems.

200.    PPI-induced AIN can be difficult to diagnose, with less than half of patients reporting a fever and, instead, most commonly complaining of non-specific symptoms such as fatigue, nausea and weakness.

201.    Use of PPI Products may lead to subclinical AIN according to multiple studies, including but not limited to:

a)    Lazarus B, Chen Y, Wilson FP, et al. *Proton Pump Inhibitor Use and the Risk of*

*Chronic Kidney Disease*. 176 JAMA INTERNAL MED. 238 (2016); and

b) DG Moledina & MA Perazella, *Proton Pump Inhibitors and CKD*, 27 J. AM. SOC. NEPHROL. 2926 (2016).

202. AIN's slow presentation can cause significant damage over time without those affected exhibiting acute symptoms.

203. Where AIN is subclinical, it can persist for months before a patient realizes their injury. By that time, their untreated AIN can lead to Chronic Kidney Disease and End Stage Renal Disease requiring the patient to undergo permanent dialysis, kidney transplant or, in some cases, death.

204. While AIN can be treated, once AIN has progressed to CKD it is incurable and can only be managed.

**ii. PPI-Induced Acute Kidney Injury ("AKI")**

205. Acute Kidney Injury is characterized by acute and sudden renal failure by which the kidneys fail to filtrate properly.

206. Studies indicate that those using PPI Products are at a more than 2.5 times greater risk than the general population to suffer AKI.

207. Studies also indicate that those who develop AIN are at a significant risk of AKI, even though they may not obviously exhibit kidney dysfunction.

208. Currently, the product labeling for PPI Products, both prescription and over-the-counter, does not contain any warning regarding the increased risk of AKI.

209. Where AKI is subclinical, it can persist for months before a patient realizes their injury. By that time, their untreated AKI can lead to CKD and ESRD.

**iii. PPI-Induced Chronic Kidney Disease ("CKD")**

210.     Chronic Kidney Disease is the gradual loss of kidney function. Kidneys filter waste and excess fluid from the blood, which are then excreted. When CKD reaches an advanced stage, dangerous levels of fluid, electrolytes and waste can build up in the body.

211.     CKD can ultimately progress to End Stage Renal Disease in which total kidney function is lost and patients must either undergo dialysis or have a kidney transplant to survive.

212.     In January 2016, a study published in the Journal of the American Medical Association found that use of PPI Products was independently associated with a $20 - 50\%$ higher risk of CKD.

213.     In February 2016, a study published in the Journal of the American Society of Nephrology found that "exposure to PPI is associated with increased risk of development of CKD, progression of kidney disease, and risk of ESRD."

214.     In April 2016, a study published in the Journal of Nephrology suggested that the development of and failure to treat AIN could lead to CKD and ESRD, which requires dialysis or kidney transplant to manage. Analyses of the study were adjusted for age, sex, race, baseline eGFR, cigarette smoking, BMI, systolic blood pressure, diabetes, a history of cardiovascular disease, antihypertensive medication use, anticoagulant medication use, statin, aspirin and NSAID use. Across all groups, "each of these sensitivity analyses showed a consistent association between PPI use and a higher risk of CKD."

215.     CKD is often a slow progressive decline in kidney function that may result in ESRD. As the kidneys lose their ability to function properly, wastes can build to high levels in the blood resulting in numerous, serious complications ranging from nerve damage and heart disease to kidney failure and death.

216.     PPI Products have also been shown to cause CKD independent of, and in the

absence of, an intervening AKI or AIN event, even where the AKI or AIN is subclinical. For example, the results of a 2017 epidemiologic study "showed a significant association between PPI use and chronic renal outcomes including incident CKD, CKD progression, and ESRD in the absence of intervening AKI." Yan Xie et al., *Long-Term Kidney Outcomes among Users of Proton Pump Inhibitors without Intervening Acute Kidney Injury*, 91 Kidney Int'l 1482 (2017).

217. To date, the labeling for Defendants' PPI Products lack adequate risk information about CKD.

## C. PPI Products Cause Rebound Acid Hypersensitivity, Worsening GERD and Acid Reflux, Creating Dependency

218. Users of PPI Products will, and have, experienced worse GERD, or acid reflux, upon ceasing PPI Product use, evidencing that PPI Products can lead to physical dependency and/or the worsening of symptoms upon removal of the PPI therapy.

219. The worsening of GERD or acid reflux after withdrawal of PPI Products has been characterized by scientists as "rebound acid hypersecretion" and is characterized by an increase in acid secretion with the withdrawal of the PPI Products.

220. This phenomenon was first identified during preclinical animal studies on rats treated with omeprazole/Prilosec.

221. Because PPI Products work by preventing the acidification of the stomach's contents by blocking the proton pumps of the stomach, the body may react by compensating with increased production of gastrin, a hormone that stimulates secretion of gastric acid. Consequently, when users discontinue treatment with PPI Products, their bodies' acid production increases beyond their pre-PPI treatment levels.

222. The increase in acid production after discontinuation of PPI Products caused and will continue to cause Plaintiffs significant harm and a dependency on PPI Products.

37

223.     After Plaintiffs' discontinuation of PPI Products, increased acid production to a level above that which existed before treatment with PPI Products was initiated has caused and will cause Plaintiffs to treat GERD as a more severe condition than that which existed when PPI Products were initiated.

224.     Several studies have shown that treatment with PPI Products induces acid-related symptoms like heartburn, acid regurgitation and dyspepsia once treatment is withdrawn in healthy individuals who have never before experienced heartburn or related symptoms.

225.     Due to rebound hypersecretion, patients are unable, in many instances, to cease use of PPI Products, despite choosing and wanting to do so after learning of the risks of using PPI Products, including kidney injuries.

226.     To date, the labeling for the Defendants' respective PPI Products contains no information regarding rebound acid hypersecretion or information that would assist healthcare providers and/or patients who suffer from this after ceasing to use PPI Products.

**D.     Safer Alternatives to PPIs**

227.     Despite the fact that PPI Products lead to an increased risk of such severe injuries as outlined herein, several safer alternatives have been and are available, including but not limited to:

a)     The use of over-the-counter calcium carbonate tablets that have been available since the 1930s, such as Maalox and Tums; and/or

b)     The use of histamine H2-receptor antagonists (also known as "H2 Blockers") that were developed in the late 1960s. H2 Blockers act to prevent the production of stomach acid, work more quickly than PPI Products and are prescribed for the same indications as PPI Products. Examples of H2 Blockers include Zantac, Pepcid and Tagamet. H2 Blockers are not associated

with an increased risk of kidney injuries.

228.     In spite of their commercial success and global popularity, up to 70% of PPI Products may be used inappropriately for indications or durations that were never tested or approved. D. Marks, *Time to Halt the Overprescribing of Proton Pump Inhibitors*, THE PHARMACEUTICAL JOURNAL (Aug. 8, 2016).

229.     Consumers, including Plaintiffs, who have used Defendants' PPI Products for the treatment of increased gastric acid have and had several alternative safer treatments available and have not been adequately warned about the significant risks and lack of benefits associated with use of PPI Products.

**E.     Injuries Resulting from PPI Products**

230.     The use of PPI Products for time periods longer than those tested or approved is a direct consequence of Defendants' (1) failure to adequately and specifically warn patients and healthcare providers as to the appropriate length of usage; (2) failure to provide adequate, clear and accurate marketing materials regarding appropriate usage of PPI Products and the appropriate and approved indications; and (3) engaging in off-label promotion of their respective PPI Products for indications that were not approved.

231.     As a result of the defective nature of Defendants' PPI Products, persons who ingested Defendants' PPI Products have been exposed to significant risks stemming from unindicated and/or long-term usage, even when used as directed and/or prescribed by a physician or healthcare professional.

232.     Consumers, including Plaintiffs, who have used Defendants' PPI Products have suffered from severe kidney injuries including, but not limited to, AIN, AKI, CKD and ESRD.

233.     Consumers, including Plaintiffs, who have used Defendants' PPI Products have

suffered from a worsening of acid-related symptoms like heartburn, acid regurgitation and dyspepsia once treatment with Defendants' PPI Products was withdrawn and have developed and suffered from a physical dependence on PPI treatment.

**F. Defendants' Actively Concealed the Dangers Associated with Use of PPI Products**

234. Defendants, through their affirmative misrepresentations and/or omissions, actively concealed from Plaintiffs and Plaintiffs' physicians the true and significant risks associated with the use of Defendants' PPI Products.

235. Defendants concealed and continue to conceal from Plaintiffs, other consumers and/or the medical community that Defendants' PPI Products can cause kidney injuries. Specifically, Defendants failed to adequately inform Plaintiffs, other consumers and/or the medical community about the serious risks associated with Defendants' PPI Products, and Defendants completely failed to warn against the risk of AKI, CKD and ESRD, and Defendants still fail to warn of these risks, even to this day. Defendants have concealed and continue to conceal and have failed to adequately inform Plaintiffs, other consumers, Plaintiffs' physicians and/or others within the medical community that over-the-counter PPI Products are associated with AIN, and fail to warn and inform regarding the risk of AIN developing into CKD and ESRD.

236. Defendants concealed and continue to conceal that Defendants' PPI Products can cause consumers to become physically dependent on PPI treatment. Specifically, Defendants have failed to inform consumers and/or healthcare providers that a patient's symptoms may worsen after the withdrawal of PPI Products.

237. As a result of Defendants' actions, Plaintiffs and/or Plaintiffs healthcare providers were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiffs had been exposed to the risks identified in this Complaint, and that those risks were

the direct and proximate result of Defendants' acts, omissions and misrepresentations.

238.     Plaintiffs would not have used Defendants' PPI Products had Defendants properly disclosed the risks associated with long-term use.

239.     Defendants had an obligation to comply with the law in the manufacture, design and sale of Defendants' respective PPI Products.

240.     Materials, including advertisements, press releases, website publications and other communications regarding Defendants' PPI Products, are part of the labeling of the Defendants' respective PPI Products, and Defendants could have altered the same without FDA approval.

241.     Defendants' marketing campaigns willfully and intentionally misrepresented the risks of PPI Products and failed to warn about the risks of acute interstitial nephritis, acute kidney failure, chronic kidney disease and other kidney injuries.

242.     Defendants' marketing campaigns and advertising to consumers failed to adequately instruct consumers regarding the appropriate duration for using their respective over the-counter PPI Products.

243.     Defendants knew or should have known of the risks of AIN, AKI, CKD and ESRD based on the data available to them or that could have been generated by them, including, but not limited to animal studies, mechanisms of action, pharmacodynamics, pharmacokinetics, preclinical studies, clinical studies, animal models, genetic models, analogous compounds, analogous conditions, adverse event reports, case reports, post-marketing reports and regulatory authority investigations.

244.     To date Defendants have failed to submit proposed labeling for their respective PPI Products to the FDA regarding the risks of AIN.

245.     To date Defendants have failed to submit proposed labeling for their respective PPI

Products to the FDA regarding the risks of AKI.

246.     To date Defendants have failed to submit proposed labeling for their respective PPI Products to the FDA regarding the risks of CKD.

247.     At all times, Defendants could have implemented changes to the labeling of their respective PPI Products regarding the risks of AIN, AKI, CKD and ESRD.

## G.     Defendants Violations of Federal Law

248.     Defendants violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq.

249.     With respect to Defendants' PPI Products, Defendants have failed to comply with all federal standards applicable to the sale of prescription drugs including, but not limited to, one or more of the following violations:

a)     Defendants' PPI Products are misbranded pursuant to 21 U.S.C. § 352 because, among other things, their labeling is false or misleading;

b)     Defendants' PPI Products are misbranded pursuant to 21 U.S.C. § 352 because words, statements or other information required by or under authority of chapter 21 U.S.C. § 352 are not prominently placed thereon with such conspicuousness and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use;

c)     Defendants' PPI Products are misbranded pursuant to 21 U.S.C. § 352 because their labeling does not bear adequate directions for use and/or the labeling does not bear adequate warnings against use where their use may be dangerous to health or against unsafe dosage or methods or duration of administration or application, in such manner and form as are necessary for the protection of users;

d)      Defendants' PPI Products are misbranded pursuant to 21 U.S.C. § 352 because they are dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended or suggested in the labeling thereof;

e)      Defendants' PPI Products do not contain adequate directions for use pursuant to 21 CFR § 201.5, because of, among other reasons, omission, in whole or in part, or incorrect specification of (a) statements of all conditions, purposes, or uses for which it is intended, including conditions, purposes, or uses for which it is prescribed, recommended or suggested in their oral, written, printed, or graphic advertising, and conditions, purposes, or uses for which the drugs are commonly used, (b) quantity of dose, including usual quantities for each of the uses for which it is intended and usual quantities for persons of different ages and different physical conditions, (c) frequency of administration or application, (d) duration or administration or application, and/or (d) route or method of administration or application;

f)      Defendants violated 21 CFR § 201.56 because the labeling of their respective prescription PPI Products were and are not informative and accurate;

g)      Defendants' prescription PPI Products are misbranded pursuant to 21 CFR § 201.56 because their labeling was not updated as new information became available that caused the labeling to become inaccurate, false, or misleading;

h)      Defendants violated 21 CFR § 201.57 because they failed to identify specific tests needed for monitoring of patients who took their respective prescription PPI Products;

i)      Defendants' prescription PPI products are mislabeled pursuant to 21 CFR § 201.57 because the labeling does not state the recommended usual dose, the usual dosage range, and, if appropriate, an upper limit beyond which safety and effectiveness have not been established;

j)      Defendants' over-the-counter PPI Products are mislabeled pursuant to 21 CFR §

201.66 because they were and are not informative and accurate;

k)       Defendants' over-the-counter PPI Products are misbranded pursuant to 21 CFR § 201.66 because their labeling was not updated as new information became available that caused the labeling to become inaccurate, false or misleading;

l)       Defendants' PPI Products violate 21 CFR § 210.1 because the process by which they were manufactured, processed and/or held fails to meet the minimum current good manufacturing practice of methods to be used in, and the facilities and controls to be used for, the manufacture, packing or holding of a drug to assure that they meet the requirements as to safety and have the identity and strength and meet the quality and purity characteristic that they purport or are represented to possess;

m)       Defendants' PPI Products violate 21 CFR § 210.122 because the labeling and packaging materials do not meet the appropriate specifications;

n)       Defendants' PPI Products violate 21 CFR § 211.165 because the test methods Defendants employed are not accurate, sensitive, specific and/or reproducible and/or such accuracy, sensitivity, specificity, and/or reproducibility of test methods have not been properly established and documented;

o)       Defendants' PPI Products violate 21 CFR § 211.165 in that they fail to meet established standards or specifications and any other relevant quality control criteria;

p)       Defendants' PPI Products violate 21 CFR § 211.198 because the written procedures describing the handling of all written and oral complaints regarding the PPI Products were not followed;

q)       Defendants' PPI Products violate 21 CFR § 310.303 in that they are not safe and effective for their intended use;

44

r)      Defendants violated 21 CFR § 310.303 by failing to establish and maintain records and make reports related to clinical experience or other data or information necessary to make or facilitate a determination of whether there are or may be grounds for suspending or withdrawing approval of the application to the FDA;

s)      Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to report adverse events associated with their respective PPI Products as soon as possible or at least within 15 days of the initial receipt of the adverse drugs experience report;

t)      Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to conduct an investigation of each adverse event associated with their respective PPI Products, and evaluating the cause of the adverse event;

u)      Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to promptly investigate all serious, unexpected adverse drug experiences and submit follow-up reports within the prescribed 15 calendar days of receipt of new information or as requested by the FDA;

v)      Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to keep records of the unsuccessful steps taken to seek additional information regarding serious, unexpected adverse drug experiences;

w)      Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to identify the reports it submitted properly, such as by labeling them as "15-day Alert report," or "15- day Alert report follow-up";

x)      Defendants violated 21 CFR § 312.32 because they failed to review all information relevant to the safety of Defendant's PPI Products or otherwise received by the Defendants from sources, foreign or domestic, including information derived from any clinical or epidemiological investigations, animal investigations, commercial marketing experience, reports in the scientific

45

literature and unpublished scientific papers, as well as reports from foreign regulatory authorities that have not already been previously reported to the agency by the sponsor;

y)   Defendants violated 21 CFR § 314.80 by failing to provide periodic reports to the FDA containing (a) a narrative summary and analysis of the information in the report and an analysis of the 15-day Alert reports submitted during the reporting interval, (b) an Adverse Reaction Report for each adverse drug experience not already reported under the Post marketing 15-day Alert report, and/or (c) a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated); and

z)   Defendants violated 21 CFR § 314.80 by failing to submit a copy of the published article from scientific or medical journals along with one or more 15-day Alert reports based on information from the scientific literature.

250.   Defendants failed to meet the standard of care set by the above statutes and regulations, which were intended for the benefit of individual consumers such as the Plaintiffs.

## ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

251.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

252.   Plaintiffs assert all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including but not limited to equitable tolling, class action tolling, delayed discovery, discovery rule and fraudulent concealment.

253.   Plaintiffs plead that the discovery rule should be applied to toll the running of the

statute of limitations until Plaintiffs knew or, through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiffs had been injured, the cause of the injury and the tortious nature of the wrongdoing that caused the injury.

254.    Despite diligent investigation by Plaintiffs into the cause of their injuries, the nature of Plaintiffs' injuries and damages and their relationship to the PPI Products was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiffs' claims. Therefore, under appropriate application of the discovery rule, Plaintiffs' suit was filed well within the applicable statutory limitations period.

255.    The running of the statute of limitations in this case is tolled due to equitable tolling. Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiffs and/or the consuming public of the true risks associated with the PPI Products. As a result of the Defendants' fraudulent concealment, Plaintiffs and/or Plaintiffs' physicians were unaware, and could not have known or have learned through reasonable diligence, that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants.

256.    Furthermore, the Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of PPI Products. The Defendants were under a duty to disclose the true character, quality and nature of PPI Products because this was nonpublic information over which the Defendants had and continue to have exclusive control, and because the Defendants knew that this information was not available to the Plaintiffs, their medical providers and/or to their health facilities.

257.    Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting a profitable drug, notwithstanding the known or reasonably known risks. Plaintiffs and/or medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks and, instead, were forced to rely on Defendants' representations.

258.    Defendants were and continue to be in possession of information and data that shows the risk and dangers of these products that is not otherwise in the possession or available to Plaintiffs and/or their healthcare providers.

259.    At the time of Plaintiffs' injuries, Plaintiffs and/or Plaintiffs' healthcare providers were not aware of any facts which would have made a reasonably prudent person suspicious of Defendants' wrongdoing because Plaintiffs and Plaintiffs' healthcare providers reasonably relied on Defendants' representations that PPI Products do not cause kidney injury.

260.    At no time prior to Plaintiffs' eventual discovery of wrongdoing did any of Plaintiffs' doctors ever inform, advise, suggest or otherwise imply that Plaintiffs' PPI Product use was a potential contributing cause of Plaintiffs' kidney injuries.

261.    Plaintiffs reasonably relied on the skill and judgment of Plaintiff's doctors and had no reason to further investigate, inquire into or suspect that PPI Products caused Plaintiffs' conditions.

262.    Plaintiffs exercised reasonable diligence in an attempt to discover the cause of their kidney injuries. Plaintiffs relied on their physicians to advise them of any known complications. Plaintiffs had no reason to believe their injuries were the result of any wrongdoing, whether intentional and/or negligent, until the discovery dates suggested below and are therefore relying on the benefit of the discovery rule.

263.    The Plaintiffs had neither knowledge nor reason to suspect that the Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment and wrongdoing by the Defendants, the Plaintiffs could not have reasonably discovered the wrongdoing at the time of his injury.

264.    At the time of Plaintiffs' injuries, Plaintiffs did not have access to or actually receive any studies or information recognizing the increased risk of kidney injuries with PPI Product use or have any discussions with their doctors that there was an association between their kidney injuries and PPI Product use.

**CAUSES OF ACTION**

**COUNT I**
**STRICT PRODUCT LIABILITY**

265.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

266.    At the time of Plaintiffs' injuries, the PPI Products manufactured by the Defendants were defective and unreasonably dangerous to foreseeable consumers, including Plaintiffs.

267.    At the time of Plaintiffs' injuries, Defendants placed PPI Products into the stream of commerce that were defective and in an unreasonably dangerous condition to foreseeable users, including the Plaintiffs.

268.    At all times herein mentioned, Defendants have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed PPI Products as described herein that were used by the Plaintiffs.

269.    Defendants' PPI Products were expected to and did reach consumers, handlers and

49

persons coming into contact with said products without substantial change in the condition in which they were produced, manufactured, sold, distributed and marketed by the Defendants.

270.    Defendants' PPI Products were manufactured in an unsafe, defective and inherently dangerous condition, which was dangerous to users, including Plaintiffs.

271.    The PPI Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective in design or formulation in that, when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of the PPI Products.

272.    At all times herein mentioned, the PPI Products were in a defective condition and unsafe, and Defendants knew or had reason to know that their PPI Products were defective and unsafe, including when used in the formulation and manner recommended by the Defendants.

273.    The PPI Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective in design and/or formulation, in that, when they left the hands of the Defendants, manufacturers and/or suppliers, the PPI Products were unreasonably dangerous, and were more dangerous than an ordinary consumer would expect, and more dangerous than other medications on the market designed to treat peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy.

274.    Defendants knew or should have known that at all times herein mentioned their PPI Products were in a defective condition and were and are inherently dangerous and unsafe.

275.    At the time Plaintiffs used Defendants' PPI Products, the PPI Products were being used for the purposes and in a manner normally intended and foreseeable, namely to treat peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced

gastrophy.

276. Defendants, with this knowledge, voluntarily designed their PPI Products in a dangerous condition for use by the public and the Plaintiffs.

277. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended and foreseeable use.

278. Defendants created a product unreasonably dangerous for its intended and foreseeable use.

279. The PPI Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were manufactured defectively in that PPI Products left the hands of Defendants in a defective condition and were unreasonably dangerous to its intended users.

280. The PPI Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which they were manufactured.

281. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiffs.

282. Plaintiffs could not, by the exercise of reasonable care, have discovered the PPI Products' defects herein mentioned and perceived their danger.

283. The PPI Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the PPI Products

created a risk of serious and dangerous side effects, including kidney injuries and other severe and personal injuries which are permanent and lasting in nature, and the Defendants failed to adequately warn of said risk.

284.    The PPI Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the PPI Products created a risk of serious and dangerous side effects, including rebound acid hypersecretion, and the Defendants failed to adequately warn of said risk.

285.    The PPI Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the PPI Products were ineffective for their intended use of treating peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy, and that there were less dangerous alternatives on the market to treat peptic disorders.

286.    The PPI Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate warnings and/or inadequate testing.

287.    The PPI Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate postmarketing surveillance and/or warnings because, even after Defendants knew or should have known of the risks and severe and permanent health consequences from ingesting PPI Products, they failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote their PPI Products.

288.    The PPI Products ingested by Plaintiffs were in the same or substantially similar condition as they were when they left the possession of Defendants.

289.    Plaintiffs did not misuse or materially alter the PPI Products.

290.    Defendants are strictly liable for Plaintiffs' injuries in the following ways:

a.    The PPI Products as designed, manufactured, sold and supplied by the Defendants, were defectively designed and placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

b.    Defendants failed to properly market, design, manufacture, distribute, supply and sell their PPI Products;

c.    Defendants failed to warn and place adequate warnings and instructions on their PPI Products;

d.    Defendants failed to adequately test their PPI Products;

e.    Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew of the risk of injury associated with the use of PPI Products; and

f.    Feasible alternative designs, including but not limited to those used of H2 Blockers and other available treatments, existed that were capable of treating Plaintiffs' conditions, while decreasing the risk of kidney injuries.

291.    By reason of the foregoing, Defendants are strictly liable in tort to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective PPI Products.

292.    Defendants' defective design, manufacturing defect and inadequate warnings on the PPI Products were acts that amount to willful, wanton and/or reckless conduct by Defendants.

293.    These defects in Defendants' PPI Products were a substantial factor in causing Plaintiffs' injuries.

294.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

295.    Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT II
## STRICT PRODUCT LIABILITY –DESIGN DEFECT

296.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

297.    At all times relevant, Defendants' PPI Products were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled and/or sold by Defendants in a defective and unreasonably dangerous condition at the time they were placed in the stream of commerce.

298.    Defendants' PPI Products were defective in design or formulation in that they were

not merchantable, reasonably suitable and/or safe for their intended and foreseeable use, and their condition when sold was the proximate cause and/or a substantial factor of the injuries sustained by Plaintiffs.

299. Defendants' PPI Products did not perform safely or as Plaintiffs or an ordinary consumer would have expected.

300. At all times relevant, the PPI Products were used as intended or in a way reasonably foreseeable to the Defendants.

301. Defendants placed their PPI Products into the stream of commerce with wanton and reckless disregard for public safety.

302. At all times relevant, Defendants' PPI Products were expected to reach, and did reach, Plaintiffs, without substantial change in the condition in which they were sold.

303. The PPI Products were sold in an unsafe, defective and inherently dangerous condition.

304. The PPI Products contained defects in their design which render the drugs dangerous to consumers, including Plaintiffs, when used as intended or as reasonably foreseeable to Defendants. The design defects render the PPI Products more dangerous than other drugs designed to treat peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti inflammatory drug induced gastropathy, and cause an unreasonable increased risk of injury, including but not limited to life-threatening kidney injuries.

305. The PPI Products were in a defective condition and unsafe, and Defendants knew, had reason to know or should have known that the PPI Products were defective and unsafe, even when used as instructed.

306. The nature and magnitude of the risk of harm associated with the design of the PPI

Products, including the risk of serious kidney injuries that may be irreversible, permanently disabling and life-threatening, is high in light of the intended and reasonably foreseeable use of the PPI Products.

307.   The risks of harm associated with the design of Defendants' PPI Products are higher than necessary.

308.   It is unlikely that users would be aware of the risks associated with Defendants' PPI Products, and Plaintiffs specifically were not aware of these risks, nor would they expect such risks.

309.   The design of Defendants' PPI Products did not conform to any applicable public or private product standard that was in effect when the PPI Products left the Defendants' control.

310.   The PPI Products' designs are more dangerous than a reasonably prudent consumer would expect when used in their intended or reasonably foreseeable manner. The PPI Products are more dangerous than Plaintiffs expected.

311.   The intended or actual utility of PPI Products is not of such benefit to justify the risk of kidney injury that may be irreversible, permanently disabling and life-threatening.

312.   At the time the PPI Products left Defendants' control, it was both technically and economically feasible to have an alternative design that would not have caused kidney injuries that may be irreversible, permanently disabling and life-threatening, or an alternative design that would have substantially reduced the risk of these injuries.

313.   It was both technically and economically feasible to provide a safer alternative product that would have prevented the harm suffered by Plaintiffs.

314.   Defendants' conduct was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Plaintiffs, with the knowledge of the safety and

efficacy problems and suppressed this knowledge from Plaintiffs, the medical community and the general public. Defendants made conscious decisions not to warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

315.     The unreasonably dangerous nature of Defendants' PPI Products caused serious harm to Plaintiffs.

316.     Defendants' PPI Products are defective in their design which renders the PPI Products dangerous to consumers, including Plaintiffs, when used as intended or as reasonably foreseeable to Defendants.

317.     The design defects render the PPI Products more dangerous than other products used for the same intended purpose, and cause an unreasonable increased risk of harm.

318.     The PPI Products' design is defective and unsafe, and Defendants knew or had reason to know that the PPI Products were defective and unsafe in their design when used as instructed and in a foreseeable manner for the treatment of peptic disorders by consumers, including the Plaintiffs.

319.     The nature and magnitude of the risk of harm associated with the design of the PPI Products, including the risk of kidney injury that may lead to permanently disabling and life threatening or life-ending conditions, was high in light of the intended and reasonably foreseeable use of PPI Products by patients for treatment of peptic disorders.

320.     Users of PPI Products would not be aware of the risks of kidney injuries associated with either the defective design or warnings associated with PPI Products through warnings, general knowledge or otherwise, and the Plaintiffs were specifically unaware of these risks, and would not be expected to be aware of these risks.

321.     The intended or actual utility and benefit of the PPI Products does not justify the

risk of kidney injuries that may be irreversible, permanently disabling, life-threatening or life ending.

322.    The design of the PPI Products was negligently formulated by the Defendants in disregard of the known risk of kidney injury.

323.    The warnings and instructions for use accompanying the PPI Products were negligently formulated by the Defendants in disregard of the known risk of kidney injury.

324.    The warnings and instructions for use accompanying the PPI Products were negligently formulated by the Defendants in disregard of the known risk of rebound acid hypersecretion.

325.    The defects in design and warnings caused and/or increased the risk of harm of Plaintiffs' injuries and damages.

326.    The defective nature of the PPI Products was a substantial factor in causing Plaintiffs' injuries.

327.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

328.    Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT III
## STRICT PRODUCT LIABILITY – FAILURE TO WARN

329.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

330.    Defendants manufactured, distributed and/or sold the PPI Products that were dangerous and presented a high risk of serious kidney and related personal injuries when used as intended or in foreseeable way.

331.    Defendants had a duty to warn Plaintiffs and their healthcare providers regarding the risks associated with ingesting PPI Products and failed to warn of the risk of kidney injuries that may be irreversible, permanently disabling and life-threatening.

332.    Defendants knew, or in the exercise of reasonable care should have known, about the risk of kidney injuries that may be irreversible, permanently disabling and life-threatening that are associated with use of their PPI Products.

333.    Defendants failed to provide adequate warnings or instructions that a manufacturer exercising reasonable care would have provided concerning the risk of kidney injury that may be irreversible, permanently disabling and life-threatening in light of the likelihood that the PPI Products would cause these injuries.

334.    Defendants failed to update warnings based on information received from surveillance and research conducted after their PPI Products were first approved by the FDA and

marketed, sold and used in the United States and throughout the world.

335.    A manufacturer exercising reasonable care would have updated its warnings on the basis of reports of injuries to individuals using PPI Products after FDA approval.

336.    When it left Defendants' control, the PPI Products were defective and unreasonably dangerous for failing to warn of the risk of kidney injury that may be irreversible, permanently disabling and life-threatening.

337.    When it left Defendants' control, the PPI Products were defective and unreasonably dangerous for failing to warn of the risk of rebound acid hypersecretion that would assist healthcare providers and/or patients who suffer from this after ceasing use of PPI Products.

338.    Plaintiffs used the PPI Products for their approved purpose and in a manner normally intended and reasonably foreseeable by the Defendants.

339.    Plaintiffs and/or Plaintiffs' healthcare providers could not, by the exercise of reasonable care, have discovered the defects or perceived the danger of PPI Products because the risks were not open or obvious.

340.    Defendants, as the manufacturers and distributors of the PPI Products, are held to the level of knowledge of an expert in the field.

341.    The warnings that were given by Defendants were not accurate or clear, and were false and ambiguous.

342.    The warnings that were given by the Defendants failed to properly warn Plaintiffs and/or Plaintiffs' healthcare providers of the risks associated with the PPI Products, subjecting Plaintiffs to risks that exceeded the benefits to the Plaintiffs. Plaintiffs, individually and/or Plaintiffs through their healthcare providers, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

343.     Defendants had a continuing duty to warn Plaintiffs and/or Plaintiffs' healthcare providers of the dangers associated with their PPI Products.

344.     Had Plaintiffs and/or their healthcare providers received adequate warnings regarding the risks associated with the use of PPI Products, they would not have used them or they would have altered the frequency or duration of use.

345.     Defendants failed to update warnings based on information received after the PPI Products entered the market, and continued to market, promote, detail, distribute and sell PPI Products without appropriately updated and amended warnings.

346.     A manufacturer exercising reasonable and prudent care would have updated warnings on the PPI Products on the basis of epidemiology studies and/or reports of injuries to individuals using PPI Products after FDA approval.

347.     Plaintiffs and their healthcare providers were led to believe, through Defendants' use of aggressive and pervasive marketing, promotion and detailing, that Defendants' PPI Products were safe and effective for treatment of peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy.

348.     The warnings and instructions that were given by Defendants to healthcare providers were not accurate or clear, and were, in fact, false and misleading.

349.     The warnings that were given by the Defendants failed to properly warn physicians and/or other healthcare providers, including those of the Plaintiffs, of the risks associated with Defendants' PPI Products, thereby subjecting patients, including the Plaintiffs, to unreasonable and foreseeable risks that exceeded the purported and marketed benefits of Defendants' PPI Products.

350.     Plaintiffs' healthcare providers reasonably relied upon the representations, warning

and instructions provided by Defendants for use and administration of their PPI Products.

351. Had the Plaintiffs and/or their healthcare providers received adequate, appropriate and correct warnings regarding the risks associated with the use of Defendants' PPI Products, these healthcare providers would not have prescribed, recommended, continued to prescribe or continued the recommendation of the PPI Products, or would have altered the duration and frequency of use.

352. Defendants' conduct as described herein was a substantial factor in causing Plaintiffs' injuries.

353. The Plaintiffs' injuries (in some cases death) were the direct and proximate result of Defendants' failure to warn of the dangers of Defendants' PPI Products.

354. As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

355. Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT IV
## NEGLIGENCE

356.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

357.    Defendants had a duty to exercise reasonable care in designing, researching, manufacturing, marketing, supplying, promoting, packaging, selling and/or distributing their PPI Products into the stream of commerce, including a duty to assure that the PPI Products would not cause users to suffer unreasonable, dangerous side effects.

358.    Defendants failed to exercise ordinary care in the design, research, manufacture, labeling, warnings, marketing, promotion, quality assurance, quality control, sale and/or distribution of their PPI Products in that Defendants knew or should have known that the drugs could proximately cause Plaintiffs' injuries and/or presented an unreasonably high risk of injury.

359.    Defendants, acting by and through their authorized divisions, subsidiaries, agents, servants and/or employees, acted with carelessness, recklessness, negligence, gross negligence and/or willful, wanton, outrageous and reckless disregard for human life and safety in manufacturing, designing, labeling, marketing, distributing, supplying, selling and/or placing into the stream of commerce their PPI Products, including but not limited to the following particular respects:

a)      Failing to use due care in design and/or manufacture of the PPI Products so as to avoid the aforementioned risks to individuals;

b)      Failing to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of their PPI Products;

c)      Failing to use reasonable and prudent care so as to conduct sufficient postmarketing pharmacovigilance and pharmacosurveillance;

d)      Failing to recognize the significance of their own and other testing, and information regarding PPI Products, which testing and information evidenced such products are dangerous and potentially harmful to humans;

e)      Failing to respond promptly and appropriately to their own and other testing, and information regarding PPI Products, and failing to promptly and adequately warn of the potential for kidney injuries including acute interstitial nephritis, acute kidney injuries and chronic kidney disease, when using their PPI Products;

f)      Failing to promptly, adequately and appropriately recommend testing and monitoring of patients upon whom PPI Products were used in light of the PPI Products' dangers and potential harm to humans;

g)      Failing to properly, appropriately and adequately monitor the post-market performance of their PPI Products and such products effects on patients;

h)      Aggressively promoting, marketing, advertising and/or selling their PPI Products given their knowledge and experience of their PPI Products' potential harmful effects;

i)      Failing to use reasonable and prudent care in their statements of the efficacy, safety and risks of using their PPI Products, which were knowingly false and misleading, in order to influence patients, such as the Plaintiffs, to use their PPI Products in excess and/or in preference to safer and effective alternative treatments;

j)      Failing to accompany their PPI Products with proper and/or accurate warnings regarding all possible adverse side effects and risk of kidney injury associated with the use of their PPI Products;

k)      Failing to accompany their PPI Products with proper and/or accurate warnings regarding all possible adverse side effects and risk of rebound acid hypersecretion associated with the use of their PPI Products.

l)      Failing to disclose to Plaintiffs and/or the medical community their full knowledge and experience regarding the potential dangers and harm associated with use of their PPI Products;

m)      Failing to disclose to Plaintiffs and/or the medical community in an appropriate and timely manner, facts relative to the potential dangers and harm associated with use of their PPI Products;

n)      Failing to warn Plaintiffs and/or Plaintiffs' healthcare providers of the severity and duration of such adverse effects;

o)      Failing to warn Plaintiffs and/or Plaintiffs' healthcare providers prior to actively encouraging the sale of their PPI Products, either directly or indirectly, orally or in writing, about the increased risk of kidney injury;

p)      Placing and/or permitting the placement of PPI Products into the stream of commerce without adequate warnings that they are harmful to humans and/or without properly warning of said products' dangerousness;

q)      Failing to withdraw their PPI Products from the market and stream of commerce, or restrict their use and/or warn of such products' potential dangers, given their knowledge of the dangers and harms associated with use of their PPI Products;

r)      Failing to respond or react promptly and appropriately to reports of their PPI Products causing harm to patients;

s)      Disregarding government and/or industry studies, information, documentation and recommendations, consumer complaints and reports and/or other information regarding the

hazards of their PPI Products and their potential harm to humans;

t)　　Under-reporting, underestimating and/or downplaying the serious dangers of their PPI Products;

u)　　Failing to exercise reasonable care in informing physicians and healthcare providers using PPI Products about their own knowledge regarding the potential dangers and harm associate with use of their PPI Products;

v)　　Failing to adequately warn Plaintiffs and/or Plaintiffs' healthcare providers of the known or reasonably foreseeable danger that Plaintiffs would suffer serious injuries or death by ingesting Defendants' PPI Products;

w)　　Promoting PPI Products in advertisements, websites and other modes of communication aimed at creating and/or increasing user and consumer demand without regard to the dangers and risks associated using PPI Products;

x)　　Failing to conduct and/or respond to post-marketing surveillance of complications and injuries associated with their PPI Products;

y)　　Failing to use due care under the circumstances; and

z)　　Other such acts or omissions constituting negligence and carelessness as may appear during the course of discovery or at the trial of this matter.

360.　　Despite the fact that Defendants knew or should have known that the PPI Products caused unreasonable, dangerous risk of kidney injury, Defendants continued to market the PPI Products to consumers, including the medical community and Plaintiffs.

361.　　Defendants knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described herein, including the failure to comply with federal requirements.

362.     It was foreseeable to Defendants that Defendants' PPI Products, as designed and marketed, would cause serious injury to consumers, including Plaintiffs.

363.     Despite the fact that Defendants knew or should have known that their PPI Products caused unreasonable risks of harm when used as intended by the Defendants, the Defendants continued to advertise, market and sell their PPI Products to patients, including the Plaintiffs and healthcare providers.

364.     As a direct and proximate result of Defendants' negligence, Plaintiffs suffered serious physical injury, harm (in some cases death), damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

365.     Defendants' knowingly and intentionally defectively designed and provided inadequate warnings relating to the design of the PPI Products in willful, wanton and reckless disregard for the safety and well-being of all patients and consumers, including the Plaintiffs, for the purpose of achieving profits and market share over safety.

366.     Defendants acted in reckless disregard to public safety and well-being, including Plaintiffs' safety and well-being, and with actual knowledge that the PPI Products were unsafe for their recommended use for the treatment of peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy.

367.     Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public, Plaintiffs, and/or Plaintiffs' healthcare providers concerning the dangers of PPI Products, and consciously decided to aggressively market and sell their PPI Products, putting economic, financial and market share advantage over safety and efficacy considerations.

368.     As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer

serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

369.    Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT V
## NEGLIGENCE PER SE

370.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

371.    Defendants violated the Federal Food, Drug and Cosmetic Act 21 U.S.C. § 301, et seq., and regulations as described herein, including but not limited to 21 U.S.C. § 352, 21, CFR § 201.5, 21 CFR § 201.56, 21 CFR § 201.57, 21 CFR § 201.66, 21 CFR § 210.1, 21 CFR § 210.122, 21 CFR § 211.165, 21 CFR § 211.198, 21 CFR § 310.303, 21 CFR § 310.305, 21 CFR § 314.80, and 21 CFR § 312.32.

372.    These statutes and regulations are aimed at preserving the health and safety of

Plaintiffs and the general public.

373.    Defendants' acts were the proximate cause and/or a substantial factor in bringing about the harm to the Plaintiffs as alleged herein.

374.    Plaintiffs are among the class of individuals that these statutes and regulations were designed to protect.

375.    Plaintiffs' injuries are the type that these federal statutes and regulations were intended to prevent.

376.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

377.    Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT VI
## BREACH OF EXPRESS WARRANTY

378.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest

sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

379.    Defendants expressly warranted that their PPI Products were safe and effective to members of the consuming public, including Plaintiffs.

380.    Defendants expressly warranted that their PPI Products were safe and effective products for use by members of the consuming public, including the Plaintiffs, for the treatment of peptic disorders and did not disclose the material risks that their PPI Products could cause serious kidney injury that may be irreversible, permanently disabling and life-threatening. The representations were not justified by the performance of the PPI Products.

381.    Defendants expressly warranted that their PPI Products were safe and effective to use.

382.    Defendants expressly represented to Plaintiffs, Plaintiffs' physicians, healthcare providers and/or the FDA that their PPI Products were safe and fit for use for the intended purpose, that they were of merchantable quality, that they did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy, that the side effects they did produce were accurately reflected in the warnings, and that they were adequately tested and fit for their intended use.

383.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that their PPI Products were not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

384.    Plaintiffs and/or their healthcare providers reasonably relied on Defendants'

express representations.

385. Defendants' PPI Products do not conform to these express representations because they are not safe and have serious side effects, including kidney injuries and in some cases, death.

386. Defendants breached their express warranty in one or more of the following ways:

a) PPI Products, as designed, manufactured, sold and/or supplied by the Defendants, were defectively designed and placed in to the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

b) Defendants failed to warn and/or place adequate warnings and instructions on their PPI Products;

c) Defendants failed to adequately test their PPI Products; and,

d) Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew the risk of injury from PPI Products.

387. Defendants made statements, affirmations and representations of fact concerning their PPI Products through their advertisements, educational campaigns and multi-platform marketing and promotional initiatives directed at consumers, patients and healthcare providers promoting unnecessary and dangerous use and overuse of their PPI Products.

388. Defendants' statements, affirmations and representations of fact did reach the Plaintiffs, and formed a "basis of the bargain" for the Plaintiffs' decision to purchase or accept the prescription of PPI Products.

389. Defendants did not disclose material risk of kidney injuries alleged herein that PPI Products caused.

390. Defendants' representations concerning the safety and efficacy of their PPI Products were not justified by their performance or benefits.

391.    Defendants expressly warranted that PPI Products were safe and effective for treatment of peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy. In fact, Defendants, through their advertisements, promoted use of PPI Products for ongoing and daily use. Their PPI Products did not conform to Defendants' representations, statements and/or affirmations of fact in terms of the express warranties made to consumers and patients concerning the drugs' safety and efficacy as formulated for use.

392.    The Plaintiffs reasonably and justifiably relied upon Defendants' representations, statements and/or affirmations of fact that their PPI Products were safe and effective when the Plaintiffs chose to purchase, use and continue to use them.

393.    The Plaintiffs were unskilled in the research, design and manufacture of medical drugs and pharmaceutical products, including Defendants' PPI Products, and reasonably and justifiably relied entirely on the skill, judgment and express warranty of the Defendants in the choosing to use Defendants' PPI Products.

394.    Defendants herein breached the aforesaid express warranties as their PPI Products were defective.

395.    Plaintiffs' injuries (and in some cases death) were the direct and proximate result of Defendants' breach of their express warranty.

396.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

397.    Defendants' conduct, as described herein, was extreme and outrageous. Defendants

risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT VII
## BREACH OF IMPLIED WARRANTY

398. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

399. At the time Defendants marketed, distributed and sold their PPI Products to Plaintiffs, Defendants warranted that they were merchantable and fit for the ordinary purposes for which it was intended.

400. Members of the consuming public, including consumers such as Plaintiffs, were intended third party beneficiaries of the warranty.

401. The PPI Products were not merchantable and fit for their ordinary purpose, because they have a propensity to lead to the serious personal injuries described in this Complaint.

402. Plaintiffs reasonably relied on Defendants' representations that the PPI Products were safe and free of defects and were a safe means of managing and treating symptoms associated with peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory

drug induced gastropathy.

403.    At all relevant times hereto, Defendants knew or had reason to know of the purpose for and manner in which users of PPI Products, including Plaintiffs, were using the PPI Products, and that those users were relying on Defendants' promotional and advertising materials in their selection of the product for that particular use.

404.    Through aggressive healthcare provider promotion and patient advertising, educational, informational and marketing campaigns, Defendants participated in the selection of their PPI Products by healthcare providers, patients and consumers.

405.    At all relevant times hereto, Defendants' PPI Products did not have the requisite clinical safety or efficacy profiles to be deemed fit for the particular purpose of treating peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy.

406.    Defendants' PPI Products did not conform to this implied warranty of fitness for the use in treating peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy.

407.    The Plaintiffs were unskilled in the research, design and manufacture of medical drugs and pharmaceutical products, including PPI Products, and reasonably and justifiably relied entirely on the skill, judgment and warranty of the Defendants in the choice to use Defendants' PPI Products.

408.    The PPI Products were neither safe nor fit for their intended use nor of merchantable quality, as warranted by Defendants to the Plaintiffs, in that PPI Products pose a dangerous risk when used as intended to cause serious kidney injuries.

409.    Defendants' breach of the implied warranty of merchantability was the direct and

proximate cause of Plaintiffs' injuries.

410.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

411.    Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT VIII**
**NEGLIGENT MISREPRESENTATION**

412.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

413.    From the time Defendants' PPI Products were first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiffs, Plaintiffs' physicians and the general public, including but not limited to the misrepresentation that PPI Products were safe and effective for the treatment of

peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy. At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale, use and overuse of their PPI Products and willfully deceived Plaintiffs, Plaintiffs' physicians and the general public as to the health risks and consequences of the use of PPI Products.

414. Defendants had a duty to ensure that the representations they made about their PPI Products were true and complete when made. Defendants made the foregoing representation without any reasonable ground for believing them to be true.

415. At all relevant times hereto, Defendants conducted sales and marketing campaigns to promote the sale of their PPI Products and deceived patients, consumers, physicians and healthcare providers, including the Plaintiffs and their healthcare providers, as to the health risks and consequences of the use of their PPI Products.

416. The Defendants made these false and misleading representations without any reasonable ground for believing them to be true concerning the safety and efficacy of PPI Products for treatment of peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy.

417. These representations were made directly by Defendants, their sales representatives and other authorized agents of the Defendants to physicians and other healthcare providers; in television media directed towards the general public; in publications, the popular press, and other written materials which were directed to physicians, patients, consumers and the general public; and on Internet websites and applications directed to consumers and physicians, including the Plaintiffs, with the intention of inducing and influencing the demand for, the ultimate prescription, purchase and use of their PPI Products.

418.     The representations by the Defendants were in fact false, in that their PPI Products are not safe, fit and/or effective for human consumption as labeled, using PPIs Products is hazardous to consumers' health, and PPI Products have a serious propensity to cause serious injuries to users, including but not limited to the kidney and related personal injuries suffered by Plaintiffs.

419.     The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of PPI Products.

420.     In reliance on the misrepresentations by the Defendants, Plaintiffs were induced to purchase and use PPI Products. If Plaintiffs had known the truth and the facts concealed by the Defendants, Plaintiffs would not have used the PPI Products or would have used far fewer PPI Products. The reliance of Plaintiffs upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know all of the facts.

421.     As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

422.     Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT IX
## FRAUD AND FRAUDULENT MISREPRESENTATION

423.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

424.   Defendants fraudulently represented to the medical and healthcare community, patients, consumers and the general public, including the Plaintiffs, that their PPI Products had been adequately tested, were safe for treatment of peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy, and were accompanied by adequate warnings.

425.   Defendants widely advertised, marketed and promoted their PPI Products as safe and effective medications for the treatment of peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy, and widely advertised, marketed and promoted PPIs as a safe for daily and extended use.

426.   These representations were made by the Defendants with the intent of deceiving the medical and healthcare community, patients, consumers, the general public and the Plaintiffs, with the intent of inducing the prescription and use of their PPI Products in circumstances that the Defendants knew were dangerous, unsafe and created a high risk of harm.

427.   These representations made by Defendants were false and misleading.

428.   Defendants knew these representations to be false when made and willfully,

wantonly and recklessly disregarded whether the representations were true.

429.     Defendants' conduct evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiffs.

430.     At the time the Defendants made aforesaid representations, Plaintiffs used Defendants' PPI Products and were unaware of the falsity of the representations and reasonably believed them to be true.

431.     In reliance on Defendants' misrepresentations, the Plaintiffs were induced to and did use Defendants' PPI Products, thereby sustaining severe and permanent personal injuries, and/or being at an increased risk of sustaining severe and permanent personal injuries in the future.

432.     Defendants knew or should have known that their PPI Products had not been sufficiently tested, were defective in nature and/or that lacked adequate and/or sufficient warnings.

433.     Defendants knew or should have known that their PPI Products had a potential to, could and would cause severe and grievous injury to the users of said product, and that they were inherently dangerous in a manner that exceeded any purported, inaccurate and/or down-played warnings.

434.     As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

435.     Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious

decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT X**
**FRAUDULENT CONCEALMENT**

436.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

437.    Prior to Plaintiffs' use of Defendants' PPI Products and, during the period in which Plaintiffs actually used Defendants' PPI Products, Defendants fraudulently suppressed material information regarding the safety and efficacy of their PPI Products, including information regarding adverse events, pre and post marketing injuries, and epidemiological studies indicating unreasonable risks associated with using PPI Products.

438.    Furthermore, Defendants fraudulently concealed the safety information about the use of their PPI Products. As described herein, Defendants' PPI Products present high risk of kidney injuries not present in other methods and drugs for the treatment of peptic disorders.

439.    These representations and omissions were made by said Defendants with the intent of defrauding and deceiving the Plaintiffs, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase their PPI Products, all of which evinced a callous, reckless, willful, depraved indifference

to the health, safety and welfare of the Plaintiffs herein.

440. At the time the aforesaid representations and omissions were made by the Defendants, and at the time the Plaintiffs used Defendants' PPI Products, the Plaintiffs were unaware of the falsity of said representations and reasonably believed them to be true.

441. Defendants fraudulently concealed the safety issues associated with PPI use to induce Plaintiffs to purchase and use, and physicians to prescribe and/or recommend their PPI Products.

442. Plaintiffs and/or their healthcare providers reasonably relied on Defendants' omissions and representations in using or prescribing the PPI Products, thereby causing Plaintiffs to sustain severe and permanent personal injuries. Defendants knew, were aware or should have been aware that their PPI Products had not been sufficiently tested, were defective in nature and/or that their PPI Products lacked adequate and/or sufficient warnings.

443. Defendants knew or should have known that their PPI Products had a potential to, could and would cause severe and grievous injury to the users of said product, and that they were inherently dangerous in a manner that exceeded any purported, inaccurate and/or down-played warnings.

444. Defendants had a duty to provide consumers, patients and healthcare providers with full, complete, accurate and truthful information concerning their PPI Products, including the appropriate use of the product.

445. Defendants also had a duty to disclose material information about serious side effects to consumers such as Plaintiffs.

446. By virtue of Defendants' omissions and partial disclosures about the medications, in which Defendants touted their PPI Products as a safe and effective medication, Defendants had

a duty to disclose all facts about the risks associated with use of the medication, including the risks described in this Complaint.

447.    Plaintiffs and/or Plaintiffs' healthcare providers reasonably relied on these material misrepresentations and omissions when deciding to prescribe, recommend, purchase and/or consume Defendants' PPIs Products.

448.    Plaintiffs' healthcare providers were not provided the necessary information by the Defendants to provide an adequate warning to the Plaintiffs.

449.    Plaintiffs were not provided the necessary information by Defendants to provide an adequate warning to the Plaintiffs.

450.    The PPI Products were improperly marketed to the Plaintiffs and/or their healthcare providers as the Defendants did not provide proper instructions about how to use the medication and did not adequately warn about the risks associated with PPI use.

451.    Plaintiffs would not know, in the exercise of reasonable diligence, that Defendants' statements concerning their PPI Products were knowingly and intentionally false and misleading, or that Defendants had not disclosed material facts and information to the Plaintiffs and/or the Plaintiffs' healthcare providers that would have been material to the choice of treatment.

452.    As a direct and proximate result of Defendants' malicious and intentional concealment of material information from Plaintiffs and Plaintiffs' healthcare providers, Defendants caused or contributed to Plaintiffs' injuries (and in some cases death).

453.    Prior to the Plaintiff's use of Defendants' PPI Products and during the period in which Plaintiffs used Defendants' PPI Products, Defendants fraudulently suppressed material information regarding the safety and efficacy of the drugs, including information regarding increased risk of kidney injuries.

454. Had Plaintiffs been aware of the hazards associated with the PPI Products, Plaintiffs would have used a safer alternative treatment for peptic disorders, including GERD, peptic ulcer disease and nonsteroidal anti-inflammatory drug induced gastropathy, would not have consumed the PPI Products and/or would have reduced the duration or quantity of use.

455. Defendants' conduct was reckless, willful, wanton, and outrageous, and manifested a reckless indifference for the safety and well-being of patients and consumers, including the Plaintiffs.

456. As a direct and proximate result of Defendants' intentional and willful fraudulent concealment of material facts and information from the Plaintiffs and Plaintiffs' healthcare providers, Defendants caused, and increased the risk of harm of, the injuries and damages suffered by the Plaintiffs from the use of Defendants' PPI Products.

457. Had Plaintiffs been aware of the hazards associated with PPI use as concealed by Defendants, Plaintiffs would have not have accepted PPI treatment and would have accepted a safer and more effective alternative.

458. Defendants actively and fraudulently concealed information in Defendants' exclusive possession regarding the hazards associated with their PPI Products for the purpose of preventing consumers, such as Plaintiffs, from discovering these hazards.

459. Defendants conduct is outrageous and shocks the conscience, and knowingly and intentionally placed considerations of financial gain, revenues and profits, market share and marketing advantage over patient safety and well-being.

460. As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental

anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

461.    Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT XI**
**VIOLATION OF CONSUMER PROTECTION LAWS**
**AND DECEPTIVE TRADE PRACTICES**

462.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

463.    Plaintiffs used Defendants' PPI Products and suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

464.    Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations in violation of the following consumer protection laws:

a) Ala. Code §§ 8-19-1 et seq.;

b) Alaska Stat. § 45.50.561 et seq.;

c) A.R.S. § 44-1521 et seq.;

d) A.C.A. § 4-88-101 et seq.;

e) Cal Bus & Prof Code § 17000 et seq. and § 17500 et seq.;

f) C.R.S. 6-1-101 et seq.;

g) Conn. Gen. Stat. § 42-110a et seq.;

h) Del. Code Ann. tit. 6, §§ 2511 et seq. and §§ 2531 et seq.

i) D.C. Code Ann.§§ 28-3901 et seq.;

j) Fla. Stat. Ann. §§ 501.201 et seq.;

k) O.C.G.A. §§ 10-1-372 et seq.;

l) Haw. Rev. Stat. §§ 480-1 et seq.;

m) Id. Code Ann.§§ 48-601 et seq.;

n) 815 ILCS 505/1 et seq.;

o) Ind. Code Ann. §§ 24-5-0.5-1 et seq.;

p) Iowa Code Ann. §§ 714.16 et seq.;

q) Kan. Stat. Ann. §§ 50-623 et seq.;

r) Ky. Rev. Stat. Ann.§§ 367.170 et seq.;

s) La. Rev. Stat. Ann.§§ 51:1401 et seq.;

t) Me. Rev. Stat. Ann. tit. 5, §§ 205-A et seq.;

u) Md. Code Ann., Com. Law §§ 13-101 et seq.;

v) Mass. Gen. Laws Ann. Ch. 93A et seq.;

w) Mich. Comp. Laws §§ 445.901 et seq.;

x) Minn. Stat. § 325F.68 et seq.;

y) Miss. Code Ann. § 75-24-5 et seq.;

z) § 407.020 R.S.Mo. et seq.;

aa) 30-14-101, MCA et seq.;

bb) R.R.S. Neb. § 59-1601 et seq.;

cc) Nev. Rev. Stat. Ann. § 598.0903 et seq.; and § 598A.010 et seq.;

dd) N. H. RSA 358-A:1 et seq.;

ee) N.J. Stat. § 56:8-1 et seq.;

ff) N.M. Stat. Ann. §§ 57-12-1 et seq.;

gg) N.Y. Gen. Bus. Law §§ 349 et seq. and §§ 350-e et seq.;

hh) N.C. Gen. Stat. §§ 75-1.1 et seq.;

ii) N.D. Cent. Code §§ 51-12-01 et seq. and §§ 51-15-01 et seq.;

jj) Ohio Rev. Code Ann. §§ 1345.01 et seq.;

kk) Okla. Stat. tit. 15 §§ 751 et seq.;

ll) Or. Rev. Stat. §§ 646.605 et seq.;

mm) 73 Pa. Stat.§§ 201-1 et seq.;

nn) 10 L.P.R.A. § 258 et seq.;

oo) R.I. Gen. Laws §§ 6-13.1-1 et seq.;

pp) S.C. Code Ann. §§ 39-5-10 et seq.;

qq) S.D. Codified Laws §§ 37-24-1 et seq.;

rr) Tenn. Code Ann. §§ 47-18-101 et seq.;

ss) Tex. Bus. & Com. Code §§ 17.41 et seq.;

tt) Utah Code Ann. §§ 13-11-1 et seq.;

uu) Vt. Stat. Ann. tit. 9, §§ 2451 et seq.;

vv) Va. Code Ann.§§ 59.1-196 et seq.;

ww) Rev. Code Wash. (ARCW) § 15.04.410 et seq.;

xx) W. Va. Code § 46A-6-101 et seq.

yy) Wis. Stat. § 421.101 et seq.;

zz) Wyo. Stat. § 40-12-101 et seq.

465. As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

466. Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT XII
## LOSS OF CONSORTIUM

467. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

468. Plaintiffs were at all times relevant hereto the spouse of a Plaintiff and as such live

and cohabit with said Plaintiff.

469.　For the reasons set forth herein, Plaintiffs have necessarily paid and have become liable to pay for medical aid, treatment and for medications, and will necessarily incur further expenses of a similar nature in the future.

470.　For the reasons set forth herein, Plaintiffs have been caused, presently and in the future, to suffer the loss of their spouse's companionship, services, society and the ability of the Plaintiffs' spouses have in those respects been impaired and depreciated, and the martial association between husband and wife has been altered, and, accordingly, the Plaintiffs have been caused great mental anguish.

471.　Defendants misled both the medical community and the public at large, including Plaintiffs, by making false representations about the safety of their products. Defendants downplayed, understated and disregarded their knowledge of the serious and permanent injuries associated with the PPI use despite available information demonstrating that the product was likely to cause serious side-effects to its users.

472.　 Defendants were or should have been in possession of evidence demonstrating that their products caused serious side effects. Nevertheless, they continued to market the products by providing false and misleading information with regard to the safety and efficacy of the PPI Products.

473.　Defendants' actions, as described herein, were performed willfully, intentionally and with reckless disregard for the rights of the Plaintiffs and the public.

474.　As a result of the foregoing acts and omissions, Plaintiffs' spouses and/or significant others were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent

and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

475.     Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiffs, and/or Plaintiffs' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT XIII**
**WRONGFUL DEATH**

476.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

477.     Plaintiffs bring this claim on behalf of the Estate and for the benefit of the Plaintiff Decedents' lawful beneficiaries.

478.     Plaintiffs-decedents left heirs, next-of-kin and/or distributes surviving who, by reason of the Plaintiff Decedents' death have suffered a pecuniary and/or non-pecuniary loss, including but not limited to support, income, services and guidance of the Plaintiff Decedents, and were all permanently damaged thereby.

479.     As a direct and proximate result of the conduct of the Defendants and the defective

nature of their PPI Products as outlined herein, Plaintiff Decedents suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

480.    As a direct and proximate cause of the conduct of Defendants, Plaintiff Decedents' beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Plaintiff Decedents' deaths. Plaintiffs bring this claim on behalf of Plaintiff Decedents' lawful beneficiaries for these damages and for all pecuniary losses sustained by said beneficiaries pursuant to applicable state law.

481.    Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiff Decedents, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiff Decedents, and/or Plaintiff Decedents' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### COUNT XIV
### SURVIVAL ACTION

482.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law

of the Plaintiffs' resident State.

483.     As a direct and proximate result of the conduct of Defendants, Plaintiff Decedents, prior to their death, were obligated to spend various sums of money to treat his or her injuries, which debts have been assumed by the Estate. As a direct and proximate cause of the aforesaid, Plaintiff Decedents were caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of their death; and, as a direct and proximate result of the aforesaid, Plaintiff Decedents suffered a loss of earnings and earning capacity. Plaintiffs bring this claim on behalf of the Plaintiff Decedents' estate for damages pursuant to applicable state law.

484.     As a direct and proximate result of the conduct of Defendants, Plaintiff Decedents and their spouses, heirs, and next-of-kin until and after the time of Plaintiff Decedents' deaths, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, other symptoms of psychological stress, disorder, and emotional distress and mental anguish, generally. This claim is brought on behalf of the Estates of the Plaintiff Decedents pursuant to applicable state law. As a direct and proximate result of the conduct of Defendants, and including the observances of the suffering of the Plaintiff Decedents, until the date of their deaths, Plaintiff Decedents suffered permanent and ongoing damage.

485.     Plaintiff Decedents left heirs, next-of-kin and/or distributes surviving who, by reason of the Plaintiff Decedents' deaths have suffered a pecuniary and/or non-pecuniary loss, including but not limited to support, income, services and guidance of the Plaintiff Decedents, and were all permanently damaged thereby.

486.     As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Plaintiff Decedents until the date of their deaths, Plaintiffs have and will continue to suffer permanent and ongoing damage which may require

future treatment. Plaintiffs' spouses, heirs, and/or next-of-kin as Administrators or beneficiaries of the estate of the Plaintiff Decedents, bring the claim on behalf of the estate for damages pursuant to applicable state law. Defendants' actions, as described herein, were performed willfully, intentionally, and with reckless disregard for the rights of the Plaintiff Decedents and the public.

487.    As a result of the foregoing acts and omissions, Plaintiff Decedents were caused to suffer serious and dangerous side effects, including serious kidney injuries and other severe and personal injuries (in some cases death), which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

488.    Defendants' conduct, as described herein, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiff Decedents, with knowledge of the safety and efficacy problems with their drugs and suppressed this knowledge from the general public, Plaintiff Decedents, and/or Plaintiff Decedents' healthcare providers. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants on each of the above-referenced claims and causes of action, jointly and severally, as follows:

a)      Awarding compensatory damages in excess of $75,000, including, but not limited to pain, suffering, discomfort, physical impairment, emotional distress, loss of enjoyment of life, loss of consortium, wrongful death and other noneconomic damages in an amount to be determined at trial of this action;

b)      Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

c)      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct;

d)      Pre-judgment interest;

e)      Post-judgment interest;

f)      Awarding reasonable attorneys' fees;

g)      Awarding the costs of these proceedings; and

h)      Such other and further relief as this Court deems just and proper.

## JURY DEMAND

TAKE NOTICE that Plaintiffs demand trial by jury as to all issues herein.


Dated:  April 16, 2018                    Respectfully submitted,

BAILEY PEAVY BAILEY COWAN
HECKAMAN PLLC

By:  /s/   Robert W. Cowan
           Robert W. Cowan
           TX Bar No. 24031976
           Attorney-in-Charge

K. Camp Bailey
TX Bar No. 24006782
5555 San Felipe Street, Suite 900
Houston, Texas 77056
Telephone:  (713) 425-7100
Facsimile:  (713) 425-7101
rcowan@bpblaw.com
cbailey@bpblaw.com

ATTORNEYS FOR PLAINTIFFS

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Timothy Austin, Individually, et al. | Abbott Laboratories, et al. |

**(b)** County of Residence of First Listed Plaintiff    Harris County, TX
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Lake County, IL
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert W. Cowan, Bailey Peavy Bailey Cowan Heckaman PLLC
5555 San Felipe St., Suite 900, Houston, TX 77056
Business: (713) 425-7100 Facsimile (713) 425-7101

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL INJURY** | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 861 HIA (1395ff) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) ☐ 891 Agricultural Acts |

*(Note: The "X" appears at ☒ 367 Health Care/Pharmaceutical Personal Injury Product Liability)*

| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | LABOR | FEDERAL TAX SUITS | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 751 Family and Medical Leave Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Employee Retirement Income Security Act | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332 (a) (1)
Brief description of cause:
Products Liability Litigation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
04/16/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Robert W. CowanT

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____