```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
 2                    Civil No. 2:17-cv-02789-CCC-MF


 3
      IN RE PROTON-PUMP INHIBITOR    :   TRANSCRIPT OF PROCEEDINGS
 4    PRODUCTS LIABILITY LITIGATION  :       Status Conference
      (No. II)                       :
 5      - - - - - - - - - - - - - - x


 6

 7                                       Newark, New Jersey
                                         September 13, 2019
 8                                       Commencing 11:50 a.m.

 9
      B E F O R E:
10
                      THE HONORABLE CLAIRE C. CECCHI,
11                     UNITED STATES DISTRICT JUDGE

12

13
      Pursuant to Section 753 Title 28 United States Code, the
14    following transcript is certified to be an accurate record as
      taken stenographically in the above entitled proceedings.

15

16    S/WALTER J. PERELLI

17

18

19    WALTER J. PERELLI, CCR, RMR, CRR
      Official Court Reporter
20    U.S. District Court
      Newark, New Jersey
21

22

23

24

25
```

```
 1    A P P E A R A N C E S:

 2                          ATTORNEYS FOR PLAINTIFFS:

 3         SEEGER WEISS LLP
           BY:  CHRISTOPHER A. SEEGER, ESQ.
 4              JEFFREY GRAND, ESQ.
                DAVID TAWIL, ESQ.
 5
           DOUGLAS & LONDON, P.C.
 6         BY:  MICHAEL A. LONDON, ESQ.
                STEPHANIE O'CONNOR, ESQ.
 7
           AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
 8         BY:  NEIL D. OVERHOLTZ, ESQ.
                JENNIFER M. HOEKSTRA, ESQ.
 9
           WEITZ & LUXENBERG, PC
10         BY:  PAUL J. PENNOCK, ESQ.
                JONATHAN M. SEDGH, ESQ.
11
           ANAPOL WEISS
12         BY:  TRACY A. FINKEN, ESQ.
                CATELYN McDONAUGH, ESQ. (by phone)
13

14                          ATTORNEYS FOR DEFENDANTS:

15         ARNOLD & PORTER KAYE SCHOLER LLP
           BY:  ARTHUR E. BROWN, ESQ.
16              MATTHEW J. DOUGLAS, ESQ.
                 - and -
17         McCARTER & ENGLISH, LLP
           BY:  GREGORY L. HINDY, ESQ.
18         Attorneys for defendant AstraZeneca

19         ICE MILLER LLP
           BY:  AMY K. FISHER, ESQ.
20         Attorneys for defendant AstraZeneca and Nerck

21         REED SMITH LLP
           BY:  JESSE ASH, ESQ.
22         Attorneys for Defendants GSK and Novartis Consumer Health

23         ULMER & BERNE LLP
           BY:  K.C. GREEN, ESQ.
24              GINA M. SAELINGER, ESQ.
           Attorneys for Defendant Procter & Gamble Entities
25
```

```
 1     A P P E A R A N C E S (cont'd):

 2         DLA PIPER
           BY:  LOREN H. BROWN, ESQ.
 3              MATTHEW A. HOLIAN, ESQ.
                STEPHEN C. MATTHEWS, ESQ.
 4         Attorneys for Pfizer and Wyeth

 5         VENABLE LLP
           BY:  CRAIG A. THOMPSON, ESQ.
 6              - and -
           TUCKER ELLIS LLP
 7         BY:  SHERRY A. KNUTSON, ESQ.
                - and -
 8         SILLS, CUMMIS & GROSS, PC
           BY:  BETH A. ROSE, ESQ.
 9         Attorneys for Takeda

10

11     ALSO IN ATTENDANCE

12         ELZUFON AUSTIN & MONDELL, P.A.
           BY:  JOHN A. ELZUFON, ESQ.
13         Special Master (Delaware)

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2       Initial presentation by Mr. Hindy.......page 7

3       Initial presentation by Mr. Pennock....page 26

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Welcome, everyone.

2          MR. SEEGER:  Good morning.

3          THE COURT:  Good morning.  We're here on In re Proton

4    Pump Inhibitor Products Liability Litigation, Number II.  It is

5    17-md-2789.

6          Let's have appearances of counsel, and also we have

7    someone on the phone with us.

8          MR. SEEGER:  Good morning, your Honor.  Chris Seeger

9    for the Plaintiffs.

10          MS. O'CONNOR:  Good morning, your Honor.  Stephanie

11    O'Connor for Plaintiffs.

12          MR. GRAND:  Jeff Grand for Plaintiffs.

13          MR. PENNOCK:  Paul Pennock for the Plaintiffs.  Good

14    morning, Judge.

15          MS. FINKEN:  Tracy Finken for Plaintiffs.

16          MR. LONDON:  Mike London for Plaintiffs.  Good

17    morning.

18          MR. SEDGH:  Good morning, your Honor.  Jonathan Sedgh

19    for the Plaintiffs.

20          MR. TAWIL:  Good morning, your Honor.  David Tawil for

21    the Plaintiffs.

22          THE COURT:  Thank you.  Is that all of the plaintiffs?

23          Yes?

24          All right.  Let's turn to the Defendants.

25          MR. BROWN:  Arthur Brown for AstraZeneca.  Good

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    morning, your Honor.

2              THE COURT:   Good morning.

3              MR. HINDY:   Good morning, your Honor.   Greg Hindy for

4    AstraZeneca.

5              MS. FISHER:   Good morning, your Honor.   Amy Fisher for

6    AstraZeneca and Merck.

7              MR. DOUGLAS:   Good morning, your Honor.   Matthew

8    Douglas for AstraZeneca and Merck.

9              MR. ASH:   Good morning, your Honor.   Jesse Ash for

10   GSK.

11             MS. SAELINGER:   Good morning, your Honor.   Gina

12   Saelinger for the Proctor & Gamble Defendants.

13             MR. L. BROWN:   Good morning, your Honor.   Loren Brown

14   for Pfizer.

15             MR. HOLIAN:   Good morning, your Honor.   Mattthew

16   Holian for Pfizer.

17             MR. MATTHEWS:   Good morning, your Honor.   Steve

18   Matthews for Pfizer.

19             THE COURT:   Anyone else?

20             MR. GREEN:   Good morning, your Honor.   K.C. Green for

21   the Procter & Gamble Defendants.

22             MR. THOMPSON:   Good morning, your Honor.   Craig

23   Thompson for Takeda and Abbott.

24             MS. ROSE:   Good morning, your Honor.   Beth Rose for

25   Takeda and Abbott.

1          MS. KNUTSON:  And Sherry Knutson, also for Takeda and
2      Abbott.
3          MR. ELZUFON:  Good morning, your Honor, John Elzufon,
4      Delaware Special Master.  Good to be here.
5          THE COURT:  Nice to see you.  Thank you so much.
6          All right.  Welcome, everyone.
7          We are going to be having argument today, and I do
8      believe we have PowerPoint presentations teed up for the issue
9      of the Tolling Agreement and the related motions to dismiss.
10         Hold on.
11         (The Court confers with the Deputy clerk off the
12     record.)
13         THE COURT:  Is there anyone holding on the phone?
14         (Garbled voice.)
15         THE COURT:  I'm sorry.  Who was that?
16         MS. McDONOUGH:  Catelyn McDonough for the Plaintiffs.
17         THE COURT:  Someone for the Plaintiffs?
18         MS. FINKEN:  Catelyn McDonough.
19         THE COURT:  What was the name?
20         MS. FINKEN:  Catelyn McDonough.
21         THE COURT:  Catelyn McDonough.  Is that correct?
22         MS. McDONOUGH:  Yes, your Honor.
23         THE COURT:  Anyone else on the phone?
24         No.  All right.  Let us begin.
25         So that as I indicated, we're going to be discussing

 1   this issue of the Tolling Agreement and how that bears on the

 2   motions to dismiss in this matter.  We're here today for a

 3   status, but as part of today's mission we are addressing that

 4   issue.  So let's start with it.  And I know we have other

 5   things on our agenda, but I think that that's the primary issue

 6   that we should be dealing with at this point in time.  And if

 7   anyone is dealing with any other issues and they need to take a

 8   break from the room to deal with bellwether planning, that is

 9   entirely appropriate and you may do so.

10           MR. HINDY:  May I, your Honor?

11           THE COURT:  Yes, certainly.

12           MR. HINDY:  Thank you.

13           THE COURT:  Thank you.

14           MR. HINDY:  Good morning, or good afternoon.  I know

15   we're right there.

16           THE COURT:  It's a little bit of both; 11:56.

17           MR. HINDY:  May it please the Court, your Honor, Greg

18   Hindy on behalf of AstraZeneca.

19           We're here today, as you said, to discuss Defendants'

20   motions to dismiss and how they relate to the Tolling

21   Agreement, and we're here because of Plaintiffs' failures to

22   live up to their end of the bargain in the Tolling Agreement.

23           I want to make sure up front and very clearly:  What

24   we're not here for is to talk about any close calls or marginal

25   calls in terms of what proofs the Plaintiffs provided after --

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    on the dates that they were due.  Our motions deal only with

2    those most egregious violators.  They're really the

3    "desperados" of the Tolling Agreement.

4              If we could turn to the first slide.  Thank you.

5              The three categories of the --

6              THE COURT:  Excuse me.  Is there a copy of the slide

7    deck that we could get, and maybe an extra?

8              MR. HINDY:  Sure.  Absolutely.

9              (A slide deck is handed up to the Court.)

10             THE COURT:  Thank you.

11             (The ceiling shade is put closed.)

12             THE COURT:  That should help us see a little bit

13    better.

14             MR. HINDY:  It's like covering the roof of a stadium.

15             THE COURT:  It's pretty incredible, but it works.

16             MR. HINDY:  Okay.  Shall I?

17             THE COURT:  Yes, go right ahead.

18             MR. HINDY:  What we're talking about here, Judge, are

19    three categories of tolling Plaintiffs.  So there are

20    Plaintiffs who complied with the Tolling Agreement, and of

21    course there are no motions filed against them;

22             Then there are Plaintiffs who produced documents in

23    compliant format but which are not adequate or qualitatively

24    reliable in the litigation and/or deficient PFSs, Plaintiff

25    Fact Sheets.  And again, we didn't move against those folks.

1    We may at some later date, but they're not included in the 5600
2    Plaintiffs that we moved against in this instance.
3         The Plaintiffs we did move against are those who
4    produced three -- or didn't produce in three categories.  They
5    produced nothing; they produced disallowed affidavits as proof
6    of use or proof of injury, or they have produced "shell" PFSs,
7    and I will show you examples of those.
8         The relief we're requesting, we're requesting that you
9    enforce the Tolling Agreement as written.  Judge, as you know,
10   it was a painstakingly long negotiation.  And we can go through
11   that a bit, but it took a lot of time, there were a lot of
12   moving parts.  And as I think we've made clear on separate
13   occasions, the Defendants really didn't want to toll.  There's
14   no real benefit to them tolling.  They don't toll typically,
15   and they didn't want to toll here.
16        And if you enforce the agreement, dismissal of the
17   Plaintiffs listed on the Defendants' motion and in their
18   appendices is the outcome.  The Tolling Agreement, Judge, was
19   the final chance for Plaintiffs to cure.  It, in effect, was
20   the cure period.
21        This litigation had been going on since 2016 in
22   various forms.  The MDL came after.
23        What we're not asking for is dismissal of Plaintiffs
24   who complied or Plaintiffs who produced inadequate, unreliable
25   or deficient materials.  Again, we're only asking for dismissal

1    of those who produced either nothing, or prohibited affidavits

2    or "shell" Plaintiff Fact Sheets.

3            As you know, Judge, the statute of limitations is a

4    fundamental and substantive right of Defendants.  And the way

5    this all came about -- if we can go to the next slide -- if

6    you'll recall the time line of this, this litigation started in

7    May of 2016.  We get to March of 2018, so 23, almost two years

8    later Plaintiffs file a bunch of bundled and shotgun complaints

9    and the docket is beginning to become very messy.

10           THE COURT:  You know what, let me just ask you a

11   question --

12           MR. HINDY:  Sure.

13           THE COURT:  -- in terms of slide number --

14           MR. HINDY:  I'm going to come back to that, Judge.  I

15   just want to get to the time line.

16           THE COURT:  I was planning to just let everyone do

17   their PowerPoints and ask questions after, but this is a little

18   fundamental, so let me ask it now.

19           MR. HINDY:  Sure.

20           THE COURT:  So in terms of the disallowed affidavits

21   I'll call it on page 2, one that says "Three Categories of

22   Plaintiffs."

23           MR. HINDY:  Yes.

24           THE COURT:  Tell me a little more in specific terms as

25   far as the disallowed affidavits --

1            MR. HINDY:  Sure.

2            THE COURT:  -- because I do have the Tolling Agreement

3    in front of me --

4            MR. HINDY:  Okay.

5            THE COURT:  -- and it does allow for PPI users to

6    provide an affidavit --

7            MR. HINDY:  Absolutely.

8            THE COURT:  -- discussing the proof of use.

9            So you're talking then about Attorney Affidavits

10   regarding proof of use as opposed to a PPI User's Affidavit?

11           MR. HINDY:  Yes, in part.  So, the Attorney Affidavits

12   are prohibited for either use or injury.  The PPI User

13   Affidavit was really only supposed to be sort of the "netting."

14   If they couldn't get a safety net, if they couldn't get a

15   record, a legitimate record of use, then they could as a -- and

16   they had to demonstrate that they provided -- or undertook a

17   good faith effort -- then they could put in a PPI User

18   Affidavit.  However, if they put in -- if the Plaintiffs or the

19   user put in an affidavit of injury, that is also disallowed.

20           THE COURT:  Okay.  Do any of the motions to dismiss

21   impact PPI User Affidavits?

22           MR. HINDY:  Yes, they do.

23           THE COURT:  How many impact those?

24           MS. FISHER:  One thirty-three.

25           MR. HINDY:  Thank you.

1            So prohibited user affidavits are -- well, 133.  But

2     there are some injury affidavits that are also -- 2194.  I'm

3     sorry.

4            THE COURT:  The first category, 2194?

5            MR. HINDY:  Yes.

6            MS. FISHER:  Your Honor, Amy Fisher.

7            This, if you add all of these up, this does not equate

8     to 5,630.  There were -- most Plaintiffs had more than one

9     violation.  So this shows you for each of these categories how

10    many Plaintiffs had that violation.  But, for example, there

11    were some individuals who provided an affidavit for proof of

12    injury but also produced a "Shell" Plaintiff Fact Sheet.  But

13    this gives you the number for each of the violations who those

14    Plaintiffs were.

15           THE COURT:  Okay.  But in terms of the first category,

16    the 2,194 prohibited proof of Injury Affidavits.  That's, in

17    fact, a PPI user as opposed to an Attorney Affidavit?

18           MR. HINDY:  Yes.

19           THE COURT:  Okay.

20           MS. FISHER:  No, it would be either.  So, they were

21    not allowed to produce affidavits at all for injury.  The

22    Tolling Agreement is clear that for injury it had to be a

23    medical record.  And so that number, the 2,194 --

24           THE COURT:  I'm following.

25           MS. FISHER:  -- is Plaintiff Affidavits and Attorney

```
 1    Affidavits, both of which are prohibited for that category.
 2                THE COURT:  What page is this on this slide?
 3                MS. FISHER:  Page 11.
 4                MR. HINDY:  11.
 5                So, Judge, to answer your question, the Use
 6    Affidavits, yes, 2500.
 7                THE COURT:  So then the next category on the same
 8    page:  Prohibited Proof of Use, Attorney Affidavit.
 9                I can get an affidavit, but you're saying it's an
10    attorney affidavit as opposed to a user?
11                MR. HINDY:  Yes.  We have some examples we can show
12    you, Judge, if you would like to see them.
13                THE COURT:  Okay.  And when we get to the Plaintiffs
14    I'm going to focus on that as well.  Okay.  Go ahead.
15                MR. HINDY:  So if we could go back to the time line.
16                So if you recall, we were in March of 2018.  The
17    Plaintiffs filed a bunch of bundled/shotgun complaints and the
18    docket was beginning to become very messy.
19                In April of 2018, Plaintiffs first approached us about
20    potentially entering into a Tolling Agreement.  And as I said,
21    our clients generally don't do that for good reason.  However,
22    at the April 10 status conference, I think you'll recall we
23    were on the record, and we had a discussion about potentially
24    entering into a Tolling Agreement.  And Mr. Brown, my
25    colleague, mentioned -- and I'm going to read from his quote at
```

1     that conference:

2             "I'm not sure tolling makes sense, but if the Court is

3     ordering us to meet and confer with the Plaintiffs, of course

4     we'll do that."

5             And of course we did do that.

6             The next slide is a quote from your Honor discussing

7     the Tolling Agreement.  And I'm going to read the highlighted

8     portion for you, Judge:

9             "So if there's a little additional time provided here

10    I think the complaints can be more organized, more pointed,

11    more anchored in the actual medical records for each individual

12    plaintiff.  I think the defendant then would have less of a

13    burden in terms of trying to figure out who was at issue with

14    respect to the medications that the plaintiff took."

15            And then it says:  "And if these pleadings went

16    forward and they were not specifically tied to the medical

17    records I think it's problematic overall."

18            Well, Judge, that was 14, 15, 16 months ago, 17 months

19    ago, and here we are.  The docket has become problematic.

20    There are plenty of Plaintiffs' pleadings that are not tied or

21    anchored in the medical records, and it needs to be cleaned up.

22            Now, now is the time.  We've given you the tools to

23    clean the record or the docket with our motion, and it's time

24    now to do that.

25            So back to the time line.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1              If we can, Amy.

2              The Tolling Agreement is signed on 2018.  In February

3    2019, the proof of use/proof of injury deadline hits, and then

4    in April 2019, the Plaintiff Fact Sheet deadline hits.

5              So we're here because the Tolling Agreement needs to

6    be enforced as written.  It's clear, it's unambiguous.  And

7    again, the Tolling Agreement doesn't allow for a cure; the

8    Tolling Agreement itself was the cure.

9              And while we can all sympathize with the Plaintiffs

10   who didn't meet their deadline either by time or with

11   information, the Third Circuit is clear:  "Sympathy aside, it

12   is axiomatic that a court may not rewrite the clear provisions

13   of a contract to make it more reasonable or to protect a party

14   against an unwelcome result."

15             It may be unwelcome, Judge, but we need to do it and

16   we need to do it now.

17             So the Tolling Agreement production requirements,

18   we'll talk about that.

19             THE COURT:  You know what, let me -- I just want to

20   turn to the Plaintiffs.  I'm not sure who is going to be

21   responding on this argument.  But in terms of the affidavits,

22   it's a big chunk of this, it's 2500.  Are we in agreement that

23   attorney affidavits were provided in lieu of PPI user

24   affidavits?

25             MR. PENNOCK:  At the time back in February, that's

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    correct, your Honor.  I will be addressing this.

2         THE COURT:  Okay.  Is there a reason, a specific

3    reason why they were done as attorney affidavits as opposed to

4    PPI user affidavits?  And I'm looking at page 7 of the

5    stipulation regarding tolling of statute of limitations.

6         MR. PENNOCK:  Well, the essential reason was -- kind

7    of there were two -- confluences of two things.  One, if you

8    may recall, the discussions regarding the Tolling Agreement

9    dragged out for quite a while.  We were seeking an extension

10   from the Defendants starting in early December because it was

11   apparent to us, as we advised them, that compliance with the

12   time lines as discussed was going to be impossible.  And we

13   were led to believe -- and again, I know we're hopefully not

14   going to have depositions and hearings regarding, you know,

15   discovery regarding this contract -- but I at least -- and I

16   think others would say this as well -- were led to believe

17   quite specifically that we would have an extension.

18        On the Sunday before the final deadline, discussions

19   with the Defendants just stopped.  We were in discussions.  We

20   thought we were getting an extension.  We had every reason to

21   believe that we were getting one, and then suddenly there were

22   "crickets."  We couldn't get responses to calls or emails.

23        So all of that led to us having to prepare affidavits

24   by attorneys, which are not insignificant.  I mean, these

25   affidavits are based upon communications that took place with

1    our clients.  So they were not -- they were not simply guesses.

2    Communications with our clients and review of information that

3    we had in our files.  So those affidavits had some factual

4    basis and we thought were sufficient under the Tolling

5    Agreement to at least cover that basis at that point.  But here

6    we are.

7                THE COURT:  Okay.

8                MR. PENNOCK:  I do have arguments on, you know, on all

9    of this that I would like to present, and I'm happy to present

10   them now if you want to move to the Plaintiffs.

11               THE COURT:  No.  You know what, I just want to focus

12   on this just one more minute.

13               In terms of following up then with the PPI user

14   affidavit after the attorney affidavit, was any attempt made to

15   do that?

16               MR. PENNOCK:  Yes.  I would like to show that to the

17   Court.

18               THE COURT:  So the process that you followed was, you

19   had an attorney affidavit, then you followed up with a PPI user

20   affidavit?

21               MR. PENNOCK:  That's right.

22               THE COURT:  Okay.  So we'll hold that thought.

23               Thank you.  Go right ahead.

24               MR. PENNOCK:  Thank you.

25               MR. HINDY:  Judge, just to address a part of that,

```
 1    they had nine months under the Tolling Agreement but they also
 2    had the previous two years.  So this was not just a mine-month
 3    issue, this is going on a three-year issue at this point.
 4            MR. PENNOCK:  Let me just say.  I can't hear that one
 5    more time, Judge.  I'm sorry to interrupt.
 6            MR. HINDY:  Your Honor --
 7            MR. PENNOCK:  But it's not an accurate statement,
 8    because we didn't represent those people for two or three
 9    years.
10            MR. HINDY:  Well, you can make that argument when you
11    get up here.
12            In any event, this litigation has been going on for a
13    long time.  And they didn't do it within the nine months.  They
14    shouldn't be given -- and, by the way, Judge, in many instances
15    we didn't move until weeks or months after the deadlines hit.
16    So they had all that period of time to cure, or most of that
17    period of time to cure, because we didn't -- almost in every
18    instance there was a lag between the deadline and when we moved
19    for dismissal.
20            So under the clear deadlines -- and again, Judge, the
21    Tolling Agreement is clear, if they don't meet the specific --
22    the proof use, which was defined as specified in the Tolling
23    Agreement within seven days --
24            THE COURT:  You know what --
25            MR. HINDY:  -- or proof of injury again --
```

1           THE COURT:  Let's do this just so we have a nice clean
2     record.
3           MR. HINDY:  Sure.
4           THE COURT:  So in terms of the actual dates of the
5     deadlines --
6           MR. HINDY:  Okay.
7           THE COURT:  Why don't you do that?  So the very first
8     deadline that we're dealing with --
9           MR. HINDY:  I believe was February 11th.
10          THE COURT:  And what was February 11th?
11          MR. HINDY:  So it was for the Plaintiffs who filed
12    their complaints on January 31st, under the Tolling Agreement
13    they had seven days, seven business days to file proof of
14    use/proof of injury, and many of these were filed on January
15    31st.  There was a small subset that were filed beforehand and
16    their proof of use/proof of injury deadlines would have been
17    seven business days after they filed their complaints.
18          THE COURT:  Okay.  So on February 11th, then they
19    would have to file proof of use and proof of injury?
20          MR. HINDY:  Yes, in the vast majority.
21          THE COURT:  What was the next date?
22          MR. HINDY:  The next date was Plaintiff Fact Sheets
23    and other related documents.  In the MDL it was April 1st,
24    2019.
25          THE COURT:  Okay.


WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1           MR. HINDY:  So proof of injury was specifically

2     defined in the Tolling Agreement.  And again, it was seven days

3     after filing of the Complaint, and as I stated, Plaintiff Fact

4     Sheets were April 1st, 2019.

5           There were consequences to the breach -- or the

6     consequence of failure to provide those proofs; and those

7     consequences were immediate dismissal by way of motion, which

8     is why we're here now.

9           So if we can turn to again -- we took these out of

10    order, and I don't think I need go through again with you your

11    Honor -- but these are the categories of the proofs -- I'm

12    sorry -- the breaches in the motion to dismiss.

13          So with that, I would just like to show you some

14    examples.  Are you okay on the numbers?

15          THE COURT:  Yes, I'm good.

16          MR. HINDY:  So this is an example of a prohibited

17    Proof of Injury Affidavit.  It's an affidavit from Mr. London.

18    And if you look at paragraph 7 -- it's probably hard to read

19    off the slide, off the big board -- but if you read it on the

20    slide, it is:  "Randy Belleman told my office that he had been

21    diagnosed and/or received treatment for a kidney injury

22    following his use of a PPI."

23          So that was the proof of use submitted on behalf of

24    Randy Belleman.  Nothing else was submitted.  Clearly a

25    violation of the Tolling Agreement, the clear terms of the

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    Tolling Agreement, and it had to have been a knowing violation.
2    The Tolling Agreement was clear that there were no affidavits
3    that could be put in to demonstrate use.

4          The next slide is a slide from Mr. Sedgh.  This is an
5    impermissible attorney proof affidavit, Proof Use Affidavit.
6    Again, attorneys were not permitted to put in Proof of Use
7    Affidavits on behalf of their clients, and, yet, here this one
8    is.

9          And then the last slide is a non-compliant Proof of
10   Use by a user affidavit.  And as you can see, it's a little
11   hard to read but it says:  "I affirm that I used Nexium from
12   2010 to July 2012," and it was on behalf of I think it's Ms.
13   Revel Williams.

14         So, again, that's a User Affidavit that basically
15   contains nothing other than her claim that she used Nexium for
16   shorter than -- approximately a two-year period or less than a
17   two-year period a decade ago.

18         These affidavits are a mockery of the Tolling
19   Agreement we entered into and the clear terms of the Tolling
20   Agreement.

21         Now, a User Affidavit had five specific categories
22   which are itemized if they were going to be compliant with the
23   Tolling Agreement.

24         I think, Judge, these examples of Plaintiffs'
25   submissions are both illustrative and representative of the

1       kind of garbage we had to cull our way through to get to the

2       motions to dismiss.  Obviously, a great portion of the

3       Plaintiffs that tolled, thousands of them satisfied the

4       requirements and are not subject to this motion.  We had to go

5       through this type of junk to get to our motions to dismiss.

6       And as I said at the beginning, the only Plaintiffs that are

7       subject to our motions to dismiss are these egregious examples

8       of a complete and abject failure to live up to their end of the

9       bargain under the Tolling Agreement.  Now, I'm not sure how

10      they can claim with a straight face that these things satisfy

11      the proofs of the Tolling Agreement.  And we think their

12      opposition is illustrative of that fact.  A vast majority of

13      the opposition was, we violated their due process in terms of

14      filing an omnibus motion.

15              And that's not true.  We did file omnibus motions, and

16      that was in large part both as an efficient measure for us and

17      for the Court.  We went through, painstakingly, through

18      Plaintiffs' submissions to determine who satisfied; who was

19      close to satisfying, and we didn't include them in the motion;

20      and who didn't satisfy and was very far on that side of the

21      ledger that didn't satisfy.

22              And when we did that we grouped them together as best

23      we could for efficiencies both for us and for the Court.  And

24      included in that submission was an appendix or appendices

25      against all the motions that identified the plaintiff's name,

1    the docket number, the attorney name, and the reason for their

2    failure to comply with the Tolling Agreement, and the reason

3    why they ended up in the motions to dismiss.

4            They could have opposed each of those motions with

5    proofs saying:  Judge, look, they're wrong, we have proof.

6    Here's the proof.  We shouldn't be on the motion.

7            And, in fact, there about 100 Plaintiffs that did

8    do that, and we worked it out with them.  Some we got wrong,

9    some they were wrong about, but we just ended up dismissing

10   about 100 voluntarily -- I'm sorry, not dismissing -- voluntary

11   withdrawing our motion to dismiss against a hundred.  There

12   were another hundred that opposed specifically on the merits.

13   And we looked at their opposition, decided they were wrong, and

14   we replied.  Those motions are still before you.  There was a

15   group of about 5400 that are subject to the egregious conduct

16   that we're talking about here.

17           THE COURT:  In terms of the ones you went back and

18   looked at, have you provided the Court with a list of those?

19           MR. HINDY:  I think we have.

20           MS. FISHER:  Your Honor, we formally have withdrawn

21   our motion with respect to those Plaintiffs, and that's been

22   granted by your Honor.  So those are no longer --

23           THE COURT:  Those were cleaned up.  We just have

24   something additional beyond that?

25           MR. HINDY:  Not yet --

1          MS. FISHER:  The motions remain pending as to 5,630

2     Plaintiffs, and that's currently properly and clearly before

3     your Honor.

4          THE COURT:  All right.  Thank you.

5          MR. HINDY:  So, Judge, they could have opposed filing

6     opposition against the merits, and they really didn't.  And I

7     think that tells volumes about what we're here and why we're

8     here.

9          THE COURT:  I think we're going to hear today as to

10    what the explanation is.

11         MR. HINDY:  Okay.

12         THE COURT:  But I fully understand your position --

13         MR. HINDY:  Okay.

14         THE COURT:  -- and I see the breakdown, and I'm going

15    to focus on the categories that we reach at this point in time

16         MR. HINDY:  If I may just conclude with one more

17    thing?

18         THE COURT:  Yes, go ahead.

19         MR. HINDY:  You'd be in good standing.  A judge in the

20    Superior Court of Quebec about a month ago dismissed a class

21    action because the two named plaintiffs couldn't produce proof

22    of injury.

23         Thank you, your Honor.

24         THE COURT:  Thanks so much.

25         All right.  Who is going to respond?

1           MR. SEEGER:  They want to move the case to Quebec.

2           (Laughter.)

3           THE COURT:  Do you have a copy of that you can hand

4    up?  Two copies, please?

5           MR. PENNOCK:  May I approach, your Honor?

6           THE COURT:  Yes.

7           (A slide deck is handed up to the Court.)

8           MR. PENNOCK:  May I proceed, your Honor?

9           THE COURT:  Yes, go right ahead.

10          MR. PENNOCK:  May it please the Court, your Honor,

11   it's interesting to me that Mr. Hindy used the word "mockery"

12   several times.

13          Will you move the slides?

14          MS. O'CONNOR:  You'll do it with the clicker.

15   But I can...

16          (Discussion off the record.)

17          MR. PENNOCK:  And I say that because really the

18   mockery that we feel from this side and everything in terms of

19   the negotiations and what led up to this Agreement and all that

20   has happened is of the success that occurred because of this

21   Agreement.

22          Mr. Hindy mentioned a few times that -- and made

23   allusion to the fact that this was, in essence, a contract.

24   But -- could you go back a slide, please.

25          What we need to understand is that is the substantial

1    performance that has occurred with that contract, and I would

2    like to go through that.  And I think once we see that we will

3    see that the Defendants got what they bargained for.

4            This is what they wanted, unquestionably.  They wanted

5    more rapid injury and proof-of-use collection than has ever

6    happened before in an MDL of this magnitude.  Ever.  We're

7    barely 24 months from the first conference in this MDL.

8    Discovery is not even close to being done of the Defendants.

9    No individualized discovery at all has taken place.  No

10   Plaintiff depositions, nothing.  We don't yet have a bellwether

11   program, and we won't go into why that is.  We're quite a ways

12   from trial.

13           So if we look at the reality of this MDL and what has

14   been provided to them, it's been a startling success for them.

15   And these are very experienced lawyers.  I think it's a bit of

16   a mockery, frankly, for someone as experienced as these lawyers

17   to stand up and say:  Oh, my gosh, it's terrible where we are

18   in this MDL.

19           We should be applauded for where we are.

20           So let's look at it.  That's what they wanted.  They

21   wanted nonfiling of cases due to investigation, giving the

22   Plaintiffs more time to investigate and then not file the cases

23   that we had because we determined, okay, these are probably not

24   cases, or we believe they're not cases.  They want to deal with

25   those.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

```
 1              They want a dismissal of those cases that were filed
 2     that did not have sufficient evidence, that should not have
 3     been filed.  Those are the three main things they wanted.  In
 4     fact, those are the three things they wanted.  And they got all
 5     of them in spades, and I'll show you, Judge.  It's been
 6     unprecedented the amount of records that have been collected,
 7     unprecedented in any MDL.  And all us here have been involved
 8     collectively in almost every single mass MDL.
 9              Thousands of cases were not filed.
10              Let's go to the next slide, please.
11              So I think the Court will see that even under a
12     contract analysis there has been substantial performance.  And
13     what there has not been, which we heard nothing about -- I
14     won't mention the word "prejudice," let's just say damages --
15     what are the damages that they're claiming from this alleged
16     breach?  But there was no breach, and that's I think what we
17     can look at.
18              Next slide, please.
19              This is the tell-all slide really.  There were 15,985
20     claimants on the Tolling Agreement.  7,355 never saw this
21     courtroom.  Because of that time period, because of that
22     investigation that was allowed, these cases were never filed,
23     they never had to deal with them, they never had to go through
24     their allegedly "garbage" affirmations.  And that I think
25     demonstrates the success of this program alone.  That slide
```

1    alone got them the primary thing they wanted.

2            Next slide.

3            Here are the number of medical records ordered since

4    this Agreement was entered into:  55,215.  And you can see the

5    breakdown of the major firms and all of the other firms that

6    were surveyed a couple of months ago.

7            I mean, if that does not demonstrate substantial

8    performance of this Agreement, again, I'm not sure what else we

9    could do.  But we've done more than that.

10            Next slide, please.

11            I want to use my numbers from my firm because I have

12    the most certainty with them and I'd like to go over those.

13            We tolled 4,970 cases.  We did not file 1,274 of those

14    cases.  I think that's approximately, what, pretty darn close

15    to 25 percent of the cases were never filed against these

16    12sDefendants.

17            That's what they wanted.  That's what Matt Holian

18    wanted, that's what all of the other lawyers wanted, and that's

19    exactly what they got.  3400 cases were filed on that.  If you

20    remember the government shut-down and all the craziness and we

21    had to file them I think overnight one day.

22            Next slide, please.

23            And this is where we are now.  This I think addresses

24    the question your Honor asked of us.  This is where we stand in

25    terms of what has occurred since this Agreement was put into

1    place and what has occurred in this MDL in 24 months.

2            65 percent have provided proof of kidney injury.  And

3    I'm not talking kidney injury of the nature that they object

4    to.  We have used their standard of what they say the Agreement

5    meant.  I accepted their assertions -- although I don't accept

6    all of their assertions -- I accepted their assertions and used

7    that data.  65 percent have already provided proof of kidney

8    injury; 73 percent have provided proof of use.  But if you add

9    in the other things that we have provided which they say don't

10   count, obviously those numbers are higher.

11           Next, please.

12           That's with respect to the proof of use and the proof

13   of injury.

14           THE COURT:  Okay.  So let's go back to this.

15           MR. PENNOCK:  Yeah.

16           THE COURT:  If you turn to page 11 of their slide deck

17   and we go through the categories that they have, it looks to me

18   like you have your figures overall.  Are your figures overall

19   versus just the figures pertaining to the motions to dismiss?

20           MR. PENNOCK:  These are my figures overall.

21           THE COURT:  Overall.  Okay.

22           MR. PENNOCK:  For all of the cases.

23           THE COURT:  For all of the cases.

24           MR. PENNOCK:  Right.

25           MR. PENNOCK:  And I know from your perspective you're

1    showing substantial performance overall.  But if you focus on

2    their particularized motions, which I think are highlighted on

3    page 11 of their slide deck -- I don't know if you're able to

4    refer back to it.

5              MR. PENNOCK:  I have it, yes.

6              THE COURT:  Okay.  How would you respond to the

7    categories that they have presented in terms of what they feel

8    is insufficient?

9              MR. PENNOCK:  Those, the cases that they're describing

10   here that they set forth are, of course, included within the

11   slide that I presented.  So there is tremendous overlap of the

12   numbers.  Most of the cases that were on that Tolling

13   Agreement -- well, I shouldn't say "most" -- but a large number

14   of those cases they've sought to dismiss.  So -- if you could

15   go back -- oh, thank you.

16             THE COURT:  For example, here's my issue.  On page 11,

17   I'm just going to go to the easiest topic first:  No Proof of

18   Use or Injury - 386 Plaintiffs.

19             What would be your response to that and why should

20   they remain in the case?

21             MR. PENNOCK:  Those are not cases -- those are cases

22   that didn't provide this proof of use back in, whatever the

23   date was, February 18th.  They are completely ignoring

24   everything that has happened since then.  So they set up this

25   date, this date -- this date that was arbitrarily selected --

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

```
 1              THE COURT:  Is it February 8th or is it February 11th?
 2              MR. PENNOCK:  I believe the date was February 11th,
 3    and I think the information had to come seven days after.  I
 4    don't have those exact dates.  We're talking about back in
 5    February, your Honor.
 6              THE COURT:  Are you saying this is not updated?  So
 7    information trickled in, but if it was beyond the cutoff date
 8    you're saying some of the individuals in this category had
 9    information provided as to proof of use and proof of injury
10    after the cutoff date?
11              MR. PENNOCK:  Yes.
12              THE COURT:  Okay.  Mr. Hindy, if you would like to
13    respond.
14              MR. PENNOCK:  All of this information has been coming
15    in -- and I wouldn't say "trickled," and I don't want to
16    quarrel with your Honor's use of that word.  But it hasn't
17    trickled in.  We have been providing information regularly --
18              THE COURT:  I didn't mean anything by the use of that
19    word, but I just meant coming in, you know, as it comes in
20    naturally.
21              Go ahead.
22              MR. HINDY:  Judge, to respond to your question.  If we
23    made a motion on March 30th, then at that point in time, you
24    know, 24 hours before that motion was filed, we didn't get the
25    proofs that were required under the Tolling Agreement.  If we
```

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1     made the motion on April 30th, the same thing, up until 24

2     hours before that motion -- so we did a check right before each

3     motion was filed to confirm that those plaintiffs in that

4     motion didn't provide the Proof of Use, Proof of Injury or

5     Plaintiff Fact Sheets that were required under the Tolling

6     Agreement, so they got until February 11th.  But in many

7     instances they got one month, two months, three months more,

8     even four months in some instances before we made the motion.

9     And we only made motions against people at the time the motion

10    was made that had not complied.

11            MR. PENNOCK:  Well, we know that many of the cases

12    they filed against us were wrong, but in any event, I can't

13    largely disagree with that.  The point is, what did they want

14    out of this process?

15            They wanted things accelerated in a tremendous way.

16    And they know that in mass courts with 15,000 potential cases,

17    getting this information in this amount of time is, as I said,

18    unprecedented.  It has been a great benefit to everyone

19    concerned, including the Plaintiffs, to have moved it this far.

20            THE COURT:  Okay.  Putting aside the global reflection

21    here, if I'm dealing in specifics and I'm dealing with the

22    specific motions that are pending before me, Mr. Hindy has

23    indicated that as of the date the motions were filed he's

24    looked at the records and determined that there's been nothing

25    provided.  So in terms of the Court reflecting on that, so if

1    I'm looking at the first category:  No proof of use or no proof

2    of injury -- say, for example a motion was filed, what, April

3    1st -- if there was nothing filed by that date, what is your

4    suggestion to the Court?

5          MR. PENNOCK:  If there was nothing -- had not provided

6    that information -- well, first, I think the Court has

7    highlighted, and Mr. Hindy as well, that each case has to be

8    looked at individually as to what transpired.  So that's number

9    one.

10         Number two, I am suggesting that the information

11   coming to these defendants over the ensuing period of time is

12   performance under this Agreement.  They are getting what they

13   set out to get, number one, and the biggest and most important

14   thing is the 7,000 cases that were not filed.  That was the

15   most -- the driving force to why they, in our understanding,

16   agreed to the tolling to begin with.

17         THE COURT:  Okay.  But if we look at the first

18   category:  No Proof of Use or Proof of Injury as alleged by the

19   Defendants.  They have 386 cases in that.  Is there any way to

20   go back and look at this and say there was proof of use and

21   proof of injury provided, or there wasn't?

22         MR. PENNOCK:  Yes, we can go back and look at any

23   particular snapshot in time and say whether there was or there

24   wasn't on any given case and whether there is today, or in some

25   instances, there has not yet been that provision of that.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1           THE COURT:  What I had suggested the last time when we

2     spoke collectively was that the parties look through these

3     categories jointly and come to some sort of conclusion as to

4     whether there was agreement, as to whether nothing was provided

5     or something was provided, or something was provided just a bit

6     over the deadline, or more than a bit over the deadline to

7     formulate some sort of categories within these categories so I

8     could effectively deal with each of these issues.  Is there

9     some way to still do that?

10          MR. PENNOCK:  There is, Judge.  And the Court -- we're

11    happy to do that and the Court should know that we have been

12    dismissing cases.

13          THE COURT:  I recognize that.

14          MR. PENNOCK:  Meaning not just the ones where

15    information is not being provided to us by our clients.  We're

16    dismissing those cases at this juncture, and there have been

17    such cases dismissed due to noncompliance by our clients -- I

18    mean dismissed by us.

19          I wanted to show the Court some information on the

20    fact sheets and the work that has been done.

21          THE COURT:  You know what, just focus again one

22    moment --

23          MR. PENNOCK:  Yep.

24          THE COURT:  -- on the proof of use, for example.

25          Okay.  So page 7 of the Tolling Agreement states that:

```
 1    Proof of use may be established through a PPI user's affidavit.
 2              And I know previously you had indicated you had done
 3    an attorney affidavit and then followed up with a PPI user
 4    affidavit.
 5              MR. PENNOCK:  Yes.
 6              THE COURT:  Is that in 50 percent of the time?  80
 7    percent of the time?  20 percent of the time?  Is there any way
 8    to get some sort of general statistic so I understand what the
 9    process employed was here?
10              MR. PENNOCK:  I don't have the data on the
11    certifications provided by the individual users.  Overall,
12    including medical records, 65 percent of Weitz & Luxenberg's
13    inventory has provided proof of injury already.  But I can
14    provide to the Court that information.  I'm sure they're
15    probably trying pull it up right now for you.  As to how
16    many -- you're asking how many clients provided a certification
17    versus the affidavits?
18              THE COURT:  Because it sounds like what you said
19    before is you immediately put it in an attorney affidavit in
20    terms of proof of use and then you followed up -- I don't know
21    in how many instances --
22              MR. PENNOCK:  That's correct.
23              THE COURT:  -- but then you followed up with a PPI
24    user's affidavit, which is the structure of the Tolling
25    Agreement.
```

1          MR. PENNOCK:  That's correct.

2          THE COURT:  And I'm just trying to get a better idea

3     so I can focus on that issue.

4          MR. PENNOCK:  For Weitz & Luxenberg, I think

5     approximately, approximately 900 clients as of a month ago had

6     not provided an individual user affidavit or certification.  I

7     believe that was the number about a month ago.

8          THE COURT:  Okay.  I'm going to ask the questions that

9     I'm sure Defendants want to ask, which is:  With the Tolling

10    Agreement, with the many months that have been provided in the

11    Tolling Agreement, with the understanding that it was becoming

12    an issue as of I think probably September of that year, why

13    were these things not done to the extent there were certain

14    elements contained within the Tolling Agreement, such as a PPI

15    User Affidavit and so on?  Why were these things not done in a

16    timely fashion; and how should the Court react to that?

17         MR. PENNOCK:  Well, the reason that they were not --

18    we did not go out and get certifications from these clients

19    early on is because under the Agreement we had an obligation to

20    make best efforts, or good faith efforts to obtain records to

21    prove these things.  And so early -- the affidavit or

22    certification requirement was supposed to be, as Mr. Hindy

23    mentioned, a last step if we couldn't get the record.  So

24    during, for example, in September -- August, September,

25    October, I mean, the record collection that was going on and

1    the attempts at record collection were massive.  I mean, as the
2    Court can appreciate, obtaining -- trying to obtain this many
3    records was a massive volume of effort, and it's not as though
4    you could just send the authorization out and you get the
5    records back in a week.  You constantly have to chase these
6    records down.
7              THE COURT:  Are there any digital platforms --
8              MR. PENNOCK:  That's why we didn't do it.
9              THE COURT:  I was going to say, are there any digital
10   platforms that you could utilize in this instance to get
11   medical records in a quicker fashion?
12             MR. PENNOCK:  Yes.  And we realized sort of post facto
13   that -- we learned about a vendor that could probably go out
14   and get a lot of this information much more quickly, and we
15   had -- but that's when -- that was after this entire process
16   took place.  But we were -- we were also using vendors to get
17   the actual records as opposed to extracting data.  But there's
18   a company we think that can go out and get this information and
19   sort of more or less extract data.  We think like
20   Medicare/Medicaid databases I think.  I think Mr. Overholtz
21   explored that for us.
22             THE COURT:  But with the date looming, why, for
23   example, would there be a choice to do an attorney affidavit
24   versus a PPI user affidavit?  Because it looks like we have
25   2,000 cases or 2500 cases that are, at least according to

1    Defendants, in that category?

2          MR. PENNOCK:  Number one, it was not clear to us that

3    an attorney speaking with and/or reviewing her/his file

4    regarding these clients and signing an affidavit, that this is

5    what they discerned.  It was not clear to us that was

6    insufficient.  We understand the Defendants' argument that they

7    believe it's plain on the face of the Agreement.  We think --

8          THE COURT:  Well, here's the issue.  I mean, should it

9    have provided specifically for an attorney affidavit then,

10   whereas here it specifically states use:  (Reading) Specific

11   pharmacy, insurance, medical or other reliable records

12   demonstrating that the PPI user ingested a PPI manufactured or

13   sold by that defendant provided, however, that if the PPI user

14   is unable after a good faith effort to procure pharmacy,

15   insurance, medical, or other records such as receipts

16   demonstrating the specific PPI use, the PPI user may provide an

17   affidavit identifying at a minimum..., and then it goes through

18   all the uses.  Are you suggesting that that sentence can

19   indicate the PPI user may use an attorney affidavit?

20         MR. PENNOCK:  I think that that is how we viewed that

21   as -- once the negotiations to extend the Agreement broke down

22   suddenly, we looked at the situation and we thought, look, we

23   could interpret that -- we did not discuss attorney affidavits

24   either way.  There was not a discussion of them, a rejection of

25   them.  It was never mentioned.

1          So we said, okay, well, what do we do now?

2          Well, let's make the effort to do something.  We can't

3   get all of these affidavits in from the clients, so let us

4   immediately go through a review of files, which we could do

5   with many, many people, and provide them at least with an

6   attorney affidavit, which is a pretty serious thing, and

7   demonstrating to them that under the terms of the Agreement we

8   were attempting to comply with what they wanted, which was a

9   fleshing out of what was used and when it was used.  And so we

10  thought that by providing the attorney affidavit at that time,

11  that that would be something that would at least be acceptable

12  to them for a limited period of time while we continued to

13  pursue the records.  Obviously it was not.

14          THE COURT:  Okay.  And what about the proof of Injury

15  Affidavit?  Because it doesn't look like there's a Proof of

16  Injury Affidavit specified in the Tolling Agreement.

17          MR. PENNOCK:  There is not.  There is a provision

18  that --

19          THE COURT:  What is your position on that?

20          MR. PENNOCK:  -- we can provide evidence of the

21  injuries here.  I think the term "evidence" is used, of the

22  injury.

23          THE COURT:  So why would an affidavit be sufficient in

24  that regard?

25          MR. PENNOCK:  Again, your Honor, in our view, based on

1   what the purpose of what this contract was for, what were they

2   supposed to get from it, we thought that it achieved that

3   purpose, particularly knowing everything that was out there in

4   terms of record orders that had been made and knowing what

5   would be forthcoming in a relatively short period of time when

6   you consider the duration of any MDL, including this one, that

7   what they hoped to achieve with this Agreement was being

8   achieved and this was a significant step toward achieving that.

9           THE COURT:  Okay.  In terms of these two categories,

10  do you know or have any statistics on, for example, prohibited

11  Proof of Use Attorney Affidavits?  I guess you can look through

12  this because I'm going to wait to get back something from both

13  sides on this.  In what instances did you follow up with a PPI

14  User Affidavit  with the identifying information?  And in terms

15  of the prohibited Proof of Injury Affidavit, in what instances

16  there did you follow up with the actual medical records or

17  other proofs?

18          And again, I'm looking at page 11 --

19          MR. PENNOCK:  Yes, I understood, your Honor.

20          I can provide that specific --

21          THE COURT:  So I have a full idea what went on.

22          MR. PENNOCK:  -- as to what you're looking for, yes.

23          THE COURT:  Let me turn to the Defendant at this point

24  in time.

25          What counsel is indicating is that he believes there

1    was substantial compliance with the contract terms and that the

2    desired result was that cases would not get filed and shouldn't

3    have been filed and, in fact, there are statistics that show

4    how many cases were not filed as a result of this particular

5    process.  So, in effect, it served its purpose and medical

6    records and other proofs were, in fact, supported for many of

7    these individuals.  And to the extent Plaintiffs started the

8    process by using, for example, a Proof of Use Attorney

9    Affidavit, they followed up with other types of proof.  What's

10   the response there?

11        MR. HINDY:  Well, your Honor, to start with, I'm glad

12   Mr. Pennock knows what we wanted in the Agreement.  What we

13   wanted was that we wanted proof of cases -- I'm sorry -- what

14   we wanted was dismissal of the 3,000 shotgun cases at the

15   beginning when we talk about that time line going back to

16   February, March of 2018.  What we got was 7500 new cases.

17        All we got were Attorney Affidavits and disallowed

18   User Affidavits and "Shell" Plaintiff Fact Sheets.

19        THE COURT:  Let me ask a question on that because I

20   asked Mr. Pennock the same question.  In terms of this

21   particular Tolling Agreement, it says the user may provide an

22   affidavit.  It doesn't specify what type of affidavit can be

23   provided.  So why couldn't an attorney affidavit satisfy that

24   provision?

25        MR. HINDY:  Okay.  Well, Judge, this was a heavily

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1   negotiated point where the attorney affidavit was raised and it

2   was rejected.  But looking at the Agreement, if you look at

3   what was specifically provided, for use, it was pharmacies.

4   Specific pharmacies, insurance, medical, or other reliable

5   records, such as receipts.  If you work your way down into that

6   use --

7           THE COURT:  Right, I'm reading the paragraph.

8           MR. HINDY:  And if the PPI user is unable after a good

9   faith effort to procure a pharmacy, medical, insurance, or

10  other record such as receipts, then, then only they could

11  provide.  It doesn't say -- so the affidavit was contemplated,

12  and this is what ended up in the Agreement.  It's a user

13  affidavit.

14          Now, we also had a question about the injury; why

15  couldn't an attorney affidavit satisfy that injury component.

16          Again, this Agreement was heavily negotiated and it

17  was something that we didn't want; really, really we didn't

18  want it.  We did it for reasons that -- in part, to accommodate

19  the Court, but with the understanding that the docket was going

20  to be cleaned up of the messy complaints that weren't tied to

21  medical records, that we would get rid of those.

22          The injury, proof of injury is specific medical

23  records demonstrating that the PPI user was diagnosed with or

24  received treatment for a kidney injury.  That's it.  That's all

25  that they can show.  It has to be a medical record provided by

1   a healthcare professional or a treatment plan provided by a

2   healthcare professional to treat the injury.  That is the only

3   piece of evidence that was acceptable, that we would have

4   accepted under the Tolling Agreement to provide the additional

5   nine months.

6            THE COURT:  Okay.  Mr. Pennock.

7            MR. PENNOCK:  Your Honor, I mean, we don't agree that

8   an attorney affidavit was discussed and rejected.  But

9    in any event, there was, as the Court can see from all that's

10  occurred and everything that occurred even on the deadline that

11  they wanted it all to happen, that there was a massive amount

12  of information that was provided under this Agreement.  And how

13  do I know what they wanted?  Because I know what they told us.

14  We didn't deal with Mr. Hindy specifically, but we understood

15  that they were hoping to see a lot of cases or potential cases

16  never get filed, and they weren't.

17           But in any event --

18           THE COURT:  You know what, let me turn to injure

19  though on page 7 of the Tolling Agreement.  "Injury.  Specific

20  medical records demonstrating that the PPI user was diagnosed

21  with or received treatment for kidney injury following

22  ingestion of a PPI."

23           So here's my question:  Why would an attorney

24  affidavit satisfy that element?

25           MR. PENNOCK:  There's a provision -- in that Agreement

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1       there's a statement regarding providing evidence of injury.

2       And the attorney affidavit again, not something that we

3       considered to be frivolous --

4               THE COURT:  Do we know what section --

5               MR. PENNOCK:  Yes.

6               THE COURT:  -- you're referring to?

7               There's something on page 6 which is a combined

8       discussion of use and injury.  Is that what you're referring

9       to?

10              MR. PENNOCK:  There's a provision regarding when they

11      could move for dismissal.  And it had to do with -- it's at

12      page 9, it's under paragraph 7(b), and there was a reference in

13      the Agreement where no evidence of use or injury is provided.

14              So at the time in February, our view was that, again,

15      an attorney providing an affidavit that there has been

16      investigation to ascertain that there was, in fact, a relevant

17      renal injury was something that should have been sufficient

18      evidence to them to accept that the Agreement was met at that

19      point.

20              And as we've pointed out, then followed up with

21      records -- which one thing that I haven't discussed with the

22      Court is, of course, we don't have control, we weren't sitting

23      on the records and just not giving them to them.  We weren't

24      sitting on the records and not reviewing them.  I mean,

25      everything that we had, had been looked at.  Everything that we

1    could order we had ordered.  And we had no control that the

2    records had not come to us yet.  I will be able to demonstrate

3    the work that was done to get those records.

4         I have a slide here that I would like to show you, the

5    number of people -- if I could go --

6         THE COURT:  Let's go through to that.

7         So you're suggesting you couldn't get the medical

8    records, so of course you couldn't comply with the deadlines?

9         MR. PENNOCK:  It was impossible if we don't have them.

10   We weren't sitting them on.  They weren't sitting in our

11   office.

12        THE COURT:  They're going to counter saying:  Well, if

13   you had started immediately you would have had time to get the

14   medical records and then you would have had sufficient

15   opportunity to meet the letter of the Agreement.

16        MR. PENNOCK:  We'll be able to demonstrate that we did

17   start immediately, Judge.

18        THE COURT:  Okay.

19        MR. PENNOCK:  Again, I've mentioned, I wasn't entirely

20   joking, that there is a lot that occurred here.  This is --

21   essentially they're moving to dismiss based on a contract

22   claim.  I mean, there's a lot of information that would need to

23   be presented to the Court that would require affidavits from

24   people in terms of supervision of personnel, what was discussed

25   on phone calls and in emails.  We hopefully won't get to that.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1         But I want to show the Court the fact sheets.

2         THE COURT:  By the way, in terms of specific proof of

3    use or proof of injury, if you take a look at the bottom of

4    page 6, it says:  (Reading) For purposes of this section,

5    specific evidence shall mean copies of specific pages of

6    medical or other records not to exceed 50 pages per PPI user

7    absent good cause, not general references to voluminous medical

8    records.

9         I mean, it doesn't reference affidavits in support

10   therein.

11        MR. PENNOCK:  It does not, Judge.  The reference that

12   we were looking at was when would it be non-compliance to the

13   point of the case being dismissed.

14        And there's, you know, the question that we think is

15   raised, is:  Is the affidavit regarding the injuries from the

16   work investigation that we had done sufficient to defeat a

17   dismissal of the case?

18        THE COURT:  Okay.  Let's move forward.

19        MR. PENNOCK:  We have also provided to this date 3,280

20   fact sheets to cure the issues with the fact sheets.

21        If you go to the next slide, please.

22        This is the number of records that my firm ordered and

23   ultimately were received and paid for.

24        Go to the next slide.

25        This is a demonstration of people that we had working

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    on this as things ramped up in October.  You can see these

2    people were only working on medical record collection, medical

3    record review and ascertaining that information from the

4    clients.

5            Could you go -- so you know, the question really gets

6    down to I think, I mean:  Has the value of what they sought,

7    has it been substantially impaired by the delay in providing

8    what they say should have been provided?

9            So even if we accept that what they say should have

10   been provided in February, has the value of that been impaired

11   to the point where we have not substantially performed on our

12   end?

13           Mr. Hindy referred a few times to the extra time that

14   we had before the motions were filed, and he said:  They didn't

15   provide any of this information even as of April 30th, before

16   one of the motions was filed.

17           I mean, that would suggest to me that he's saying:

18   But at that point that would have been fine.  Meaning, what we

19   had hoped to get we had gotten and the Agreement insofar as

20   that case we'll accept as having been performed.

21           So what about a month later or two months, or three?

22   I mean, look, we agree that at some point here the value of

23   what they sought in this Agreement is substantially impaired

24   and cases need and will have to be dismissed.  We are already

25   dismissing some voluntarily.  We don't think that as of this

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    date for all of these cases that that is true.  We think that

2    if you -- especially -- I know the Court was appropriately

3    interested in the specific numbers of who hasn't complied, who

4    has, and I was showing you the overall global compliance.  But

5    the overall global compliance was what the main purpose was

6    here, was to get the mass of -- get our arms around the mass of

7    cases, let them get their arms around the mass of cases.

8              And I would say at this point in time we have

9    substantially done that.  We have gotten our arms around the

10   mass of cases.  They have as well.

11             And we are years from this MDL ending.  I mean, one

12   attorney from their side mentioned to me earlier that, you

13   know, I don't know if I'll live to see the end of this MDL,

14   because it's a big MDL.  That doesn't mean -- but we're doing

15   so much work here.  This is a successful MDL.  This has been a

16   success.  This has been something that anyone could go out and

17   say -- we've been involved in all of them -- and say:  Look at

18   what we did here in the space of 24 months.  This is how many

19   cases were not filed, this is how many cases were documented.

20   It's really quite an amazing program that we have had here.

21             And the reason I mentioned that we have time to go is

22   because, okay, sure, at some point there's substantial

23   impairment in what they bargained for.  But we certainly, I

24   don't think -- or I would suggest to the Court, we're not at

25   that point yet for all of these cases, particularly the ones

1     where the information has been provided at this time.

2          THE COURT:  Well, I certainly recognize the successes

3     of doing this and following through with this, and I do also

4     recognize as I highlighted previously that a good number of

5     cases were not filed as a result.  And obviously from the

6     statistics I can see how much effort was put into the process

7     and how much work was done to acquire medical records and so

8     on.  And I know we're not talking about small numbers, we're

9     talking about a rather large MDL at this point in time.  And I

10    know you're also making the point that there is great

11    substantial compliance here, and certainly the purposes of this

12    whole Tolling Agreement were met and even you've gone above and

13    beyond that.

14         However, looking at this from Defendants' perspective,

15    they have certain cases that they have highlighted that they

16    believe have not been compliant with the tolling procedure.

17    And we've gone through some of their statistics today, and they

18    have gone through, as I've asked them to do, in terms of

19    looking at the specific categories of which Plaintiffs had no

20    proof of use or no proof of injury and then the gradations

21    therein.

22         So in terms of listening to both sides at this point,

23    what I'm hoping that you will be able to do is at least agree

24    upon those individuals for whom we have received no proof of

25    use, no proof of injury.  Do you think you'll be able to do

1    that?

2              MR. PENNOCK:  Yes, your Honor.

3              THE COURT:  Because those should be pretty clear cut

4    for us.  And then with respect to the proof of use attorney

5    affidavit, if you can break that down further, the numbers the

6    Defendants have on their list, because those are the ones we're

7    dealing with as far as the motions go, which one of those were

8    followed up with PPI users' affidavits, when were they followed

9    up with?  And again, I'm going to have to reflect to what

10   extent the use of the attorney affidavit fits into this

11   procedure.  I've heard Mr. Hindy say that it's not part of the

12   negotiation or the Agreement and we're just dealing with a

13   situation of a PPI user's affidavit.

14             Mr. Pennock, you've identified in certain paragraphs

15   here which just referred to evidence, essentially support.  So

16   these are some things that I'm going to take a look at.

17             But I think it would be helpful for both sides if I

18   get some agreement as to those Plaintiffs for whom we have no

19   proof of use, no proof of injury.  I am confident that you will

20   be able to agree upon certain of these individuals because

21   that's just something very easily identifiable.

22             Mr. Hindy.

23             MR. HINDY:  If I may, Judge, Mr. Pennock said that

24   Weitz & Luxenberg has dismissed a number of cases.

25             What they've dismissed off of our motions are 20

1     cases, a total of 50 across all Defendants.

2          The appropriate I think remedy here -- we have put in

3     so much work going through and determining which Plaintiffs

4     should or shouldn't be off the Tolling Agreement, which should

5     or shouldn't be in our motions to dismiss.  It was a

6     tremendous, Herculean undertaking.  I think the appropriate

7     remedy here would be, you dismiss all without prejudice and set

8     a date certain by which they need to demonstrate that they

9     complied with the Tolling Agreement, and that's the easy way to

10    do it.

11         The burden shouldn't be on us to demonstrate what

12    Proof of Use, Proof of Injury or Plaintiff Fact Sheets are in

13    or not in.  We've done that already as of the date of our

14    motions being filed.  We can't go through this again and have

15    to do this work over because they couldn't live up to their end

16    of the bargain.

17         THE COURT:  Let me ask both sides:  Do you have

18    sufficient databases containing the materials that we're

19    discussing?

20         MR. PENNOCK:  Yes.

21         THE COURT:  So someone would be able to go through,

22    for example, from the Plaintiffs' side and go through this

23    category, in 386 cases no proof of use, no proof of injury and

24    say, okay, we looked at it and we agree or we disagree on five

25    or seven, whatever it is?

 1              MR. PENNOCK:  Yes.

 2              THE COURT:  Similarly, you'd be able to go through the

 3    remaining sections on here:  No Plaintiff Fact Sheet.  I

 4    mean --

 5              MR. HINDY:  Judge, they already have our master

 6    appendix.  They can go through it and check off which ones --

 7              THE COURT:  You say they already have it?

 8              MR. HINDY:  Oh, they don't.  It was submitted in

 9    the --

10              MS. FISHER:  It was attached to our letter --

11              MR. HINDY:  Attached to the letter.

12              MS. FISHER:  -- with the Defendants' position

13    statement letter from the last conference.

14              THE COURT:  Look, I very much appreciate that the

15    Defendants have put together this list and put all their effort

16    into looking at this.  At this point now I want to get

17    Plaintiffs' full response to it so I can determine how to best

18    handle these various categories.

19              MR. PENNOCK:  Understood, your Honor.

20              THE COURT:  So --

21              MR. PENNOCK:  We will do that.

22              THE COURT:  -- why don't we do this.  Is there

23    anything else --

24              MR. HINDY:  There's one thing I would say.  I think

25    again the appropriate remedy --

1        THE COURT:  You're suggesting we dismiss them without

2    prejudice?

3        MR. HINDY:  Yes.  And they have to come back and they

4    have to show, and their ticket back in is the proof.

5        MR. PENNOCK:  Your Honor --

6        MR. HINDY:  I think that's a reasonable request, by

7    the date that it was either due or by the date we filed the

8    motion.

9        THE COURT:  Okay.  Mr. Pennock.

10       MR. PENNOCK:  I certainly will talk to Mr. Hindy about

11   exactly what he's proposing.  I'm a little unclear.  But we are

12   in favor of anything, and have been for many months, that would

13   resolve this massive disagreement.  You know, there has been a

14   lot of talk about agreements, contracts.  I hate to use this

15   analogy, but in some ways it's as though we were supposed to

16   provide deliverables to them on a date certain, and we told

17   them it wasn't going to happen on that day, but we have them

18   all and they are coming and --

19       THE COURT:  That's why I want to get a better snapshot

20   of the breakdown.

21       MR. PENNOCK:  -- there's no disadvantage to them of

22   them not getting the deliverables.

23       Judge, one last point I just want to --

24       THE COURT:  Go right ahead.

25       MR. PENNOCK:  I'm sure it wasn't deliberate.  Okay?

1    But the Defendants' papers said that we were aggressively

2    advertising still.  And that kind of bothered me because it

3    sounds like:  Well, gee, you can't even handle the cases you

4    have and you're still advertising?

5            It's just not true.  I wanted to put that on the

6    record.

7            The last advertising that my firm had was almost two

8    years ago.  And as I note here, it was four months after the

9    MDL was formed, two months before we even talked about a

10   Tolling Agreement and six months before the Tolling Agreement

11   was agreed to.  I just wanted to take that point that was made

12   in their papers and scratch that.  Because it resonated because

13   it would seem rather reckless if we were still advertising at

14   this point, and I wanted to point that out to the Court.

15           Thank you.

16           THE COURT:  Thank you for that.

17           Mr. Hindy.

18           MR. HINDY:  Your Honor, I think I can be brief.

19           THE COURT:  Yes.

20           MR. HINDY:  I just need to respond.  So there is still

21   advertising at least as of the last status conference on Weitz

22   & Luxenberg's website.  So --

23           MR. PENNOCK:  That's not --

24           MR. HINDY:  The last status conference there was when

25   we last checked.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1          MR. PENNOCK:  Well, that's not -- in our world, that's

2     not advertising, and that's just alerting.  That's what you do.

3     So, I mean, I wish that actually yielded results.

4          (Laughter.)

5          MR. HINDY:  In 2016, before the JPML, Mr. Pennock

6     stated -- and this is almost three years ago -- that his firm

7     personally had 5,000 cases under investigation.  There may be a

8     few more, but that's basically the body of what we're talking

9     about here.

10         MR. PENNOCK:  No.  He's imagining it's a one-to-one,

11    that those 5,000 people are the same 5,000 people we have.  Of

12    those 5,000 people, probably 4,000 of them were rejected.

13    Investigation means that.  I mean, we probably have looked at

14    20,000 inquiries, many of which never saw the light of day on

15    this Tolling Agreement.

16         MR. HINDY:  Judge, let me just get back --

17         THE COURT:  Yes, go right ahead.

18         MR. HINDY:  We want a dismissal procedure which is

19    what we got under the Tolling Agreement.  We made the motions,

20    we've done the work.  We cannot do any more checking,

21    verifying.  I think you have to dismiss without prejudice and

22    give them 30 or 60 days to come back and say, here, I'm back in

23    because I have proof.  And it has to be the proof that

24    satisfies the Tolling Agreement, not some conjured proof that

25    wasn't specifically articulated and memorialized in the

 1    Agreement that was negotiated painstakingly by tremendous

 2    lawyers from both sides over the course of three months.

 3         THE COURT:  Well, Mr. Pennock, what would you suggest

 4    at this point in time in terms of trying to give me more

 5    information regarding these various motions to dismiss?

 6         MR. PENNOCK:  I think that what -- at this point in

 7    time, we are now about six months after the initial compliance

 8    paper.  We believe that we should identify all of those cases

 9    where the Plaintiffs have not provided us with -- or provided

10    anyone with the information that has been demanded of them or

11    requested of them in terms of proof use.  And if they have not

12    provided, for example -- not "for example" -- if they have not

13    provided the certification that we have been seeking from them,

14    I think we need to -- we need to put those cases on a dismissal

15    docket and alert them that:  Your case is going to be

16    dismissed -- or it is dismissed unless you do something else

17    within some limited period of time.

18         But there's a few caveats to that, Judge.  And one of

19    them is that a lot of times the plaintiffs are failing to tell

20    us, not because they're failing to comply but because they just

21    don't know exactly, or somewhat what they used and when they

22    used it and they want us to obtain it from records.  So if we

23    did a comparison of, okay, these people have not given a

24    certification.  Why?  Well, are there record orders out for

25    their pharmacy records, for their prescription records?  Did we

1    get them back?

2           I mean, obviously almost in all instances it would be

3    no, because we would have provided them already.  So --

4           THE COURT:  Let's deal with the easiest categories

5    first.  For those individuals that haven't done anything,

6    haven't responded in any way, where you have no materials for,

7    don't you think it's time that we deal with those?

8           MR. PENNOCK:  Yes, I do.

9           THE COURT:  When can we get a list of those

10   individuals off of the list that Defendants have provided on

11   these motions?

12          MR. PENNOCK:  I mean, I would like to say less than 30

13   days, but here's my problem.  I have to look and see:  Have I

14   been -- have I been hocking some pharmacy?  My people have been

15   trying to get these pharmacy records for six months and can't

16   get them, and maybe if we get them it's going to provide the

17   information.  That's not the Plaintiffs' fault.

18          MR. HINDY:  Judge, can I just show you something?  I

19   need to show you something.

20          THE COURT:  Yes.

21          MR. HINDY:  May I approach?

22          THE COURT:  Yes.

23          MR. HINDY:  This is a Plaintiff's Fact Sheet that was

24   among the 4600 that we had to go through.  Okay?  And that

25   Plaintiff Fact Sheet.  Just thumb through it, because it is so

1    devoid of any fact that it shouldn't be called a fact sheet.

2    What it is, is a group of papers stapled together with some

3    questions.  They don't need pharmacy records or any records for

4    that matter.  All they need is information from their clients

5    and a signature from their clients.  And these are the things

6    that we had to go through to determine who made the cut and who

7    didn't.

8            THE COURT:  I think at this point in time it's going

9    to shift to the Plaintiffs to break down what they've provided.

10   So I recognize that you put in the effort on the motion.

11           MR. HINDY:  Thank you.

12           THE COURT:  Mr. Pennock, if you're able to go through

13   this list, that's really I think what I need at this point in

14   time.  Because I'm sure you would agree that some of these are

15   going to be subject to dismissal.

16           MR. PENNOCK:  Yes, I agree.

17           THE COURT:  If someone hasn't provided anything at

18   all --

19           MR. PENNOCK:  I completely agree that there are cases.

20   We have -- you know, we have been dismissing them voluntarily.

21   I mean, to brush off that we've dismissed 50 cases voluntarily,

22   that's no big deal, I mean, I understand Mr. Hindy doesn't

23   practice on our side, but that's 50 cases, 50 people that

24   thought they had a claim.

25           THE COURT:  I recognize that.  And obviously every

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1      case matters and every case relates to an individual and this
2      may be meaningful to them.  So I don't do it without really
3      scoping the entire record here.  That's why I'm asking you to
4      go back and take another look at it --
5              MR. PENNOCK:  Yes.
6              THE COURT:  -- because I don't want to just
7      preliminarily dismiss until I hear back from you.
8              However, what I would like you to do is take a look at
9      the various materials that have been provided for the
10     individuals who are subject to the motions and give me a better
11     snapshot as to what we're dealing with.  And again, I'm
12     confident that some of them you're just going to be able to
13     say:  There's nothing here.  We were never able to obtain
14     anything.  They can't go forward.  Others you're going to give
15     me somewhat more of an explanation and I think in a categorized
16     form:  Oh, we couldn't get in touch with them; or the pharmacy
17     closed down, we couldn't get any records because it's not in
18     existence; and this is the procedure we followed; and we did it
19     right away and it was right after the deadline.  Others might
20     have been way out there in time, and I may go back and go:  Why
21     did it take so long?
22             So there are issues that we have to deal with within
23     the issues.
24             MR. HINDY:  Judge, may I?
25             THE COURT:  Yes.

1        MR. HINDY:  This is what they should have done in

2    opposition to our motions, and they didn't do it.  So we're now

3    here six months later in some instances from the first motions

4    filed.  We need an order today that says they're dismissed and

5    they have 30 days, 45 days, whatever you find appropriate, to

6    get back in with the proofs.

7        MR. PENNOCK:  Let's remember, they made omnibus

8    motions --

9        MR. HINDY:  If we don't get that we'll just be right

10   back here in another four months arguing about what is

11   satisfied, when they provided it, and was it substantial

12   performance.

13        It wasn't substantial performance.

14        THE COURT:  I think what we have to do is this --

15        MR. PENNOCK:  It was an omnibus motion with lines that

16   many times were wrong.  But look, I certainly am the last

17   person that wants to be back here in four months talking about

18   this issue.  I want to get it resolved.  I want cases to go

19   away if they just can't -- if we just can't provide the proof.

20        THE COURT:  In order for these cases to go away,

21   unfortunately given the magnitude of the number of cases in

22   this particular case, you're going to have to take a look at

23   them, you're team will have to take a look at them and

24   determine who has a story to tell and who has nothing at all.

25        MR. PENNOCK:  Got it.  We'll do it.


WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1          MR. HINDY:  Maybe, Judge, what we can do is put it on

2     a 30-, 45-day time line where if they don't provide the proofs,

3     then they get dismissed.  Because we can't just keep stretching

4     this out because the docket is not getting any cleaner.

5          THE COURT:  And I don't want to stretch it out.  But

6     at the same time, I'm unable to determine what to do with some

7     of these cases at this point since I have a difference of

8     opinion and I'm going to need a little bit more information

9     provided.  But I don't want this to carry on.  I want it to be

10    something of the past.  So I think --

11         MR. PENNOCK:  Judge, if you give me a week to figure

12    out the questions that you've asked, and also to figure out how

13    long would it take us to sort out the stories of each of the

14    cases to present them in a way that both sides can look through

15    them, I just need like a week to sort out how long it will

16    take.  It might be, you know, less than 45 days.

17         THE COURT:  Would you be able to within 14 days tell

18    us who definitively should be dismissed?

19         MR. PENNOCK:  As of right now that we think

20    definitively should be dismissed?  Yes, I can do that.

21         THE COURT:  Why don't we start with that as the

22    schedule.  Ten days from today is what?  Court is fittingly

23    Friday the 13th, everyone, so...

24         (Laughter.)

25         MR. PENNOCK:  I should have known.


WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1            THE COURT:  By September 23rd.  You can do it in

2     letter form.  Write us a letter.  Indicate who you believe

3     should be subject to dismissal, and again because they have not

4     provided anything, and this is against the motions, not the

5     entirety of the case.  We're just going to deal with the

6     motions.  And I think -- let me speak to Mr. Hindy.

7            So this is a pretty accurate -- this is an accurate

8     summation of the motions then on page 11 of your slide deck?

9            MR. HINDY:  Yes, your Honor.

10            THE COURT:  Okay.  If there's any questions, certainly

11     go back.

12            Do you have a list of who fits within each category?

13     They're all broken down?  Okay.

14            MS. FISHER:  Your Honor, they're broken down by

15     columns.  So because some Plaintiffs have upwards of two,

16     three, four different violations, they fit in different

17     categories.  It's cleanly delineated for each plaintiff which

18     categories they fall into.

19            THE COURT:  Okay.  Did you say you gave that copy

20     over?

21            MS. FISHER:  It was attached to our previous letter.

22     Since then there have been some additional withdrawals based on

23     dismissals, and so this is the most updated version which I

24     think we handed over.  We have more copies.

25            THE COURT:  I think that sounds fine.  Hand it over.

1           You can take a look at the list.  See if you can
2      figure out who we can eliminate off the bat with the easiest
3      sort of criteria.  Then it becomes a little bit more
4      complicated in terms of those individuals we need a little bit
5      more information on.
6           So why don't by day ten you tell us who can
7      definitively be dismissed and what you're doing to determine
8      the status of the other individuals.
9           MS. FISHER:  Can I make a suggestion?
10          THE COURT:  Yes.
11          MS. FISHER:  What if we were to say, within 10 days
12     they give a list of who can be definitively dismissed, and
13     within 30 days, 45 days, you're essentially going to enter a
14     show cause order for the rest of the plaintiffs, they have to
15     advise why they should not be dismissed, as to how they
16     complied in the past, either by the deadline or by the date of
17     our motion?  This has gone on long enough, your Honor.
18          THE COURT:  Okay.
19          Mr. London, go ahead.
20          MR. PENNOCK:  I'm in favor of anything that will
21     expedite a resolution of these motions.  But I'm a little
22     hesitant to agree to something or to not object to something
23     when I don't know if I'm going to be under an impossible time
24     burden.  But the faster that we can get to the end of these
25     questions, the happier I will be, I promise you, Judge.

1          And in terms of Amy's suggestion, I'm processing it.

2     But, you know, it might make some sense that if we come forward

3     in a particular period of time showing what has transpired

4     behind us, then those cases will be okay, and those that we

5     can't show that won't be, in addition to figuring out in the

6     next 10 days what cases can or maybe should be dismissed at

7     this juncture.  And again, I can't lobby for their dismissal

8     but I may be in a position where it would not be appropriate

9     for me to object to it.

10          THE COURT:  How much information will you be able to

11     give us on the status of the cases overall in 10 days?

12          Mr. London?

13          MR. PENNOCK:  In terms of each story?

14          THE COURT:  Yes.

15          MR. PENNOCK:  Not very much.  I mean, that's very

16     hard, because that's a -- you know, that information lies

17     within logs, electronic files for the client, like ordered

18     records.  I mean, we have the ordered records dates -- I'll

19     have to assess it, Judge.  Ten days sounds a little quick for

20     giving the story.

21          THE COURT:  Is 10 days enough on the total --

22          MR. PENNOCK:  Ten days is enough for what we think,

23     not for you.

24          MR. LONDON:  Mike London.

25          I need to be heard on this "rocket docket."  We can't

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    get defense depositions in less than four months.  And your

2    Honor, I think we were poised to have potentially a workable

3    plan except they kept popping up saying:  We need dismissals

4    today.

5          The cases that should be dismissed, and just putting

6    it in specifics, you saw the Weitz & Luxenberg specifics.

7    We've had 1487 cases in the Tolling Agreement.  167 have been

8    dismissed.  I have 85 more I'm trying to dismiss, and I think

9    should be.  I can't -- and I've got letters out to clients.

10   We're working with Amy very well on dismissing them, her

11   office.  They're sometimes not filing them when we tell them

12   we'll dismiss them.  There was further motions.  We give them

13   the dismissals or voluntary continuances.  But I have to speak

14   to these clients, and I've given them certain time limits.  And

15   I think I'll get another 85 --

16         THE COURT:  What kind of time limits have you given

17   them?  Because we can piggy-back off of your schedules.

18         MR. LONDON:  I think reporting to the Court at the

19   next status conference in 30 days on this next threshold issue,

20   this 216 cases, whatever it may be where there's been no proof

21   provided and no use -- no proof or no injury provided, I think

22   that's a doable time.  Ten days is really going to prejudicial

23   to us getting to these clients.  Fourteen days; those four days

24   isn't going to help.  This case has moved but --

25         MR. PENNOCK:  Judge, there's clearly some disagreement

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    on how fast certain things can happen.  Can we just take a few

2    days for us to, you know, come to a consensus on our side --

3              MS. FISHER:  Your Honor --

4              MR. PENNOCK:  -- may I just say, with an eye toward,

5    with an eye toward and the goal of, first of all, the 10 days

6    which I'm going to comply with, the dates that you're setting,

7    and hopefully literally by the middle of next week have some

8    agreement as to whether we can all meet those dates?

9              MS. FISHER:  Your Honor, with all due respect, I think

10   we need a deadline today.  We filed these motions in December,

11   March, April, June, and July.  They've had ample time to

12   respond.  In fact, they asked your Honor for a 60-day extension

13   of time to respond, which they took, and then still responded

14   at a 30,000 foot level.  We need a definite time for them to

15   individually advise whether these Plaintiffs should not be on

16   this dismissal list.

17             THE COURT:  Well, you know what, just to be fair to

18   everyone here, we did spend an awful lot of time on the

19   bellwether process which absorbed everyone's efforts, and it's

20   ongoing.  So this issue, we didn't actually hear from the

21   parties until this date as far as oral argument on it because

22   we've been focusing on other matters.  However, with respect to

23   this, I too want to put it to rest as quickly as possible.  I'd

24   like to be able to move forward on it, but I actually think

25   this argument was very helpful for both sides because now you

1    can see exactly what they're focusing on and they've broken

2    down the categories in a way that I think it's very easy to

3    respond to.  Not easy in terms of actually going and doing the

4    calculations as to what actually was filed, but easy in terms

5    of conceptualizing what the various issues are.  So I think

6    that that has been helpful in moving it forward.

7          With that moved forward at this point, I want this to

8    be a procedure that we can clamp down on everything but still

9    have it be something that's doable.  So now I'm asking you,

10   with the intent that the Court would like to dismiss those

11   cases for which nothing has been produced thus far, no proof of

12   use, no proof of injury, how much time do you legitimately

13   feel -- and I know there's a whole team out there -- that you

14   need to be able to do that?  I mean, I'd like to hear from you,

15   then I'm going to give you my suggestion.

16         MR. PENNOCK:  I believe that -- talking about just the

17   complete non-compliant plaintiffs?

18         THE COURT:  Yes, from the ones in the motions.

19         MR. PENNOCK:  For the ones that have given -- maybe

20   they've not complied with any proof of use certification?

21         THE COURT:  For example, you could start with the

22   first 386.  It's indicated on their chart, no proof of use, no

23   proof injury.  Someone can go through that.

24         MR. PENNOCK:  If they're my cases, I can have answers

25   on all of that in -- the Court wanted 10 days, so I'll get it

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    done in 10 days.  But I may be in a materially different

2    position than Mr. London is on his cases.  He may have a

3    different process.

4              THE COURT:  Mr. London, what is your suggestion?

5              MR. LONDON:  My suggestion would be 30 days.

6              THE COURT:  Very loud.

7              MR. LONDON:  Thirty days would be my suggestion, your

8    Honor.

9              THE COURT:  Why don't we do this, why don't you guys

10   give me a status report in 10 days.  I want to know who thus

11   far you can get off that list if there's anyone.  And I'm not

12   searching for people to get off, but if there is nothing that

13   has been provided on behalf of someone, I need that

14   information.

15             MR. PENNOCK:  Understood, Judge.  We've got it.

16             MR. LONDON:  I understand that, and I'm not trying to

17   be disruptive.  But I think everybody would prefer a dismissal,

18   voluntary discontinuance by the client, and that's what we are

19   aiming for.

20             THE COURT:  So how much time do you give your clients

21   to make that decision?  Because I'm trying to start with where

22   you're at, use it as a platform, and be able to follow through

23   with it.

24             MR. LONDON:  So, for example, anyone who has not

25   responded to that, by way of example, we would issue a letter

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    today:  Please be advised you better respond in 21 days; 14

2    days.

3              MS. FISHER:  No, no.

4              MR. HINDY:  This should have been going on.

5              MR. LONDON:  Excuse me.  And it is going on.  But now

6    the Court is suggesting, and you're hemming and hawing that

7    suddenly you need 10 days.

8              Your Honor, we'll get to this later.  We can't get an

9    AstraZeneca deposition scheduled quicker than 121 days.

10             MS. FISHER:  That's not relevant.

11             MR. LONDON:  These cases are Case Number 800 on an MDL

12   docket that will never see a trial.  So putting in perspective

13   the "elephant" which is getting an AZ deposition in 121 days --

14   Pfizer is worse -- or an extra 20 days to speak to a client

15   whether they will consent voluntarily to a dismissal, are we

16   really having this argument right now with counsel?

17             MS. FISHER:  Your Honor, we are --

18             MR. LONDON:  We extend every courtesy and request at

19   every moment.  When I ask counsel over there who is standing up

20   for a few extra days to provide a Plaintiff Fact Sheet that was

21   due under this Agreement on April 1st, the answer was "No."

22             Counsel, myself, came home from a family vacation

23   early to do this because the CMO-9 deficiency process wouldn't

24   apply to these cases.

25             So there's a lot at stake here.  And they're making a

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    mountain out of a molehill, your Honor.  Twenty days extra?
2    That's what this is about when we can't get an AstraZeneca
3    deposition quicker than 121 days.

4              MS. FISHER:  Your Honor, that is not --

5              MR. LONDON:  I apologize for getting sort of excited
6    over this, Judge, but this is getting borderline ridiculous
7    when we're talking 20 days.

8              MS. FISHER:  We're not talking 20 days, your Honor.
9    The Tolling Agreement deadline is not in the future, it's not
10   October 13th, it's not September.  It was February for Proof of
11   Use and Proof of Injury; it was April 1st for Plaintiff Fact
12   Sheets.

13             What we're asking for is an order that states these
14   individuals could show that they complied in the past and that
15   our motions were wrong, or there was some extraordinary,
16   compelling reason why they shouldn't be on the motion, not for
17   a letter to go out to Plaintiffs to say:  You have another 30
18   days to comply or you'll be dismissed.  That was not the
19   Tolling Agreement.

20             That's not what your clients signed on to.

21             MR. HINDY:  Judge, if you want to give them 30 days to
22   try to show what proofs they have, we have to set the deadline
23   of when those proofs were filed.  They have to be filed either
24   by the deadline or when we made the motion.  And if they
25   didn't, then they have to be out.

1          MR. PENNOCK:  That was not my understanding of what

2     was offered 25 minutes ago, and that's the problem with having

3     this discussion in open court.

4          THE COURT:  Let me ask this.  Would it be helpful to

5     go back and look at these additional categories together?

6          MR. PENNOCK:  I would love to sit down with Mr. Hindy

7     and Amy and go over all of this together, in person.  I would

8     welcome that.

9          THE COURT:  Is it possible --

10         MR. PENNOCK:  And furthermore, again, I am committed

11    to the shortest possible deadlines that we can come up with.

12         Mr. London is right, you have to give clients time for

13    them to consent to a voluntary dismissal.  But speaking for

14    myself, I certainly recognize that these clients have been

15    given time, and I intend to tell them, in my opinion, the Court

16    intends to dismiss your case.  And so we want to get to an end

17    of this quickly.  I would love to set a date right now and meet

18    with Mr. Hindy and Amy or to participate by phone and try

19    and --

20         THE COURT:  Can we do this --

21         MR. PENNOCK:  I can do it on Monday.

22         MS. FISHER:  Your Honor, with all due respect again,

23    you can see how thick this is.  The respective Defendants have

24    spent hundreds of thousands of dollars paying their counsel to

25    go through the documents that were produced or not produced in

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    conjunction with the Tolling Agreement deadline.

2            THE COURT:  I understand.  I certainly understand your

3    position, and I understand their position too, that they put a

4    lot of time and effort in trying to get medical records.  And

5    you know what, at this point we're dealing with the issue of to

6    what extent there is compliance.  So there's been money spent

7    on both sides.  But if it's down to me dismissing someone's

8    case, I want to have the full record before me and not just

9    guess on certain things.

10           MS. FISHER:  And that's fine.  If they want to go

11   through and tell us why they think their client shouldn't be on

12   the list.  But it's not helpful for us to have to go back and

13   look through this material again --

14           THE COURT:  I've already indicated they're going to be

15   looking through their materials.

16           This is what we're going to do:  Within 10 days you'll

17   meet and confer, and you'll each send me a letter limited to

18   three pages as to what the status is.  If you're able to

19   determine who you think is subject to dismissal by then you're

20   going to include it in the letter, but we're going to continue

21   this.  And then I'm going to read the letters and then I'll

22   contact you and set another schedule after I read them based

23   upon what I see.

24           MR. PENNOCK:  We'll do that right away, Judge.  Thank

25   you.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1           THE COURT:  Thank you.

2           And you folks can talk to one another about setting up

3      a time to meet and confer regarding this, then we'll take it

4      from there.

5           I think everyone understands what my interest is here.

6      My interest is to be fair to everyone, but at the same time I

7      need a little bit more information.  And I think it would be

8      helpful in terms of bringing those motions up to date.  Some of

9      them were filed in March, some of them were filed in April.  If

10     there's extra stuff that has been placed into those files,

11     maybe it is pertinent and I should be informed about it.

12          Okay.

13          MR. PENNOCK:  Thank you, your Honor.

14          THE COURT:  Thank you.

15          So let's do this.  Everyone has been sitting for a

16     while.  Why don't you take a 10-minute break.  We'll regroup.

17     I know folks have still been talking about bellwethers, so you

18     can do that for a little bit, and then when you're done with

19     that, why don't you come in and give me a heads-up.

20          MR. SEEGER:  Okay.

21          THE COURT:  Okay.  Thank you.

22          THE DEPUTY CLERK:  All rise.

23          (A recess is taken.)

24          (At 1:25 p.m., the proceedings on the record

25     conclude.)


WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ