1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
2                 Civil No. 2:17-md-02789-CCC-MF


3

IN RE PROTON-PUMP INHIBITOR    :  TRANSCRIPT OF PROCEEDINGS
4  PRODUCTS LIABILITY LITIGATION  :    - Status Conference -
   (No. II)                       :
5   - - - - - - - - - - - - - - - x


6


7                                      Newark, New Jersey
                                       February 20, 2020
8


9   B E F O R E:


10                  THE HONORABLE CLAIRE C. CECCHI,
                    UNITED STATES DISTRICT JUDGE
11


12

13  Pursuant to Section 753 Title 28 United States Code, the
    following transcript is certified to be an accurate record as
14  taken stenographically in the above entitled proceedings.


15
    S/WALTER J. PERELLI
16


17


18
    WALTER J. PERELLI, CCR, RM, CRR
19  Official Court Reporter
    U.S. District Court
20  Newark, New Jersey
    wjpccr1975@gmail.com
21


22


23


24


25

```
 1   A P P E A R A N C E S :

 2        ATTORNEYS FOR PLAINTIFFS:

 3        SEEGER WEISS LLP
          BY:  JEFFREY GRAND, ESQ.
 4
          DOUGLAS & LONDON, P.C.
 5        BY:  MICHAEL A. LONDON, ESQ.
               STEPHANIE O'CONNOR, ESQ.
 6             BRIAN J. PERKINS, ESQ.
               BESS DEVAUGHN, ESQ.
 7
          AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
 8        BY:  NATHAN C. BESS, ESQ.

 9        WEITZ & LUXENBERG, PC
          BY:  JONATHAN M. SEDGH, ESQ.
10
          NAPOLI SHKOLNIC, PLLC
11        BY:  SHAYNA E. SACKS, ESQ.

12        ANAPOL WEISS
          BY:  TRACY A. FINKEN, ESQ.
13
                    ATTORNEYS FOR DEFENDANTS:
14
          ARNOLD & PORTER KAYE SCHOLER LLP
15        BY:  ARTHUR E. BROWN, ESQ.
               MATTHEW J. DOUGLAS, ESQ.
16             - and -
          McCARTER & ENGLISH, LLP
17        BY:  GREGORY L. HINDY, ESQ.

18        ICE MILLER LLP
          BY:  AMY K. FISHER, ESQ.
19        Attorneys for Defendant AstraZeneca and Merck

20        FAEGRE DRINKER BIDDLE & REATH LLP
          BY:  ABIGAIL M. LUHN, ESQ.
21        Attorneys for Defendant Merck

22        REED SMITH LLP
          BY:  STEPHEN J. McCONNELL, ESQ.
23             JESSE J. ASH, ESQ.
          Attorneys for Defendants GSK and Novartis Consumer Health
24
          SILLS, CUMMIS & GROSS, PC
25        BY:  CHARLES J. FALLETTA, ESQ.
```

```
 1          Attorneys for Defendants Novartis Entities
            (Novartis Corporation, Novartis Pharmaceuticals
 2          Corporation; Novartis Vaccines and Diagnostics, Novartis
            Institute for Biomedical Research)
 3
            ULMER & BERNE LLP
 4          BY:  K.C. GREEN, ESQ.
                 GINA M. SAELINGER, ESQ.
 5          Attorneys for Defendant Procter & Gamble Entities

 6          DLA PIPER
            BY:  LOREN H. BROWN, ESQ.
 7               KATHERINE B. W. INSOGNA, ESQ.
                 MATTHEW A. HOLIAN, ESQ.
 8               STEPHEN C. MATTHEWS, ESQ.
            Attorneys for Pfizer and Wyeth
 9
            VENABLE LLP
10          BY:  CRAIG A. THOMPSON, ESQ.
                 - and -
11          TUCKER ELLIS LLP
            BY:  SHERRY A. KNUTSON, ESQ.
12               - and -
            SILLS, CUMMIS & GROSS, PC
13          BY:  BETH A. ROSE, ESQ.
                 - and -
14          ORRICK
            BY:  WENDY BUTLER CURTIS, ESQ.
15          Attorneys for Takeda

16          GREENBERG TRAURIG, LLP
            BY:  MARISSA BANEZ, ESQ.
17          Attorneys for Santuris and Salix

18     ALSO IN ATTENDANCE:

19          ELZUFON AUSTIN & MONDELL, P.A.
            BY:  JOHN A. ELZUFON, ESQ.
20          Special Master (Delaware)

21          MARIAM KOOHDARY, ESQ., Corporate Counsel, AstraZeneca

22          DANIEL HEALEY, ESQ., Senior Corporate Counsel, Pfizer

23          MARGARET E. IVES, ESQ., Corporate Counsel, Takeda

24          AKIN GUMP STRAUSS HAUER & FELD LLP
            BY:  SEAMUS C. DUFFY, ESQ.
25          Attorneys for Merck
```

 1                THE DEPUTY CLERK:  All rise.

 2                THE COURT:  Good afternoon, everyone.

 3                Have a seat while we try to see who we have on the

 4      conference call.

 5                (There is a pause while setting up the phone

 6      conference.)

 7                THE COURT:  Hello.

 8                (No response.)

 9                THE COURT:  I'm going to start while you're trying to

10      get them on.

11                THE DEPUTY CLERK:  They're on.

12                THE COURT:  Hello.  Anyone on the line?

13                No response.

14                We are here on In re Proton-Pump Inhibitor Products

15      Liability Litigation.

16                Let me get the appearances of counsel.

17                MS. O'CONNOR:  Good morning, your Honor.  Stephanie

18      O'Connor for the MDL Plaintiffs.

19                MR. GRAND:  Your Honor, Jeffrey Grand for the MDL

20      Plaintiffs.

21                MR. LONDON:  Michael London for the MDL Plaintiffs.

22                MS. FINKEN:  Tracy Finken for the MDL Plaintiffs.

23                MR. PERKINS:  Good morning, your Honor.  Brian Perkins

24      for the MDL Plaintiffs.

25                MR. SEDGH:  Good morning, your Honor.  Jonathan Sedgh

1    for the Plaintiffs.

2        MR. BESS:  Good morning, your Honor.  Nathan Bess for

3    the Plaintiffs.

4        MS. SACKS:  Good morning, your Honor.  Shayna Sacks

5    for the Plaintiffs.

6        THE COURT:  Thank you.

7        Let's turn to this side.

8        MR. BROWN:  Good morning, your Honor.  Arthur Brown

9    for AstraZeneca.

10       MR. HINDY:  Good morning, your Honor.  Greg Hindy from

11   McCarter & English for AstraZeneca.

12       MS. FISHER:  Good morning, your Honor.  Amy Fisher

13   from Ice Miller for AstraZeneca and Merck.

14       MR. DOUGLAS:  Good morning, your Honor.  Matt Douglas

15   for AstraZeneca.

16       MR. ASH:  Good morning, your Honor.  Jesse Ash for

17   GSK.

18       MR. McCONNELL:  Good morning, your Honor.  Steve

19   McConnell on behalf of Defendant GSK.

20       MR. GREEN:  I've had a rough start to the morning,

21   but good morning anyway.

22       K.C. Green for the Procter & Gamble Company and

23   Manufacturing.

24       THE COURT:  All right.  Thank you.

25       MR. L. BROWN:  Good morning, your Honor.  Loren Brown

1      for Pfizer.

2              MS. ROSE:  Good morning, your Honor.  Beth Rose for

3      Takeda and Abbott.

4              MS. KNUTSON:  Good morning, your Honor.  Sherry

5      Knutson for Takeda and Abbott.

6              MR. THOMPSON:  Good morning, your Honor.  Craig

7      Thompson for Takeda and Abbott.

8              THE COURT:  All right.  Anyone else?

9              MR. ELZUFON:  Good morning, your Honor.  John Elzufon,

10      Delaware Special Master.  It's always a pleasure to be here.

11              THE COURT:  Always a pleasure.  Thank you.

12              MS. SAELINGER:  Good morning, your Honor.

13              Gina Saelinger for Procter & Gamble.

14              THE COURT:  Anyone else we missed?

15              MS. BANEZ:  Good morning, your Honor.  Marissa Banez

16      for Santuris and Salix.

17              THE COURT:  Okay.

18              MR. FALLETTA:  Good morning, your Honor.  Charles

19      Falletta for Novartis.

20              THE COURT:  Anyone else?  No?  Okay.

21              Welcome, everybody.  I've spoken to you off line, and

22      we were discussing an Order to Show Cause regarding certain

23      Plaintiffs who have not yet produced materials in this case.

24      That's one of the issues we're going to talk about today.  I

25      recognize we have a status conference, there are a number of

1    issues on our list to address today pursuant to the agenda that
2    you sent in.  So we will try and get to those matters, but I
3    think at present we should probably deal with the issue of the
4    112 Plaintiffs that you folks have been discussing who have not
5    produced anything in this case yet.
6            So let me hear from both sides on that and we'll deal
7    with that issue first.
8            MS. FISHER:  Your Honor, Amy Fisher on behalf of
9    AstraZeneca and Merck.
10           As you noted, we talked back in chambers.  The parties
11    worked out a proposed Order to Show Cause which has been
12    emailed to chambers.  All parties have signed off on that and
13    we request that you enter it today on the record.
14           THE COURT:  Okay.  And let me hear from the Plaintiffs
15    on that.
16           MR. LONDON:  Your Honor, I believe that's accurate.
17           THE COURT:  Okay.  Now let me just discuss with
18    counsel one issue.  I have the document here, I printed it out.
19    It just says, "Any Plaintiffs who fail to respond within 10
20    days are automatically dismissed."
21           I will say, when you don't indicate what the dismissal
22    is, it's a dismissal without prejudice.  However, I deal with
23    the Clerk's Office, so I'm going to be more specific about this
24    and I'm going to put "Without Prejudice" on that sentence.  All
25    right?  And I think with that I'll sign it and put it on ECF.

1          Any issues before we move forward?

2          Okay?  Sounds good?  Thank you.

3          And thank you for working on that diligently and

4     getting that done here in the courtroom and presenting a

5     proposed form of order.  It's much appreciated.

6          So with that, let's turn to the next issues on the

7     agenda.

8          MS. FISHER:  Your Honor, if I may, one more issue on

9     tolling.

10          THE COURT:  Yes.

11          MS. FISHER:  So, I have a proposed withdrawal of

12     Defendants' motion to dismiss with respect to the two

13     Plaintiffs that claim to not be tolling Plaintiffs.

14          THE COURT:  Yes.

15          MS. FISHER:  Without waiving any arguments as to any

16     other Plaintiffs as we don't necessarily agree with that

17     description, we have agreed to dismiss those two and I would

18     like to hand that Order up.

19          THE COURT:  Excellent.  Thank you very much.

20          MS. O'CONNOR:  No objection.

21          MS. FISHER:  Plaintiffs have copies.

22          THE COURT:  Thank you.

23          MR. BROWN:  Your Honor, the only other thing I wanted

24     to add was, in the back we also discussed beyond the 112 what

25     we could do to sort of focus us.  I think I was accused of

1    having a great idea.

2         THE COURT:  You had a perfect idea I indicated.

3         MR. BROWN:  And this was to help the Court look at and

4    discuss at the next conference, which I think is April 2nd, the

5    other buckets of tolled Plaintiffs so we can begin to decide

6    how we're going the deal with those cases.

7         THE COURT:  I think absolutely.  And that's basically

8    the request of the Court at this point is, if you could take a

9    look at some of the issues that are arising in those other

10   cases, whether it's a plaintiff who submitted materials that

11   are late, or submitted them just beyond the date they were

12   supposed to be submitted, or failed to provide proof-of-use or

13   proof-of-injury, just characterize them so then I can have

14   something in front of me that I can actually rule on.  That

15   would be helpful.

16        MR. BROWN:  Thank you, your Honor.

17        THE COURT:  And there may be other categories.  You'll

18   have to take a look at them and determine.

19        And to the extent there are any issues on them, I

20   would expect whoever is dealing with them from the Plaintiffs'

21   team and from the Defendants' team, if you could also have a

22   meet-and-confer on though issues as you're developing those

23   lists, that would be very helpful.  All right.

24        The next issue.  Where are we at in terms of the

25   bellwether-eligible case review process?  Is everything moving

1      forward accordingly?  I know there was a little bit of a hiccup

2      with respect to documents and the Marker Group, and that's also

3      on the agenda.  Where are we at in terms of that?

4                MR. LONDON:  Your Honor, Michael London here.

5                I think a quick report.  Yes, there was that hiccup,

6      and I think Mr. Grand will address that hiccup later in the

7      agenda and the days that were lost.  But basically, as the

8      Court knows, the cases were whittled down to 873 that were

9      Stage 1-eligible.  Perhaps there were others, but that's the

10     list that we landed on.  From there we went down to 200 random

11     with ten more cases added; five selected by Defense five

12     selected by Plaintiffs.

13               I think we're going through our assessment of those

14     cases to select 16 by March 5th.  The Defendants are going

15     through their process to select their 16 by March 5th.  What we

16     are seeing -- and I'm sure Defendants are too, and we'll see

17     more of it -- is unfortunately, random is not necessarily

18     always representative.  I think we've obviously briefed this

19     ad nauseam, and I think judges that have done random at some

20     point have never gone back to it, as they stated.  But we are

21     seeing some statistical challenges that don't necessarily show

22     representativeness.  It is what it is.  But we're still early

23     on in the process, and I believe we're on target to meet our

24     March 5th date.  And then following that, each side will strike

25     six cases on March 24th, leaving us the final 20 to start core

1    discovery probably March 25th -- not probably, I guess possibly

2    the evening of March 24th, but realistically March 25th.

3            THE COURT:  All right.  So you're moving forward on

4    that issue then.

5            Anything from the Defendants?

6            MR. BROWN:  No, your Honor.  We're going to meet the

7    deadline of selection by March 5th and strikes by March 24th,

8    and the Defendants don't anticipate any issues or problems.

9            THE COURT:  Great.  Perfect.

10           And I know there was some issue with respect to costs

11   in the letter regarding Marker Group, and it looks like you're

12   going to move forward and then potentially hopefully you can

13   work that out as you move forward on it.

14           I know you said perhaps the Court would weigh in on

15   that but maybe there is some avenue for an amicable resolution

16   on that issue.

17           MR. GRAND:  Well, your Honor, just so maybe I can be

18   heard on the issue because, frankly, there were some

19   misrepresentations made about that in the letter that was

20   submitted to the Court by Defendants.

21           First off, while we did stand here on November 15th

22   and say that we had an agreement in principle, what we were

23   discussing at that time period was very different than what was

24   ultimately proposed to us.  First off, at that time, if you

25   recall, there were 1200 cases on the list, and we had requested

1     that Defendants provide us with whatever records they had so we

2     could evaluate those 1200 cases, start looking at them prior to

3     randomization.

4            It took some time before we received a proposal.  And

5     during that time period individual firms were sending us their

6     records, then the Court randomized the cases and we were down

7     to 210, at which point we no longer needed -- the PSC no longer

8     needed to get the records from the Defendants.

9            We never had an agreement to the Order that they

10    attached to their letter.  We had discussed some cost sharing

11    in reference to that original group of, I think it was about

12    950 cases, but what we discovered and what Mr. Camp told me in

13    our subsequent negotiations is what's really happening here is

14    that Defendants made a terrible deal with Marker.  They are

15    paying vastly more for record collection than any Plaintiff's

16    firm would ever pay, and what they're trying to do is they're

17    trying to pass their costs on to us.  And, frankly, when we

18    told them we don't need to get the records through Marker, we

19    don't need to get the records through you, Marker provides us

20    with copies of records for $45 per provider, and that incensed

21    them so much they shut down our access to the records for

22    almost seven days.

23           Now, we're not complaining.  We're going to meet our

24    deadline, but it was outrageous.  And so what we have agreed to

25    do is with respect to the 210 cases, we are going to sort of

1    kick the can of cost sharing down the road.  Defendants may

2    elect to make a motion with respect to those 210 cases, and I

3    think we would be opposing it depending on whatever they're

4    proposing.

5              THE COURT:  Okay.

6              MR. GRAND:  But I just wanted to make it clear that we

7    never had an agreement on the actual order that had been sent

8    around.

9              THE COURT:  Thank you.

10             MS. FISHER:  Your Honor, Amy Fisher on behalf of

11   AstraZeneca and Merck.

12             I take issue with that.  We did have an agreement.  We

13   talked in court.  We noted to the Court that we had an

14   agreement in principle, it just had not been reduced to

15   writing.

16             The parties had agreed that Plaintiffs were to share

17   in 50 percent of Defendants' actual cost.  We had a CMO that

18   was negotiated.  Plaintiffs made a few changes; we made some

19   changes.  The final process of that was Mr. Grand set some

20   final changes which we agreed to, and then a couple of weeks

21   went by and we didn't hear anything, and in the meantime they

22   were getting records directly from Marker Group at $45 a set

23   when, in fact, the Defendants are paying roughly $161 a set.

24             So when we learned that, and that was without our

25   authorization to Marker Group --

1          THE COURT:  I'm sorry.  If each side could weigh in.
2     How much is at issue here total?
3          MS. FISHER:  We don't know that yet, which is why we
4     proposed we put a pin in this argument.
5          THE COURT:  I think that makes sense.
6          MS. FISHER:  I did want to clarify they had agreed to
7     pay 50 percent.  Their obtaining records from Marker Group was
8     done without the Defendants' authorization.  We never blocked
9     their access.  We simply said, you can get the records, but you
10    have to pay the 50 percent of the cost that you agreed to,
11    which would be roughly $80.55 a set.
12          They said no.
13          So that their access would not be interrupted any
14    further we agreed to go ahead and let Marker Group continue to
15    charge them $45 a set with the express agreement that --
16          THE COURT:  When you say -- I know we're going to do
17    this at a later date -- but when you say "per set," does that
18    mean per plaintiff or per provider?
19          MS. FISHER:  Per provider.
20          THE COURT:  Per provider, yes.
21          MS. FISHER:  So our cost is $160 per provider.  50
22    percent of that would be $80.55. Marker Group is charging them
23    $45, which we were not aware of until just recently, so we
24    agreed to table that, but with the understanding that we will
25    be becoming back to seek those costs.

1           THE COURT:  Okay.

2           MR. GRAND:  Your Honor, that is extremely misleading.

3    First off, Plaintiffs have been getting records from Marker

4    Group since the PFS Order was entered.  Defendants have known

5    that.  We actually -- Marker helped them generate deficiencies

6    for the PFS.  We provide authorizations for it.  So that is the

7    deal that individual Plaintiffs have made with Marker.  Marker

8    does that in every single litigation.  So for the Defense to

9    say that they didn't know that we were --

10          THE COURT:  And I know we're going to do this at a

11   later date and we have other things on the agenda so I'm going

12   to move us forward in a second, but what did the Plaintiffs

13   believe they were entering into as an agreement in principle?

14   And you thought you were already getting the records.  What did

15   you think you were entering into?

16          MS. FISHER:  Right.

17          MR. GRAND:  We thought we were going to be getting a

18   download of records directly.  This was for the PSC to get

19   access to the records, if you recall.  Individual Plaintiffs'

20   firms have always been able to have access to the records.  We

21   thought the PSC would be able to get access because we thought

22   that was the fastest way to get records so we can evaluate

23   these cases.  But individual firms, including my own, have

24   always been able to go to Marker and get copies of records for

25   their own clients.

1          THE COURT:  So you're getting a double set then.  Each
2     individual lawyer was getting their own client's materials and
3     then the PSC was intending to get an additional set as --
4          MR. GRAND:  We were going to get our own set so we
5     could do the valuations very quickly.
6          THE COURT:  And that was to be done electronically, or
7     do they actually send you the paper files?
8          MR GRAND:  Whatever was needed to be done.
9          THE COURT:  No.  What was the intention at that time?
10         MR. GRAND:  We were expecting, frankly, that we would
11    just get, frankly, like a drive sent to us.  Now what they
12    ended up proposing to us was the creation of the special portal
13    that we would have to pay administrative fees, and then we
14    would pay for copy fees on top of that.
15         Now, when they're saying it's $88, that's their cost,
16    that's patently false.  They're paying a flat rate collectively
17    of a thousand dollars per Plaintiff, regardless of the --
18         MS. FISHER:  No.
19         MR. GRAND:  -- number of providers that there are and
20    regardless of what records there are.  It has never been
21    explained to us how they came in with there number of $88 and
22    we're paying 45.
23         THE COURT:  Okay.  I'm going to draw this to a close
24    very quickly because we're going to move on to the next issue
25    because we're going to wait to see what happens with this, but

1    get the last word.  Go ahead.

2            MS. FISHER:  Yeah.  So the bottom line is, they agreed

3    to pay 50 percent of the cost.  Then they realized the Marker

4    Group was charging them $45 per provider without Defendants'

5    knowledge of that, and so they walked away from the proposed

6    CMO in order to do it this other way.

7            We can talk about the cost later, your Honor.  They

8    have access to the records.  They're getting them, everyone

9    will be able to meet their deadline and we'll bring this up to

10   you at a later time.

11           THE COURT:  Sounds good.  Thank you.

12           MR. GRAND:  Thank you, your Honor.

13           THE COURT:  So then the next issue is you have some

14   discovery matters.  There's a motion to quash a non-party

15   discovery request which is pending.  I understand that, so I

16   will be dealing with it.

17           Anything on that before I move forward on the agenda?

18           No?  Okay.

19           And then there is -- is there something on that last

20   issue?  There's an open motion to quash the non-party discovery

21   request.

22           Did you want to say anything on that?

23           MS. FINKEN:  Your Honor, yes.  So we're prepared to

24   talk about that today if you would like, but there's a motion

25   for a Protective Order that has been filed by that business as

1    well that's pending, and I don't think that the lawyer for Lucy

2    Business Services is here today to discuss it.

3              THE COURT:  Okay.  And was that person intending to be

4    present when it was discussed?

5              MS. FINKEN:  I would think so.

6              THE COURT:  So we can hold on that issue then.

7              MS. FINKEN:  Will we be able to set a date for oral

8    argument?

9              THE COURT:  We can discuss it during the next

10   conference if you would like to do that.

11             MR. THOMPSON:  That's fine, your Honor.

12             Ms. Finken and I talked about this and we were curious

13   as to whether counsel for Lucy Business would be present to

14   argue today.

15             THE COURT:  And I'm not certain.  I mean, I'm fine

16   going either way, it depends on whether they need to be

17   present.  They do have an application.  Right?  I would think

18   they probably would want to be heard or at least be given the

19   opportunity to weigh in.

20             MS. FINKEN:  They have a pending motion.  It's their

21   records that are being requested, so I would think --

22             THE COURT:  Let's hold on that issue then.  Is that

23   okay?

24             MR. THOMPSON:  That's fine, your Honor.

25             THE COURT:  Okay.

1          MS. O'CONNOR:  What we can do then is notify them that
2     they can expect oral argument on April 2nd.
3          THE COURT:  Exactly.  So if they would like to be
4     heard, they can come that day.
5          MS. FINKEN:  Thank you.
6          THE COURT:  Let's see.
7          Then there's a proposed Case Management Order.  This
8     is again discussing Plaintiffs who failed to provide fact
9     sheets.  Anything on that issue?
10          MS. FISHER:  Yes, your Honor.  So, obviously we've
11     been talking about this for a number of years.  At the November
12     or December status conference you ordered that the parties meet
13     and confer on a cleanup CMO.  Defendants talked about it and
14     thought it would be easiest for the Court and for Plaintiffs
15     and for everyone to break that into two different CMOs:  One
16     dealing just with the Plaintiffs who have missed the PFS
17     deadline and have still not produced the PFS --
18          THE COURT:  And these are all the non tolling
19     Plaintiffs.  Correct?
20          MS. FISHER:  Correct.  And saving the Stage 2
21     Plaintiffs for later.
22          So we prepared a short, simple, straightforward CMO
23     that deals with the Plaintiffs who have not produced a PFS in
24     this litigation despite the deadline.  There are a little over
25     600 Plaintiffs who are overdue with their production of the

1    PFS; roughly 150 who have been due for over a year; we have 79

2    motions to compel that are fully briefed, some of which have

3    been pending for almost two years, and that process really

4    isn't working under CMO 9.  So Defendants submit that this

5    proposed CMO which is extremely straightforward gives the

6    Plaintiffs another chance, another notice that their PFS is

7    overdue.  They'll have a certain period of time to comply, and

8    if they don't, then their case would be dismissed.

9             THE COURT:  Okay.  Thank you.

10            Yes.

11            MR. GRAND:  Thank you, your Honor.

12            As the Court's aware, this proposed cleanup order has

13   been on the agenda since I think the summer of last year, and

14   every conference we came in and we said we're happy to talk to

15   them, please send us the order.

16            They sent us the order a week ago and haven't talked

17   to us about it.  They wanted to do a meet-and-confer.  That

18   wouldn't work with Mr. Katz's schedule, our designee, to

19   address the issue.  But we are a little puzzled by their

20   decision to sort of break it into different stages because --

21            THE COURT:  Do you want to do this:  You're here

22   today, maybe you can talk about it after the conference.

23            MR. GRAND:  Part of the problem, your Honor, is that I

24   don't know who's implicated by it, I don't know what individual

25   law firms are implicated by it.  They haven't told us who the

1    actual Plaintiffs are.  And given that we're talking about

2    dismissal of their cases, we would like to know that and be

3    able to consult with the other law firms.

4              THE COURT:  Okay.  So who exactly is on the

5    Plaintiffs' team that has to be present to talk about this?

6              MR. GRAND:  Seth Katz.

7              THE COURT:  That's it?

8              MR. GRAND:  Yeah.

9              MS. FISHER:  Your Honor, we sent them the proposed

10    Order -- it's not even three papers, double-spaced -- a week

11    ago yesterday.  We split it into two to actually make it

12    easier.  And I see multiple lawyers over there.  I don't know

13    why Mr. Katz is the only one that can talk about this.  He

14    doesn't even have any Plaintiffs who are on the PFS CMO.  At

15    any rate, we're happy to provide them with the list, but we

16    would think that they would know which of the Plaintiffs have

17    not submitted Plaintiff Fact Sheets.  Regardless, it doesn't

18    really matter who has and who hasn't.  The fact is, there are

19    some that haven't.

20              THE COURT:  You know what, with the intent of moving

21    this along, if you have the list and can share it and you

22    can -- can you get a date and time where you can talk to one

23    another?  It sounds like it's just Mr. Katz.  Is there anyone

24    else who is dealing with the issue?

25              MR. GRAND:  He can certainly confer with them, but we

1    will need to speak to the individual Plaintiffs.

2         THE COURT:  I understand.  You're saying they sent it

3    last week.  Has anything been done with it since then?

4         MS. FISHER:  He did not respond to our request to meet

5    and confer.

6         MR. GRAND:  You proposed a date.  Mr. Katz said he

7    couldn't make that and actually asked that we not put it on the

8    agenda this week because he wanted a chance to review.  We

9    wanted an opportunity to do what we were asking to do --

10        MS. FISHER:  We can take a break right now and review

11   it with them if they want to talk about it.

12        MR. GRAND:  I don't know who the Plaintiffs are and

13   what their individual circumstances are.  And, frankly, I don't

14   know if they've done, quite frankly, what was required under

15   CMO 9.

16        THE COURT:  You can talk about this afterwards and you

17   can send in an update.  And if you have a new proposed Case

18   Management Order or you're good with the one that was sent in,

19   you can send that in again.

20        What exactly are you looking for so we can start

21   moving this forward right now?  So you're looking for the names

22   of the Plaintiffs?

23        MR. GRAND:  I would like to know the names of the

24   Plaintiffs.  We would like the opportunity to speak with their

25   counsel because, frankly, we already have a PFS Order that

1    addresses what to do when you don't file -- when you don't

2    submit a fact sheet.  And I don't know that they've even

3    complied with that.  There's --

4         MS. FISHER:  We have, your Honor.  For all 600

5    Plaintiffs who have not produced a Plaintiff Fact Sheet, we've

6    sent the Notice of Noncompliance.  After that -- these are all

7    Plaintiffs who asked for an extension -- we gave them

8    extensions so, that's 120 days; we then sent a Notice of

9    Noncompliance which is 21 days; we then sent an offer to meet

10   and confer, which is 14 days; and then we filed motions to

11   compel.  Seventy-nine of those are fully briefed.  So the

12   process is not working which is why we need a straightforward

13   process.

14        THE COURT:  Okay.  So why don't do you this:  You're

15   going to actually after this coordinate a time for you to speak

16   with Mr. Katz and go through this, give him whatever

17   information can move him along, and let's see if we can draw

18   this to a head.

19        MS. FISHER:  Could we ask for a call with the Court in

20   14 days?

21        THE COURT:  You know what, why don't we do this.  In

22   14 days why don't you provide a status to the Court as to where

23   you're at because I will be on trial.

24        MS. FISHER:  Thank you.

25        THE COURT:  Thank you.  So you can either call, both

1    sides can call, or you could have one point person call and

2    give a little update, or if you want to write a short letter,

3    that's fine too, however you want to handle it.  But I would

4    like to know where you're at in 14 days.

5              MS. FISHER:  Thank you, your Honor.

6              THE COURT:  Thank you.

7              Okay.  The next issue.  This is on the Plaintiffs'

8    side:  Open motions to challenge privilege claims.

9              Anything on that other than the fact that it's

10   pending?

11             Go ahead.

12             MR. GRAND:  Yeah, your Honor, it's just that we wanted

13   to -- it is pending and, you know, I think the Court had

14   previously indicated you would rule on the papers.  We're happy

15   to do oral argument if you want to set a date for that if it

16   will help the Court.

17             THE COURT:  Is it okay if I rule on the papers?  Does

18   anyone really need to be heard?

19             MR. DOUGLAS:  It's fine with the Defendants if you

20   rule on the papers.

21             THE COURT:  Anything?

22             MS. O'CONNOR:  If I could just say one thing about

23   that?

24             THE COURT:  Yes.

25             MS. O'CONNOR:  One of the motions involved a witness

1    by the name of Svante Joelson.  He's a witness based in Sweden.

2    We do have a trip planned to Sweden in April to go there and

3    take some depositions, and depending upon the Court's ruling,

4    we would like to potentially group that deposition if the Court

5    so orders --

6              THE COURT:  Understood --

7              MS. O'CONNOR:  -- at that time.

8              THE COURT:  I'll take a look at that.  If I need oral

9    argument on this, I'll let you know.  Maybe we can do something

10   over the phone if we need something quick.

11             MR. DOUGLAS:  Thank you, your Honor.

12             MR. GRAND:  Thank you.

13             THE COURT:  The next is updates on discovery.  So who

14   would like to provide on each side?  There's a list of items:

15   Deposition scheduling; SAS production; clinical and preclinical

16   trial information; and the Plaintiffs' third request for a

17   production of documents.  Where are we at?

18             MS. O'CONNOR:  Your Honor, I probably will be

19   addressing the bulk of those.  If we start with depositions, I

20   think I have to hearken back to an earlier conference where now

21   I'm appearing in a sequel to an Ingmar Bergman film regarding

22   the issues that the PSC has been dealing with and the

23   frustrations that we've been experiencing with regard to

24   scheduling depositions.

25             It has taken us -- and I do have a slide if the Court

1    wishes to see it, and I can share it with counsel -- an average

2    of 138 days to do depositions.  The slide that I have -- if I

3    can hand it up to the Court?

4              THE COURT:  Sure.

5              MS. O'CONNOR:  This is actually, Judge, to provide the

6    Court more with a historical --

7              THE COURT:  Did you give a copy to the Defendants?

8              MR. BROWN:  We just received one for the first time

9    just now.

10             THE COURT:  Okay.

11             MS. O'CONNOR:  The purpose of it is not to go over old

12   history, this is depositions, Judge.  There's 20 of them on the

13   list that have been conducted, not all have been completed,

14   including the deposition of Ms. Hellgren.

15             The point being is that this historically has been our

16   experience from the time that we notice a deposition, which is

17   the first date that you see, to the date that the witness is

18   produced, which is the second date that you see at the end.

19   And the reason I'm bringing this up today is not to complain

20   about old history but to let the Court know that we are

21   concerned about going forward.

22             For example, in early January this year we noticed

23   several depositions.  Putting aside the Sweden-based witnesses

24   that are subject to the Hague, that's a whole different

25   situation, we strove --

1          THE COURT:  How is that going?

2          MS. O'CONNOR:  We're waiting.

3          THE COURT:  Okay.

4          MS. O'CONNOR:  They had a Swedish version of my Ingmar

5    Bergman film.  Really, all kidding aside, my local counsel

6    tells me that Judge Alsin, who your Honor kindly responded to

7    some time ago --

8          THE COURT:  Yes.

9          MS. O'CONNOR:  -- is working on what I think was

10   termed her "decision," so we really don't know what she's going

11   to do with that.  But we are talking about a total of eight

12   witnesses who were subject to the Hague, seven of which are

13   before Judge Alsin in the District Court of Gothenburg.  So

14   obviously this is very important to us, and we're unable to do

15   very much at the moment in that regard.

16          But again, with an eye towards trying to group

17   depositions in a common sense way, we recently submitted, or,

18   rather, served three notices on counsel for AstraZeneca,

19   noticing three witnesses whom we, I believe, have confirmed are

20   current employees of AstraZeneca in Sweden.  And I have asked

21   counsel to see if we can group those depositions, if possible,

22   with the April trip.  There's been another witness, a single

23   witness offered for May 29th, and I've indicated if we could at

24   least group witnesses that can't be produced in April and

25   possibly even by then we'll have some feedback from the Court

1    in Sweden.

2         But the issue remains, even with U.S.-based employees,

3    in early January -- January 7th, to be exact -- we noticed the

4    deposition of a U.S.-based former employee.  We didn't hear

5    until about a month later that she could be produced some time

6    in March, and then we were told that she can't be produced

7    until I think almost the end of April.

8         I had already assigned out that deposition.  I had an

9    attorney working on that particular deposition.  And this of

10   course was very disappointing, and I have echoed those

11   sentiments to counsel on a number of occasions.

12        Another example is, on January 10th, we noticed the

13   deposition of a current employee of AstraZeneca.  Approximately

14   one month later -- actually we noticed it for a specific date.

15   And then about one month later we were told that he could be

16   produced in March, and now the latest is the witness can be

17   produced some time in April, which is extraordinarily

18   inconvenient --

19        THE COURT:  Okay.  Let me dive in here.  So it sounds

20   like you're looking for a more efficient process for moving

21   these depositions forward so they can be grouped at least by

22   location.

23        MS. O'CONNOR:  Correct

24        THE COURT:  And even if you have a second grouping,

25   that's fine, but at least you have some of them going at the

1    same time and at the same spot.

2          MS. O'CONNOR:  And if I may, your Honor, I don't mean

3    to cut you off --

4          THE COURT:  Yes.

5          MS. O'CONNOR:  -- but we have a proposal, and what

6    we've been doing in the most recent round of deposition notices

7    that were sent out for whom I believe are current or at least

8    U.S.-based employees, both current and former, is that we're

9    noticing for what we consider to be real dates; dates that are

10   within 30 to 45 days of the date of the notice and asking that

11   the Defendants, if they cannot produce the witness on that

12   particular day, that the Defendant be required to produce the

13   witness within some 15-day period thereof.  Otherwise --

14         THE COURT:  Have you given that to the Defendant?

15         MS. O'CONNOR:  I have not.  It's something we talked

16   about this morning.

17         THE COURT:  Okay.  So maybe you can do that.  They can

18   take a look, they can call their witnesses.  But obviously we

19   are all interested in moving this forward.  I'm sure they are

20   too.

21         MR. DOUGLAS:  Your Honor, if I could just provide some

22   information.  We are interested in moving this forward, and we

23   are working hard on this.  Just for context, there have been 28

24   AstraZeneca depositions completed in this litigation, including

25   the six -- the 30(b)(6) notices.  There are 27 pending notices

1      now, 11 of which came in in the last week; 17 since the last

2      conference; eight of which came in yesterday.  We are working

3      on this, but it's a lot.  A lot of these are former employees

4      who we do not control.  They have full-time jobs.  As to the

5      three Sweden witnesses that came in in the last week, one of

6      them I've actually confirmed is not a current employee, but the

7      two that are, I do believe that I'm pretty close to confirming

8      an April date that would match for one of them --

9                  THE COURT:  Good.

10                  MR. DOUGLAS:  -- and a May date that would match with

11      the other Sweden trip.

12                  THE COURT:  That sounds good.

13                  MR. DOUGLAS:  So we're working hard on this.  And we

14      have, like I said, 27 pending notices.  That's a lot.  But the

15      deadline is September 15th.  We're getting them dates.  We're

16      working as best we can, some of which involves witnesses that

17      we don't control because they are former -- some of them are

18      former employees located in foreign countries where they have

19      certain rights.  That's why we have it pending in front of the

20      Court in Gothenburg.  So we're doing our best.

21                  THE COURT:  I'm satisfied that you understand the

22      importance of moving this forward and I'm satisfied that you

23      understand the importance of trying to group it.  So I think

24      really at this point in time, if you have any particular deps

25      that haven't been scheduled and you want to have something

1    concrete scheduled as to them, you can communicate and see what

2    you can get in terms of deps.  I heard what you said; some of

3    them you have control over, some of them you do not have

4    control over.  Correct?

5              MR. DOUGLAS:  Correct.

6              MR. GRAND:  Your Honor, look, I just want to add that

7    these Defendants begged and insisted on the discovery cutoff in

8    September, and we are running out of time.  We cannot have

9    "business as usual."  They've been telling us all along they're

10   doing their best, but they can't seem to get us a witness in

11   less than four months.

12             MR. BROWN:  Your Honor, I want to add something.  I

13   sat here unsuccessfully three times to argue for an earlier

14   cutoff in generic discovery, and the Plaintiffs said no, and

15   the Court ultimately agreed when we had the grand deal on the

16   schedule.  That deadline is September.  There's a soft cap here

17   of 55 witnesses.  Including the Hague witnesses, there are now

18   52 on the board.  Right?  We are offering dates in April and

19   May.  We are six months away from that generic discovery

20   schedule.  We are -- and I've committed to this Court to group

21   these depositions together in ways that make sense.

22             THE COURT:  I understand.  And that's all we can ask

23   for.

24             MR. BROWN:  These people have full-time jobs.  Many of

25   them don't work for us anymore.  These pose some challenges

 1    and so we do our level bet.  And we are six months away from
 2    that generic discovery deadline and we have 52 witnesses to
 3    deal with.
 4            THE COURT:  Why don't we do this.  When do you think
 5    you might be able to get dates for all the individuals they're
 6    seeking to depose?  How long is that going to take?
 7            MR. BROWN:  I sent out eight dep notices yesterday.
 8    I'm not sure --
 9            THE COURT:  I get it.  I'm just asking:  How long does
10    that generally take to assign dates to these various deps?
11            MR. BROWN:  It varies by witnesses.
12            THE COURT:  So can I get you folks on a schedule then?
13            MR. BROWN:  To give dates?
14            THE COURT:  To give dates.
15            MR. BROWN:  There will be different cutoffs for the
16    people who don't work for us anymore.
17            THE COURT:  I don't know.  Just in general, what do
18    you think?
19            MR. BROWN:  I think by the next conference we could
20    have dates for all the witnesses.
21            THE COURT:  Can you do it within two weeks?
22            MR. GRAND:  Fourteen days.
23            MR. BROWN:  I can't do it within two weeks.
24            THE COURT:  Can you do it with the ones you have
25    control over within 14 days?  I don't mean take the

1   depositions, I mean give them the dates.

2          MR. BROWN:  I'll tell you what:  We've agreed for a

3   status call for some open issues.  We can give you a status

4   report of where we're at in two weeks.

5          THE COURT:  In terms of the people you have control

6   over though, you can't get dates within 14 days?

7          MR. BROWN:  Well, it depends on their schedules.

8   Right?  So some of these people have full-time jobs, projects.

9   So litigation is not their full-time job.

10         THE COURT:  You can contact them and get some

11  available dates.  I don't mean actually take the depositions

12  within 14 days, I mean provide a date in the future for a

13  deposition.

14         MR. BROWN:  Your Honor, I'm struggling to understand

15  how in 14 days I need to line up depositions that --

16         THE COURT:  How many people?

17         MR. BROWN:  There are 17 outstanding now --

18         THE COURT:  Okay.

19         MR. BROWN:  -- of which we offered a handful of dates.

20         THE COURT:  So the 17 which you feel you have control

21  over, and how many --

22         MR. BROWN:  Not all of those 17 still work for us.

23         THE COURT:  Okay.  Why don't do you this --

24         MR. BROWN:  But I -- I can give a status report in

25  take weeks.

 1          THE COURT:  Give the status report in two weeks
 2    knowing that I really want to push this forward.  And I
 3    understand it's a difficult thing; you need people to respond.
 4    But 14 days sounds like a decent amount of time to be able
 5    to --
 6          MR. BROWN:  If we want to advance the cutoff for
 7    generic discovery, something I advocated for, so we could
 8    produce all these witnesses by June or July, then I will
 9    consider that.  But if we're going to keep the generic
10    discovery deadline to September, we have other things to do.
11          THE COURT:  At this point I'm going to leave all the
12    discovery deadlines that everyone worked very hard to put
13    together in place.  But I just want to move these depositions
14    forward.  And I'm sure you understand they need to move these
15    forward as well.  And some witnesses may be a little bit more
16    difficult than others.  The grand bulk of these witnesses
17    should have dates within two weeks.  I don't see any reason why
18    that shouldn't be.
19          So you can provide a status.  And, by the way, as I'm
20    going through this, if someone wants to be the scribe for
21    sending in a proposed form of order, that --
22          MR. GRAND:  I'll take care of it, your Honor.
23          THE COURT:  Good.  Thank you.
24          Okay.  What is the next discovery issue?
25          MR. GRAND:  The next two issues were AstraZeneca's

1    continuing status production and their response for the

2    clinical and preclinical trial information.  I conferred with

3    Mr. Douglas prior to the conference and --

4              THE COURT:  Good.

5              MR. GRAND:  -- we're satisfied at this point that we

6    can take both of those issues off the table.

7              THE COURT:  Excellent.

8              MR. GRAND:  I do want to state that AstraZeneca did

9    provide us with the -- if you recall, your Honor, we had wanted

10   interrogatory responses with information about the clinical

11   trials and whether they've been provided to the FDA.  They have

12   provided -- we negotiated an hour list of questions.  I think

13   we got it down to four questions which they did provide to us

14   for both their clinical and preclinical.  Our intention is,

15   we're going to serve the same discovery on the remaining

16   Defendants who have conducted clinical and preclinical trials

17   because we're going to need that information from all

18   Defendants.

19             THE COURT:  Okay.

20             MR. DOUGLAS:  Your Honor, I would just add that there

21   were over 1900 studies we're talking about going back decades.

22   It was a tremendous effort.  We did listen to your Honor and

23   take your guidance, work with the Plaintiffs to negotiate

24   something.  We provided something to them last week.  It's an

25   extensive amount of information, and there are still a few

1   things we're investigating on that, and so we will probably

2   supplement that before the next conference.  But it is an

3   example of where we worked together and worked hard and got

4   them what they wanted.

5          THE COURT:  That is a very good report.  I do

6   appreciate it.  Thank you very much.  Thank you.

7          All right.  The next issue, PSC's third request for

8   production of documents.

9          MS. O'CONNOR:  Your Honor, that will be me.

10          The third request for production of documents is

11  actually a production of things, and the "things" that we're

12  looking for is basically three questions:  One has to do with

13  tissue slides from the animal studies, or what's known as the

14  nonclinical/preclinical studies; the second question is for the

15  actual histopathology slides that may have been stained and are

16  typically preserved; and the third question is seeking color

17  photographs or color plates that are sometimes taken under

18  microscopic review.  We have an expert -- experts ready,

19  willing and able to review slides, and that is primarily the

20  thrust of what we're looking for.

21          Just by way of background, your Honor, hundreds of

22  nonclinical studies have been done between the various

23  Defendants, Takeda, AstraZeneca, and we believe in some regard,

24  Wyeth.  So what we're trying to do is get slides from studies

25  that we have targeted that we believe are key issues -- will

1    have key issues about the claims by the companies that all is

2    well with the animal studies and there is no sign of any renal

3    disease.  We've limited our request to the renal

4    histopathology, and we think they're reasonable requests.  I

5    think about 40 for each of the Defendants, something like 40

6    out of the hundreds that were done, again based on our

7    consultation with our experts.

8         I have been in discussion with Takeda's counsel, with

9    AstraZeneca's counsel, Mr. Douglas, in fact, and they have

10   responded.  And of course we have objections that we have to

11   deal with, and we've agreed that we need to meet and confer and

12   shall do so over, hopefully, the next several weeks.  I just

13   wanted the Court to be aware that it's separate and apart from

14   the clinical trial data that Mr. Douglas and Mr. Grand just

15   spoke about moments ago.

16        THE COURT:  Understood.  Understood.

17        So, anyone on the defense side need to weigh in on

18   that?  Sounds like you folks are working on that issue.

19   Correct?

20        MR. DOUGLAS:  We are working on it and have agreed to

21   meet and confer and discuss it.  That's about it.

22        THE COURT:  Excellent.  Thank you.

23        Anything else?

24        I just went through what was on the agenda that was

25   provided, but any additional issues that anyone needs to

1    address before we conclude for the day?  Anything?

2              All right.  Sounds good.  Pleasure to see you all.  We

3    will meet you next on April 2nd.

4              All right.  Thank you folks.  Take care.

5              (Conclusion of proceedings.)

6                            ooOoo

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25