1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
2                  Civil No. 2:17-md-02789-CCC-MF


3

    IN RE PROTON-PUMP INHIBITOR    :   TRANSCRIPT OF PROCEEDINGS
4   PRODUCTS LIABILITY LITIGATION  :     - Status Conference -
    (No. II)                       :        BY TELEPHONE
5    - - - - - - - - - - - - - - - x


6


7                                      Newark, New Jersey
                                       April 22, 2020
8                                      Commencing 11:00 a.m.

9   B E F O R E:

10                THE HONORABLE CLAIRE C. CECCHI,
                   UNITED STATES DISTRICT JUDGE
11


12

13  Pursuant to Section 753 Title 28 United States Code, the
    following transcript is certified to be an accurate record as
14  taken stenographically in the above entitled proceedings.


15
    S/WALTER J. PERELLI
16


17


18
    WALTER J. PERELLI, CCR, RM, CRR
19  Official Court Reporter
    U.S. District Court
20  Newark, New Jersey
    wjpccr1975@gmail.com
21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2         ATTORNEYS FOR PLAINTIFFS:

 3         SEEGER WEISS LLP
           BY:  CHRISTOPHER A. SEEGER, ESQ.
 4              JEFFREY GRAND, ESQ.

 5         DOUGLAS & LONDON, P.C.
           BY:  MICHAEL A. LONDON, ESQ.
 6              STEPHANIE O'CONNOR, ESQ.

 7         AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
           BY:  NEIL D. OVERHOLTZ, ESQ.
 8
           WEITZ & LUXENBERG, PC
 9         BY:  PAUL J. PENNOCK, ESQ.

10         BURG, SIMPSON, ELDREDGE, HERSH, JARDINE PC
           BY:  SETH A. KATZ, ESQ.
11
           NAPOLI SHKOLNIC, PLLC
12         BY:  SHAYNA E. SACKS, ESQ. (nonparticipating)

13         ANAPOL WEISS
           BY:  TRACY A. FINKEN, ESQ. (nonparticipating)
14

15                   ATTORNEYS FOR DEFENDANTS:

16         ARNOLD & PORTER KAYE SCHOLER LLP
           BY:  ARTHUR E. BROWN, ESQ.
17              MATTHEW J. DOUGLAS, ESQ.
                  - and -
18         McCARTER & ENGLISH, LLP
           BY:  GREGORY L. HINDY, ESQ.
19
           ICE MILLER LLP
20         BY:  AMY K. FISHER, ESQ.
           Attorneys for Defendant AstraZeneca and Merck
21
           REED SMITH LLP
22         BY:  STEPHEN J. McCONNELL, ESQ.
           Attorneys for Defendants GSK and Novartis Consumer Health
23
           ULMER & BERNE LLP
24         BY:  K.C. GREEN, ESQ.
           Attorneys for Defendant Procter & Gamble Entities
25
```

```
 1   A P P E A R A N C E S (cont'd):

 2        HOLLINGSWORTH LLP
          BY:  ANDREW REISSAUS, ESQ.
 3        Attorneys for Defendants Novartis Entities
          (Novartis Corporation, Novartis Pharmaceuticals
 4        Corporation; Novartis Vaccines and Diagnostics, Novartis
          Institute for Biomedical Research)
 5
          DLA PIPER
 6        BY:  MATTHEW A. HOLIAN, ESQ.
               STEPHEN C. MATTHEWS, ESQ.
 7        Attorneys for Pfizer and Wyeth

 8        VENABLE LLP
          BY:  CRAIG A. THOMPSON, ESQ.
 9           - and -
          TUCKER ELLIS LLP
10        BY:  SHERRY A. KNUTSON, ESQ.
             - and -
11        SILLS, CUMMIS & GROSS, PC
          BY:  BETH A. ROSE, ESQ. (nonparticipating)
12           - and -
               CHRISTOPHER ALLEN, ESQ. (nonparticipating)
13             Takeda Corporate Counsel
               Litigation Department
14        Attorneys for Takeda and Abbott

15

16

17

18

19

20

21

22

23

24

25
```

1                    (Off the record discussion.)

2                    THE COURT:  Let's begin then.

3                    We are on in the matter of In Re Proton Pump Inhibitor

4          Products Liability Litigation, it's 17-mdl-2789.

5                    Let's have appearances of counsel.

6                    MR. SEEGER:  Good morning, your Honor.  Chris Seeger

7          for Plaintiffs.

8                    MS. O'CONNOR:  Good morning, Judge.  Stephanie

9          O'Connor for the Plaintiffs.

10                   MR. PENNOCK:  Good morning, your Honor.  Paul Pennock

11         for the Plaintiffs.

12                   MR. LONDON:  Good morning, your Honor.  Michael London

13         for the Plaintiff.

14                   MR. GRAND:  Good morning.  Jeff Grand for the

15         Plaintiffs.

16                   MR. OVERHOLTZ:  Good morning, your Honor.  Neil

17         Overholtz for the Plaintiff.

18                   MR. KATZ:  Good morning.  Seth Katz for the

19         Plaintiffs.

20                   THE COURT:  Okay.  Is that everyone for the

21         Plaintiffs?

22                   Let's turn this over to Defendants.

23                   MR. BROWN:  Arthur Brown for AstraZeneca.  Good

24         morning.

25                   MR. HINDY:  Good morning, your Honor.  Greg Hindy,

```
 1    AstraZeneca.
 2            MS. FISHER:  Good morning, your Honor.  Amy Fisher for
 3    AstraZeneca and Merck.
 4            MR. DOUGLAS:  Good morning, your Honor.  Matt Douglas
 5    for AstraZeneca.
 6            MR. THOMPSON:  Good morning, your Honor.  Craig
 7    Thompson for Takeda and Abbott.
 8            MS. KNUTSON:  Good morning.  This is Sherry Knutson,
 9    also for Takeda and Abbott.  Beth Rose is appearing for us as
10    well on the participant line, and Chris Allen is with us from
11    the Litigation Department.
12            MR. ALLEN:  Good morning, your Honor.
13            MR. GREEN:  Good morning, your Honor.  This is K.C.
14    Green appearing in court for the first time in a 1990
15    Cincinnati Reds World Series sweatshirt.
16            THE COURT:  All right.
17            (Laughter.)
18            MR. McCONNELL:  Good morning, your Honor.  Stephen
19    McConnell on behalf of GSK.
20            MR. HOLIAN:  Good morning, your Honor.  Matt Holian
21    from DLA Piper on behalf of Pfizer.
22            MR. MATTHEWS:  Good morning, your Honor.  Stephen
23    Matthews from DLA Piper on behalf of Pfizer.
24            MR. REISSAUS:  Good morning.  Andrew Reissaus for
25    Novartis.  Good morning.
```

1              THE COURT:  Okay.  Is that everyone?  I think so.

2              Well, welcome, everyone.  How is everyone doing?  Are

3      you faring through this crisis?

4              Everyone doing okay?

5              UNIDENTIFIED VOICE:  We are.

6              MS. FISHER:  Yes, your Honor.  Thank you, Judge.

7              THE COURT:  Understood.

8              This has not been easy, but I appreciate you all

9      participating in this teleconference.  We will try and deal

10     with the open issues that we have in this case and try to keep

11     pace with our schedule as we have it as best we can.

12             As I indicated, we did receive our agenda.  I have the

13     agenda before me.  I don't know how you would like to proceed.

14     Do you want to proceed in terms of the order on the agenda?

15     And does anyone sort of want to act as a point person for each

16     side and let us know who is going to be talking to the specific

17     issues?

18             MR. SEEGER:  Judge, probably going in the order on the

19     agenda, just because we have so many speakers and we're doing

20     it telephonically, might make sense just to --

21             THE COURT:  Does that sounds fine?

22             MS. FISHER:  Yes, your Honor.

23             THE COURT:  Okay.  The first issue is the Update on

24     the Bellwether Trial Pool and Strike Process and

25     Bellwether-specific Issues.

1         MR. SEEGER:  So, we have AstraZeneca on the agenda and

2    we have an issue to raise here that we think is incredibly

3    important.  And just to put it in context, your Honor, you

4    worked incredibly hard trying to put together, helped us put

5    together a bellwether program which we got to.  We worked out a

6    process for randomizing cases and then striking them.

7         The issue I want to raise and put -- and I think we're

8    raising it incredibly early.  We were going to raise it April

9    2nd but that got pushed off because we were in the middle of

10   the COVID-19 situation and it just wouldn't have made sense to

11   go forward, so we are raising it at the first possible

12   opportunity regarding the New Jersey bellwether cases.

13        There is a particular case -- so, two cases were

14   selected by the Defendants, two cases were put in from

15   Plaintiffs.  What happened in the strike process is the

16   Defendants struck the two cases put in by the Plaintiffs,

17   that's their right to use their strikes, and we struck one of

18   the cases, one of the two cases put up by the Defendants.  The

19   case we did not strike is the one we want to talk to you about

20   and ask you how you'd like to handle the problem I'm about to

21   frame.

22        The case is a Plaintiffs' case.  So to frame this

23   briefly, your Honor, because these calls tend to go longer than

24   they need to.  So this particular case has a number of problems

25   that we would like to frame for your Honor.  It's really the

1    example that I framed in chambers many times and said that
2    cases will be picked that are absolutely untriable.  And if you
3    remember, the concern that the Plaintiffs always have is that
4    the Plaintiffs will not only take a triable case but it will be
5    too good.  And our concern was that cases would be put in that
6    really shouldn't have been selected in the first place, and
7    this is a perfect example.

8         There is a long record here of, you know, let's just
9    say opioid drug product use that would make this case not only
10   not representative, but not proper for a trial.  And
11   definitely, even if it were a case that would up for trial one
12   day, would not on the kind of case that we think the Court
13   would want to try in the first round of bellwether picks.

14        So here's the problem.  Let's assume we go ahead and
15   we brief this for your Honor or we explain it further and you
16   agree with us, now we're stuck with no cases for New Jersey to
17   try.  Which to me sounds like the Defendants had their one shot
18   at their trial, they wanted their New Jersey trial, they
19   selected a case that really should have never been selected,
20   and there are plenty of cases that could have been picked from.
21   We think that once we show you the details and the facts and
22   the records behind this case, we think you'll agree.

23        So I think the next question is:  What's next?
24   Because I think as part of the bellwether process we agreed to
25   a New Jersey case being in the mix, I think it was the second

```
 1    case if I remember.

 2             THE COURT:  Yes.

 3             MR. SEEGER:  So there are a lot of solutions to this.

 4    One solution is we could put all the New Jersey cases back in,

 5    work them up and the Court can pick the one that you would like

 6    as the second case.

 7             The problem and the reason we're raising this early is

 8    because we think we should make this showing to you now based

 9    upon the records that exist that they have and we have.  And if

10    you agree this case shouldn't be in, then I don't think either

11    side should have to spend money doing depositions or continuing

12    to work it up for a trial that won't occur any time soon for

13    that case.

14             So I'm trying to flag some of these issues.  And maybe

15    at this point I'll stop talking and if your Honor wants a

16    defendant to address it they can but --

17             THE COURT:  I was going to say, did you have an

18    opportunity to speak with any of the Defendants on this issue?

19    That's number one.  And number two is, I'm not sure what you

20    said in the beginning in terms of this particular individual.

21             So you chose not to exercise the opportunity to

22    strike?  Is that it?

23             MR. SEEGER:  We didn't.  In the same sense that you

24    would be using a peremptory for a case that should be caused

25    off.  We just felt like there's no way -- we felt like it was
```

1    going to be obvious.  Look, if we're wrong, we're wrong.  But

2    we feel like it's going to be very obvious to the Court when

3    you see the facts behind this case that the case never should

4    have put in and we should not have had to use a strike on a

5    case like this.

6              THE COURT:  Okay.  Who would like to respond?

7              MR. BROWN:  We may have more to add.  But as Chris

8    pointed out --

9              THE REPORTER:  Please identify yourself.

10             MR. BROWN:  This is Arthur Brown.

11             THE COURT:  How are you?

12             MR. BROWN:  I'm doing well.  Chasing a 14-month

13   around, but that's okay.  He's outside my door now looking at

14   me.

15             So, Chris has not raised this particular issue or this

16   case with me since the pandemic came on.  But I want to remind

17   the Court of a couple of things.  First of all, we worked for

18   over a year on this bellwether selection process.  This process

19   included randomizations, using strikes, and these 19 cases,

20   including the one mentioned by Mr. Seeger, I think are

21   representative.

22             Chris points out correctly that there were four cases.

23             He could have struck this case.  The Plaintiffs had

24   six strikes and they could have struck this case, and that

25   they're looking to get an extra strike here does not make

 1    sense.

 2              There was a Jersey case that the Plaintiffs Steering

 3    Committee did strike but they left that case -- this case --

 4    alone, and now they're coming back to try to remove it from the

 5    pool.

 6              Mr. Seeger is right, that he did raise drug use as an

 7    issue in chambers I believe.  I'm not sure we discussed it on

 8    the record.

 9              THE COURT:  Yes, we definitely discussed it at some

10    point.  I'm not sure whether it was in conference or whether it

11    was on the record if you ended up with someone who was in this

12    type of category.

13              MR. BROWN:  Right.  And there is one plaintiff here --

14    and I'm sorry I used the name earlier -- but the one New Jersey

15    plaintiff remaining here has some history of drug use.  And

16    interestingly, we've looked at this.  And of the chronic kidney

17    disease patients that exist in the U.S., 12 percent of them

18    have used cocaine, heroin, or methamphetamine.  I mean, I will

19    provide those cites to the Court.  But that one of the 19

20    remaining bellwether Plaintiffs, in a process we negotiated

21    over a year, appears in this pool should come as a surprise to

22    nobody.  Because more than 12 percent of the CKD population in

23    the U.S. have some history of drug use.  Said another way:

24    That we have one of 19 is indeed representative.

25              And to revisit this process after a year of

1    negotiations, after more times than I can count sitting in the

2    back on the phone, on the record, at this point when we have a

3    New Jersey plaintiff that the Plaintiffs could have struck and

4    did not does not make sense to me and would be unfair for this

5    process.

6              THE COURT:  Let me just ask you both collectively:

7    How many New Jersey plaintiffs did we have in the pool to pick

8    from?

9              UNIDENTIFIED VOICE:  That's a good question.

10             UNIDENTIFIED VOICE:  Four, your Honor.

11             MR. SEEGER:  There was a total of four that it wound

12   up.  So they struck our two cases and we struck one, and then

13   we have this issue on the one remaining.

14             But do you mean in the larger pool?

15             THE COURT:  No, in the pool that you were able to pick

16   from where we had --

17             MR. SEEGER:  Oh, four.

18             THE COURT:  -- we did the random selection and the

19   whole analysis from which you actually ended up picking the

20   plaintiff from.

21             MR. BROWN:  There were eight New Jersey plaintiffs I

22   think out of like 210 cases.

23             MR. SEEGER:  Very representative.  Look it's part of

24   the bellwether process.  I do want to let the Court know -- and

25   Arthur is right that we have not specifically discussed this

1    case -- but we did -- when we looked at this we did try to

2    negotiate a deal with the Defendants -- Arthur, I don't

3    remember if it was you or one of my team approached you -- but

4    it was that there would be no strikes for Jersey cases and that

5    ultimately we would work them up.  Any issues with them we

6    would bring it to your Honor and then ultimately once they were

7    worked up through Court, discovery and whatever, the Court

8    could then make the decision which New Jersey case to try,

9    because there are so few of them.

10             THE COURT:  There are few of them, I agree.

11             MR. SEEGER:  Yes.

12             THE COURT:  Do you want to take a stab at trying to

13   work through this issue?

14             MR. SEEGER:  Yes, sure, always happy to do it.  You

15   know, sometimes we're successful.

16             THE COURT:  If you could give us something to work

17   with.

18             MR. SEEGER:  Yes, your Honor, absolutely we'd love to

19   do that.  And like I said, we just wanted to raise it early

20   enough so the defense was aware of the issue that we're raising

21   and you're aware, and we'll keep circling back.  But we wanted

22   to --

23             THE COURT:  I think that makes sense.  Because, look,

24   obviously there's two ways to handle it:  Either one, either

25   the bellwether plaintiff goes forward or doesn't.  But if

1      there's a chance that the plaintiff is not going to go forward

2      there's no need for everyone to spend time and expense on that

3      particular plaintiff.  And I'm not saying what we're going to

4      do on this because I want to think about it and also hear what

5      you may come up with in terms of suggestions once you have an

6      opportunity to speak about it so I can further ponder where

7      you're at and then what we might actually end up doing.

8              But I do recognize it's a small pool of New Jersey

9      Plaintiffs, and I also recognize that we talked about no one

10     was interested in having someone -- I think we specifically

11     used the word "drug addict" -- in the case.  And I'm not

12     certain what the situation is with this particular plaintiff,

13     but if the factors are so extreme we did come to some sort of

14     an informal agreement that those type of plaintiffs were not

15     the ones that should end up in the bellwether population

16     ultimately going to trial.

17             So with that, nothing that I've said there is new.  I

18     believe that's what has transpired.  But I suggest that perhaps

19     you go back and talk about it and we can pick it up during our

20     next conference, or if anyone wants to do a short conference

21     just designed to flesh out this issue prior to our next major

22     conference we could do that as well.

23             How does that sound?

24             MR. BROWN:  Your Honor, just to make the record clear,

25     the Defendants did not formally or informally agree that

1      someone who has used drugs is not representative.  I just gave

2      you statistics about the prevalence of drug use in the CKD

3      population.  That said, of course if the Court is ordering us

4      to meet and confer, we can do that.  There's a solution here:

5      The Plaintiffs can dismiss that case and the Defendants can

6      replenish and select another case.

7              MR. SEEGER:  That's our problem.  That's exactly the

8      angle and the gamesmanship that's going on here that we're

9      trying to avoid, Arthur, and that's why I'm raising it with the

10     Court.  Because whatever the Court decides, we're going to go

11     along with it one way or another obviously.

12             But for you to just cite statistics -- look, you're an

13     excellent lawyer and a great guy, but you're not an expert on

14     this.  And you citing stats like this doesn't mean anything.

15     We'll probably find statistics that say other things.

16             The bottom line though is that if somebody is abusing

17     an opioid product, there are many issues that go into that,

18     many issues having to do with the person himself, and sometimes

19     they're not at fault at all.  So if you're picking somebody

20     with a cocaine, a heroin or opioid problem it's going to become

21     a trial about their addiction and it's not going to be very

22     informative and it's not going to produce any useful

23     information for the reason that we're doing bellwether trials.

24     That's our view.

25             Now, I know you disagree and I'm happy to talk about

1    it.  You and I talk once a month anyway.

2         MR. BROWN:  Yes, but you chose not to use a strike on

3    it.

4         MR. SEEGER:  We didn't think we should.  I absolutely

5    acknowledged that in my presentation to the Court.  We did not

6    use a strike because we think this one is really out in left

7    field.  That is absolutely our view.

8         THE COURT:  So why don't you do this:  Whoever needs

9    to talk on the Plaintiffs' and Defendants' side you can get

10   together and flesh that out a little bit.  As I said, if we can

11   get in to a head or if you have a stumbling block and you want

12   to do a quick conference regarding just this issue, that's fine

13   as well.  I'm here and available to go through this issue.  But

14   I think in terms of the agenda and the length of the agenda at

15   this point in time, I think that's enough on this and we can

16   have you go meet and confer and then report back to us so we

17   can try to move it forward.  How does that sound?

18        MR. SEEGER:  Thank you, your Honor, that's perfect.

19        THE COURT:  Great.  Let's move forward.

20        Our next issue is Plaintiff-specific Deficiencies.

21        MS. FISHER:  Yes, your Honor.  This is Amy Fisher on

22   behalf of AstraZeneca and Merck, and I can address this.

23        THE COURT:  Go ahead.

24        MS. FISHER:  Good morning.

25        THE COURT:  Good morning.

1          MS. FISHER:  We are continuing to identify missing

2     data points for the 19 bellwether plaintiffs as we dig further

3     into these cases.  There's one that I wanted to raise

4     specifically today, and we can raise additional as we find in

5     future conferences.  But I think the overall issue here is that

6     for these 19 picks, counsel must immediately respond to provide

7     the information that is missing or this process can't move

8     forward.

9          So specifically today the issue we wanted to raise is

10    for Plaintiff Christine Bertram, a plaintiff-picked case

11    represented by Weitz & Luxenberg.  We are missing proof of

12    personal representative information which makes the

13    authorizations not viable.  So we would like the Court to

14    instruct the Weitz & Luxenberg firm to provide that as soon as

15    they are able to.

16          THE COURT:  Okay.  Counsel.

17          MR. PENNOCK:  We are and have been working to obtain

18    the appointment of the administratrix.  That process is

19    expected to conclude in a matter of a few weeks here.  It is

20    Weitz & Luxenberg's only case that happened to end up in this

21    pool.  We are working on it really diligently.  I mean, I can

22    provide the details on that if anyone wants it.  But recently,

23    in fact, we sent a mobile notary out to the home of the

24    daughter to get the papers signed and we really don't think

25    that this will in any way inordinately impede the progress of

1    this bellwether case.  It may be one that lags a little behind
2    some of the others, but in all bellwether processes there are
3    cases that move forward faster and cases that move forward
4    slower.  At this point this will be one that moves forward a
5    little more slowly.  But who knows, by the end of this process
6    it could be at the front of the pack.  I mean, I know that I
7    have handled bellwether processes more times and for longer
8    than really anyone on this phone, any lawyer on either side on
9    this phone I should say.  So I've seen cases start out slowly
10   in the process and then end up to be the case that's done
11   first.

12            So we're working on it diligently, and I submit to the
13   Court that we will get this rep appointed and do everything we
14   have to do to get these records in the hands of the Defendants.

15            THE COURT:  Okay.  And again, there are authorizations
16   for records, is that it?

17            MR. PENNOCK:  Yes, the rep has to be appointed to sign
18   the authorizations, and we've appointed at the very least on an
19   interim basis.

20            THE COURT:  And again, in terms of your time frame,
21   you think it's what, very generally?

22            MR. PENNOCK:  I'm sorry, your Honor?

23            THE COURT:  In terms of your time frame to get the
24   representation or get the representative to do -- the
25   administratrix, how long did you say about?

1          MR. PENNOCK:  Well, we have an estate lawyer engaged
2     in the estate in issue, and we're thinking it's going to be
3     probably at least 30 days.

4          THE COURT:  Thirty days.  Okay.

5          MS. FISHER:  Your Honor, could we get a deadline maybe
6     in advance of the next status conference to get an update on
7     the status of that proceeding?

8          THE COURT:  I think that's fine.

9          Mr. Pennock, when do you think you could give an
10    update?

11         MR. PENNOCK:  I think I'll be able to give an update
12    in a couple weeks, Judge.  I mean, so I'll give it to Amy just
13    as soon as I have information that gives us a better sense of
14    when the Order will come out.  We're going to do everything we
15    can to get the Court involved to do this quickly.  And again, I
16    think we'll be on track with this case well within the time
17    frames that we're hoping to get this bellwether process
18    completed.

19         THE COURT:  Okay.  Do you want to give an update in,
20    what, 14 days?  Do you think that will be doable?

21         MR. PENNOCK:  Yeah, I think that will be, Judge.

22         THE COURT:  Okay.  By the way, Mr. Grand, you usually
23    help us with the proposed form of order.  Would you mind taking
24    down what our dates are?

25         MR. GRAND:  Yes, your Honor.

1           THE COURT:  Okay.  Great.  Thank you.

2           MS. FISHER:  Your Honor, 14 days would be May 6th.

3           THE COURT:  May 6th it is.  Okay.

4           MS. FISHER:  Thank you very much.

5           THE COURT:  Thank you.

6           MS. FISHER:  Thank you, Mr. Pennock.

7           MR. PENNOCK:  Thank you.

8           THE COURT:  Okay.  Let's move to the next issue.

9           We have Updating Defense Fact Sheets in accordance

10   with Case Management Order 22 and Defendants' Fact Sheets

11   Deferral Agreements between the parties.

12          MR. GRAND:  Yes, your Honor, this is Jeff Grand.  I'll

13   be addressing this issue.

14          THE COURT:  Great.  Thank you.

15          MR. GRAND:  This relates to custodial file productions

16   that were initially asked by the PSC to accompany the defense

17   fact sheet, and what this relates to are sales representatives

18   that called on the Plaintiffs' prescribing physicians.  And

19   these are important for discovery, particularly core discovery,

20   because these files typically contain notes about the

21   interactions with the physicians, any questions or concerns

22   that may have been raised by a physician, the materials that

23   were provided to physicians about the drugs.  So it's an

24   important part of Plaintiffs' discovery and part of working up

25   any case.

1          Now, we've initially asked that all of them be

2     produced.  And at the time we were negotiating the Defense Fact

3     Sheets, Defendants I think appropriately pointed out that it

4     was too burdensome for them to produce it for every case, so we

5     created a Deferral Agreement that would make that production

6     happen after the bellwether pool had been picked.

7          So on April 3rd we requested production of all of the

8     sales custodial files for the bellwether cases.  Defendant

9     didn't respond to us for two weeks, at which point they stated

10    they wanted a uniform cap for all the Defendants of the four

11    custodial files per case.  They're saying they can't produce

12    these files for 90 days despite the fact that they've known who

13    these folks are for some time now, and they also wanted to

14    further restrict production of the district managers who

15    supervise the sales reps until after the trial cases are

16    selected.

17         Now, this is unacceptable to Plaintiffs for several

18    reasons.  One is, we actually need to look at the sales rep

19    custodial files in order to determine which reps we want to

20    depose.  They want us to pick blindly four cases, you know,

21    four sales reps, get their files, and then decide out of those

22    four which ones we should depose.

23         That's backwards, your Honor.  And, frankly, we don't

24    think there should be uniform caps for all Defendants, because

25    Defendants are situated very differently in this case.  For

1    example, Takeda, the Takeda Defendant only has two cases in the

2    trial pool.  It may be perfectly appropriate for them to

3    produce all the sales reps in those two cases and that may not

4    be much of a burden.  AstraZeneca is in I think almost every

5    case, they may have different concerns.  But I think it

6    shouldn't be sort of a global cap, they should just produce

7    them all.  Because, frankly, when we were discussing the

8    bellwether process, Plaintiffs' initially proposal was for six

9    cases.  It was Defendants who insisted that we have a large

10   bellwether pool, and now that we have one they're saying it's

11   too burdensome for them to produce the custodial files that

12   they previously agreed to produce.

13        THE COURT:  Okay.  Let me jump in.  Let me ask you.

14   In terms of the custodial files, I recognize there's a

15   different amount for each Plaintiff, but what is the range?

16   How many are we talking about roughly per Plaintiff?  Or what

17   is the highest amount that you have for Plaintiffs?

18        MR. GRAND:  The highest amount I've seen for a

19   plaintiff -- and forgive me, your Honor, I'm not versed in

20   every single plaintiff's defense fact sheet -- but the highest

21   that I've heard of thus far is there is one -- I believe one

22   Defense Fact Sheet where there's 11 custodial files named.

23        MS. KNUTSON:  Your honor, this just points out, we

24   have two cases in the bellwether pool.  In one of those cases

25   we have 29 caps on Takeda sales representatives and that does

1       not include the district managers.  So it does vary greatly

2       from case to case.  That's one that has an awful lot of sales

3       reps and would be quite burdensome for them to produce them

4       all.

5              MR. DOUGLAS:  Just for context, we are in 18 of the

6       bellwether cases, and just the sale rep custodial files alone

7       total 690 that we have identified, and that also does not count

8       the district managers.  So we're talking about a massive number

9       of custodial files.  The request from the Plaintiffs is way out

10      of line with what other MDL courts and consolidated litigations

11      from state court cases have ordered.  So that's why we did

12      respond to them and said, you know, this is not going to work

13      and we need to talk about it.  And, your Honor, we have not yet

14      had a meaningful opportunity to meet and confer about this one

15      either.

16             THE COURT:  Okay.  I'm going to say, it sounds like

17      it's probably not enough since these are actually bellwether

18      plaintiffs and we're going to proceed to trial at least on some

19      of them at this point.  But I recognize that if we're close to

20      700 files, 690 custodial files, you know, that is a significant

21      number as well.  Tell me what other judges have done from your

22      perspective.

23             MR. DOUGLAS:  Your Honor the Benicar litigation in the

24      District of New Jersey in 2016, the order was for the

25      plaintiffs to identify one sales representative for each

1    bellwether case, which was then -- the custodial file was to be

2    produced.  The same as in the Zarelto litigation in the Eastern

3    District of Louisiana, 2015.  And the GIT and the Pelvic Mesh

4    Litigation, it was either one or two sales reps.

5         I would point out that Plaintiffs are not picking

6    blindly.  They have the call notes, and have for some period of

7    time, which have the recording of the interactions with each of

8    the sales representatives with the doctor and a record of that,

9    so they do have those to help narrow who they might want to

10   depose and talk to.  So, that's what we've seen in other

11   litigations.

12        MR. PENNOCK:  Your Honor, this is Paul Pennock.

13        There certainly is an ability in terms of what has

14   been ordered in terms of sales reps in different MDLs.  But

15   certainly limitations of one or two, I wouldn't say that that

16   is typical.  It could even be on a case-by-case basis.  I mean,

17   very often there will be multiple, very important sales reps

18   with respect to the prescribing doctors.  Sometimes it's

19   because they're teaming up, sometimes it's because it's

20   different time periods.  One rep is detailing at the initiation

21   of the prescription, another rep is detailing a few years later

22   when some label changing occurs, and there were some minimal

23   label changes here over time, or other scientific information

24   has come out.

25        And so, you know, to really to have an arbitrary

1    window, especially a small one, is going to be I think

2    ultimately very prejudicial in many of the cases.

3            THE COURT:  Okay.

4            MR. PENNOCK:  Then I don't want the experience that

5    was just related, I don't know if it was by Matthew Douglas or

6    someone else, for the Court to think that's how things have

7    been handled.  We can come up with numerous examples where the

8    sales rep discovery has not only been extensive but ultimately

9    critical at the time of trial.

10           THE COURT:  Okay.

11           MR. GRAND:  Jeff Grand.

12           Just to be clear, I want to make sure there's not

13   confusion between the number of depositions that are taken of

14   sales custodians, sales reps and the number of custodial files

15   that are produced before that can happen.  Because what we're

16   talking about is having a custodial file so we can make the

17   selections we need to make.  And it's not just limited to call

18   notes.  Call notes are just a piece of the puzzle.

19           MR. PENNOCK:  That's true, Judge.  And, in fact, I

20   mean many years most of the -- well, several of the

21   manufacturers switched to drop-down menus for the call notes.

22   So whereas the call notes used to be an organic process where

23   the rep would actually write things in and the notes would be

24   somewhat informative as to what was going on in reality, they

25   switched to these drop-down menus that just completely

1    constrain what was recorded and it was almost meaningless and

2    rote and repetitive for all of the doctors.  So what Jeff is

3    saying, we need to get way beyond the call notes to get into

4    these files to make reasonable selections of who we think we

5    should be deposing.

6              THE COURT:  And if we're exploring that, as long as

7    there are drop-down menus, are these files voluminous?  What do

8    they actually contain?

9              MR. PENNOCK:  Well, the call notes which we have,

10   they're fairly voluminous but it's almost often in the nature

11   essentially of a spreadsheet.  It's a database of notes that

12   are made on a laptop.

13             THE COURT:  Okay.

14             MR. PENNOCK:  The files are beyond that.  That's the

15   communications happening between and among the team that's

16   detailing the doctors.  Emails and so forth are very important

17   evidence as to what was actually happening at the point of

18   contact regarding the central aspects of this claim, which is

19   failure to warn and learned intermediary.

20             THE COURT:  Let me ask the Plaintiffs.  Would it be of

21   assistance to get call notes first and look at them and then

22   determine what custodial files you actually need thereafter?

23             MR. GRAND:  We already have the call notes, your

24   Honor.  Those were produced as part of the defense fact sheet.

25             THE COURT:  Okay.

1           MR. GRAND:   The component, as Mr. Pennock had pointed

2      out, is we don't have any of the communications amongst the

3      team, we don't have -- that discussed concerns that may have

4      been raised by doctors.  For instance, when news articles go

5      out, you know, people in corporate will push out:  Here's what

6      you should say to doctors if they ask you this question.  That

7      gets funneled out through the district managers to the sales

8      reps.  These are the types of things that are contained in

9      these files, and that's why we need to look at these files

10     before we can pick which sales reps we want to depose.

11          As I think Mr. Douglas pointed out, we only have four

12     depositions that we can take in each case.  The Plaintiffs only

13     have four, so we have to choose carefully.  And to do so we

14     need to be educated as to what's in the file.  We can't make

15     the selection strictly from call notes.

16          THE COURT:  Okay.  So you have all the call notes as a

17     base level here, you've already been provided them now, it's

18     the fuller file that you're seeking?

19          MR. GRAND:  Exactly, your Honor.

20          THE COURT:  Let me turn to the Defendants on this.

21          If it's 695 and we're dealing with a very large MDL,

22     it doesn't sound like a very large number at the onset.

23          MR. DOUGLAS:  Your Honor, if I could clarify, there's

24     always been 128 custodial files produced by AstraZeneca

25     company-wide.  This is all the emails, this is the full

1    custodial file.  And they request now an additional 700.  Those
2    were produced every 120 days that the original 128 in batches
3    of 10 to 13, and now they've asked for 700 custodial files in
4    21 days.  That was, you know, an enormous magnitude --
5              THE COURT:  I mean, it may be digitized though.
6              MR. DOUGLAS:  Well, one, the collection of custodial
7    files right now have to take place remotely which impacts the
8    speed at which it can be done.  But there's a reason that we
9    negotiated it in the first instance 120 days per -- and then
10   they request and waived the original custodial files.  These
11   are no different.  These are company employees, some of who
12   have been there for a long time, massive amounts of emails and
13   shared documents and things that were distributed.

14              And I want to clarify.  The call notes do contain
15   significant information.  They're not just meaningless
16   drop-downs in this particular case, and they have those since
17   2018 and 2019 for the volumes of individuals, so that they are
18   able to narrow that.  Which is why I also want to clarify that
19   the orders that I was talking about in Benicar and Xarelto and
20   other pharmaceutical litigations were limited to custodial
21   productions for sales representatives, typically one or two.
22   I'm happy to look at other orders the Plaintiffs want to send
23   for other things, but nothing I've ever seen got into the
24   hundreds.  That's so far beyond the scope of what anyone has
25   done with the incredible burden on the company that --

1          THE COURT:  Let me turn to the Plaintiff.  Let me turn
2     to the Plaintiff.

3          Is there any way to narrow the scope here?

4          MR. GRAND:  Your Honor, I'm happy to meet-and-confer
5     with them as we initially tried to do.  And I think Mr. Douglas
6     is correct, we weren't able to do it before this conference,
7     but I want to -- I would rather negotiate with them
8     individually rather than deal with some sort of global cap
9     across all parties.

10         THE COURT:  Okay.  Why don't we do that.  Why don't we
11    do that, and why don't we start that and have date by which
12    you're going to communicate with the various separate
13    defendants.  Do you want to talk within the week?

14         MR. GRAND:  Yes, we can certainly do that within seven
15    days, your Honor.

16         THE COURT:  How is that for the Defendants?

17         MR. DOUGLAS:  That's fine.  We're happy to talk
18    individually with them as well.

19         THE COURT:  Okay.  Perfect.

20         Is that good for everyone?  Why don't we do this:
21    Does anyone have an issue with the seven days?

22         (Silence.)

23         THE COURT:  No?  Okay.

24         I am looking at my phone which is beeping.  The
25    receiver doesn't go off.  If it does go off I'll have to jump

```
 1    off the call for a moment and get back on.  But in any event,
 2    let's move on.
 3         Okay.  So then now I'm moving on to Tolling Motions.
 4    I think this is organized so we can proceed efficiently.
 5         As far as the March 10, 2020 Order to Show Cause,
 6    which is Docket Entry 562, I have that in front of me.  I
 7    believe there's no issue with respect to that.  Correct?
 8         MS. FISHER:  Your Honor, that's correct.  We have
 9    proposed dismissal orders for --
10         THE COURT:  I think the proposal dismissal order is at
11    563.  Is that accurate as well?
12         MS. FISHER:  The docket entry for the Order to Show
13    Cause is 562.  There are 67 of the 68 plaintiffs that did not
14    respond to the Order to Show Cause, and so those cases are
15    already automatically dismissed without prejudice.  However, in
16    the past with other Orders to Show Cause you have gone ahead
17    and issued individual dismissal order entries on each of the
18    docket --
19         THE COURT:  Yes, I think 563 is an example of a past
20    order that we did and we're planning to use it as a template
21    for the ones moving forward.
22         MS. FISHER:  Okay.  Thank you.
23         THE COURT:  Let me just make sure.  Any issues from
24    anyone on that?
25         MR. LONDON:  Mike London, your Honor.
```

1          There are no issues with respect to the 67 dismissals

2     of the 68 Plaintiffs on that Order to Show Cause, Docket 562.

3     There is an issue -- and the Court might be getting it to on

4     the next item -- with respect to a potential, or a requested

5     dismissal with respect to one Plaintiff, Ms. Weese.  And the

6     Plaintiffs oppose dismissal of that case and --

7          THE COURT:  I think it's 67 out of 68.  I think that's

8     how the Plaintiffs were presenting it.  No?

9          MR. LONDON:  That's correct.

10          THE COURT:  Okay.  Except for Ms. Weese?

11          MR. LONDON:  Yes, that's correct.

12          MR. GREEN:  But Defendants don't agree that number 68

13     shouldn't be in the mix too.  But it has to be dealt with

14     separately than the other 67 of course.

15          THE COURT:  Okay.  We have agreement on the 67 at

16     least?

17          MR. GREEN:  Correct.

18          MS. FISHER:  Yes, your Honor.

19          THE COURT:  All right.  So we will take care of that.

20     We did will do a dismissal order that is similar to what we did

21     in 563.  Okay?

22          The next matter on our agenda is the Proposed Orders

23     to Show Cause regarding 7 Carey, Danis and Lowe Plaintiffs, and

24     that was submitted by consent on April 9th, 2020 for entry.

25          MS. FISHER:  Correct, your Honor.

1           THE COURT:  Is there any issue as to that, or can we
2     proceed along the same lines as we just discussed with respect
3     to the -- well, actually on that we would be entering the Order
4     to Show Cause.  Correct?
5           MS. FISHER:  Correct, and that's a consented order,
6     there is no issue, we can go ahead and enter that and start the
7     deadline running.
8           THE COURT:  Anyone with an issue?
9           No.  Okay.  So we will be doing that.  That sounds
10    fine.
11          The next issue is Proposed Case Management Order
12    Number 9A.
13          MR. PENNOCK:  Sorry to interrupt, but we skipped one
14    bullet point.
15          THE COURT:  I'm sorry.
16          MS. FISHER:  Your Honor, we also have as a consented,
17    non opposed proposed Order to Show Cause for 224 Plaintiffs
18    from the Aylstock firm --
19          THE COURT:  Yes, I have that as well.
20          MS. FISHER:  -- from April 17th, for entry.
21          THE COURT:  Is there any issue on that one?
22          MS. FISHER:  There is not, your Honor.  That's
23    consented.
24          THE COURT:  Okay.
25          MS. FISHER:  We also have the Douglas & London

1    Plaintiff Weese responsive to the Order to Show Cause which is

2    fully briefed at Docket Numbers 562, 566, 567.

3           And I believe, Mike, we submitted an additional

4    document.

5           THE COURT:  Yes.  So I understand that.  The Weese one

6    we have issues with, but what I was going to go through were

7    the ones that were agreed upon.  So that at this point in time

8    I think we have the agreed upon, we're going to be a dismissal

9    corresponding to the March 10th, 2020 Order to Show Cause,

10   which was is Docket Entry 552; then we have the 7 Carey, Danis

11   and Lowe Plaintiffs and we're going to go ahead with an Order

12   to Show Cause on that.  We have the other issue with respect to

13   the Alystock application as well, we're going to be dealing

14   with that.  I understand Weese has some contested issues so

15   we're going to hold that for now.  There is also something on

16   here regarding a meet-and-confer with a Weitz & Luxenberg

17   plaintiff, so what are we doing on that issue?

18          MS. FISHER:  Yes, your Honor.  So, we have been trying

19   to go through the remaining Plaintiffs subject to the tolling

20   motions to dismiss.  There are 4,537 Plaintiffs who remain

21   pending on tolling motions to dismiss.  And we're tackling them

22   in small bites as you instructed and going through first those

23   who have confirmed on their January 31st submission that they

24   produced either no proof-of-use or proof-of-injury at all or

25   only one category and not the other.  So that's how these

1    various orders to show cause that you have been talking about
2    today have been consented to and entered and are running their
3    course.

4           We proposed to the Weitz & Luxenberg firm an Order to
5    Show Cause with respect to 275 of their 2,269 Plaintiffs who
6    remain subject to the tolling motion to dismiss.  And of these
7    275, these are all Plaintiffs who in the Plaintiffs' January
8    31st tolling submission confirmed that they have produced
9    either no proof-of-injury or just a proof-of-injury affidavit,
10   and/or have produced no proof-of-use or just a proof-of-use
11   attorney affidavit only.

12          So these are the types of Plaintiffs that are on the
13   other orders to show cause.  These are individuals who have
14   only produced one category and not the other, or produced
15   nothing at all.  And we're not really getting anywhere with
16   Weitz & Luxenberg on that.  They're not willing to mirror the
17   January -- I'm sorry -- February 21st Order to Show Cause for
18   the other Plaintiffs that were on the first Weitz & Luxenberg
19   Order.  So we're not really sure what the difference is here
20   because these are the same plaintiffs, the same type of
21   plaintiffs who were on the initial ones, the same type of
22   plaintiffs who were on the Care, Danis & Lowe, the Douglas &
23   London, and the Alystock Order to Show Cause.

24          MR. PENNOCK:  I hope the Court recalls, because
25   apparently Ms. Fisher does not, that for our side, I mean I

1    took the lead on trying to address those Plaintiffs who had

2    just utterly failed to comply with what was required of them,

3    and ultimately through a different process, processes both

4    through orders to show cause and voluntary dismissals 699 cases

5    were dismissed.

6           THE DEPUTY CLERK:  Counsel, counsel, the Judge's line

7    dropped, so please hold.

8           MR. PENNOCK: Okay.

9           THE DEPUTY CLERK:  Is the coordinator still on the

10   line?  Because she's not getting through.

11          (Discussion off the record regarding the Court losing

12   phone connection.)

13          (There is a pause in the proceedings.)

14          THE DEPUTY CLERK:  Okay, she's on the line.  She's

15   waiting for the coordinator to put her in.

16          THE COURT:  Okay, counsel.  Back on.

17          Okay.  I lost you folks.  Hopefully that's it.  We're

18   back on.

19          MS. FISHER:  Your Honor, just let me summarize.  I'm

20   not sure where we were --

21          MR. PENNOCK:  I was speaking.

22          MS. FISHER:  Yes, I think Mr. Pennock was still

23   talking.

24          So just to get a quick recap.  We have an Order to

25   Show Cause as to 275 Weitz & Lukenberg plaintiffs who have

1        either shown no proof-of-use or proof-of-injury even still

2        today from the Tolling Agreement deadline one year ago, and we

3        would like to move forward with that so that we can then search

4        and look through some of the other buckets.  We're still

5        getting through these buckets of individuals who have no

6        proof-of-use and/or proof-of-injuries.

7                    So ahead, Mr. Pennock.

8                    THE COURT:  Okay.

9                    MR. PENNOCK:  Judge, as the Court may recall, I took

10       the lead in making sure that cases that were completely

11       non compliant and did it almost inextricably were dealt with

12       and dealt with expeditiously and agreed to a very abbreviated

13       Order to Show Cause to deal with those cases, and ultimately

14       699 cases were dismissed for noncompliance.

15                   These cases do not fall into that category.  These 275

16       cases are cases where affidavits of use were provided as were

17       permitted under the agreement, or medical records were provided

18       and, in fact, in many of them both affidavits and medical

19       records for proof-of-use were provided.  By "many," I mean

20       dozens.

21                   In the majority of cases records of proof-of-injury

22       have also been provided.  There is one case that remains

23       completely non compliant that was discovered during this

24       process.

25                   There are approximately 35 cases where the client has

1        not returned to us the proof-of-use affidavit nor have we been
2        able to obtain the medical records showing use.  Yet, we have
3        medical records and have supplied them that show injury.  Those
4        35 cases I would put in one bucket; and then there's the group
5        that's in another bucket that has provided the affidavits; and
6        then there's a group that have provided both the affidavits and
7        the medical records.  So there are multiple sub-buckets, if you
8        will, to this group of 275.

9              My objection to what the Defendants were proposing is
10       they wanted to (a) treat them all the same, and (b) treat them
11       in essentially the same manner as the ones that I agreed to
12       expeditiously deal with last year.  These each will need to be
13       addressed in a way that permits the Plaintiffs, including
14       myself, to show what was done and the due diligence that was
15       done to obtain perhaps for some of them relief from the Court
16       from a dismissal.  And that's why I've asked in the
17       meet-and-confers, my partner, Mr. Sedgh, asked the Defendants
18       to do something differently in terms of the orders to show
19       cause.  We need more time and they need to be more
20       individualized in what they address.

21             So, I'm happy to go back to the drawing boards on a
22       meet-and-confer, but that's the reason we've reached a
23       loggerheads because they want the treat them as though they
24       were completely non compliant, and we think they should be
25       treated differently and in a more reasoned approach and

```
 1    certainly with more time.
 2              THE COURT:  Okay.
 3              MS. FISHER:  Your Honor, can I just jump in real
 4    quick?
 5              THE COURT:  Yes, go ahead.
 6              MS. FISHER:  We're happy to meet and confer with them,
 7    but the problem here is that we've tried to.  And what Mr.
 8    Pennock is saying is a surprise to me because I have not been
 9    privy to any offers to meet and confer on this issue, but
10    rather to a very short response that they don't agree that
11    these cases should be on an order to show cause, to which we
12    followed up multiple times and asked for clarification and
13    discussion.
14              THE COURT:  Okay.
15              MS. FISHER:  Can I clarify one thing, your Honor,
16    which is, we're not disputing the fact that some of these 275
17    cases have an affidavit of use or have a record of injury, but
18    they only have one or the other.  There are no cases in these
19    275, at least as reported on claimants' own submission on
20    January 31st, that have claimed a late cure for both
21    categories.  These are claims that have one, albeit tardy, but
22    not the other.  So we're happy to talk through it, but that's
23    really the first step here is that we would like your direction
24    to have a meaningful meet-and-confer in a short period of time,
25    your Honor.
```

1           THE COURT:  It sounds like you're both in agreement

2   and it sounds like, I mean, that you're willing to do a

3   meet-and-confer on this.  You see this from two different

4   perspective obviously.  This is not an unusual issue, and we've

5   heard this on other matters and we've been able to sort of

6   bring them to a close as well.

7           So what period of time do you want to discuss this?

8   Let me hear from both of you.  Any suggestions?

9           MR. PENNOCK:  Judge, I can talk to Amy at some point

10  in the next seven days.

11          THE COURT:  Okay.

12          MS. FISHER:  If we could do an update to the Court in

13  seven days I think that would be great.  I mean, I would like

14  to know if they are alleging the information on their own

15  tolling submission from January 1st is not correct.  Because

16  based on our review of it, these are all cases that have one

17  category but don't have the other, then I guess that submission

18  needs to be updated and amended.

19          So I would like to know, Mr. Pennock --

20          MR. PENNOCK:  The information as of the date we

21  submitted it was correct.  There are cases that have both at

22  this point in time.

23          But the problem, your Honor -- I'll address you, not

24  Amy -- is that there is due diligence that we will be able to

25  demonstrate with regard to trying to collect medical records.

1      That's something completely out of our control.  It's an

2      impossibility of performance in terms of getting these records

3      it seems to her.  So I will talk to Amy about it and try to

4      come up with a process that seems reasonable and in terms of

5      timing and what evidence can be adduced so that the Court can

6      decide I guess what's going to happen on these cases.  I mean,

7      I would like to get it resolved with the Defendants instead,

8      but the short form, you know, ten-day or whatever it was,

9      15-day order to show cause that I agreed to previously with the

10     other cases doesn't fit for these situations.

11              THE COURT:  I understand what you're saying, that this

12     is not as easy as some of the other cases, you're going to need

13     to go through them and flush them out a little bit more.  So if

14     you can folks can meet and confer on this, that will be

15     helpful.

16              MS. FISHER:  Your Honor --

17              THE COURT:  And I think we need to move this along a

18     little.  But to the extent that will result in a resolution,

19     that's fine, we can pick it up from where you're at.

20              MS. FISHER:  Your Honor, can we get a set -- Mr.

21     Pennock, would you be willing to provide a breakdown of the

22     names and which category you believe these each fall into?

23     Because we're not going to be able to have a meaningful

24     meet-and-confer if the information on the January 31st tolling

25     submission that was by each specific plaintiff is no longer

1    accurate.

2          MR. PENNOCK:  I'll give it to you by Friday.

3          MS. FISHER:  That would be great.  Thank you.

4          THE COURT:  Thank you for that.

5          Anything else on these motions to dismiss, orders to

6    show cause?

7          Okay.  So now as to Proposed Case Management Order 9A.

8          MR. KATZ:  Seth Katz for the Plaintiffs.

9          Good morning, your Honor.

10         THE COURT:  Go ahead.

11         MR. KATZ:  I guess it's afternoon.

12         I've been working, and been fairly successful, in

13   negotiating the CMO with Ms. Fisher and Mr. Camp related to a

14   process for Plaintiffs who never served a fact sheet.  If

15   you've secured it and there's a dispute about whether or not

16   there are deficiencies, that's not part of the process that

17   we're talking about now, that's separate.  Those would remain

18   under the existing CMO.

19         This would just take -- kick in after not serving a

20   fact sheet at all, getting the non compliance letter the

21   meet-and-confer in 14 days and then we're working on that

22   process.  And we've reached a point where we're down to two

23   issue after a lot of give-and-take and wordsmithing amongst

24   three of us.  And let me just lay out what those two issues

25   are.  The first is whether the dismissals would be without

1    prejudice like you addressed in the tolling motions moments

2    ago, or with prejudice.  And I'm sure you can guess which side

3    is on which version of the dismissal and I probably don't need

4    to go into that very much.

5              THE COURT:  You don't need to.  And obviously on this,

6    as with everything else, I will do them without prejudice.

7              MR. KATZ:  Okay.  And then the other issue -- and

8    admittedly this is one that we haven't actually had a chance to

9    actually speak on the phone about because it came up late -- is

10   whether or not in light of what's going on in the world,

11   electronic signatures on the fact sheet.  Now, if you don't

12   have a signature at all, that doesn't aid your case under this

13   CMO.  But we proposed -- and again it was late in the process,

14   it's part of a negotiation -- that some kind of electronic

15   signature should be sufficient under this process.  You know,

16   whether it's a photograph of the signature page, whether it's

17   an email of the signature page --

18             THE COURT:  I mean, I think that that would be fine

19   under the current circumstances.

20             Is there any issue with that?

21             MS. FISHER:  Well, your Honor, we're not talking

22   about -- I'm not opining or taking a position on electronic

23   signatures or non original signatures for PFSs that are

24   produced in conjunction with the deadline and CMO 9.  We're

25   talking about Plaintiffs who in some cases for two or three

 1    years have failed to produce a Plaintiff Fact Sheet.

 2              So the plaintiff would be subject to the CMO, they

 3    would get ample notice, they would get ample opportunity to

 4    cure, and we think that these plaintiffs should have to have a

 5    signature.  Not just a photocopy of the signature.  We haven't

 6    talked about that and that might be something we can work on.

 7    But what was proposed to us was an e-signature.  And I just

 8    think for 426 Plaintiffs to have failed to serve a PFS after in

 9    some cases two or three years, an ample passage of time, so

10    should at the very least have to sign with their own hand their

11    Plaintiff Fact Sheets.

12              THE COURT:  Okay.  Is there any issue with taking a

13    photo of their signature?

14              MS. FISHER:  I haven't talked with the Defendants

15    about that or the clients.  I think that's something that we

16    can certainly discuss and get back to Mr. Katz on.  Again, when

17    this came up yesterday we were just talking about e-signatures.

18    So I guess we can talk about that and then we can get back

19    to --

20              THE COURT:  Considering where we're at now there has

21    to be some form of an e-signature or some version of it that

22    has to be workable.  So, I think --

23              MR. KATZ:  Yeah.  And, you know, "e-signature" is kind

24    of a specialized term.  But e-signatures aren't good under the

25    Care Act.  But I'm happy to talk with Amy and John about this

1    particular issue and see if we can get it hammered out as to

2    the last term and then kind of get everybody on our side on

3    board as they're going to talk to the other defense counsel.

4    So I don't think that would take very long.  And your Honor's

5    guidance about it being without prejudice also probably takes

6    this down to one issue.

7        THE COURT:  Perfect.  And I just want to point out one

8    thing.  If you're going to do something with the Case

9    Management Order, I know you have it listed on the agenda as

10   9A, just give it whatever new number a case management order is

11   as a proposed number and then you can indicate under it that it

12   relates to number 9.

13       MR. KATZ:  Okay, we can make that change easily.

14       THE COURT:  All right.

15       MS. FISHER:  Thank you, your Honor.  This has been a

16   extremely amicable process with Mr. Katz.

17       THE COURT:  Okay.

18       MS. FISHER:  So I think we can get it hammered out in

19   the next couple of days and get something submitted to you.

20       THE COURT:  Great.

21       MS. FISHER:  Just to circle back real quick.  We did

22   forget -- my apologies -- one tolling issue which was related

23   to Plaintiff Weese who was the sixty-eight plaintiff on the

24   Douglas & London show cause --

25       THE COURT:  No problem.  On Weese I think we discussed

1    it.  There's some opposition there.  Correct?

2        MS. FISHER:  Right.  And I think Mr. Green for Procter

3    & Gamble is going to talk about that on behalf of the

4    Defendants and Mr. London for Plaintiffs.

5        THE COURT:  Okay.  Go ahead.

6        MR. GREEN:  Your Honor, do you want us to go first or

7    would it be better for Plaintiffs to explain why they failed to

8    comply?

9        THE COURT:  I recognize that we have some submissions,

10   so you can be brief and highlight your position.  Thank you.

11       MR. GREEN:  Your Honor.

12       MR. LONDON:  Your Honor, Michael London.

13       I thought the Court was taking this on submission and,

14   frankly, we're somewhat surprised at the opposition.  But

15   nevertheless, as the Court will recall, in Docket 562 an Order

16   to Show Cause was issued for 68 Douglas & London Plaintiffs for

17   not providing proof-of-use and proof-of-injury records.  We

18   sent this Order to Show Cause obviously to our clients, and as

19   indicated by Ms. Fisher earlier, 67 did not respond, one did

20   respond.  That one plaintiff is Jeanie Weese.  And she provided

21   us with injury records and proof of her use -- it was

22   over-the-counter -- an affidavit.

23       I might not be as fresh as -- an affidavit is

24   sufficient for proof-of-use records both in the Tolling

25   Agreement and in the PFS.  Those materials you were uploaded to

1    Markers, which is the website that the Defendants use for the

2    records.  Certain defendants who are no longer implicated said:

3    Thank you for sending this.  Can you please let us out.  This

4    proof-of-use information is sufficient.  We of course let them

5    out.  And then we get a motion from Mr. Green and his client

6    saying, interestingly, that the proof-of-use was insufficient

7    and that it was tardy.

8         I address the insufficient argument because the

9    Tolling Agreement I don't need to cite in line and verse, it's

10   in our papers, says an affidavit is sufficient.  The Court may

11   recall we discussed over-the-counter uses, affidavits wouldn't

12   be sufficient, and that was submitted.

13        The tardiness argument is also vexing because

14   plaintiff -- granted it's late -- responded to the Court's

15   Order to Show Cause.  So if it was after the 28 days I would

16   understand the tardy argument, but it was on day 26 of the 28

17   days allotted by the Court.  So that argument, frankly, doesn't

18   carry any weight.  I appreciate Mr. Green will likely say:

19   Well, it's tardy under the Tolling Agreement.

20        The Tolling Agreement doesn't have a tardiness

21   provision.  It says -- that's why we're in this kind of

22   amorphus state of what happens when they're late.  And what the

23   core Defendants have created is this order to show cause

24   finality process:  Respond or your gone.

25        Plaintiff responded.  Sufficiency of the records

1     should not be disputed.  And certainly here when we have an

2     injury record, nobody is disputing her injury, and now we have

3     an affidavit saying "I used this over-the-counter product," I'm

4     befuddled at the opposition and, frankly, the case, we submit,

5     should be removed from the order to show cause and not

6     dismissed as Mr. Green seems to advocate in his filing.

7              Thank you.

8              THE COURT:  Okay.  Thank you.

9              Mr. Green.

10             MR. GREEN:  Thank you, your Honor.  K.C. Green for

11     Procter & Gamble, but also on behalf of AZ in this one.  It's

12     not just P&G that's insisting that what we got here was

13     woefully late and woefully inadequate.

14             From our perspective, your Honor, this case is frankly

15     "Exhibit A" of how some of the Plaintiffs and their counsel are

16     abusing the system here and thumbing their nose at the

17     agreement they willfully signed.

18             To take a look at this plaintiff, she got nine months

19     to investigate her claim through the Tolling Agreement.  And

20     what did she do?  She did absolutely nothing.  She files the

21     complaint the end of January of 2019, and she checks the box

22     after every single PPI in the complaint, plus the -- checks the

23     box, "other."  We still don't know what "other" is.  But she

24     checks every single box.  She checks every single box after

25     every defendant.  So basically did nothing.

1          And then what does she do after that?  She's got an
2    obligation within seven business days for the Tolling Agreement
3    to supply the proof-of-use and proof-of-injury information, and
4    what does she do then for many months?  Absolutely nothing.

5          We finally had the Defendants, all of the Defendants,
6    including a bunch of defendants who it now appears this lady
7    finally realized, whoa, I didn't take nine of them, I took
8    one.

9          The Defendants have to analyze this case, move to
10   dismiss it.  Ultimately the Court issues a show cause order, at
11   which point we're already 13 months past when this information
12   was to have been supplied in order to be compliant with the
13   Tolling Agreement.  That Order by the Court required her to,
14   quote, explain why her case should not be dismissed for failure
15   to comply with the parties' Tolling Agreement, unquote.

16         And as we sit here today she has still not explained
17   why her case should not be dismissed for failure to comply with
18   the Tolling Agreement.  She clearly failed to comply with it,
19   and she's given that no explanation as to why it took her 14
20   months and a motion to dismiss and a show cause order for her
21   to do anything, virtually anything.  I mean, she didn't file an
22   affidavit saying:  I was abducted by aliens for the last 12
23   months and therefore couldn't collect this information.
24   Nothing.  We have no explanation as to why it took so long; and
25   on top of that, why it remains well off base in terms of what

1     is required by the Tolling Agreement.

2          The submission that Plaintiffs made, as I say, offered

3     nothing to justify the failure to comply with the Tolling

4     Agreement.  They offered absolutely nothing on eight of the

5     PPIs she originally claimed that she took.  I mean, it just

6     baffles -- it boggles the mind how she could file a complaint

7     and say she took nine PPIs and then turn around and say 14

8     months later, I took one.

9          The submission -- now she said she took one PPI rather

10    than the nine.  And seriously, it took nine months of tolling

11    and 14 months of failing to comply to come up with that?

12         And as to the one PPI that she now claims she used, we

13    get no record at all.  There's no written record.  So that part

14    of the Tolling Agreement is not complied with.

15         Mr. London is absolutely correct that there was an

16    exception if you made great strides and great efforts to try

17    and get records and were unable to do so, you could put in an

18    affidavit.  But that affidavit, the Tolling Agreement makes it

19    very clear that that affidavit need to -- at a very minimal,

20    the language is that at a minimum, that affidavit must contain

21    the following five points.  And this plaintiff, that affidavit

22    picks two of the five required points in the affidavit

23    requirement for the Tolling Agreement.

24         The three that she missed, one of which seems to be an

25    awfully easy one to hit if any effort had been made whatsoever

1    is the affidavit must say at what store or pharmacy the product

2    was purchased.  That's not in the complaint.

3         THE COURT:  Okay.  You know what, let me just jump in

4    for a second.  All of this is in your papers.  Correct?

5         MR. GREEN:  Most of it, yes.

6         THE COURT:  Is there anything that you would like to

7    say that's not in your papers?

8         MR. GREEN:  Well, I will add, that the point the

9    Plaintiffs have raised in their -- I don't know what you want

10   to call it -- there's a response to a show cause order or reply

11   I guess, their last filing raised the, frankly, ridiculous

12   suggestion that the fact that after 14 months and a motion and

13   we file our response, Plaintiffs finally say -- well, even

14   then, Plaintiffs' counsel and plaintiff did nothing to dismiss

15   the Defendants whose -- admits the products weren't taken, it

16   took the effort by the Defendants to get that dismissal.  But

17   somehow from that process in their most recent filing,

18   Plaintiffs are arguing that the fact that the other defendants

19   took dismissals somehow validates what was submitted by this

20   plaintiff, which is just beyond belief.  Because the

21   Defendants, those defendants shouldn't have been riding in the

22   case for 14 months while this lady did nothing.  But it

23   certainly doesn't validate the inadequate -- or the adequacy of

24   what she submitted.  Because what she submitted is clearly well

25   off base in terms of what is required.  And I would venture to

1    say that a call from the co-defendants that have been

2    dismissed, they would all agree that what plaintiff submitted

3    here was woefully inadequate as well as late.  And for those

4    reasons we think this lady, her claim should also be dismissed

5    per the show cause order.

6              THE COURT:  Thank you.

7              MR. HINDY:  Judge, if I could add a few points because

8    I don't want it to get lost in the weeds here.

9              THE COURT:  Okay.

10             MR. HINDY:  The Weese case is pretty representative of

11   many, many cases in this MDL, and that is, many cases were

12   filed when they really knew nothing about them.  As Mr. Green

13   pointed out, I think she checked off boxes that she used every

14   one of the PPIs and sued all the Defendants.  And that scatter

15   shot approach has really hurt and stalled this litigation in

16   some ways.  It's more than two years later now we've learned

17   that she only ingested one of the PPIs, Prilosec,

18   over-the-counter.

19             And that's really the "dirty little secret" of this

20   MDL.  When a significant number of plaintiffs filed their cases

21   they really knew nothing about them.  And now we've wasted two

22   years, or 15 months on getting to the bottom of this.  It took

23   a motion to dismiss, an order to show cause -- you know, an

24   argument, many months of delay therein, finally an order to

25   show cause entered by your Honor.  And now, of the 68 cases on

1    that order to show cause, 67 were dismissed but this one

2    remains, and this one should be dismissed.

3          If you look at what the Tolling Agreement provides for

4    a PPI user affidavit, it's significant pieces of information.

5    Here, all she did was say:  I used it and/or I recall taking a

6    PPI, and/or recall being prescribed a PPI by my doctor, and/or

7    recall purchasing it.  So it's the qualifying statements

8    without any indication of what she actually did to research or

9    review or the due diligence she did to actually determine what

10   it was she took.

11         And just to correct one misstatement.  The Tolling

12   Agreement did require seven days after they filed their

13   complaints off the Tolling Agreement, that they provide

14   proof-of-use/proof-of-injury, and if they didn't they were

15   subject to motions to dismiss or they were subject to

16   dismissal, which is why we moved to dismiss in 5,000 of these

17   cases and why a significant amount, I think it's around 4,000,

18   maybe 4500, still remain on that original motion to dismiss

19   list.

20         So if we have to go through this exercise with every

21   one of those who either filed tardy proof-of-use or

22   proof-of-injury or still had gaps in what they have filed that

23   are insufficient with the Tolling Agreement, we'll be at this

24   for years, literally years.  And I think we need to get on this

25   and dismiss those from the lawsuit.  It's cheapening the

1     lawsuit to those who are rightfully in it with the proper

2     documentation, and it hurts all the other Plaintiffs, it hurts

3     the Defendants in terms of spending time, and certainly it

4     hurts the Court in having to deal with it and listen to us go

5     on and on about it over and over.

6            Thank you.

7            THE COURT:  Okay.

8            MR. LONDON:  Your Honor, it sounds like the woes of

9     the world between counsel there.

10           So we're here to address the Weese case.  And, you

11    know, Mr. Green spoke many times, but clearly, clearly,

12    clearly.  I remember years ago a judge told me that when

13    someone says "clearly" it usually ain't clearly.  It ain't

14    clear.  And I'm not sure where to address Mr. Green's

15    arguments.  I don't really intend to.  I don't believe he

16    articulated much.

17           With respect to what Mr. Hindy indicated, he is

18    correct that there are a lot of motions to dismiss.  And where

19    he's incorrect is that many of these are being addressed by the

20    Court to the order to show cause process.  This litigation

21    hasn't been stalled one iota because of Ms. Weese's case or any

22    of these cases.  The litigation has moved on.  These are

23    case-specific issues.  These have not impacted anything.  But

24    that's not really the crux of this argument here.  This is the

25    Weese case.  And 67 other cases were dismissed properly.

1          I, frankly, can't fathom the bellyaching, and I don't

2     think the Court should hear this.  And Ms. Weese complied.  I

3     was surprised to see Mr. Green's objection.  But she complied.

4     She gave them -- this is precisely why you gave them the order

5     to shows cause.  In 14 or 18 days they got 67 dismissals.  Ms.

6     Weese gave the information.

7          And I think what underscores the disingenuousness of

8     their argument is that they're arguing tardiness -- she

9     complied with the Court's order -- and they're arguing

10    insufficiency.  They know that the affidavit suffices for

11    over-the-counter records.

12         So with that, your Honor, I think on the Weese case we

13    think the case should remain.  She complied with the Court's

14    Order to Show Cause and with the Tolling Agreement.

15         Thank you.

16         THE COURT:  Thank you.  Obviously I'm not deciding

17    this today.  I appreciate the arguments that have been

18    presented, but I am going to take a look at it.

19         And with that, are we able to move on?

20         Okay.

21         MR. HINDY:  One point, and that is the 67 cases that

22    were dismissed should never have been filed in the first place.

23    And that has wasted time.  That's what's stalling -- it wastes

24    defendant time.  Maybe Mr. London doesn't appreciate that, but

25    it wastes our time in reviewing what has been filed, the

1    insufficiencies in those cases.  So of the 67 of the 68 cases,

2    none of them should have been filed.

3              MR. LONDON:  Your Honor, we actually don't dispute

4    that fact.  As the Court may recall, and the Court will

5    certainly recall, Plaintiffs were trying to negotiate at the

6    time of a Government shutdown an inability to file cases.  And

7    we thought we had an understanding with defendants -- and I

8    think we all know certain defendants pooled the wool out on

9    that situation -- we hoped to delay those filings so we can

10   gather more.  But the Defendants would not give reprieve so we

11   could gather more records.  That was the Defendants.  These

12   filings were at their doing.  So we have gone far afield of Ms.

13   Weese's claim who complied with the Court's Order to Show

14   Cause.

15             So Mr. Hindy can try and rewrite the history, but when

16   these cases were filed we talked about bundling, we talked

17   about the burden on the Court's staff, we begged and asked the

18   defendants for a reprieve.  Some defendants on this call

19   agreed.  Other defendants said they agreed and pulled the wool

20   out -- the rug out from the Plaintiffs at the last minute when

21   we had all relied on what we thought was an agreement.

22             So I don't think Mr. Hindy should take the time to try

23   to rewrite history, nor should he do it on one specific case,

24   the Jeanie Weese case, where she complied with the Court's

25   Order to Show Cause.  Hopefully now we're done.

1          THE COURT:  I think with that, let's move on.  As I

2     indicated, I want to look at the application.  We're not going

3     to be deciding anything today.  I understand what your

4     arguments are but I would like to look at it myself and go back

5     to what you submitted in writing.  So there's still opportunity

6     here to discuss this, but I think I've received enough today.

7          Is there one last thing?

8          MS. FISHER:  Your Honor, I apologize because I know

9     you don't like to keep talking about this and I don't either

10    but I could not live with myself on behalf of my client if I

11    did not say one more thing here, which is to, number one,

12    clarify that the tardiness issue is really irrelevant.  That

13    was just something to point out that after all of this period

14    of time you would think that whatever was going to be produced

15    would be compliant.  And what was produced we're not talking

16    about insufficiency as we're hearing, it was not compliant.  It

17    was an affidavit that didn't comply.

18         And as Mr. Hindy said -- and I think why we're so

19    exercised about this -- this one case, while this one case is

20    emblematic of really a large problem with this entire docket of

21    14,000 Plaintiffs.  If you look at Mr. London and Ms.

22    O'Connor's cases, they have over 1500 cases in this MDL, and

23    taking aside the tolling cases, only 10 percent of them are

24    Stage 1 substantially complete.

25         And so for reasons like that being filed, not only is

1    it a burden on the Court to address these issues and we've

2    spent 30 minutes talking about this one case today and on the

3    Defendants, but we're talking about each Defendant's patient's

4    safety and global regulatory departments who are having to go

5    through each of the new complaints --

6            THE COURT:   You know what, I understand the arguments

7    in terms of burdens and issues on both sides.   I get it.   I

8    think we have to move on.   All right.

9            And I appreciate the concern here, but given the

10   length of our agenda for today, I think we can move on from

11   this issue.   As I indicated, I'm going to take a look at the

12   papers, I'm going to reflect upon what you said.   Everyone has

13   had a chance to speak on this.   I think, let's move on.   All

14   right.

15           MS. FISHER:   Thank you.

16           THE COURT:   Thank you.

17           As far as the next issue on the motions to withdraw.

18   We had received several motions to withdraw as counsel, and we

19   held on to them because there was no indication on them that

20   the plaintiff had additional days to find new counsel or go

21   pro se.   I believe today we received in new drafts, new

22   versions of those orders.   And I don't see there is any issue

23   with them, so I planned on granting those applications to

24   withdraw.

25           Does anyone have any issue on those?

1           MS. FISHER:  No, your Honor, I think those have all
2      been non opposed.
3           THE COURT:  Great.  The next one is Volume and
4      Viability of 2020 Complaints.
5           MS. FISHER:  Yes, your Honor.  I think this is a good
6      segue of where we were on the tolling issue.  The 2020
7      complaints are a subset of a larger issue.  We have the
8      litigation, the MDL, that's been pending for four years, and as
9      we've said the vast majority of the plaintiffs still cannot
10     demonstrate that they either took the products alleged or
11     suffered the alleged injury.
12          So it's disconcerting to suggest that we see here just
13     in 2020 that there are now almost 14,000 cases in this MDL,
14     almost 1,000 of which have been filed just in the last couple
15     of months.  So we have cases where there have been no product
16     ID, cases where there has been no proof-of-injury.  We have 247
17     cases against AZ alone that are duplicate cases, some are
18     triplicate cases that we can't get this information despite
19     weekly requests from the Defendants.
20          The problem with this is that the way the protocol and
21     the CMOs are structured, these cases are not vetted for filing,
22     not all of them, but a lot of them, and they remain unvetted
23     and then we have to deal with these cases, the Defendants and
24     the Court, in any number of ways through an agonizing now
25     two-year long tolling process.  And as I said, we just spent

1    over 30 minutes on one tolling plaintiff.  No Plaintiff Fact

2    Sheet Notice Letters, their motions to compel, their months and

3    months of negotiations on a no-plaintiff fact sheet CMO, a yet

4    to be negotiated Stage 2 CMO or no injury CMO, statute of

5    limitations motions, and so on and so forth.

6         For the cases outside of 2020, your Honor, of the 7200

7    cases that were filed from the inception of this litigation

8    through 2019, and that are not subject to the tolling motion to

9    dismiss, only 28 percent are Stage 1 and substantially

10   complete.  And while some cases are getting dismissed, and we

11   appreciate that, the docket is continuing to fill back up at an

12   alarming rate.  The cases that we know, some of which are time

13   barred, cases that were on monthly tolling lists from one-year

14   states, one-year statute of limitation states that are now just

15   being filed and are clearly time barred, cases that don't have

16   proof-of-use because we're getting requests directly to

17   Defendants' safety departments for proof-of-use records the

18   same day a case is being filed, complaints that have no date of

19   injury; and of course proof-of-injury is not required as part

20   of the current PFS.

21        So back when the original Plaintiff Fact Sheet was

22   negotiated and the original CMO was entered, there were only a

23   couple hundred cases and so the process was not one that could

24   necessarily work.  A full-blown long form Plaintiff Fact Sheet

25   produced months and months down the road was not necessarily

1    problematic.  However, with 14,000 cases now in this MDL, we

2    really need an earlier, more straightforward protocol that we

3    can employ at the outset of each case to separate the wheat

4    from the chaff.

5         Let me just give you one specific that I think is

6    really compelling and then I can tell you what we would propose

7    we do to fix this going forward.  Of the Plaintiff firms who

8    have 80 percent of the docket, for their cases that have

9    reached the PFS deadline and are not part of the tolling

10   motions to dismiss, the percentage of Stage 1 substantially

11   complete cases range from a mere 6 percent to 18 percent.

12        So we would like your Honor's cooperation and

13   encouragement to meet and confer with the PSC on a process

14   whereby at the outset of each case proof-of-use is required,

15   date of injury and a proof of injury production in the form of

16   perhaps a short plaintiff profile form or some other process

17   the parties can agree to.  And I think that's something that we

18   can start talking about with the PSC now, and we would ask for

19   a deadline to meet and confer on that and then update the Court

20   on the status of that meet-and-confer.

21        THE COURT:  Okay.  Anyone on this?

22        MR. PENNOCK:  Paul Pennock.

23        I'm not sure what issues the Court would like me to

24   address.  This one that's just been raised here at the end is

25   some type of new process.  While I know this may have been

1    discussed briefly with Mr. Katz and maybe only in the last day

2    or so, we've not discussed it on our side yet.  Obviously we

3    can talk with them about it, but there's just a lot to unpack

4    from what Ms. Fisher was just laying out on the table.

5           The bottom line is, this drug does not have a warning

6    on it for chronic kidney disease.  If they want to stop chronic

7    kidney disease filings, they should go and advise their clients

8    to put a warning on it instead of meddling with the FDA to

9    prevent a warning, which is what they've been doing for two

10   years

11          There are people that are going to continue to be

12   diagnosed with chronic kidney disease that we believe was

13   caused by this drug.  We will always, and always have had, the

14   problem of healthcare providers not cooperating with

15   plaintiffs' lawyers to provide records in the time frames that

16   we need to get them.  That's nothing new.  It's been going on

17   for decades.  There have been statutes that have been enacted

18   to require healthcare providers to act upon those requests,

19   even what the costs of those records should be.  So that's

20   nothing new.  It's difficult.  We stand ready to defend our

21   efforts of due diligence in what we have done in these cases,

22   and some of them might not look at strong in terms of that as

23   others but the vast majority will.

24          But the bottom line is that there are new and

25   additional plaintiffs in cases that will be filed and it's

1    going to continue.  I mean, I don't know what else to tell them
2    about that.

3              As far as issues concerning why are these cases being
4    filed now three years into this MDL?  Many of them were
5    retained only in the last year or year and a half or even in
6    the last months.  These cases, again, these people are being
7    diagnosed and then seeking counsel.  Also, there are obviously
8    states that have much longer statutes of limitations than
9    others.  For example, Florida has a four-year statute of
10   limitations from discovery.  So there are all sorts of reasons
11   why these cases are being filed now and they will continue to
12   be filed.

13             In terms of the duplicate and triplicate cases, that
14   is the first I've heard that.  That doesn't mean they haven't
15   raised it with someone and it just hasn't reached me.  I'm
16   happy to personally take that issue on and find out what's
17   going on on that because I've already sent an email on it, and
18   that certainly raised my eyebrow and I want to find out what's
19   happening there.  That's an example of a problem that can and
20   should be fixed expeditiously.  But there will be new filings.

21             I think that the process that Mr. London spent
22   probably two months or more negotiating regarding fact sheets
23   at the beginning of this litigation is adequate to the task and
24   is really quite similar in most ways to fact sheet processes
25   that have happened in other MDLs.

1             So, if the Court wants me to address something
2       specific, I can do that.
3             THE COURT:  No, I think that that's fine.  Obviously
4       you haven't had a chance to discuss any of this.  I would
5       imagine you are able to put your researches together to
6       determine whether there's anything to be done with those and
7       how to address them.
8             In terms of any of the other issues, I suppose you
9       could have a meet-and-confer on this issue.  But what I'm
10      hearing is that there are just new cases arising at this point
11      in time and that they are getting filed.  So go ahead with your
12      meet-and-confer on this, but I'm not sure what the real result
13      is going to be here on this aside from the actual duplicates,
14      which I think you should address.
15            MR. PENNOCK:  I will, Judge, I will address that.  And
16      on the other issues I will take the lead with Ms. Fisher in
17      addressing these in the coming month.
18            MS. FISHER:  Thank you, your Honor.  And thank you,
19      Mr. Pennock.
20            We will certainly work with him on the duplicates.  I
21      do want to clarify that this has not been raised with Mr. Katz.
22      To the extent he's getting that email from his side, this is
23      not something that we talked about.  That was limited to just
24      addressing the plaintiffs who have not provided a Plaintiff
25      Fact Sheet.  But I do think that that process is telling, the

1      fact that we have to amend the CMO and have a process for

2      plaintiffs who have not provided a Plaintiff Fact Sheet for, in

3      some cases, two or three years.  You know, that's the issue.

4      And when we have this large of a volume of cases, a long form

5      Plaintiff Fact Sheet that is not required until after service

6      and after a defendant's notice of appearance, and then even

7      then 90 days, that was a reasonable amount of time.  But now

8      with this many cases there needs to be a way for us to get some

9      information, some basic information about the viability of the

10      case at the beginning and perhaps to have a short form

11      Plaintiff Fact Sheet at the beginning, and then if the

12      plaintiff is Stage 1, then a long form Plaintiff Fact Sheet is

13      required.

14              I'm just following here some of the things we can talk

15      about.  But I think Mr. Pennock also mentioned in some cases

16      these individuals have just retained counsel.  Retention of

17      counsel information might be helpful for us to evaluate some of

18      these cases as well.  We're not disputing that some of these

19      are viable cases, but as your Honor had seen through the

20      tolling process, a large number of these cases are not viable

21      and should not have been filed, or at least not against some

22      defendants against whom they were named.

23              So we would like to use the next couple of months, the

24      next six months to get a process in place that vets these cases

25      at the outset so that your Honor is not having to deal with the

1    viability of cases that have been filed three, four years down

2    the road.  Because, for example, these new cases that have been

3    filed in 2020, it's possible that we might not get Plaintiff

4    Fact Sheets for those until actually 2022.

5              THE COURT:  Okay.

6              Let's move on to the next issue.  I think it's PSC's

7    Motion to Quash Non-Party Discovery Request.

8              Are you going to hold on for another day, is that it?

9              MR. THOMPSON:  That's correct.  And just so the record

10   is clear, counsel for Lucy Business Service has been

11   unavailable to date.  We did reach out to counsel, and the name

12   is Wailes, George Wailes, W-a-i-l-e-s.

13             THE COURT:  Yes.

14             MR. THOMPSON:  And Mr. Wailes has indicated that he

15   will be available for the May 20th CMC, and so we can recheck

16   the issue on the calendar at that time.

17             THE COURT:  Okay.  That sounds fine to me.  Let's move

18   forward then.

19             Now, the next issue is Effectuation of Dismissal of

20   Novartis Entities.

21             And I believe we have a draft of a proposed form of

22   order.  Any issues on that?

23             MR. REISSAUS:  Yes, your Honor.  This is Andrew

24   Reissaus for the Novartis entities.

25             I don't think there are any issues for the Court to

1    address right now.  We have agreement from the PSC.  We've been
2    working with Mr. Grand on this to the dismissals.  There's one
3    paragraph in the draft that we sent the Court that deals with
4    the procedure for the dismissals that the PSC is reviewing.  My
5    hope is that we can finalize that very soon and get a final
6    order to you maybe as early as the end of the week, perhaps
7    next week.

8             THE COURT:  Okay.  That sounds fine.

9             Anyone on that issue?

10            MR. GRAND:  Yes, your Honor.

11            That is correct, we are reviewing the order.  We hope
12    to get that to the Court.  I think we may need up to 30 days to
13    ensure that the list is accurate because that's not something
14    the PSC can do on behalf of other Plaintiffs.  We will have to
15    sort of circulate that list to all law firms that are
16    implicated --

17            THE COURT:  Yes.

18            MR. GRAND:  -- to make sure it's accurate.  But we
19    would expect to at least have an order, the order finalized
20    within seven days.

21            THE COURT:  Okay.  That sounds fine, so we will be on
22    the lookout for it.

23            And if there are any issues we'll be happy to deal
24    with them, but otherwise it sounds like you are both working
25    through this.

1           Now, Update on Discovery.

2           And there are a variety of discovery matters.  The

3    first is on deposition scheduling.  So let me hear from who

4    wants to be heard on that issue.

5           MS. O'CONNOR:  Your Honor, Stephanie O'Connor.

6           As you know, there are a number of bullet points under

7    the Update on Discovery and different folks will be addressing

8    different issues.  I just want to say at the outset that I

9    think that bullet point number two that deals with remote

10   depositions is somewhat subsumed in updating deposition

11   scheduling which I would like to address briefly before others

12   address this too.

13          THE COURT:  Go ahead.

14          MS. O'CONNOR:  As your Honor is aware, I brought to

15   the Court's attention the concern on the part of the PSC for

16   some time, I would say the last several CMCs I've raised the

17   issue of recalcitrance in rescheduling depositions primarily

18   regarding AstraZeneca.  I thought that in order to frame the

19   rest of the discussion about depositions some statistics might

20   be in order.

21          AstraZeneca has not produced a witness at deposition

22   since December 4th, albeit notices have been issued for dates

23   far sooner than anything having to with COVID.

24          And with regard to Takeda, we've had one deposition

25   this year in January of one witness.  There have been no

1    depositions aside from one, and I think there's been only one

2    deposition this year in late February of P&G.  So here we are

3    late April and we've had two depositions this year with an

4    opportunity to have done more much before the COVID-19

5    situation, which will be addressed separately.

6             I just want the Court to be aware that this is where

7    we are, and the other concerns will be addressed as well.

8             THE COURT:  All right.  Thank you so much.

9             Who else wants to join in and respond?

10            MR. DOUGLAS:  Matt Douglas very briefly on behalf of

11   AstraZeneca.

12            THE COURT:  Yes.

13            MR. DOUGLAS:  We had 12 depositions scheduled to occur

14   in April and May and then a couple into June before COVID-19

15   hit.  So I do think that after the conversation we had with the

16   Court, I believe it was in February, we proposed dates, we had

17   agreed upon dates and locations for those 12, and then the

18   global pandemic hit.  So I don't believe that there's validity

19   to that "recalcitrant" issue, but I don't think there's

20   anything for the Court to address there.

21            THE COURT:  Let me just talk about the schedule moving

22   forward.  Have you folks really spoken and agreed on a path for

23   moving forward?  Because of course we have a schedule in place

24   and I would like to keep it as close as possible to it.  So to

25   avoid anything disruptive, that would be disruptive to our

1    schedule I would like to build in a plan so we know we're going

2    to move forward with some degree of deliberateness.

3            Who wants to talk about that?

4            MR. GRAND:   Jeff Grand.

5            I think part and parcel of that plan is getting an

6    order in place for the remote depositions because that really

7    is the only way to keep us moving forward.  And the order that

8    the PSC proposed does not put anyone at risk or endanger

9    anybody's safety.  As we noted in our opposition papers to

10   Defendants' motion for a stay, we will defer the deposition of

11   any employees or former employees who were involved in

12   developing treatments for COVID-19.  We will defer the

13   depositions of any treating physicians of the Plaintiffs

14   because we understand the medical community is really taxed

15   right now.  But there are witnesses who aren't involved in such

16   work whose depositions should continue as scheduled.  There's

17   marketing personnel, there's sales reps, there's plaintiffs and

18   their family members.

19           But Defendants, they adjourned 11 witnesses in April.

20   They're suggesting now in their motion for a protective order

21   to adjourn another eight.  That's 19 witnesses.  And,

22   frankly -- and there's been no commencement on depositions of

23   Plaintiffs or their family members which would be required

24   under our bellwether discovery plan.

25           And we believe, frankly, that we're going to be living

1    in this world now for several more months.  Because even if

2    some restrictions start to be lifted, there are going to be

3    attorneys, there's going to be witnesses who are not

4    comfortable traveling, who are not comfortable being in another

5    room with somebody.  And certainly even if things do sort of

6    begin to open up again there are going to be all types of

7    social distancing restrictions in place.

8              So our plan accounts for all of that.  And these are

9    difficult times.  And the fact that something is inconvenient,

10   the fact that something is a little harder to do than the way

11   we're used to doing it should not be a basis for basically

12   grinding this litigation to a halt.  We can move forward with a

13   lot of depositions if we can take them remotely.

14             Defendants, we proposed this twice to Defendants.

15   Frankly, we proposed it right before even the core discovery

16   period started and we've been -- this has been rejected over

17   and over again which is why we submitted the proposed order to

18   your Honor.  But we need to get this in place.  And, frankly,

19   even if your Honor was inclined to grant their motion to stay

20   this litigation until May 15th, we would still need a remote

21   deposition order in place because we've got to get caught up

22   here and we've got to take the depositions we're supposed to be

23   taking during this time period.

24             THE COURT:  Okay.  Anyone?

25             MR. THOMPSON:  Your Honor, Craig Thompson for Takeda

1    and Abbott.  I'll be addressing the motion for a protective
2    order.
3         Let me start by answering your question directly.  No,
4    we've not agreed upon a path moving forward.  We have invited
5    Plaintiffs to discuss it and we've not been able to have a
6    meet-and-confer on the issue.
7         THE COURT:  Okay.  You know what, let me stop right
8    there.  Shouldn't we be doing that?  Because obviously it's in
9    everyone's best interest to move this forward, to stick to our
10   plan.  We worked diligently to arrive at the plan.  And I
11   realize the circumstances are unprecedented with the COVID-19
12   virus and we are all addressing that and trying to determine
13   how to best move forward while still addressing those issues.
14   But I would imagine that there is some opportunity for sitting
15   down and determining which witnesses could have their
16   depositions go forward first who are not directly impacted, and
17   you could move from there.  And I think at this point most
18   litigation, most large-scale litigation is going forward with
19   providing some opportunity for videotaped depositions in order
20   to move their cases forward.
21        So with that in mind I think it would be a proper time
22   for both sides to get together and sort of structure how the
23   depositions are going to proceed.
24        MR. THOMPSON:  If I might, your Honor, just in advance
25   of our most recent Protective Order.  We don't disagree with

1    that and, in fact, that's part of our request in our motion and
2    it's a very simple request, your Honor, at least in part with
3    what you're saying.  The postponed depositions that are
4    currently scheduled in May, they order us to meet-and-confer by
5    May 15th, and then --

6         THE COURT:  Here's the question though.  Why would we
7    have to defer all deps through May 15th?  Why wouldn't be able
8    to start taking deps as a matter of this week?  I mean, to the
9    extent the prep has already been done, why wouldn't they be
10   able to be placed on the calendar and why wouldn't they be able
11   to move forward?

12        If you are able to do videotaped depositions, it seems
13   to me that everyone should be able to address the schedule and
14   move forward.  At this point then that would be talking about
15   almost three weeks of a standstill.

16        MR. THOMPSON:  Let me address that, your Honor.  We're
17   not talking about putting the litigation to a grinding halt,
18   that's simply untrue.  What we are doing is looking at the
19   circumstances that you indicated, your Honor, are
20   unprecedented, I think everyone certainly understands that, and
21   looking at how best to move forward.

22        I'm reminded, your Honor, at the beginning of this
23   litigation when the topic of dismissals was on the front
24   burner, I recall your Honor saying both off and on the record
25   that you don't just see cases or case numbers but you see

1    people.  And all we're asking you to do today, your Honor, is

2    to stay consistent with that perspective at least and not just

3    see depositions of people.

4         THE COURT:  Let me just jump in again on that.  And

5    obviously that makes sense and I stand by that position.  But

6    at the same time, if certain individuals could be deposed now

7    and they don't have any compelling circumstances for not taking

8    their depositions at present, why wouldn't be able to structure

9    the line of depositions in a way that we would be able to

10   engage with people who can go forward with their depositions

11   during this period; and those who have some difficulty,

12   obviously we're going to structure it so that they're not

13   impacted at this point?

14        MR. THOMPSON:  That assumes that everyone can go

15   forward immediately.  That also assumes that preps have taken

16   place.  And, in fact, not all preps have taken place.

17        We have had, your Honor, with respect to a former

18   employee trouble getting in touch with them, and some may

19   simply say to us:  Look, I'm not prepared to do anything at

20   this time.  I'm nervous, I'm anxious, I'm litigation-naive.

21   There are any number of things that we have to continue to

22   address over the next several weeks, and we will continue to do

23   that.

24        Today's issue, for example, is Exhibit A.  Just this

25   call we've had issues with people connecting, we've had your

1    Honor unfortunately drop off for a little bit of time, Walt

2    could not hear some of the things.  I mean, there are some

3    logistical concerns we have to address, there are safety

4    concerns we have to address, there are personal concerns we

5    have to address.  Just today, as Mr. Brown indicated earlier,

6    his 14-month-old was looking in the window at him.  We've been

7    able to work remotely because we've been able to control, in

8    part, our space, but there are times, three times just today

9    your Honor, a 9-year-old, a 14-year-old and a 16-year-old have

10   come in for various reasons, and my sense is that my experience

11   is not uncommon, it's probably more common than it is uncommon.

12        I just want to focus on and make sure we're focusing

13   on all the people involved and that we're adjusting accordingly

14   for that we are in unprecedented times, and we need to make

15   sure that when we have that conversation, that we have that

16   conversation with the folks in mind, with the people in mind.

17        THE COURT:  Let me --

18        MR. THOMPSON:  There are logistic concerns that were

19   raised in my papers --

20        THE COURT:  Let's talk about that though, because

21   obviously videotaped depositions nothing new.  Videotaped

22   depositions take place in circumstances not involving our

23   current crisis.  So just as a framework, any issue with respect

24   to those?

25        MR. THOMPSON:  Videotaped depositions do, in fact,

1    take place.  But I will say, your Honor -- and this is another
2    strong, significant concern of ours -- usually counsel
3    defending those depositions are in the room with the witness.
4    And as we noted in our papers, that's an extremely important
5    point, one that I commend your Honor's attention to a
6    Declaration submitted by Chris Allen who is also on the line
7    from Takeda.  So in those videotaped depositions there is
8    significant contact between the defending attorney and the
9    witness prior to the prep as well as during the course of the
10   deposition.  So we certainly don't object to the fact that --
11   or argue the fact that videotaped depositions take place, but
12   that's in a different context.
13          THE COURT:  Well, you know what, I do know my brethren
14   in similar cases have been authorizing videotaped depositions
15   to go forward.  And obviously everyone is mindful that certain
16   individuals are impacted.  They're not going to be going
17   forward at this point in time.  But if we have other
18   individuals who can be deposed, I certainly don't think that we
19   should halt the litigation at this point in time and do a wide
20   scale stay here.  There's got to be some way that we
21   accommodate videotaped depositions, allow them to proceed.
22          I'm just going to draw an example.  I mean, we are
23   doing sentencings and pleas via videotape at this point in time
24   in criminal proceedings.  There's got to be a way to have this
25   schedule move forward.

1           MR. GRAND:  We're not sure who you wanted to response
2    from, your Honor.
3           THE COURT:  Let's hear a response from the Plaintiff,
4    please.
5           MR. GRAND:  I think Mr. Pennock had something to say,
6    but I want to make it clear that --
7           THE COURT:  I'm sorry.  Who is speaking now?
8           MR. GRAND:  This is Jeff Grand.  I apologize.
9           THE COURT:  Go ahead.
10           MR. GRAND:  I want to make it really clear that their
11    motion does not say:  Let's talk about doing remote
12    depositions.  Their motion says:  Let's wait until May 15th.
13    Let's take down all depositions for May, and then on May 15th
14    we'll talk about whether we're going to have to take down more
15    depositions.  So they have flat out been opposed to remote
16    depositions, and in their papers they say they're flat out
17    opposed to remote depositions.
18           But I would note that during this very phone call that
19    we've had today, another order just came down ordering remote
20    depositions over defendants' objections, because courts are
21    recognizing that this is a viable way to move forward.  And I
22    know Mr. Pennock has something to say, but I can also tell you
23    that Mr. Overholtz who is on the phone has done remote
24    depositions prior to COVID-19 and he can speak to the
25    technology and security of this.  We've seen several

1    demonstrations over the last couple of weeks as well.

2            THE COURT:  Go ahead.

3            MR. THOMPSON:  If you're asking for my response, your

4    Honor, I do just want to reemphasize that we are not in any --

5    this is Craig Thompson -- in any way asking for this litigation

6    to come to a screeching grinding halt.  We're not.  There is a

7    request for a stay in the proceedings, a very brief stay for

8    the depositions scheduled in May.

9            I can let you know, your Honor, that with respect to

10   the deposition of a Takeda witness for April, we've already

11   rescheduled that for June.  So those conversations that we were

12   talking about in our motion are taking place.  We're not

13   talking about putting anything on hold or grinding the

14   litigation to a halt.  We're talking about putting a pause in

15   the litigation right now while we adjust for this and start

16   talking about how these depositions can, in fact, move forward.

17   That's what we said in our papers.  Not let's just wait until

18   May 15th and then talk whether we can do remote depositions.  I

19   don't think --

20           MR. PENNOCK:  Saying that it's not a halt and saying

21   it's a pause doesn't mean it's not a halt.  We've had, I don't

22   know, how many multiple depositions, many of which, two or

23   three of which I was taking scheduled for April.  They pulled

24   them down unilaterally.  Now at that juncture we didn't raise a

25   stink about it.  We could have proceeded with these remotely at

1    that time.  Everything was in place with the court reporters to
2    do it.  This is not magic.  It's not rocket science.  It's easy
3    to do these depositions remotely, as Mr. Overholtz can tell
4    you.  That's number one.

5         So we've already been delayed for the entire month of
6    April.  Now they're proposing delaying us for the entire month
7    of May.  That is a two-month grinding halt or a two-month
8    pause, whatever you want to call it.  Nothing will be
9    happening.  These depositions are set, they are assigned,
10   people are preparing them and we're ready to go.  And we should
11   proceed, as the Court said, with those witnesses that don't --
12   that are not impacted in some way where the deposition should
13   not proceed.  And we should proceed with the ones in July, and
14   we should reschedule -- I'm sorry in June -- and we should
15   reschedule the April ones for July and we should just start
16   this process of doing this.

17        If suddenly the sky collapses I'm sure they'll be back
18   here saying:  See, we told you, we couldn't do these remotely.

19        That's not going to happen.  It's happened.  These
20   depositions are happening all over the country.  These are the
21   most sophisticated lawyers in the country on the other side and
22   no one on the other side is going to be sitting in the
23   deposition room kicking their client's leg on the answers.
24   They don't need to be in the room and we should just proceed as
25   scheduled in May.

1           THE COURT:  Okay.

2           MR. THOMPSON:  It's not true that the --

3           (Several Counsel speaking simultaneously.)

4           THE COURT:  One at time, please.

5           Mr. Overholtz, go ahead.

6           MR. OVERHOLTZ:  Yes, your Honor.

7           Just so I can let the Court know, we've been asked to

8     address the issues of the feasibility, security and capability

9     of doing these depositions in other MDLs that are ongoing right

10    now.  So we conducted a significant amount of work over the

11    past several weeks since this pandemic started, including

12    working very closely with the court reporting company that

13    we're using in the PPI litigation, Golko, to ensure that these

14    depositions proceed and create a product that is identical to

15    what you would have if we were doing in-person depositions.

16    You know, the fact that the documents are captured as they

17    would be on site, that the documents are being captured just

18    the way they would be at an in-person deposition.

19          We have had multiple demonstrations with Golko

20    Technologies related to how the depositions will be recorded so

21    that they record it in a secure manner, that the digital video

22    feed is recorded just the same as it would be in the middle of

23    an in-person deposition.  We have worked with the vendor

24    specifically with how documents get transferred to a deposition

25    so that the witness can see the document on the screen just

1    like they would in an in-person deposition, but also that they

2    and their counsel have full access to the complete document

3    that's transferred, not across the table, but digitally as the

4    deposition progresses so that they have full access to the full

5    document if that become a necessity.

6         We've also worked with Zoom as well as Golkow on the

7    security issues.  And we make sure in drafting our protocol

8    that those security issues that maybe someone raised that were

9    in the news have all been addressed so that we have passwords,

10   we have unique meeting IDs, we have waiting rooms that only

11   those who should be in the deposition can see the deposition,

12   all the recordings are made on-site where the videographer or

13   the technician is and not over the cloud.  And we also talked

14   to them about making sure we can do checks before the

15   deposition begins to ensure that we have the right connection

16   feed, we have the right camera and the camera angle so that

17   everything will go smoothly and that we can address any issues.

18   And, of course, we're willing to work with the Defendants on

19   issues related to particular witnesses related to particular

20   technical issues that we have to get over, but we do believe we

21   can move forward.

22        And as your Honor said, we had a hearing in another

23   case recently and they're holding hearings in criminal matters

24   where everybody is in remote locations, and those are being

25   handled right now fine.  And I've conducted several of these

1    Zoom depositions.  The quality has never been a problem; and

2    sometimes they simply just go a little smoother when everybody

3    is not in the room together.

4            And so I think we can move forward now.  And I can

5    certainly address any other technical issues that the

6    Defendants have or if the Court has any.

7            THE COURT:  Thank you.

8            MR. THOMPSON:  Craig Thompson.

9            Let me just say, all that sounds great.  We've not

10   been able to talk with or negotiate the details of the CMO,

11   which is the second part of our request, as you know, and we do

12   need some time to hear all this, to vet it ourselves of course

13   and speak with our clients and the witnesses.

14           THE COURT:  So why don't we do this.  Why don't we

15   have you folks talk about it.  I don't know what type of

16   committee you want for the Plaintiffs' side and the

17   Defendants's side.  But obviously I think you're going to need

18   to discuss this to get to the finer points of it no matter

19   what, but I do see that we're going to have to move forward

20   with some version of this.

21           I appreciate that Mr. Overholtz has gone through and

22   looked at some of the logistical issues and I think he can be a

23   resource in terms of providing responses to the Defendants to

24   the extent there's any inquiry as to how these are actually

25   going to proceed or how they could proceed.  But I think you're

1    going to have to talk about it and I think you're going to have

2    to look at the schedule and determine which depositions can

3    actually go forward first.  And then for those individuals

4    where they have special issues due to the crisis, obviously I'm

5    going to be understanding and flexible on those.

6          MR. PENNOCK:  This is Paul Pennock.

7          Could we have your direction to have an initial

8    discussion with the Defendants tomorrow and follow up

9    discussion on Friday?  And then we'll have a good sense of how

10   much more time they think they need to evaluate these, keeping

11   in mind that I think Mr. Grand sent them our proposed order --

12   well, he can speak to the date of that -- they've had it for a

13   while.  This has been going on all over the country.  Their

14   brother and sister attorneys all over the country have been

15   doing these for major law firms.  So could we just start this

16   process tomorrow in a conversation?

17         THE COURT:  Let's start with Mr. Thompson.

18         Are you able to do that or whoever would be on this

19   particular team dealing with this issue, would they be able to

20   speak tomorrow?

21         MR. THOMPSON:  I'm certain that I can, but I can't

22   speak for everyone.  I do think that we may need some time to

23   gather our thoughts, but I do think it's important to talk

24   about it as soon as possible.

25         THE COURT:  Okay.

 1          MR. PENNOCK:   Tomorrow, and then we can get the ball
 2     rolling.
 3          THE COURT:   I think that sounds fine.
 4          Yes, go ahead.
 5          MR. GRAND:   This is Jeff Grand.
 6          Your Honor, can part of that instruction be the
 7     Defendants identify for us which of the witnesses that have
 8     been taken down and which are still currently scheduled are
 9     actually active in developing treatments for COVID-19?  Because
10     it's not clear to us which ones are.
11          MR. BROWN:   This is Arthur Brown.
12          May I speak, please?
13          THE COURT:   Yes, go ahead.
14          MR. BROWN:   Thank you.
15          We have incredibly short deadlines for a very
16     important issue for the Defendants, of course, tomorrow.  Let
17     me just raise a few other points.  You know, some of the
18     materials that I use for my witnesses are in my office, and I'm
19     going to have to go to my office to get some of those
20     materials.  And that's going to be a fun expedition for me into
21     Manhattan because those aren't electronically organized in
22     materials that I would normally use during a deposition
23     preparation.
24          I appreciate the fact that we have depositions on the
25     calendar.  And we have blown deadlines on the tolling, but we

1    have a generic discovery deadline for September.  No one is

2    suggesting these obligations and deadlines can't be met.  But

3    suddenly we have to get these depositions done as soon as

4    possible.  And that sounds like that's what the Court is

5    thinking.

6           I want the Court to appreciate that the materials I

7    need for some of my witnesses are going to be in my office and

8    I'm going to have to go in and get them.  I'm not going to have

9    the privilege or opportunity to sit next to these witnesses

10   when I prepare them like I normally would, and maybe that's the

11   world we live in.  But in addition to witnesses who might be

12   working on COVID-related activities, we have to be able to talk

13   to them about whether they have child-care issues, whether they

14   have --

15          THE COURT:  Let me just interrupt just for one moment.

16          You're going to talk about this.  You're going to talk

17   about which witnesses you think you have the capability of

18   moving forward with and you're going to put those at the top of

19   the schedule.  Those that you feel you have some difficulty

20   with as a result of the crisis, maybe those are going to go

21   later.

22          Look, I appreciate everyone would prefer to be in

23   their offices and dealing with these in the traditional way

24   that we deal with things, myself included.  But I do believe at

25   this point in time that we do have to look at alternatives to

1    how we traditionally approach these issues.  And I'm not saying

2    that you have to fully decide what you're going to do in terms

3    of moving forward tomorrow, but I think a dialogue needs to be

4    opened as to how we can begin to accomplish the tasks that are

5    before us with due consideration since some of these issues are

6    going to be difficult.  But we're going to have to work through

7    them and try to make arrangements for a schedule with those

8    individuals who can be deposed.  I think that we are going to

9    have to move forward with video conferencing, we're going to

10   have to address any logistical issues that arise and try and

11   finesse those issues so that we can move forward.

12         I fully understand that individuals might have some

13   difficulties as a result of this crisis, whether it's on the

14   lawyer end or whether it's on the witness end, and I'm happy to

15   hear from you on those issues, but I think we have to get the

16   ball rolling in terms of how to move forward on this.  And in

17   order to do that you have to talk to each other.

18         MR. THOMPSON:  You're right, your Honor, and that is

19   the primary purpose of our motion for a protective order such

20   that we have the time to do that, so that we pull down the

21   depositions in May, have them rescheduled and then talk about

22   how best to move forward with each individual witness.

23         THE COURT:  Here's what I want to do.  I don't think

24   that we need to change the schedule for me at this point.

25   We're now in April.  Why don't you folks talk about this for

1     the next week and see if you can deal with tweaking the

2     schedule and figure out how to move forward with certain

3     depositions.  I mean, rather than a wholesale, put off the

4     depositions, I would rather you talk and determine which

5     depositions can actually go forward through this means so we

6     can make some progress here.

7          And I'm not certain that this is just an issue that's

8     going to be May, it might be an issue that we have to deal with

9     in June.  I don't know how much further it's going to go.

10    Things are unpredictable at this point in time.  It may change.

11    And you watch the news and day-by-day you have sort of a

12    different instruction in terms of moving forward.  But I think

13    we have to be prepared so that we can make further progress on

14    our case.

15         But again, I'm going to underscore:  I'm sensitive to

16    what Defendants are saying in terms of some of their witnesses

17    and I'm certainly not going to have someone who has been

18    directly impacted by COVID-19 sit for their deposition.  I'm

19    going to be flexible on this.  But I think certain depositions

20    that don't have any issues associated with them as far as this

21    crisis that can proceed should be put in the queue, put on the

22    schedule so that they can proceed.  But I don't know who those

23    individuals are.  You folks know who those individuals are, and

24    the only way we're going to get a schedule for moving forward

25    is if you communicate with one another.

```
 1            MR. PENNOCK:  Very good, Judge.  I'll reach out to

 2    Craig.  We'll with set a time to at least get the ball rolling

 3    with discussions tomorrow and we'll take it very quickly to try

 4    and resolve all these points that you're making.

 5            THE COURT:  Perfect.

 6            MR. THOMPSON:  Your Honor, just making it clear for

 7    the record that, understanding your Honor's point, being

 8    impacted by COVID is not only working on COVID-related issues,

 9    there are other ways that parties and witnesses are impacted by

10    COVID that we need to put into the discussion as well for

11    every --

12            THE COURT:  And I tend to agree with you there.  I'm

13    sensitive to those issues.  I understand what you're saying.

14    But I'm certain that there will be some individuals who do not

15    fall into that category although I'm not privy to that

16    information at this point in time, that's why I think you folks

17    have to talk.

18            MR. THOMPSON:  And one final point.  In another piece

19    of litigation I was involved in -- Mr. Overholtz mentioned

20    some -- in a litigation I was involved in in Maryland, the

21    magistrate judge there was also sensitive to the needs of all

22    the parties, all the witnesses.  But he did indicate very

23    clearly, look, if anyone, anyone, paralegal, court reporter,

24    LAA or whomever has any concern, problem going into the office,

25    doing anything related to this deposition, they have veto power
```

1    and it won't go forward.  There was an understanding that there

2    were folks who were scared.

3              Mr. Brown can't go into his office.  I can't go into

4    my office.  I can't meet with my witness.  I can't sit down

5    with my witness to prepare them.  I, like Mr. Brown, am an old

6    school guy and like paper behind us.  It won't be able to be

7    created.  Those are all the things that will be go into the mix

8    of this conversation when we meet.

9              MR. PENNOCK:  I'm more old school than both of you,

10   and we'll be able to do this very effectively, Craig.

11             But let's start just talking about it and you can list

12   down all the issues you have and we can try to find a way

13   around them.

14             THE COURT:  I think that's appropriate.

15             MR. GRAND:  I find that most offices, even though

16   they're shut down, some people are working on Scype and Zoom,

17   essential personnel.  I haven't encountered a law firm yet that

18   doesn't have a mail room and isn't mailing things out to

19   lawyers who need them.

20             THE COURT:  I'm tend to agree to that, but I'm happy

21   to hear if there are circumstances where it becomes difficult

22   to do that.  So I'm happy to hear that.  But I do recognize

23   that law firms are generally sending in a few people to at

24   least pick up the mail and forward materials to lawyers who

25   need them.  But I'm very sensitive to that issue and I

1  understand what you're saying.  At the same time I think you

2  need to advance the ball on this issue.  And certainly

3  discussing it, thinking about a schedule, thinking about some

4  of the logistics here are important and I think we need to move

5  it forward.

6         MR. THOMPSON:  This is the final thing I will say and

7  I apologize for extending the conversation.  But I'm gathering

8  that part of what you're directing us to do is also negotiate

9  the CMO that was submitted by --

10        THE COURT:  Yes, certainly.

11        MR. PENNOCK:  Judge, we'll get on it.

12        THE COURT:  Thank you very much.

13        All right.  I think our next issue, unless someone

14  wants to add to the schedule, it's Open Motions to Challenge

15  Privilege Claims.  It's an issue that we had touched upon at

16  some point in the past.  I'm not certain where we are on that

17  issue, so if someone wants to discuss that, you may go ahead.

18        MS. O'CONNOR:  If I may, there are a couple more

19  bullet points under "Update on Discovery"

20        THE COURT:  I'm sorry.  Okay.  Go right ahead.

21        MS. O'CONNOR:  Thank you.  I appreciate it.

22        Very quickly on the Status of Depositions, former

23  AstraZeneca employees residing in Sweden, our local counsel has

24  been in touch with the court.  We learned that the court

25  virtually closes for the summer, and so there's a proposal on

1    the table before the court to push the Swedish depositions -- I

2    think it's eight altogether -- to the point in time when the

3    court reopens.  There's no scheduled date yet, but we're

4    keeping our eye on the ball with regard to those eight Swedish

5    depositions for which your Honor did issue a Letter of Request.

6              THE COURT:  Okay.  Any issue from anyone on that?

7              MR. BROWN:  Your Honor, this is Arthur Brown.

8              I know there was a proposal for late August.  It has

9    not been set by the Court but I think that was the Plaintiffs'

10   local counsel's proposal to the court in Gothenburg.  That

11   might pose some issues for us.  We will, of course, report back

12   to you on May 20th about some of those issues.  I would note

13   that all of the former witnesses, the eight witnesses who were

14   subject to the Hague Order are over 65, an at-risk group for

15   COVID.  I'm sure the court there will make accommodations for

16   those folks.  We just don't know much about it yet.  We have

17   not had a chance to fully review the submission, but we'll

18   update you on May 20th.

19             THE COURT:  Okay, that sounds fine.

20             Any issue with that?

21             MS. O'CONNOR:  No.  Just to note that perhaps

22   additional depositions might also be a possibility with regard

23   to those depositions.

24             Paul, I'm sorry.  You were going to say something.

25             MR. PENNOCK:  No, there's no issue.  I mean, we were

1    just following the court's lead over there and we'll see

2    what --

3        THE COURT:  I think that's the best approach.  We'll

4    get an update during our next call.

5        MS. O'CONNOR:  Also, Judge, something that I had

6    brought up at the last CMC, and that refers to the PSC's third

7    request for production of documents and materials.  In this

8    case we're talking about histopathological materials, tissues,

9    drugs and tissues and color photographs and slides of tissues

10    that had been taken during the course of nonclinical studies by

11    the Defendants.

12        We served our RFP on Takeda and AstraZeneca last fall.

13    There were meet-and-confers that occurred in the fall, and then

14    more recently, as I advised the Court at the last CMC, we would

15    be doing -- we made some headway with Takeda.  We received a

16    list or rather a response to the list that we provided and

17    studies that are available for which slides, for example, are

18    available and where.  We do have an expert ready, willing and

19    able to review the slides when perhaps the situation with COVID

20    opens up and that's feasible.  But at least we know what we

21    have and what we will be looking for.  They will be providing

22    us with some more responses and we await that.

23        However, with regard to AstraZeneca, we've not been

24    able to really get anywhere.  Essentially they've provided us

25    with nothing by way of a response other than objections and a

 1     promise to look for things that goes back to last fall.

 2              Mr. Pennock and I had a meet-and-confer conference on

 3     March 9th with counsel for AstraZeneca in which they had no

 4     more to tell us than they had last fall.  And then most

 5     recently I wrote a letter to counsel reminding them they were

 6     to get back to us and at least give us a list of what they had

 7     found vis-a-vis nonclinical materials that had been subject to

 8     our request, and basically we have been told -- and counsel

 9     will correct me if I'm wrong -- that because of the COVID-19

10     situation they are unable to give us any information.  And that

11     is a problem.  Before bringing a motion to compel I wanted to

12     bring this to the Court's attention.

13              THE COURT:  All right.  Anyone?

14              MR. DOUGLAS:  Matt Douglas.

15              So we did have a meet-and-confer on March 9th about

16     this and we were making progress in pulling together

17     information from AstraZeneca as to what they were talking

18     about:  Decades old rat kidney tissue from a number of studies

19     that were done many years ago, and so these things are in deep

20     archives.  We have people looking into it, pulling information

21     together.  That was as of March 9th.  I discussed it with Mr.

22     Pennock and Ms. O'Connor.

23              And then there was a global pandemic and three days

24     later AstraZeneca imposed restrictions on its employees and

25     facilities.  And that obviously had many high priorities,

1    activities in the company, you know, related to what to do with

2    ongoing clinical trials, and it's really been in critical mode

3    since that time and I do not at this point have a specific

4    update.  But we had pulled the indexes and were going to be

5    digging in archives and trying to figure out what is still in

6    existence in boxes at those facilities.

7              What I do know is that if there is anything there --

8    and I think there will be a handful of studies that the

9    Plaintiffs requested -- it's all outside the U.S., it's some

10   combination of the UK and Sweden.  So there's not going to be

11   any ability for the parties to travel internationally with

12   experts and review the materials at any time in the immediate

13   near future.  And I do hope to have an update on what exists

14   soon, but I don't have one at the time.

15             THE COURT:  Understood.  That sounds reasonable.

16             Anything from the Plaintiffs on that?  It sounds like

17   it's very difficult to get that information together.  But

18   otherwise as of March 9th you were meeting and conferring in an

19   effort to actually present something as a production or at

20   least gather together the materials.  Correct?

21             MS. O'CONNOR:  Well, no, I disagree with the

22   characterization, your Honor.  First of all, the RFP was served

23   last September.  We had a response on October 30th that

24   basically said, you know, objection, objection, and we'll

25   search and we'll look.  Then on October 30th I had a call with

 1    Mr. Douglas and another attorney and we discussed it.  We were
 2    told that they would have a full report for us by some date in
 3    November.  I think it was mid-November.

 4            THE COURT:  Although, you know what, let me just bring
 5    us up-to-date so we can think about what we can actually do.

 6            At this point in time, bringing us up to March is when
 7    we were meeting and conferring, and obviously now we're dealing
 8    with another crisis on top of it.  Is there any other way to
 9    deal with these materials?  That's really what I want to get my
10    hands around now.

11            MS. O'CONNOR:  When I had the meeting with Mr. Douglas
12    and another attorney, I pointed out to them the deposition
13    testimony of one of their own witnesses, a 30(b)(6) witness, a
14    nonclinical, who testified, number one, that the vast majority
15    of pathology should be available.  He did not say that it was
16    located in Sweden or the UK.  He gave the name of the person
17    who would be able to provide that information about what is
18    where and so forth.

19            And, you know, I have to ask Mr. Douglas:  Did you ask
20    Mr. Billger (phonetic) or Dr. Billger after our call on the 9th
21    where these materials were when I pointed out the deposition
22    testimony to you?

23            MR. DOUGLAS:  Your Honor, as I said, we're looking
24    into it.  We're looking at all the sources we can at the
25    company.  In the meantime I believe Takeda and the Plaintiffs

1    have identified material in the new labs that Takeda still has,

2    so we will continue to try to pin down exactly what AstraZeneca

3    has and where it is.

4              But in the meantime I believe that when restrictions

5    are lifted and there's some ability to do it, a starting point

6    will be for Takeda and the PSC to work out some sort of

7    protocol to review the materials and do that and then ours will

8    follow.  So we're doing the best we can.  I will provide an

9    update hopefully soon when I can, but I'm not sure there's

10   anything else to do --

11             THE COURT:  Yes.  I know.  I understand you.

12             MR. PENNOCK:  Can I say one thing, your Honor?  Simply

13   this.  All we ask at this point because of COVID-19 is that Mr.

14   Douglas continue to work to find the materials and pin down

15   where they are, as he just said.

16             THE COURT:  And I think that's appropriate.

17             MR. PENNOCK:  We may go there now or not be able to go

18   there for months, and even though we don't have a specific

19   protocol he should be able to tell us where it all is:  That

20   we've identified this stuff in this location from these

21   clinical trials.  This is what it is.  And that seems to me

22   that can still continue, and we'll wait for him to report back

23   on May 20th.

24             THE COURT:  How does that sound?

25             MR. DOUGLAS:  Your Honor, absolutely.  I will work on

1    that.

2              THE COURT:   Okay.   I think that that sounds fine.   It

3    sounds like you're reaching out to your sources trying to do

4    the best that you can do in order to organize at least by way

5    of an outline or a framework as to where these materials might

6    be, so you can give us the update the next time we have our

7    call.

8              MR. DOUGLAS:   I will.   Thank you, your Honor.

9              THE COURT:   Thank you very much.

10             Anything else on discovery?

11             Okay.   And the last matter on the list that I have

12   here is PSC's Proposed Motions to Challenge Privilege Claims.

13             Who would like to address that?

14             MR. GRAND:   Yes, your Honor.   As I recall, your Honor

15   said you were going to decide those on the papers.   I don't

16   think either party has anything to add at this point.

17             THE COURT:   Okay.   Is that right?

18             MR. DOUGLAS:   Yes, that's correct.

19             THE COURT:   I will take another look at your papers

20   and then I will get back to you on that.   And those are Docket

21   Entries I believe 388 and 433.

22             Very well.   Okay.   Well, counsel, we've had a long

23   call but I hesitate to ask:   Is there anything additional that

24   you need to discuss?

25             MR. PENNOCK:   No.   I'm trembling now.

1                (Laughter.)

2                THE COURT:  We're approaching the finish line.  Now

3        with you're all exhausted, is there anything else that anyone

4        needs to discuss?

5                UNIDENTIFIED VOICE:  No.

6                UNIDENTIFIED VOICE:  No, your Honor.

7                THE COURT:  No, all right.  Well, that sounds fine.

8                Our next call, again, is May 20th I believe.  Okay.

9        It is currently scheduled as an in-person status conference.

10       We are going to be taking that to a telephone conference.  Do

11       you need to set it up with new numbers or would these numbers

12       suffice for that in terms of the telephone numbers?

13               MR. GRAND:  I think we would likely need to set up new

14       numbers, your Honor.  So we can provide that information with

15       the agenda as we did this time.

16               THE COURT:  That's fine.  When do you want to get me

17       the agenda for that?  Usually we do a couple of days

18       beforehand.  Do you want to do either the 15th, or I guess you

19       could even do the 18th if you like, of May.

20               MR. GRAND:  That's fine, your Honor.  Thank you.

21               THE COURT:  Okay.  What should we do?  You know what,

22       let's aim for the 15th.  If something interferes and you need

23       to do it on Monday you can call us and let us know.  So May

24       15th an agenda, joint as usual.

25               All right.  I think that's it.  Thank you, all, for

1       your presentations, your participation.  I hope you are all

2       healthy and safe at home.  And if you need anything obviously

3       you can contact us.  You can reach out to Jacquie our Deputy

4       who is on the line with us still.  If you need a transcript

5       from Walter, Walter you're still on with us?  Right?

6               THE REORTER:  Yes, Judge.

7               THE COURT:  You can make arrangement with Walter.  But

8       otherwise I look forward to hearing from you on so many of

9       these issues.  I recognize that you're going to be meeting and

10      conferring on a number of issues.  So to the extent there's any

11      issue arising out of any of those conversations, you can

12      recognize that we are available if you need a telephone

13      conference on short notice.

14              But otherwise, good luck to you all and thanks again.

15      We're concluding for today.  Take care, everyone.

16              (At 1:40 p.m., the conference is concluded.)

17                              ooOoo

18

19

20

21

22

23

24

25