# EXHIBIT 1

```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF NEW JERSEY

 3    _____

 4    IN RE: PROTON-PUMP            2:17-MD-2789(CCC)(MF)

 5    INHIBITOR PRODUCTS                 (MDL 2789)

 6    LIABILITY LITIGATION

 7                              Judge Claire C. Cecchi

 8    This Document Relates to:

 9    All Actions

10    _____

11                        - - -

12                   REMOTE HEARING

13         BEFORE SPECIAL MASTER ELLEN REISMAN

14                Monday, April 4, 2022

15                        - - -

16         This is the Remote Hearing In Re:

17    Proton-Pump Inhibitor Products Liability Litigation,

18    commencing at 10:00 a.m., Monday, April 4, 2022,

19    before Juliana F. Zajicek, Registered Professional

20    Reporter, Certified Shorthand Reporter and Certified

21    Realtime Reporter.

22                        - - -

23

24
```

```
  1               A P P E A R A N C E S :
               (All Parties Appeared Remotely)
  2
  3    ON BEHALF OF THE PLAINTIFFS:
  4          LAMINACK, PIRTLE & MARTINES LLP
             5020 Montrose Boulevard, 9th Floor
  5          Houston, Texas 77006-6533
             713-292-2750
  6          BY:  BUFFY MARTINES, ESQ.
                  buffym@lpm-triallaw.com
  7
  8          MORGAN & MORGAN
             333 West Vine Street, Suite 1200
  9          Lexington, Kentucky 40507
             859-899-8785
 10          BY:  JOSH AUTRY, ESQ.
                  jautry@forthepeople.com
 11
 12          MORGAN & MORGAN
             350 Fifth Avenue, Suite 6705
 13          New York, New York 10118
             212-738-6299
 14          BY:  PAUL PENNOCK, ESQ.
                  ppennock@forthepeople.com;
 15               JONATHAN M. SEDGH, ESQ.
                  jsedgh@forthepeople.com
 16
 17          DOUGLAS & LONDON, P.C.
             59 Maiden Lane, 6th Floor
 18          New York, New York 10038
             212-566-7500
 19          BY:  MICHAEL LONDON, ESQ.
                  mlondon@douglasandlondon.com;
 20               STEPHANIE O'CONNOR, ESQ.
                  soconnor@douglasandlondon.com;
 21               ANNE (BESS) E. DeVAUGHN, ESQ.
                  bdevaughn@douglasandlondon.com;
 22               SARA CASTRONUOVA, ESQ.
                  scastronuova@douglasandlondon.com
 23
 24
```

```
 1                    A P P E A R A N C E S :
                 (All Parties Appeared Remotely)
 2
 3   ON BEHALF OF THE PLAINTIFFS (Continued):
 4         ANAPOL WEISS
           One Logan Square
 5         130 North 18th Street, Suite 1600
           Philadelphia, Pennsylvania 19103
 6         215-735-0773
           BY:  TRACY A. FINKEN, ESQ.
 7              tfinken@anapolweiss.com
 8
     ON BEHALF OF DEFENDANT ASTRAZENECA PHARMACEUTICALS LP
 9   AND ASTRAZENECA LP:
10         ARNOLD & PORTER KAYE SCHOLER LLP
           250 West 55th Street
11         New York, New York 10019-9710
           212-836-8572
12         BY:  ARTHUR E. BROWN, ESQ.
                arthur.brown@arnoldporter.com;
13              JULIE B. DU PONT, ESQ.
                julie.dupont@arnoldporter.com;
14              JEFFREY H. HOROWITZ, ESQ.
                jeffrey.horowitz@arnoldporter.com;
15              MICHAEL SCHISSEL, ESQ.
                michael.schissel@arnoldporter.com;
16              THOMAS BIRD, ESQ.
                thomas.bird@arnoldporter.com;
17              JAKE MILLER, ESQ.
                jake.miller@arnoldporter.com;
18
19         WILLIAMS & CONNOLLY LLP
           725 Twelfth Street, N.W.
20         Washington, D.C. 20005
           202-434-5567
21         by:  JESSICA BODGER RYDSTROM, ESQ.
                jrydstrom@wc.com;
22              ANDREW RUDGE, ESQ.
                arudge@wc.com;
23              J. LIAT ROME, ESQ.
                lrome@wc.com
24
```

```
 1                  A P P E A R A N C E S :
                (All Parties Appeared Remotely)
 2
 3   ON BEHALF OF DEFENDANT ASTRAZENECA PHARMACEUTICALS LP
     AND ASTRAZENECA LP (Continued):
 4
          ICE MILLER LLP
 5        One American Square, Suite 2900
          Indianapolis, Indiana 46282-0200
 6        317-236-5924
          BY:  KATHERINE D. ALTHOFF, ESQ.
 7             katherine.althoff@icemiller.com;
               OLGA VOINAREVICH, ESQ.
 8             olga.voinarevich@icemiller.com
 9
     ON BEHALF OF GLAXOSMITHKLINE:
10
          REED SMITH LLP
11        Three Logan Square
          1717 Arch Street, Suite 3100
12        Philadelphia, Pennsylvania 19103
          215-851-8121
13        BY:  STEPHEN J. McCONNELL, ESQ.
               smcconnell@reedsmith.com
14
15   ON BEHALF OF PROCTOR & GAMBLE:
16        ULMER & BERNE LLP
          312 Walnut Street, Suite 1400
17        Cincinnati, Ohio 45202-4029
          513-698-5000
18        BY:  GINA M. SAELINGER, ESQ.
               gsaelinger@ulmer.com
19
20   ON BEHALF OF PFIZER:
21        DLA PIPER
          51 John F. Kennedy Parkway, Suite 120
22        Short Hills, New Jersey 07078-2704
          BY:  STEPHEN C. MATTHEWS, ESQ.
23             stephen.matthews@dlapiper.com;
               ANDREW ANDRZEJEWSKI, ESQ.
24             andrew.andrzejewski@dlapiper.com
```

```
 1                 A P P E A R A N C E S :
                (All Parties Appeared Remotely)
 2
 3   ON BEHALF OF PFIZER (Continued):
 4        DLA PIPER
          33 Arch Street , 26th Floor
 5        Boston, Massachusetts 02110-1447
          617-406-6046
 6        BY:  KATIE INSOGNA, ESQ.
               katie.insogna@dlapiper
 7
 8        DLA PIPER
          1251 Avenue of the Ameircas
 9        New York, New York 10020-1104
          212-335-4846
10        BY:  LOREN H. BROWN, ESQ.
               loren.brown@dlapiper.com
11
12   ON BEHALF OF DEFENDANTS TAKEDA/ABBOTT:
13        TUCKER & ELLIS LLP
          233 South Wacker Drive, Suite 6950
14        Chicago, Illinois 60606
          312-624-6307
15        BY:  JAMES W. MIZGALA, ESQ.
               james.mizgala@tuckerellis.com
16
17        TUCKER ELLIS LLP
          950 Main Avenue, Suite 1100
18        Cleveland, Ohio 44113
          216-696-4456
19        BY:  MICHAEL J. RUTTINGER, ESQ.
               michael.ruttinger@tuckerellis.com
20
21        TUCKER ELLIS LLP
          515 South Flower Street, Forty-Second Floor
22        Los Angeles, California 90071
          720-897-4401
23        BY:  K. MICHELE ANDERSON, ESQ.
               michele.anderson@tuckerellis.com
24
```

April 11 2022

```
 1                  A P P E A R A N C E S :
              (All Parties Appeared Remotely)
 2
    ON BEHALF OF DEFENDANTS TAKEDA/ABBOTT (Continued):
 3
         VENABLE LLP
 4       750 East Pratt Street, Suite 900
         Baltimore, Maryland 21202
 5       410-244-7400
         BY:  JASON C. ROSE, ESQ.
 6            jcrose@venable.com
              CRAIG A. THOMPSON, ESQ.
 7            cathompson@venable.com
 8
 9
    ALSO PRESENT:
10
         ETHAN GREENE, ESQ.
11       ANDY KARRON, ESQ.
         JULIAN MOSS, Law Clerk;
12          Reisman Karron Greene LLP
13       DANIEL HEALEY
14       MEG THOMPSON
            Morgan & Morgan
15
         DARCELLE ADLER, ESQ.
16          Senior Counsel at AbbVie
17       LEO RAKITIN, ESQ.
            Senior Counsel at AstraZeneca
18
         EMILY SY, ESQ.
19          Litigation Counsel at Takeda;
20       MARGARET IVES, ESQ.
            U.S. Litigation & Investigations, Takeda
21
22
23
24
```

April 11, 2022

```
 1          THE SPECIAL MASTER:  All right.  So let's go on

 2   the record.  And so what we are doing today is oral

 3   argument on the various Daubert motions and on our

 4   defense motions for summary judgment.  And a couple of

 5   things I just wanted to say upfront.

 6               I looked at the outline that we did, the

 7   procedures outline, and I think we left out the

 8   Mann -- Mann's name on -- on the oral argument on

 9   plaintiffs' omnibus motion to exclude experts.  I

10   think it should have been on there.

11               I also noted that it looks to me like we

12   are having argument on four plaintiff experts and five

13   defense experts and I -- you know, the timeframes are

14   a little bit longer as to the plaintiffs' experts,

15   shorter as to the defense experts.  I'm obviously, you

16   know, if need be will allow people to have some

17   additional time, although I'm really hoping that we

18   don't end up using all of the time.  I think, as I was

19   sitting down and calculating this this morning, it is

20   a lot of time, and believe it or not I have actually

21   read all of this stuff.  There are many large

22   notebooks strewn around this room, and because I -- I

23   have to read things in hard copy.  So we killed a lot

24   of trees here.
```

April 11, 2022

```
 1                I would appreciate, and I think we said

 2   this in the procedures, if there are particular points

 3   that you think might be unappreciated from the -- the

 4   papers, that you emphasize those, but other --

 5   otherwise, you know, I don't -- you don't need to

 6   rehash everything that's in the papers because I've

 7   read them and my partner Andy has read them, and so,

 8   you know, I think -- I think maybe we could not spend

 9   all day together, as delightful as I'm sure that will

10   be.

11                One thing -- one thing I wanted to raise

12   just in the way of full disclosures upfront, there

13   is -- I don't know any of these experts personally

14   except one who I did meet years ago, somewhere between

15   15 and 20 years ago, and that's Mary Ann Mann, and I

16   think I had one meeting with her in connection with a

17   case I was working on at the time.  Not surprising,

18   I've been doing this for 37 years.  Honestly, I would

19   have thought more of them might have crossed my path,

20   but -- but I just wanted people to know that in the

21   interest of full disclosure.

22                So with that, let's get started and

23   somebody should raise their hand, whoever is going to

24   address the motion.
```

 1                I think Wells is the first one?

 2                Okay.

 3        MS. DU PONT:  Good morning, Special Master.  My

 4    name is Julie du Pont.  I'm going to be speaking on

 5    behalf of AstraZeneca.

 6                And if I have your permission, do you mind

 7    if I share some slides to assist with my argument?

 8        THE SPECIAL MASTER:  Sorry, I'm not the most

 9    technologically sophisticated.  Yes, it is fine for

10    you to share some slides.  Okay.

11        MS. DU PONT:  Can you see those?

12        THE SPECIAL MASTER:  Yes, I can.

13        MS. DU PONT:  Good morning, Special Master.

14    Defendants' brief on Dr. Wells, I think, clearly sets

15    forth the defendants' argument as to why Dr. Wells

16    should be excluded under Daubert, and consistent with

17    what the Special Master just said, I'm not going to

18    belabor and repeat all of those arguments that were

19    set forth in our motions.  I think my point today is

20    simply to briefly underscore a few key issues for the

21    Special Master.  And that's what I will be doing.

22                First, the central issue in both Rieder

23    and in Bales that the jury will need to decide is

24    whether PPIs caused each of these plaintiffs' chronic

1    kidney disease.  Tellingly here, we know that

2    Dr. Wells is not offering an opinion about whether

3    PPIs cause chronic kidney disease.

4              At his deposition he was asked:

5              "...are you offering an opinion that --

6    that your calculation and the change in eGFR

7    establishes to a reasonable degree of medical

8    certainty that PPI use can cause kidney injury?"

9              His answer:  "No."

10             And plaintiffs acknowledge in their motion

11   that they are not offering causation -- that he is not

12   offering causation opinions with respect to PPIs and

13   CKD.

14             They likewise state --

15        THE SPECIAL MASTER:  Can I ask you a question,

16   can I interrupt and ask you a question?

17        MS. DU PONT:  Sure.

18        THE SPECIAL MASTER:  Are you saying that any

19   expert who says they are not offering causation

20   opinions should be excluded?

21        MS. DU PONT:  No, that's not what I'm saying.

22   What I'm saying is that Dr. Wells' testimony needs to

23   provide -- needs to be relevant to the issue and the

24   issues in this case, and I will add that not only is

1    he not offering causation opinions, he admits he is

2    not doing any hypothesis testing and that he admits

3    that his opinions don't offer any clinical

4    significance.

5        THE SPECIAL MASTER:  But aren't there a lot

6    of -- I mean, there are other experts, I mean, I've

7    been through all of them now, who are -- who are

8    offering opinions that do not reach the ultimate

9    conclusion of whether a PPI product caused the

10   plaintiff's CKD and they are still providing relevant

11   and admissible evidence, I believe.

12            So I'm not -- I'm not sure why that would

13   be an -- especially given his field, he is a

14   biostatistician, and they often don't provide

15   causation evidence, they just tell you about the data.

16       MS. DU PONT:  Well, Dr. Wells has in other cases

17   provided causation testimony before, but as you can

18   see, he has not offered that here.  And not only is he

19   not offering any causation testimony, as I just

20   mentioned, he is -- he is not even testing any

21   relevant hypothesis through his metaanalysis,

22   including the -- the particular hypothesis that PRAC

23   looked at, and that was plaintiffs' argument, was that

24   he was offering some sort of rebuttal to PRAC's --

 1    PRAC's opinion, but, in fact, he repeatedly admitted

 2    that he wasn't doing any hypothesis testing

 3    whatsoever, and that he had no knowledge of what PRAC

 4    really does generally or specifically did with respect

 5    to PPIs here.

 6              So not only is he not offering causation

 7    opinion, he doesn't provide any fit to the relevant

 8    issues in this case whatsoever.

 9        THE SPECIAL MASTER:  Well, one question I had,

10    in the plaintiffs' papers, I think they said that the

11    analyses that he is performing were ones that had been

12    requested by PRAC and not done by AZ, is that correct?

13        MS. DU PONT:  I don't believe that is correct.

14              What -- what Dr. Wells did was he first

15    conducted the meta-analysis doing what essentially AZ

16    did and PRAC reviewed, which was including the

17    four-week studies.  He then did an analysis where he

18    excluded those less than four-week studies, and

19    finally got the opinion that he wanted, that there was

20    a decline in eGFR.

21        THE SPECIAL MASTER:  And so are you saying that

22    there was no legitimate scientific basis for him to

23    exclude -- to exclude the four-week studies and

24    that's -- and is that the basis -- I know in your

 1   papers you say that his methodology was result driven.

 2           Is that the basis for why you say it was

 3   result driven?

 4       MS. DU PONT:  I mean, I think that -- that

 5   Dr. Wells offers the explanation that he spoke with

 6   some of the plaintiffs' expert nephrologists and they

 7   believed that the four-week studies -- the less than

 8   four-week studies, I should say, would not add

 9   anything, but that is at odds with what PRAC itself

10   said, first of all.  And the fact of the matter is the

11   way in which Dr. Wells conducted his analysis suggests

12   it was with -- it was results driven.  And what I mean

13   by that is he -- he says -- he puts in his report only

14   the metaanalysis where he excludes the four-week data.

15           When asked after the fact at his

16   deposition whether he had conducted analyses including

17   the four-week data, he explained that he actually did

18   that analyses first and that then didn't find a

19   significant decline in kidney function with that

20   analysis.  So he did the second analysis excluding

21   those studies and actually found a decline in kidney

22   function.

23           What is bothersome about that approach is

24   if you thought he was going to conduct the

 1   metaanalysis with his -- the intent to exclude those

 2   four-week studies, shouldn't he have done that first

 3   and then pressure test it by adding them back in?  He

 4   did not do so.  So his after-the-fact explanation sort

 5   of defies common sense.

 6            If it is okay, Special Master, I can move

 7   on to our second argument in the brief?

 8       THE SPECIAL MASTER:  Yes, go right ahead.  Thank

 9   you.

10       MS. DU PONT:  And here, and I'll just stop

11   sharing my screen, I just want to emphasize the two

12   courts that have recently excluded Dr. Wells for

13   similar results driven meta-analyses.  The first is

14   the In Re Incretin case in the Southern District of

15   California decided just last year, where the court

16   found that he had no adequate scientific reason for

17   his metaanalyses, that his method was arbitrary and

18   not scientifically sound.  The second case is In Re

19   Byetta, California Supreme -- Superior Court, also

20   decided last year, again, the court found no

21   scientifically reliable basis for Wells' litigation

22   decision-making where he arbitrarily changed his

23   analysis by excluding certain data from his

24   metaanalysis and got a different result.

1          Here we know that Dr. Wells arbitrarily

2    excluded several four-week studies after first

3    conducting an analysis that included them.  It was

4    only after excluding those studies that he got the

5    significant decline in kidney function.  He then only

6    presented that second analysis in his report.

7          The Special Master should follow the

8    reasoning of In Re Incretin and In Re Byetta and

9    similarly exclude Dr. Wells' opinions here.

10          And I'll reserve the rest of my time.

11          Sorry.  Do you have another question?

12     THE SPECIAL MASTER:  Okay.  Yeah.  I assume that

13    you expect to be offering the PRAC data at trial, is

14    that right?

15     MS. DU PONT:  That -- that is not necessarily

16    true.  I think the part -- that AstraZeneca intends to

17    move to exclude foreign regulatory.  Now, whether or

18    not we win that motion is a -- is a decision yet to be

19    decided, but, no, I would not assume that we will be

20    relying on PRAC at trial.

21     THE SPECIAL MASTER:  I don't think I have any

22    other questions for you.  Thank you.

23     MS. DU PONT:  Thank you.

24     THE SPECIAL MASTER:  Who is up next?

April 14, 2022

 1          Okay, James.

 2      MR. MIZGALA:  Good morning, Special Master.  I

 3  just want to just emphasize a point about PRAC.

 4  Takeda did not put PRAC in their preemption and we did

 5  our own analysis, our epidemiologist has done his own

 6  analysis of the clinical trial data.  So we won't be

 7  offering the PRAC data, but even if we were, the fact

 8  is, is that Wells can't tell you what his analysis

 9  mean in terms of the safety of PPIs and no other

10  expert on plaintiffs' side has taken his analysis and

11  said, This is what it means.  So what's a jury

12  supposed to do with that when he can't even tell you

13  what the clinical significance of his data is.  And

14  I'll reserve the rest of my time unless you have a

15  question.

16      THE SPECIAL MASTER:  Okay.  Thanks, Jim.

17          Who from plaintiffs' side is going to be

18  responding?

19          Stephanie.  Hi.

20      MS. O'CONNOR:  Hi, Ellen.  Hi.

21      THE SPECIAL MASTER:  Okay.

22      MS. O'CONNOR:  Stephanie O'Connor for the

23  plaintiffs.  And I will be arguing in opposition to

24  both AstraZeneca and Takeda's joint motion, as I

Apr 11 2022

1    understand it to preclude or exclude Dr. Wells.

2         First of all, let me say that all

3    Dr. Wells did was take the same data that -- with

4    regard to AstraZeneca, that AstraZeneca produced to

5    PRAC and conducted a metaanalysis that the PRAC

6    actually asked about in the incident of signal CKD

7    detection back in September of 2016.  They asked to

8    receive data on all clinical trials that had looked at

9    kidney function data, gave as examples estimated

10   glomerular filtration, or GFR, and asked for a

11   metaanalysis if available.

12        Now, what the companies did was they

13   provided essentially summary arithmetic measures,

14   summary statistics.  They didn't provide individual

15   patient-level data.  They provided summaries across

16   studies.

17        In the case of AstraZeneca, who has

18   conducted over 1600 studies, perhaps even 2,000

19   studies, up to that number, they submitted 22 studies

20   in response to Question No. 3 from PRAC seeking

21   information on kidney function.

22        Takeda has conducted hundreds of studies

23   across the three products that they submitted data

24   for, that being lansoprazole, dexlansoprazole, and

1    pantoprazole, submitted a total of seven studies.  All

2    right.

3              So to the extent that we hear that there

4    was cherry-picking or selection of studies, it is the

5    defendants actually who have engaged in cherry-picking

6    and selective process in providing information to the

7    PRAC.

8              And the reason it is relevant, not having

9    to do with whether or not PRAC is a foreign regulatory

10   agency, but they cannot use it as both a shield and a

11   sword.  They can't say that Dr. Wells can't talk about

12   his statistical interpretation of the same data that

13   was submitted to the regulatory authorities in Europe

14   and yet hold that data up, including in communications

15   with the FDA, to say that the clinical trial data is

16   clean.

17             In the preemption motion they do talk

18   about the significance of the clinical trial data.  I

19   heard your question and answer from Ms. DuPont, and as

20   we sit here today, we don't know what the answer is to

21   that.  But Dr. Wells should be able to and the

22   plaintiffs should be able to rebut claims by the

23   manufacturer defendants that their clinical trial data

24   is clean and that there is no problem.

 1           We've heard it throughout this litigation.

 2    It started on science day and it has continued through

 3    the depositions of practically every expert that I

 4    have defended in this case.

 5       THE SPECIAL MASTER:  Can I -- can I ask you a

 6    question, Stephanie?

 7           So they've made the point that, you know,

 8    he is not going to talk about, you know, whether PPI's

 9    cause CKD in a particular case or more generally

10    and -- and that I think Mr. Mizgala made a comment

11    that he wouldn't be able to tell what the safety

12    data -- what the data mean for safety purposes.

13           What exactly is the testimony that you

14    envision this witness offering and how is that

15    relevant to the case.

16       MS. O'CONNOR:  So basically, as we know, and you

17    pointed out in your questioning, Dr. Wells is not a

18    medical doctor.  He has conducted a biostatistical

19    analysis, as biostatisticians do, on data, again,

20    submitted by both the manufacturers to PRAC in support

21    of their claim that there is nothing in the clinical

22    trials to be concerned about.

23           By the time Dr. Wells would testify at

24    trial, we will likely have heard from at least two

1    nephrologists, board certified nephrologists, and the

2    jury will have learned through the course of the

3    plaintiffs' case what estimated glomerular filtration

4    rate means, or eGFR.  And we all know, sitting here,

5    that a reduction in eGFR is associated with renal

6    disease, all right, a reduction of, I believe it is

7    less than 60 milliliters per minute squared for a

8    period of greater than three months.

9            By the time Dr. Wells gets on the stand,

10   the jury will know what GFR is and he would present

11   the forest plots that are attached as Exhibit A to

12   show where it is the reductions are seen.  It is a

13   statistical analysis.

14           He will explain that everything to the

15   left of 1 as seen in every one of the forest plots for

16   both AZ and for Takeda shows a statistically

17   significant reduction in glomerular filtration rate.

18           Now, he is not going to, as a nonmedical

19   person, testify about the significance of that.  That

20   will be left to the plaintiffs' nephrology experts of

21   whom two have been designated in Mr. Rieder's case.

22       THE SPECIAL MASTER:  I thought I heard one of

23   the -- either Julie or James say that none of the

24   other experts are going to rely on his testimony, his

April 14, 2022

1   data.

2           Is that -- is that correct?

3       MS. O'CONNOR:  I think it is a misstatement of

4   the situation.  All of the experts had Dr. Wells'

5   report on their materials considered list.

6           Dr. Ross discusses, because his report was

7   due about a month later, discusses in detail at Pages,

8   I believe it's 363 and 364 of his report, discusses in

9   detail the Wells' metaanalysis, pointing out that

10  while the defendants could have done it, they didn't,

11  and Dr. Wells did the very type of statistically

12  sound, methodologically sound metaanalysis of their

13  clinical trial data.

14          The experts have reviewed Dr. Wells' data,

15  they didn't dispute the data, they formed their own

16  opinions, of course, as experts must and do, but they

17  did consider Dr. Wells' analysis.

18      THE SPECIAL MASTER:  Okay.  Before we run out of

19  time, I wanted to ask about those two cases where he

20  was excluded.  And I don't remember which was which,

21  but one of them did involve, I think, one of the same

22  criticisms the defendants are making here, which is

23  that data were arbitrarily excluded from -- from an

24  analysis and, you know, it seems -- we looked at those

1    cases as well, and it seems somewhat analogous,

2    frankly, to the facts here.

3              Do you have any response to that?

4        MS. O'CONNOR:  Yes, I do.

5              First of all, both of the decisions that

6    they cite to concern Byetta, also known as incretin or

7    vice versa.  The first of those two cases, which is

8    the incretin decision, came out in March of 2021

9    followed within a month by the Byetta decision.  The

10   incretin decision is a District Court of California

11   trial court, and the Byetta decision, again, it's the

12   same product or -- same product, is the State Court in

13   California.

14             So first and foremost, neither of these

15   are Circuit Court cases, appellate-level cases.

16             I think that there is a difference, if you

17   read -- essentially they are saying the same thing,

18   both the State Court and the -- and the Federal Court.

19             First and foremost, the claim that there

20   was no scientific basis for the exclusion of the

21   studies that Dr. Wells excluded in that case, all

22   right.  Here we have a much, much different situation.

23   As Dr. Wells described, all right, he did three --

24   basically three things.

April 11, 2022

1                    First, he reviewed the Signal Assessment

2      report by the rapporteur as well as comments by the

3      member states.  That is attached as an exhibit to --

4      Exhibit 4 to the Wells opposition.

5                    And what I'd like to do, Ellen, if I may,

6      since I think I do have some time left, is read from

7      Page 13 of 26 of Exhibit 4, which is an assessor's

8      comment in a dialogue box in which they are looking at

9      the Takeda data, which is the 12-week or more studies

10     in terms of the duration.  And they note that there is

11     a difference, that they submitted studies no less than

12     12 weeks of duration, and the statement, and I read

13     from that document in the dialogue box:

14                    "It is reasonable to suppose that shorter

15     trials would tend to be less likely to detect events

16     of interest or evidence of changes in kidney function

17     than longer trials because of their shorter duration.

18     It is unlikely that excluding such trials would bias

19     the results of the analysis away from detecting an

20     association between lansoprazole and CKD or kidney

21     dysfunction."

22                    Obviously it includes by definition the

23     four-week studies, the shorter duration studies that

24     Dr. Wells ultimately excluded from his analysis in

1    arriving at his opinions.

2              So he saw this information, then he saw

3    that Takeda itself, in submitting its data and its

4    response to the PRAC, indicated that it was relying

5    upon the KDIGO definition of CKD, which I mentioned

6    earlier, that being a GFR less than 60 milliliters per

7    minute squared for a period of greater than three

8    months.  By definition, the four-week studies have no

9    relevance.

10             And finally, the third thing that

11   Dr. Wells did as distinguished from what occurred in

12   the Byetta and the incretin cases is he consulted with

13   two nephrologists who told him, and he disclosed it,

14   they had the opportunity to ask him about it, they

15   asked very little, but they told him that the

16   four-week studies were unlikely to yield any change in

17   GFR that would inform a nephrologist or anyone looking

18   at data like this as to whether there really was a

19   change in renal function.

20        THE SPECIAL MASTER:  Okay.  Thanks, Stephanie.

21   I think your time is up, but thank you.

22             Julie or James, do you want to respond?

23        MS. DU PONT:  I would like to respond, if that's

24   okay.

1          THE SPECIAL MASTER:  Yes, go ahead.

2          MS. DU PONT:  I first just want to point out

3     that Dr. Ross was specifically asked at his deposition

4     whether he was relying on Dr. Wells' analysis and he

5     specifically answered no.

6               Plaintiffs seem to suggest that Dr. Wells

7     is offering a rebuttal opinion about the kind of

8     analysis that the defendant should have submitted to

9     PRAC, but Dr. Wells has repeatedly admitted that he is

10    not doing any sort of hypothesis testing, including

11    whether he was testing the hypothesis that PRAC was

12    looking at.  And, in fact, he has admitted that he

13    doesn't have specific knowledge about what PRAC

14    actually did here or general knowledge about what PRAC

15    does generally.

16              I'd also add that the preemption issue is

17    a legal issue for the court to decide and does not

18    provide a basis for Dr. Wells to offer any opinions to

19    the jury.  The Supreme Court held in Albrecht that:

20              "We here decide that a judge, not the

21    jury, must decide the preemption question.

22              "In those contexts where we have

23    determined that the question is 'for the judge and not

24    the jury,' we have also held that 'courts may have to

April 11, 2022

 1    resolve subsidiary factual disputes' that are part and

 2    parcel of the broader legal question."

 3              Simply put, the jury will not be

 4    addressing preemption and so what Dr. Wells said about

 5    PRAC has no relevance here.

 6              And then, finally, just -- just with

 7    respect to -- I'll -- I'll stop there.  Thank you.

 8         THE SPECIAL MASTER:  Okay.  James?

 9         MR. MIZGALA:  Just quickly.

10              Ms. O'Connor mentioned that Wells is going

11    to get up and talk about his analysis and then the

12    jury is going to hear that and somehow the jury is

13    going to know what the clinical significance of an --

14    of his findings are, because these nephrologists,

15    which she didn't name, but the two at issue are Fine

16    and Powers, and I'm looking at Dr. Powers' deposition

17    transcript, and he says that Dr. Wells' report is not

18    one that he had reviewed in connection with this case.

19              So there -- those opinions have never been

20    disclosed, that any one -- any one of their experts

21    has relied on Dr. Wells' analysis.  It is not in their

22    response.  You'll notice there is a footnote that

23    starts going down that road, but it is incomplete, and

24    so they can't point to any affirmative evidence that

1    any of their experts have relied on Dr. Wells'

2    analysis.

3              What they want to do is throw it out there

4    and let the jury speculate as to what it means, and

5    that's -- that's just not right.

6         THE SPECIAL MASTER:  Okay.  Thanks.

7         MS. O'CONNOR:  Ellen, I'm sorry, may I just

8    address one thing?

9         THE SPECIAL MASTER:  Sure.

10        MS. O'CONNOR:  Please allow me.  Thank you.  I

11   appreciate it.

12             With respect to -- I'll just address AZ's

13   argument, I think I've already said what it is that we

14   would prepare, how we would present Dr. Wells.  I've

15   heard more than once and I've seen in the papers this

16   business about hypothesis testing.

17             Dr. Wells -- first of all, the EMA didn't

18   ask for hypothesis testing.  They asked for a

19   metaanalysis and a metaanalysis includes significance

20   testing, the calculation of confidence intervals.

21   That is something that neither AZ or Takeda did, but

22   Dr. Wells did it.

23             And why did he do it?  Because you just

24   can't, to use an analogy, have a jigsaw puzzle with a

1    thousand pieces, put it on the table and say here it

2    is.  What you have to do is you've got to connect the

3    dots, you've got to put the pieces together, present

4    the picture and show what it means.  And you do it in

5    a statistical interpretation and analysis by doing

6    calculations of confidence intervals by doing

7    significance testing, none of which was done by either

8    of the defendants in this case.

9        THE SPECIAL MASTER:  Okay.  Thank you.

10           All right.  Let's move on to Gilbert

11   Moeckel, and I think there are two motions pending

12   with regard to him.  One is the qualification motion

13   and one is a motion to exclude his testimony.

14           And who is going to argue that one?

15           Okay.  Katherine, go ahead.

16       MS. ALTHOFF:  Hi, good morning, Special Master.

17   My name is Katherine Althoff.  I don't think we've met

18   before.  So I am pleased to meet you today.

19       THE SPECIAL MASTER:  Nice to meet you.

20       MS. ALTHOFF:  Nice to meet you.  I am

21   representing AstraZeneca on these motions and my

22   colleague James Mizgala from Takeda is also going to

23   be, I think, speaking on these motions as well.

24           As you saw, the motion to disqualify

1    really relates to AstraZeneca, but the motion to

2    exclude addresses both defendants.  So I actually have

3    a few slides that I'm going to share as well here.

4        THE SPECIAL MASTER:  I'd like to start with

5    the --

6        MS. ALTHOFF:  Sure.

7        THE SPECIAL MASTER:  -- the motions to

8    disqualify, if we can, because I think, you know, that

9    obviously is -- is -- well, I'd just like to start

10   with that one.

11       MS. ALTHOFF:  I agree, because if the -- you

12   know, if he is disqualified then in fact there is not

13   much to talk about on a motion to exclude.  So I think

14   you should -- do you have it in front of you, can you

15   see it?

16       THE SPECIAL MASTER:  Yes, we see it.

17       MS. ALTHOFF:  Okay.  Great.

18            So, your Honor, again, with regard to --

19   Special Master, with regard to the motion to

20   disqualify, this one relates to AstraZeneca, and I'm

21   not -- for some reason it is not wanting to -- let's

22   see if I can get it to go down here.  Well, it worked

23   this morning.  There we go.  All right.

24            And specifically here with regard to the

April 11, 2022

1    motion to disqualify, Special Master, what I tried to

2    do on this opening slide was really say for you really

3    why this should be granted.

4              And here we have Dr. Moeckel's own

5    statement, which is:  "I am very interested in working

6    with Ice Miller and Katherine," that Katherine is me,

7    "on the interesting Astra[Z] legal cases."

8              And this, of course, statement was made by

9    Dr. Moeckel a very long time ago at the very inception

10   of this litigation when we were starting to look for

11   general causation-type experts in this litigation, not

12   knowing who our particular plaintiffs were, there was

13   no bellwethers yet, we did not know about Mr. Rieder

14   yet or Mr. Bales, but we were looking for general

15   kidney pathologists and in particular human

16   pathologists, and that's why I was reaching out to

17   Dr. Moeckel.

18             So it's important here, I think --

19        THE SPECIAL MASTER:  Okay.  Can I --

20        MS. ALTHOFF:  Yes, go ahead.

21        THE SPECIAL MASTER:  You may have this already,

22   but, I mean, we've looked at some of the case law,

23   and, I mean, I guess one of the key issues is I saw

24   in, I guess it was your papers, a consulting agreement

1    that he sent over to you.

2         MS. ALTHOFF:  Yes.

3         THE SPECIAL MASTER:  Was there ever a consulting

4    agreement -- I mean, I assume in cases like these you

5    have a standard consulting agreement that you sign

6    with all of your experts.

7              Was such a consulting agreement ever

8    signed by both parties or was -- did you ever sign the

9    agreement that he sent over?

10        MS. ALTHOFF:  So, that's a good question, and

11   what happened here was Dr. Moeckel, and actually if we

12   go to this next slide we should be able to get it

13   here.  So, in fact, that consulting agreement I think

14   is up on the screen right now, and --

15        THE SPECIAL MASTER:  Yeah.

16        MS. ALTHOFF:  Yeah.  And so Dr. Moeckel sent

17   that to us and we responded with an e-mail that said,

18   Yes, we absolutely would like to engage you as a

19   consultant.

20             So did we sign the same document that he

21   sent us, no.  Instead we responded with an e-mail and

22   it actually came from me.  And then, thereafter, you

23   know, in reliance on that we went forward and met with

24   him.

1       THE SPECIAL MASTER:  Do you have a copy of your

2   e-mail in the PowerPoint here?

3       MS. ALTHOFF:  Not in the PowerPoint, but it

4   would be an exhibit to our motion, Special Master,

5   because it would be attached to my declaration.

6       THE SPECIAL MASTER:  Okay.  And -- okay.  Keep

7   going.

8       MS. ALTHOFF:  Yeah, sure.

9           So what happens next.  Let's see here.  I

10  don't know why this is not advancing correctly.  All

11  right.  There we go.

12          So I met with Dr. Moeckel.  This was not

13  simply a case as some of the ones that have been cited

14  in some of the motion with regard to a single phone

15  call or where you blast a bunch of experts with

16  materials.  This is not that case.

17          I actually flew to New Haven, Connecticut

18  and met with Dr. Moeckel.  I spent two hours in his

19  office and I had a roadmap of things I wanted to talk

20  to him about and met with him for two hours.  We

21  talked about everything from his background and

22  expertise as a human kidney pathologist, not working

23  for the plaintiffs in this case, but then also talked

24  with him about who we had retained, who we were

1    thinking about retaining.  These were not only experts

2    that would ultimately be disclosed in this case but

3    also consulting experts.

4              We talked to him about the plaintiffs,

5    what we expected to be their mechanistic theories, we

6    talked to him about our mechanistic theories, and at

7    the end of that two-hour meeting, I asked him again if

8    he continued to want to meet with us and he said he

9    did.

10             And so I asked him what next steps would

11   be, and he said, Please send me some materials, which

12   I did.  I sent him two binders of materials of

13   literature, medical literature and scientific

14   literature from this case, which ultimately I would

15   say showed up on his materials considered list.

16        THE SPECIAL MASTER:  Okay.  Can I ask you a

17   question?

18        MS. ALTHOFF:  Absolutely.

19        THE SPECIAL MASTER:  Was he paid?  Have you

20   ever -- has AstraZeneca ever paid him for any of the

21   time he spent meeting or reviewing that literature?

22        MS. ALTHOFF:  That's a good question.  I mean, I

23   will tell you no, we did not send him payment.  He

24   told us he would expect payment.  He sent us his fee

Apr 11 2 1  2022

1  schedule, which is in our papers, told us how much he

2  would charge us.

3           As is the case often with these experts,

4  until they get closer to writing their report they

5  don't send a bill and he didn't.  He didn't send a

6  bill, he didn't tell me he didn't want to, he didn't

7  tell me that he didn't expect to be paid.  He told me

8  he expected to be paid.  He just never sent a bill.

9      THE SPECIAL MASTER:  Did you ever ask him for a

10  bill?

11      MS. ALTHOFF:  Not that I recall.  No, not that I

12  recall.

13      THE SPECIAL MASTER:  Okay.  Okay.  I mean, I'm

14  just trying to go through the criteria that I think a

15  lot of the case law has looked at.

16           Let me ask you, there is a long period,

17  and I can see it on your -- on your timeline from '17

18  to '20.  That's a long time not to be in touch.

19           Was there any contact between anyone on

20  your side of the table with him in that roughly

21  three-year period checking in with him, that kind of

22  thing, any of that?

23      MS. ALTHOFF:  No, and here is why.  Dr. Moeckel

24  was not going to be someone who looked at particular

 1    bellwether cases and looked at medical records or even

 2    biopsies.  We only have one case in the initial

 3    bellwethers that has a biopsy.  And so really we

 4    wanted him to look at medical literature and give

 5    general testimony, if called, from a pathologist's

 6    perspective.

 7            And so there really was no reason during

 8    that period of time to check back in with him.  We had

 9    talked with him, we knew what his preliminary opinions

10    were, and the parties were busy in the bellwethers

11    taking depositions, looking at particular plaintiffs

12    and that really wasn't going to be his role.

13            And I think the questions that your

14    Honor -- that, Special Master, you are asking, really,

15    go to the Syngenta factors or, you know, whichever

16    type of case you want to look at, and whether we had

17    an objectively reasonable belief that we had retained

18    him.

19            And what I would say to that is, I think

20    the best piece of evidence there is not only the

21    consulting agreement that he signed, but also the fact

22    that I reached back out to him in November of 2020.

23    If I didn't think I had retained him, why would I

24    reach out to him again and ask him to, you know, start

April 11, 2022

1    meeting with me to put together an expert report.

2         THE SPECIAL MASTER:  Um-hum, okay.  I think we

3    found Exhibit D.  And is this the e-mail that says:

4              "We thank you for your e-mail and fee

5    schedule.  Please do not hesitate to contact me or

6    Katherine for any questions.  We look forward to

7    working with you and will be in touch."

8              Is that what you're -- I just want to make

9    sure that's the document?

10        MS. ALTHOFF:  I think so.  There were several

11   e-mails around that time, but that was -- yeah, that

12   works.

13        THE SPECIAL MASTER:  And when did you first --

14   maybe you have this in your timeline.  When did you

15   first find out that he was working with plaintiffs'

16   counsel?  I guess the expert report was submitted in

17   2021, right?

18        MS. ALTHOFF:  Correct.  Yeah, in April of 2021

19   we got his expert reports and I was as shocked as

20   anyone to see his report in their stack.

21             We had reached out to him, you know, in

22   November of 2020 and received back, I guess you would

23   say a cryptic e-mail, which is only really cryptic in

24   hindsight where he said he is not available for legal

1    consultation in the foreseeable future.  But if we

2    take ourselves back to November of 2020, I will tell

3    you we were hearing that kind of thing from lots of

4    healthcare providers who were busy with COVID or their

5    organizations were limiting, you know, their contact

6    outside of the hospital because of COVID.  And so when

7    I got it, I was disappointed because we were

8    interested in working with him as a human renal

9    pathologist, but I was -- it didn't tell me, Boy, I

10   think he has switched sides.  It never, never crossed

11   my mind until I got the expert report.

12        THE SPECIAL MASTER:  Okay.  And then at that

13   point what did you do?

14        MS. ALTHOFF:  Well, we noticed his deposition

15   along with, you know, all of the other experts, and I

16   took his deposition.

17        THE SPECIAL MASTER:  Okay.

18        MS. ALTHOFF:  And asked him about it.

19        THE SPECIAL MASTER:  And did you reach out to

20   plaintiffs' counsel at that time to say, What's going

21   on here or anything like that?

22        MS. ALTHOFF:  No.  We took the deposition and,

23   frankly, I wanted to hear what the expert had to say

24   with regard to, you know, was he going to say I told

1    them all along or any such thing.  It was a bit of an

2    awkward situation.

3          THE SPECIAL MASTER:  Okay.  I think we are down

4    to about 15 seconds according to my timekeeper here.

5              Is there anything else that you wanted to

6    add, take another minute or two?

7          MS. ALTHOFF:  No.  I think, you know, if you

8    look at the situation, I do think we have an

9    objectively reasonable belief that we had a

10   confidential consulting relationship based on the

11   facts here, and this is just not the type of behavior

12   that this -- that the court should countenance.  We

13   think he should be excluded on this basis because this

14   is -- you know, it's not going to look good to the

15   jury when you see this and it looks poorly on the

16   judicial process.

17         THE SPECIAL MASTER:  Okay.  Thank you.

18             Who is going to respond for plaintiff

19   side?

20         MR. PENNOCK:  Good morning, Special Master.

21   Paul Pennock for the plaintiff.

22         THE SPECIAL MASTER:  Hi Paul, how are you doing.

23             Katherine, we still have your screen up, I

24   think.

April 11, 2022

```
 1              Still up.  There we go.  Okay.

 2              All right.  Go ahead, Paul.

 3         MR. PENNOCK:  Thank you.

 4              First, I probably -- I probably should say

 5    and remind the Special Master, at least, as you saw in

 6    the papers that we -- I did not know that this contact

 7    had taken place, so -- in terms of her -- in terms of

 8    her going to meet in Connecticut or anything of that

 9    type.  I never had, therefore, any conversations with

10    them about those discussions, neither did Bess

11    DeVaughn or Tracy Finken who had been working with

12    him.  We knew that a reach out had occurred years

13    earlier and that's it and we didn't question him about

14    it.

15         THE SPECIAL MASTER:  When did you start meeting

16    with him, Paul?  When did your team start meeting with

17    him and did you ask him about, you know, whether he

18    had been contacted by any other party?

19         MR. PENNOCK:  So it was in November of 2018 that

20    we first started having contact with him.  I was not a

21    part of that at that time.  And there was -- as I

22    understand it, he did say the other side reached out

23    to him a couple of years earlier and that's the extent

24    of it from what we knew.
```

1          You know, the further exposition of the

2    contact all happened at the deposition.  You know, I

3    was surprised by it, on the one hand, but on the other

4    hand I'm glad I hadn't had any discussions with him

5    about it.

6          So he had really no recollection of it.

7    He didn't even recognize counsel that had been at this

8    meeting.  I mean, counsel has testified that it was a

9    two-hour meeting.  You know, I don't know that that's

10   borne out.  But in any event, he had really no

11   recollection of it, any materials that were sent he

12   did not have, and as far as he was concerned it all

13   ended almost as fast as it began.

14         And to -- so that's sort of just the

15   context that we were not understanding what had

16   occurred with respect to that until the deposition

17   took place.

18         I -- you know, we were not told when the

19   report came out what had happened.  I can't really lay

20   too much fault at that.  You know, I'm just, like,

21   look, she wanted to come him and question him cold on

22   it, take me by surprise, well, that worked, she did.

23         And I don't lay a lot of blame there, but

24   I think the fundamental issue, at least the first

```
 1   fundamental issue is whether or not there was this

 2   contract.  I suppose someone, particularly lawyers,

 3   somehow could read into that responsive e-mail that

 4   there was a meeting of the minds to form a consulting

 5   relationship.  I mean, I would suggest it's ambiguous

 6   at best, sending that to a doctor saying, he says I'm

 7   very interested in going forward and then -- and

 8   working with Ms. Althoff and then they respond, We

 9   look forward to working with you.

10            You know, I can tell you that certainly

11   from Dr. Moeckel's point of view, he did not have a

12   consulting relationship with them.  They had left it

13   there.  They never went forward and they did not sign

14   the document that he sent to them asking them to sign,

15   which to him, you know, you can see why to him that

16   would indicate they don't want me.  I've sent them my

17   deal.  They've not signed it.  They just sent me an

18   e-mail and that was the end of it.  So --

19       THE SPECIAL MASTER:  Was that a stated -- his

20   stated position, that he did not think that he had

21   a -- he had been retained by him?

22       MR. PENNOCK:  He absolutely did not think he had

23   in any way been retained by them.  He didn't even

24   review the literature that was provided to him.  And
```

1    the reason is because there was no follow-up on what

2    he asked them to do.  I mean, he took the initiative

3    to say, Here is my deal, this is my consulting deal

4    with a signature line and it never came back.

5              So then in the intervening time period, of

6    course, we are doing the same kind of reach out and we

7    get in touch with him.

8              And I just want to note a couple of other

9    things, Ellen.  Again, I'm sorry.  I'm regurging

10   (sic) -- regurging the papers a little bit,

11   regurgitating it.  They didn't have him sign a

12   protective order, they didn't have him sign any

13   confidentiality agreement, they didn't make any

14   payments, those things that you were asking about.

15             And so this, to me, is sort of the same

16   type of instance that I've had myself, where I've

17   reached out to somebody and had a conversation with

18   them and they said, Oh, thank you, and then they never

19   responded to my further inquiries and then they show

20   up on the defense side.  That's happened more than

21   once, several times.  And I don't think that it in any

22   way compromises or reflects badly on the integrity of

23   the trial process because these conversations took

24   place.  And, you know, whether --

April 11, 2022

```
1        THE SPECIAL MASTER:  I thought I read in
2   someone's papers that there was a notebook of studies
3   that was given to him with, I don't know what the
4   number is, like 30 studies, and that in his -- his
5   report that he did for plaintiffs he utilized, I don't
6   know, 28 of them.  I might not have the exact numbers
7   right, but I thought I read that.
8            And doesn't that indicate that at least --
9   at the very least he looked at the materials that the
10  other side had culled for him?
11       MR. PENNOCK:  No, and the reason is because
12  these are materials in common.  These are publicly
13  available published literature which are -- you know,
14  there is a certain volume, as you know, of literature
15  that's always, you know, revolving around the core
16  issues in a case and these were some of those
17  articles, particularly as they concerned the issues on
18  both animal and human pathology.  And so we had the
19  same selection that they had or some portion of the
20  same selection.
21            So that was overlap due to the fact that
22  these are, indeed, the articles that you would provide
23  to somebody to take an initial look, but I don't know,
24  other than what they've told me, what they sent to
```

1   him, because he did not have it.

2              And after the deposition, that was one of

3   my first questions:  Do you have anything still?  And

4   he did not.

5              So -- so that is -- you know, if we looked

6   at really any of the experts, I think Special Master,

7   you know, whether -- if you look at a nephrologist, a

8   general causation nephrologist, if they had one, you

9   would look and you would see they have all of the same

10  epidemiological articles.  It is in that vein and I

11  would suggest that it's -- to say it's common would be

12  an understatement.  So he did not utilize what they

13  sent him in any way.

14             So I don't think that the integrity of the

15  trial process is in any way reflected upon -- or badly

16  reflected upon because of this.  It was really, I

17  think, innocent on both our part for sure and -- and I

18  would suggest equally for sure on Dr. Moeckel's part.

19  He is a doctor.  He didn't think he had any agreement,

20  we hadn't heard from them in two years and we reached

21  out to them and he said, Okay, I'll take a look at

22  what you want me to look at, and it proceeded from

23  there.

24             You know, if -- I think that the court has

April 14, 2022

 1   seen -- you've seen, Special Master, there needs to be

 2   specific and unambiguous confidential disclosures, I

 3   don't think there is any record that that took place.

 4            And so if you take this record on its

 5   whole, I would suggest, I really don't think they even

 6   get close to being able to disqualify him for these

 7   communications that happened.  He didn't think he had

 8   an agreement, he didn't look at anything they had, he

 9   doesn't even remember the meeting, he didn't even

10   remember Ms. Althoff who was sitting there across the

11   table from him, and furthermore, we had a span of two

12   years until he consulted with us and another two years

13   before they reached out to him again.

14            You know, to suggest that, Well, we just

15   really didn't need to talk to a pathologist until four

16   years later, okay, I would say that if you have a real

17   relationship with an expert of any caliber, let alone

18   a world class expert like this and you really wanted

19   to work with him and you thought you had a

20   relationship with him, you would have had some contact

21   in between and had provided some payment to him for

22   whatever work you thought he had done, although they

23   never checked to see if he did the work that they

24   thought he was doing, which was reviewing these

April 11, 2022

```
 1    literature articles and, in fact, he had not been.

 2            So I think that if you look at all of the

 3    case law, it just really doesn't cross the bar in

 4    terms of disqualifying this expert that has done a

 5    massive amount of work on behalf of plaintiffs in this

 6    case.  Thank you.

 7        THE SPECIAL MASTER:  Thanks, Paul.

 8            Katherine, do you want to respond?

 9            You are muted, Katherine.

10            Can you unmute her?

11            Can you unmute yourself, Katherine?

12        MS. ALTHOFF:  Yep, there we go.

13        THE SPECIAL MASTER:  Yep, there we go.

14        MS. ALTHOFF:  Yeah, I don't want to regurgitate

15    what we've already talked about.  Judge, just a couple

16    quick points.

17            I mean, Paul's big point was really the

18    doctor sent her a consulting agreement and she didn't

19    sign it and so he didn't believe that there was any

20    relationship.  Unfortunately that sort of belies the

21    timeline.

22            The doctor sent the consulting agreement

23    in 2016 and then I met with him for two hours after

24    that, two months after that.  So, you know, I think
```

April 11, 2022

```
1   that the fact, you know, whether we signed the

2   agreement or whether we sent him an e-mail saying,

3   Yes, we want to work with you and then I met with him

4   for two hours, I think, is -- it certainly does not

5   make -- does not break the case for sure.

6            Paul also raises the issue that there was

7   no protective order sent to Dr. Moeckel.  Well, of

8   course there was no protective order yet in the case

9   at that point in time.  And we didn't send Dr. Moeckel

10  any confidential records designated in the case, in

11  other words, we didn't send him any of the plaintiffs'

12  medical records, so there was no reason for him to

13  sign a protective order.  And once again, that is not

14  dispositive of the issue.

15           And, you know, finally, there were a

16  number of assertions made about whether, you know,

17  what Dr. Moeckel told them and what Dr. Moeckel's

18  impression was during the deposition.  None of this is

19  evidence and it is not in the record.  There is

20  nothing in the record with regard to whether

21  Dr. Moeckel told the plaintiffs that he had been

22  previously retained or didn't or what his contacts

23  were.  In fact, I heard for the first time today that

24  he told Paul that he had -- had a reach out but didn't
```

1    disclose the two-hour meeting.  That's all news to me

2    and it's certainly not in the record.  And this, you

3    know, he didn't know who I was.  I think he did know

4    who I was at the deposition, but regardless, that's

5    not in the record that he didn't.

6              So, again, I think these --

7         THE SPECIAL MASTER:  Can I ask one more question

8    of you?

9         MS. ALTHOFF:  Sure.

10        THE SPECIAL MASTER:  Do you -- I mean, do you

11   have a standard consulting agreement that you normally

12   give to your experts, I mean, because the one that he

13   has that's there doesn't look -- I've done a lot of

14   consulting agreements over the years -- doesn't look

15   like any that I would normally have done.  I mean, do

16   you -- is that something you normally would do if you

17   were going to use the expert?

18        MS. ALTHOFF:  Not necessarily.  At the beginning

19   stages of an expert consultation, I typically meet

20   with them, I often retain them via e-mail and then at

21   some point in time sometimes I will provide a more

22   complex one, but not necessarily.  And certainly with

23   regard to the experts in this case, in this MDL, not

24   all of them have, you know, big, long complex

1    consulting agreement.  It's -- I just -- I don't

2    necessarily do it.  I don't think it's necessary.  And

3    so, no, I wouldn't typically sign his agreement, which

4    is why, you know, we retained him via e-mail.

5        THE SPECIAL MASTER:  Okay.  Thanks very much to

6    both sides.

7            And I guess now do we want to move on to a

8    discussion of your motion to exclude testimony?

9        MS. ALTHOFF:  Sure.

10       THE SPECIAL MASTER:  Okay.  Are you going to do

11   that too, you and James?

12       MS. ALTHOFF:  Yes.  Let me just advance through

13   here.

14       THE SPECIAL MASTER:  By the way, while you are

15   doing that, I just wanted to ask that to the extent

16   that anybody is using slides, using PowerPoint slides

17   in -- in connection with their arguments, can you,

18   when the arguments are done, send those to me, please,

19   by e-mail, I'd appreciate it.

20       MS. ALTHOFF:  Sure.

21       MR. PENNOCK:  If we could get a copy as well.

22       THE SPECIAL MASTER:  And send that to opposing

23   counsel as well.

24            Yeah, I was just going to say that, and to

 1   opposing counsel as well.

 2        MR. PENNOCK:  And the court reporter.

 3        THE SPECIAL MASTER:  And the court reporter,

 4   obviously, as well.

 5             Okay.  Go ahead, Katherine.

 6        MS. ALTHOFF:  Great.

 7             Special Master, again, Katherine Althoff

 8   on behalf of AstraZeneca, and again, I believe James

 9   Mizgala is going to be maybe adding some comment on

10   behalf of Takeda.

11             So pivoting from the motion to disqualify

12   to the motion to exclude, and, again, on this first

13   slide what I tried to do was sort of sum up in a

14   sentence why our motion should be granted and why

15   Dr. Moeckel should be excluded.

16             And here, specifically, Dr. Moeckel

17   testified that his job in this case for the PSC was to

18   review pathological findings, if any, in the kidneys

19   of test animals.  So, in other words, he was retained

20   to be an animal pathologist.  And when asked at his

21   deposition about that, he told us:  "I am not an

22   animal pathologist."

23             It's really pretty simple.  Is this a

24   qualifications case?  Sort of.  But what you really

1    find out is that because he is not an animal

2    pathologist and because this isn't what he does, he

3    has done some testing, but this isn't what he does in

4    his ordinary life, he did not have a reliable

5    methodology that he used, and ultimately his

6    qualifications don't fit.  And then, lastly, of

7    course, we can get to the fact that if, in fact, he

8    can render testimony about what he saw in the slides

9    of animal kidneys, he has testified he can't link that

10   up to humans.  And it's just simply his observations

11   of what he saw in the animals.

12           And, unfortunately, plaintiffs have nobody

13   else.  This is a little bit like Wells, but here --

14       THE SPECIAL MASTER:  Can I ask a question?

15       MS. ALTHOFF:  Uh-huh.

16       THE SPECIAL MASTER:  Can I ask a question.  I

17   mean, you are saying he is a human pathologist, not an

18   animal pathologist, but we -- and God knows I'm a long

19   way from being a pathologist, but don't we often in

20   these kinds of situations regarding drugs, we look at

21   animal pathology data because it provides some

22   information that might or might not be relevant to --

23   to humans.

24           So, I mean, I just -- I wonder, you know,

Apr 1 4 - 2 022

1    and maybe I'm wrong about this, but that a pathologist

2    who can look at human path slides probably could look

3    at animal path slides as well, especially in this

4    context where we do use animal data all of the time in

5    evaluating drugs?

6        MS. ALTHOFF:  Yeah, that's -- that's a very good

7    question, Special Master, and here is why that's not

8    the case here:  Because the key issue here is a

9    condition called "chronic progressive nephropathy."

10   Chronic progressive nephropathy, if you look in the

11   textbooks, is a rat-specific or for sure a

12   rodent-specific disease.

13           So if you only look at humans and if you

14   only look at human pathology, you've never seen

15   chronic progressive nephropathy.  And, in fact,

16   Dr. Moeckel has never seen chronic progressive

17   nephropathy.  And as a human pathologist that is not

18   surprising.

19           However, here the key testimony and the

20   critical issue is AstraZeneca and Takeda, in their

21   animal studies, reported to the FDA that what was seen

22   in terms of findings on the kidney pathology was

23   chronic progressive nephropathy.

24           Now, Dr. Moeckel, who has never seen it

1    and who is not an animal pathologist, wants to come in

2    and testify, Oh, I looked at those slides and I did

3    not see chronic progressive nephropathy, the

4    rat-specific condition.  That requires an animal

5    pathologist.

6         THE SPECIAL MASTER:  Let me ask you another

7    question.  I mean, you were -- you either retained him

8    or were considering retaining him, as we've discussed

9    previously.

10            What -- why if he is -- why if he is

11    someone who is not qualified to give an opinion in

12    this case?

13        MS. ALTHOFF:  Oh, I'm not saying he is not

14    qualified to give an opinion in this case.  We wanted

15    to retain him and did retain him as a human

16    pathologist.  So to testify as to what, for instance,

17    acute interstitial nephritis looks like in a human on

18    biopsy.  And as a human animal -- or excuse me -- as a

19    human kidney pathologist, you know, what drug-induced

20    interstitial nephritis looks like and what causes it.

21            That's not what he is doing here.  Here he

22    is looking at rats and dogs and he says he has never

23    looked at a dog before, and telling you what he sees

24    on the slides and whether it is consistent with a

 1   rat-specific condition or not.  And his testimony is

 2   it's something else.

 3        THE SPECIAL MASTER:  Okay.  Thank you.

 4             Anybody -- is James going to address this

 5   or...?

 6        MS. ALTHOFF:  Yeah, I'm happy to have James

 7   comment as well.

 8        THE SPECIAL MASTER:  I didn't know.  I didn't

 9   know.  I'm just asking.  If not, we can go to the

10   plaintiff side.

11        MR. MIZGALA:  Just quickly, Special Master, this

12   is really very similar to the Wells situation.  I

13   mean, again, you have -- you have this expert who says

14   I've done -- I've looked at all of these slides and

15   made mental notes about them and -- and then -- I

16   can't -- but I can't tell you what that means with

17   respect to humans.

18             I mean, if you look back, yes, there are

19   cases where, you know, animal testimony -- or

20   testimony regarding animal studies has been allowed in

21   cases, but that's where somebody says, Oh, and what

22   that means with respect to the humans having a

23   condition is it's more likely than not or something.

24   There is some sort of expert opinion tethered to that

1    analysis.  We don't have that here.

2              The plaintiffs have conceded that he is

3    not opining that the use of PPIs causes CKD in humans.

4    He is not opining that the animal findings prove that

5    PPIs cause kidney injury, and he is not opining on

6    mechanisms of PPI toxicity.

7              Again, so what's a jury to do?  They

8    want -- they want -- and none of their expert -- other

9    experts say, Oh, I looked at what Dr. Moeckel did and

10   that's -- and that -- and what it means is this in my

11   analysis of causation.  We don't have that anywhere.

12             So, again, we are left with the jury

13   speculating as to what these animal findings mean.

14             Thank you.

15        THE SPECIAL MASTER:  Thanks.

16             Okay.  Who is talking for plaintiff side?

17   Paul, is that you again?

18             Okay.  It's Paul.

19        MR. PENNOCK:  Thank you.

20        THE SPECIAL MASTER:  Can you unmute, Paul.  You

21   are muted.

22        MR. PENNOCK:  Oh, I'm sorry.

23        THE SPECIAL MASTER:  There you go.

24        MR. PENNOCK:  Oh, okay.

```
 1          THE SPECIAL MASTER:  No problem.

 2          MR. PENNOCK:  I guess I'll just first quickly

 3     address what I -- the qualifications assertions that

 4     defendants are making.

 5               It is in the record, Special Master, and

 6     it is certainly in our brief, Dr. Moeckel is

 7     extensively experienced in animal pathology and

 8     conducting research regarding animal pathology and

 9     including rats.  There has made -- much has been made,

10     as it often is, sound bites here or there, he had not

11     seen CPN in rats, and that's a very relevant lack of

12     finding by him because he has always been -- or almost

13     always been dealing with younger rats.  And the

14     position and one of the bases of his opinions, that

15     these lesions he is seeing in the Takeda and

16     AstraZeneca younger rats are not CPN is because you

17     don't see it in younger rats.  And so if you are

18     looking at these lesions, and he had other

19     pathological features, histopathological features that

20     he didn't see in these lesions, then that's -- that's

21     the point.  You see these lesions in older rats.

22               And so the fact that he hasn't seen older

23     rats very often and, therefore, he hasn't seen a lot

24     of CPN.  But that's a little bit of a side note.
```

April 14, 2022

1                    The qualifications, I think, you know,

2    best might be summed up at Page 18 of the brief.  I

3    know you probably don't want me to regurgitate this,

4    but I think it bears pointing out.  You've had -- I

5    don't know how anyone could have possibly read all of

6    this briefing.

7         THE SPECIAL MASTER:  It is a lot of paper, for

8    sure.

9         MR. PENNOCK:  It is the most paper I've ever

10   seen, I think.

11                   You know, the Yale University has named a

12   research laboratory after Dr. Moeckel, the Moeckel

13   Lab, where:  Students doing post docs are exposed to a

14   wide variety of physiologic, biochemicals, cell

15   biological, molecular and cell biology experimental

16   protocols, as well as different transgenic and

17   knockout technologies to generate animal models for

18   tubular injury regeneration, end quote.  And this is

19   the mission statement of the lab created at Yale and

20   named after Dr. Moeckel.

21                   Moreover, this is also a quote:  "The

22   student will be exposed to human kidney biopsy

23   material in an attempt to correlate findings in the

24   animal and cell culture models with actual

```
 1    pathology" -- "or pathological mechanisms in patient

 2    kidney biopsy tissue."

 3              So, you know, the rest of the record is

 4    replete with his qualifications that I think are

 5    really about as strong as you can get, which is borne

 6    out by his CV and all of the work that he has done

 7    which has included a great deal of animal work.

 8              In terms of the next issue that has been

 9    raised, which is -- I think by James -- kind of hit

10    the point most pointedly, Dr. Moeckel is coming in to

11    testify, as histopathologists do, that -- let me

12    withdraw that, Special Master.  Let me approach it

13    from the other direction.

14              What if the only evidence in this case

15    were all of the animal studies from two different

16    defendants were looked at by pathologists and there

17    were no findings of any lesions that might be

18    correlated with a human lesion, that the only findings

19    in all of the pathology were chronic progressive

20    nephropathy in the rats and that only has to do with

21    rats, what if that were the only testimony in the

22    case?  That would be a big issue for any case where

23    you are claiming that a compound has caused a toxic

24    effect in a human in the kidneys.
```

 1              So what do we have?  We have an expert who

 2   is coming in to say, No, hold the phone.  That's not

 3   correct.  When I look at all of this pathology, I do,

 4   in fact, see lesions that -- in these rats that are

 5   not chronic progressive nephropathy that appear to be

 6   a tubular interstitial nature -- type of

 7   histopathology, lesion, and in addition I've seen

 8   evidence in these slides that that injury has, in

 9   fact, caused chronic kidney disease in the rats that's

10   unrelated to chronic progressive nephropathy.

11              I mean, to say that that has no --

12        THE SPECIAL MASTER:  How do you -- how do you

13   link it, though?  I mean, I think the question that

14   Takeda's counsel, James, was raising is who is going

15   to link that testimony on the part of, you know,

16   Dr. Moeckel to an effect in humans?  I think that's

17   the point -- at least a point that James was making

18   that, you know, it is all well and good to talk about

19   what happened to the rats, but how do you link that to

20   impact on humans?

21        MR. PENNOCK:  Very good.  So to answer that

22   specific relevance question, but I think there is

23   another relevance point, both of our experts, both

24   Dr. Charytan and Dr. Fine, have, of course, applied a

April 14, 2022

```
 1   Bradford Hill analysis to causation, general causation
 2   of these -- of this disease entity with these
 3   compounds.  And both of them in walking through the
 4   well accepted Bradford Hill approach and criteria have
 5   identified that in addition to all of the clinical
 6   evidence that we see, in addition to the evidence that
 7   we see in clinical trials, in addition to the evidence
 8   that we see in the many case reports, in the case
 9   series and, of course, all of the epidemiological
10   studies that have come out, in addition to all of
11   that, there is evidence of -- of an effect in animals
12   and they will say and have said and it is something
13   that is routinely testified to that when you are
14   assessing human causation, you do look to the animal
15   to see what, if anything, was occurring in the animal
16   regarding the organ of interest and the disease of
17   interest in the animal.
18            And it's -- and in some ways it's -- it is
19   a matter of looking at it to see if there is nothing,
20   because if there is nothing, as I started out, if
21   there is nothing in the animal evidence at all and
22   it's a competent body of animal evidence, that
23   certainly raises a question in a Bradford Hill
24   analysis of, if we are having this effect in humans,
```

1    why is there no biologically plausible preclinical

2    evidence that we are seeing in the animals or in

3    vitro, why does that not exist.

4              And it confounds, without the animal

5    evidence or the -- and/or the in vitro evidence, it

6    somewhat confound the Bradford Hill method or, I'm

7    sorry, analysis of all of the evidence that exists.

8    It certainly raises a question if there is no animal

9    evidence that needs to be explained by the doc -- the

10   medical doctors who are giving -- who are giving

11   causation opinions.

12             So -- so the importance of the animal

13   evidence and the fact that there are some indicia of

14   renal toxicity in the animal reports that these other

15   experts read does -- does play a role in the

16   evaluation of causation.  And I say these other

17   experts, I -- it was either Fine or Charytan that went

18   through this -- went through this evidence or both,

19   and probably Stephanie can answer that, but it's part

20   of the Bradford Hill.  So that's how it is connected

21   up as to the relevance for human causation.  It is in

22   the general causation piece.

23             In addition -- and I hope that's answered,

24   that question or at least --

APF 11-1-1  2022

```
 1        THE SPECIAL MASTER:  It answers it, yes.

 2        MR. PENNOCK:  -- or at least appears to, okay.

 3             So the second, I think, relevance

 4   consideration for this evidence is, of course, in the

 5   conduct of the company, not just in what should have

 6   occurred when you have -- if you have properly

 7   evaluated your animal evidence, what should have been

 8   occurred -- what should have flowed from your

 9   identification of possible renal toxicity of a chronic

10   nature in your animal models, other than something

11   specific to the animal model.

12             Well, if that comes out, if you find that,

13   if you identify it, if you properly evaluate it and

14   assess it, then you should, and I think we see this

15   throughout Dr. Ross's description of what happened

16   here, that should give you some kind of signpost on

17   the road, not that you don't put the drug on the

18   market, not -- not that you're -- you're going to put

19   in a warning of renal toxicity when you launch of the

20   drug, but it is a signpost that, you know, there might

21   be a bridge out ahead and -- and so now you are alert,

22   which is why we do animal studies, first we do them to

23   see if something ridiculous happens, like they all get

24   cancer and die, but really, we are looking to create
```

1    signposts of what might happen in the clinical

2    setting, what might happen postmarketing.  And so if

3    we had properly done our work, we say, Oh, there might

4    be some renal toxicity in there.  Oh, that might be

5    relevant to humans.

6              Well, guess what, you launch the drug and

7    suddenly you are getting case report after case report

8    published in reputable journals saying, Hey, I just

9    had a -- I had a patient, two patients, three

10   patients, seven patients, which is what happened, as I

11   think the Special Master knows, throughout the '90s,

12   of renal effects and ultimately chronic toxicity.

13   Well, that's why those signposts exist in the animal

14   studies and that is the other relevant aspect of

15   Dr. Moeckel's testimony in this case and in any case.

16       THE SPECIAL MASTER:  Okay.  Thank you, Paul.  I

17   think our time is up.

18       MR. PENNOCK:  Thank you.

19       THE SPECIAL MASTER:  I think you might have a

20   few minutes for rebuttal if Katherine or James want to

21   say something.

22              Katherine does, okay.

23       MS. ALTHOFF:  Yeah, just a couple of quick

24   points.

APRIL 11, 2022

1              Paul identifies on Page 18 the extensive

2    animal qualifications of Dr. Moeckel.  What's very

3    important here is Dr. Moeckel, to the extent he works

4    with animals, he works with models of injury of

5    animals.  So where they try to take an animal and

6    simulate what they see in humans.  So they'll clamp

7    off a kidney and simulate acute kidney injury.  That's

8    what he does.  That's why he is not seeing chronic

9    progressive nephropathy.

10             What he has a very, very little experience

11   at all in is toxicity studies where you take an

12   animal, you give them a drug and you see what happens.

13   He does models of kidney injury.  It is a totally

14   different deal than -- than he does within toxicity

15   studies.

16             Next, with regard to the link up, if there

17   is a link up, it's not in the record.  I saw nothing

18   in the plaintiffs' briefs that say Charytan relies on

19   Moeckel, there is nothing that says that Dr. Fine

20   relies on Moeckel.  I'm not aware of that.

21             So, you know, do they talk about animal

22   evidence?  I'm sure they do, as does their other

23   expert Dr. Smith who reviewed AstraZeneca's own

24   preclinical filings with the FDA and reached certain

April 11, 2022

```
 1   opinions about that.  And there is no Daubert motion

 2   pending on Dr. Smith.

 3              But what we are talking about here is

 4   Dr. Moeckel reviewing slides that he is not qualified

 5   to do and didn't use the correct methodology to do and

 6   then nobody relying on him to connect that up to what

 7   does that mean for humans.

 8        THE SPECIAL MASTER:  Thank you.

 9              James, did you want to add anything?

10        MR. MIZGALA:  No.  Well, just, you know,

11   Ms. O'Connor earlier pointed out when talking about

12   Wells, you have to have somebody connecting the dots

13   and that is just not happening here.  No one is saying

14   I -- I took Dr. Moeckel's analysis and that means that

15   I can use that in my Bradford Hill analysis.  It is

16   just not happening.

17        THE SPECIAL MASTER:  Okay.  Thank you.  All

18   right.

19              I guess where we are now is Ross, is that

20   right?  And who is going to speak to that one?

21              Okay.  Mr. Horowitz.

22        MR. HOROWITZ:  Yes.

23        MR. RUTTINGER:  Also Mike Ruttinger for Takeda.

24        THE SPECIAL MASTER:  How are you?
```

 1        MR. HOROWITZ:  Good.  How are you?

 2        THE SPECIAL MASTER:  Good.

 3        MR. HOROWITZ:  So, Special Master, again, Jeff

 4   Horowitz, Jeffrey Horowitz on behalf of AstraZeneca

 5   and I'm going to argue the motion to exclude

 6   plaintiffs' regulatory expert Dr. Ross, along with

 7   Mike Ruttinger, who is going to speak on behalf of

 8   Takeda, as he said.

 9            I know that you are more than well versed

10   in the world of Daubert and FDA expert or purported

11   FDA expert testimony, so I think -- you know, I think

12   we can --

13        THE SPECIAL MASTER:  I have done a little of

14   that work over the years, yes.

15        MR. HOROWITZ:  Yes, I am well aware.

16        THE SPECIAL MASTER:  And, I mean, I want to

17   start out by saying, you know, you really -- you

18   aren't really disagreeing that Ross is qualified as an

19   FDA expert, are you?

20        MR. HOROWITZ:  Not as an FDA expert, of course

21   not, no.

22        THE SPECIAL MASTER:  All right.

23        MR. HOROWITZ:  This is a unique -- you know, it

24   seems that in today's day and age, you know, everybody

1    wants to talk about Parisian and the Trayslol opinion

2    and courts tend to try to find ways not to go full,

3    you know, full Parisian Trayslol.

4            I think this is a unique situation, a

5    unique case, and that may just be merited here for two

6    reasons.  No. 1, you have a stunningly fulsome

7    regulatory record on the very issues that are at the

8    core of these cases.  It's -- it's going to be laid

9    out, I think, in some detail more for you tomorrow

10   when William and Mike argue preemption, but you can't

11   get away from it.

12           And then the second piece is the absence

13   of fit, I think, is really stunning here as well,

14   which is the real opinions that Ross purports to offer

15   don't really fit the facts of these cases where the

16   claim is really for CKD and yet he really doesn't

17   opine, certainly not clearly, that that's what was

18   missing from the label.  He talks about ATIN and CTIN

19   in this mythical reference to sequela that really has

20   no support in what he cites.

21      THE SPECIAL MASTER:  Yeah, I think -- can I just

22   say I think there is something, and maybe when it is

23   his turn to speak we can address it, of a disconnect

24   here about exactly what they are claiming should have

1    been disclosed, warned of, et cetera.

2            I mean, it seems to me that ATIN and CTIN

3    are distinct from CKD.  But you don't dispute, do you,

4    that they can lead to -- to CKD and that's why they

5    are relevant?

6        MR. HOROWITZ:  I don't know that -- I don't

7    think it's as clean as you are suggesting, which is

8    what plaintiffs and Ross would like that to be the

9    case.  And the best, I think, answer to that is in the

10   FDA's review analysis, particularly in 2019 and 2020,

11   or really even post 2016, once you get the -- the

12   Lazarus literature report, because the CKD is unique

13   and it is a defined renal injury that is separate and

14   apart from CTIN and ATIN.

15           And I think this really underscores the

16   problem with Ross's report, which is he is not the

17   person to make that connection and it is certainly the

18   methodology that he applies to try and make that

19   connection through this prism of, Well, I'm the

20   regulatory guy, so I can -- I can -- I can make that

21   connection.  It doesn't work.  You can't do it.

22           Let me -- let me -- if it's okay, Special

23   Master, I want to start with some context on Ross,

24   which is --

```
 1          THE SPECIAL MASTER:  Okay.

 2          MR. HOROWITZ:  -- you may recall he came in to

 3   replace, you know, Dr. Kessler when Dr. Kessler went

 4   back to the company, we can talk about that

 5   separately, and he comes in on March 15th.  Two months

 6   later he serves a report that is 274 pages long.  And

 7   that is sort of one of the mantras, if you look at the

 8   plaintiffs' opposition brief, Well, you know, I wrote

 9   this 274-page report in two months.  And when I asked

10   him, this is Page 117, Line 24 of his deposition to

11   Page 118, Line 5:

12          "Before you were retained by the lawyers

13   in March of this year to provide a report on May 15th

14   of this year, I think I told -- I think you told me

15   you didn't know anything about PPIs and CKD, right,

16   that's what you said?

17          "Answer:  I think that's a fair

18   statement."

19          So he comes in, and in two months purports

20   to do a comprehensive fulsome regulatory review of

21   this record that has been subject to scrutiny by FDA

22   for the number of years it has been, it's -- the

23   contrast between reality and the role that Dr. Ross is

24   purporting to play is stunning.
```

 1              And then the second piece is, you know, it

 2    has become popular for the FDA experts to sprinkle

 3    this sort of like, I call it the ipse dixit fairy dust

 4    of, Well, I was an officer at FDA and so I just

 5    applied the same methodology, you know, that I would

 6    have had I been at FDA.

 7              Well, of course they are going to say

 8    that, but the real question is:  Did they do it, did

 9    they really dig in and review the materials and

10    actually apply the regulations and explain how they

11    are applying the regulations.

12              And it is eminently clear from Dr. Ross's

13    report, and then, you know, his deposition, frankly,

14    he almost makes Parisian look responsive.  You know,

15    you've got to alligator wrestle him on every single

16    question.  The reality is he cites the kinds of

17    materials, I'm not going to dispute that, that you

18    would expect an FDA officer, you know, medical officer

19    or medical reviewer to look at.  Of course he does.

20    But there is no explanation as to how he truly applies

21    the standards.  It is really just a recitation of

22    studies, adverse event reports, case reports and then

23    there is an immediate leaping to these conclusions,

24    you know, arguing the plaintiffs' case, the oath

1    swearer testimony, if you will, that doctor -- and

2    that the Judge Kapel (phonetic) pointed out way back

3    when.  I mean, that's really what this report is.

4            And then, if you actually contrast what he

5    says and in, you know, the opinions that he offers

6    with the actual record, the documents themselves that

7    the jury can look at, the jury can review, you know,

8    he offers this idea about severe sequela that should

9    have been in the label even pre 1996 even in the

10   context of acute IN.

11           Well, the 2014 label change, the FDA

12   specifically, in response to the citizen petition

13   specifically chooses not to include that language.  He

14   may disagree with it, but he doesn't even address it.

15       THE SPECIAL MASTER:  I have a question on that.

16           Isn't the point, I think, that plaintiffs

17   are making, and I think you -- again, I think you guys

18   may be talking past each other to some extent, is the

19   plaintiffs' point I think is that a warning about ATIN

20   and CTIN would highlight that there is a risk to --

21   there is kidney toxicity, there is a risk to the

22   kidneys and, I mean, he does, in quite some detail in

23   his report, and, you know, I don't know how it was put

24   together or whatever, but he goes through and refers

1    to all of these earlier reports, challenge,

2    rechallenge stuff, and concludes from that that an

3    earlier warning was required.

4              I mean, I do think, you know, whether you

5    agree that he -- he dug into the data the way you

6    would like him to or did the review you would like him

7    to, I do think that's the point he is making, is it

8    not?

9         MR. HOROWITZ:  I agree that's the point he is

10   trying to make, but the manner -- it is the

11   methodology, the manner in which he gets there is

12   deficient because he doesn't explain, he doesn't say

13   how he leaps from, you know, a discussion of a single

14   dechallenge -- rechallenge, dechallenge case to

15   reasonable evidence of a causal association.

16             And in particular, again, he mixes -- I

17   think one of the great examples I wanted to show you,

18   and it is not really set forth directly in the papers,

19   if you look at Paragraph 598 of his report, which is

20   something that the plaintiffs cite in their opposition

21   on Page 9 and emphasizing exactly what you just

22   referred to, if you look at what he actually says, he

23   says that:

24             "A warning of a risk of acute interstitial

1   nephritis with the potential to cause permanent renal

2   impairment, including chronic kidney disease, should

3   have been submitted before 1996."

4           Respectfully, that makes no sense.  And,

5   again, you know, CKD is separate and apart, it is

6   distinct from ATIN and CTIN and it's just a perfect

7   example of what's happening here.  It is just leaping

8   to these conclusions, mouthing the regulations.  I

9   mean, any -- any -- any regulatory expert, even

10  Parisian now knows that you have to mouth the words

11  "reasonable evidence of a causal association" and, you

12  know, to cite to 201.57, but you've got to lay it out,

13  you've got to explain how you get there.

14          And the problem here is he is doing it in

15  the face of an FDA record like the 2014 label change

16  where exactly what Ross is saying was not included,

17  the sequela, and he doesn't even address it.

18          And then you have the 2017 TSI conclusion.

19  I mean, it is publicly available.  And I asked him

20  about that also at his deposition.  He didn't even

21  know about it, and he doesn't address it in his report

22  where the FDA's TSI review concludes specifically no

23  action is necessary with respect to CKD.

24          And then you get to 2019 and '20, and

April 11, 2022

 1   although he cites to some of the documents and

 2   purports to put forth a regulatory record, it is

 3   cherry-picking and he doesn't address head on the

 4   documents that say 180 degrees the opposite of what he

 5   says.

 6              That's not a methodology.  He just ignores

 7   the fact that there are statements by FDA, by the

 8   epidemiology group that's doing the review, by the TSI

 9   group that's doing the review, that specifically says,

10   We have a reason and a rationale for not offering a

11   CK -- or for not including a CKD warning.  He just

12   ignores it.

13              That is ipse dixit on steroids, that is

14   Joiner, it's a gap, it is an analytical gap.

15        THE SPECIAL MASTER:  Okay.  I think -- I think

16   we've got -- we called time.

17              Who from plaintiff side is going to

18   address?

19              It looks like Paul again.

20        MR. PENNOCK:  I will, yes.

21        MR. HOROWITZ:  I'm sorry.  Did I take Mike's

22   time as well?

23        THE SPECIAL MASTER:  Oh, I'm sorry.  I

24   apologize.  I forgot.  Sorry, Mike.

 1       MR. RUTTINGER:  The Takeda motion is a separate

 2  motion, Special Master, so we can do it in whatever

 3  order you want.

 4       THE SPECIAL MASTER:  No, no, no, go ahead.  I

 5  think it's better -- Paul, unless you disagree, I

 6  think it is better to let defendants have their say

 7  and I think it will abbreviate things if you can

 8  respond to both together.

 9            Is that okay?

10       MR. PENNOCK:  Yes, I absolutely agree to that.

11       THE SPECIAL MASTER:  Okay.

12            Go ahead, Mike.  I'm sorry.

13       MR. RUTTINGER:  Good morning, Special Master,

14  Mike Ruttinger for Takeda.  I'll try do keep it fairly

15  brief because Takeda's motion is confined to the Bales

16  case, but there are a couple of unique issues relevant

17  to the Bales case that are kind of implicated by some

18  of your questions that I think we can had address.

19            So I want to begin with Takeda's fit

20  argument as to Dr. Ross's testimony in the Bales case.

21            Special Master, you raised this question

22  that a lot of the issues implicated by plaintiffs'

23  opposition to the Daubert question is, you know, this

24  kind of blurring of lines between acute TIN, chronic

April 11, 2022

```
 1    TIN and chronic kidney disease.  And I'm going to

 2    share a slide here that reflects Dr. Ross's testimony

 3    on this point that I think helps to address this.

 4              So chronic kidney disease is a distinct

 5    kidney injury characterized by an irreversible loss of

 6    kidney function over 90 days.  In this it is distinct

 7    from the other kidney injuries discussed by the

 8    plaintiffs in Dr. Ross such as acute kidney injury,

 9    TIN, acute TIN, chronic TIN, and this is a fact that

10    Dr. Ross himself acknowledged during his deposition

11    testimony.

12              Now, I want to emphasize this distinction

13    because Dr. Ross also said the first published report

14    in evidence associating a distinct condition of

15    chronic kidney disease with PPIs did not come out

16    until 2016.

17              Well, with respect to the Bales case, the

18    last instance of Plaintiff Freddy Bales's use of

19    Takeda's product was 2007.  So to the extent that

20    Dr. Ross's opinions about CKD are premised on evidence

21    that doesn't come out until nine years after

22    Plaintiff Bales used -- last used Takeda's Prevacid

23    drug, it doesn't strike us that there is any actual

24    fit between his CKD-specific opinions and the facts of
```

Apr. 11, 2022

1    the Bales case.

2            Now, with respect to the evidence that has

3    come out regarding Bales's own conditions, it is clear

4    that --

5        THE SPECIAL MASTER:  Can I interrupt you there

6    for a minute, Mike?

7        MR. RUTTINGER:  Of course.

8        THE SPECIAL MASTER:  Can I interrupt you there

9    for a minute?

10           I have seen that quote used many times in

11   the papers, and, I mean, no doubt he says -- he says

12   what he says.  He says that the Lazarus, et al.

13   studies were the first group of studies to report on

14   the relationship between PPI and CKD, but if you look

15   at his report, as the point I was making earlier, you

16   go back to, I don't know, Paragraph 445, 443,

17   somewhere around there, and he really does talk about

18   earlier reports.  And I think taking that one

19   statement about 2016 is a little bit out of context.

20           Now, that may be the CKD versus ATIN and

21   CTIN distinction that we've talked about, but I do

22   think there is -- there -- and you can disagree with

23   it, but I think there are statements in his report

24   that suggest that risks were known earlier.

April 14, 2022

```
 1        MR. RUTTINGER:  So this gets to the second

 2   question I kind of wanted to address that you

 3   raised -- or Mr. Horowitz, I'm sorry, raised, which is

 4   the distinction between chronic kidney disease

 5   specifically and this notion that plaintiff advocates

 6   of a generalized notion of renal toxicity.

 7            So if you look at the information

 8   predating 2016 and Lazarus that Dr. Ross looks at, he

 9   talks a lot about TIN and potential sequelae of TIN.

10   But, again, those are actually clinically distinct

11   conditions, whereas in most instances the evidence

12   shows and the reports show that AIN, ATIN, CTIN, for

13   example, are, you know, inflammation of the

14   interstitia that actually is often reversible.

15            Chronic kidney disease as a distinct

16   medical condition is actually considered to be

17   irreversible.  And so chronic kidney disease is also

18   the only condition, not only alleged by Plaintiff

19   Bales, it is the only one he has ever been diagnosed

20   with, but I think most importantly to this point, no

21   witness and no evidence in this case has ever

22   attributed Plaintiff Bales's chronic kidney disease to

23   any of those other conditions that Dr. Ross talks

24   about, such as the TINs.
```

1            So the Daubert fit analysis, when you look

2    at the case law, normally requires a nexus between the

3    expert's testimony and the facts of the case, such

4    that it is going to be helpful to the trier of fact in

5    resolving that disputed issue.  Dr. Ross's testimony,

6    however, won't add anything to the discussion of CKD,

7    at least in 2007, since he himself has admitted there

8    is no reported association between PPIs and CKD before

9    2016.

10            Now, I do want to add a little bit to what

11    Mr. Horowitz has already said about reliability, just

12    kind of pointing this -- pointing you, Special Master,

13    to a couple of the actual examples of this that I

14    think are really quite fitting.

15            So, you know, plaintiff at length, as we

16    discussed, in their brief details a lot of the

17    materials that Dr. Ross looked at, case reports,

18    challenge, dechallenge reports, but the Daubert

19    reliability analysis requires more from a regulatory

20    expert than just simply, you know, recite the

21    standards.

22            So if you look at Dr. Ross's report, in

23    Paragraphs 32 and 153, he acknowledges that both the

24    newly acquired information standard and the causal

April 14, 2022

```
 1    association standard.  So 21 CFR 314.3 and 201.57.
 2    You are going to hear a lot more of those about that
 3    in the preemption arguments tomorrow.  I'm not going
 4    to go into detail on that, but suffice it to say that
 5    both of those regulatory thresholds have to be met
 6    before a drug manufacturer can make a label change.
 7             Now, Dr. Ross says, Well, the information
 8    I looked at is newly acquired information, but other
 9    than saying early on in Paragraph 153, newly acquired
10    information as defined by the FDA is information
11    showing a greater severity or frequency of risk, the
12    rest of the report is silent as to whether any of
13    those reports, studies or articles he cites actually
14    show a greater severity or frequency of risk.
15             So if he is not doing a comparison of what
16    he is alleging to a baseline of the knowledge that was
17    already known, he can't support an opinion that that
18    was newly acquired information meeting the regulatory
19    threshold.  So that, I think, is where in our view the
20    reliability of his methodology breaks down is while
21    he's cited the correct standards and he has looked at
22    much of the information he might have looked at as a
23    medical officer of the FDA, he has never -- you have
24    heard several times today already -- connected the
```

Apr 11 1- 2022

1    dots.  He never connects the dots between that

2    regulatory standard and the data he is looking at and

3    whether it actually meets the metric of a greater

4    severity or frequency of risk.  In short, he is

5    skipping the most important step that as a regulatory

6    expert you take, applying the regulatory standards

7    that he learned and experienced in his time at the FDA

8    to the data.

9              Now, I do want to mention just two more

10   quick adjacent points on Dr. Ross specific to the

11   Bales case.  He does in his report express an opinion

12   that in 1995 there was already existing information

13   that would support a label change with respect to

14   acute TIN.  He says that information existed by the

15   time that Takeda's Prevacid came on the market in

16   1995.  So by definition, Dr. Ross's opinion as to

17   acute TIN is related to a pre-approval claim, there is

18   a lot of case law out there in the preemption context

19   that more or less uniformly acknowledge that

20   pre-approval claims are preempted.

21             So regardless of what else we said about

22   Dr. Ross, we don't think that he should be allowed to

23   offer that opinion as to ATIN with respect to the

24   Bales case for Takeda.

April 11, 2022

1           And there are also a number of different

2    areas within his report where he claims that Takeda

3    was failing to carry out pharmacovigilance obligations

4    under the regulations.  It is very clear there is no

5    private right of action to enforce those various

6    regulatory obligations under the FDCA.  So to the

7    extent he is offering testimony that would suggest

8    Takeda failed to carry out, say, pharmacovigilance

9    obligations under the regulations, we think that's

10   clearly preempted under a fraud on the FDA Buckman

11   preemption theory.

12           So with that I'd like to reserve just a

13   couple of remaining minutes for rebuttal.  Thank you.

14       THE SPECIAL MASTER:  Okay.  Thank you.  All

15   right.

16           Paul, go ahead.

17       MR. PENNOCK:  Thank you.

18           First, I think I have to note that I feel

19   like I'm hearing a lot of new arguments and points in

20   the two arguments by counsel.  One I would just like

21   to make mention of specifically, although there were

22   quite a few, that is this seeming innuendo that

23   somehow Dr. Kessler prepared all of -- you know, some

24   substantial portions of this report because of when

1    Dr. Ross was engaged.  It is simply not true, A, and,

2    B, it is not part of the record, and, C, really should

3    not have been in this record, this transcript

4    shouldn't have been littered with that.  I don't think

5    it's something that should have been part of this

6    discussion.  I would move to strike it.

7             And Dr. Ross, hopefully he will testify at

8    trial and when he does I think anyone attending will

9    be struck by his brilliance.  He is a -- he is a

10   brilliant person.

11            In any event, so let's talk first about

12   qualifications.  You know, somebody mentioned he is a

13   medical reviewer and so as a medical reviewer he, you

14   know, claims he knows how to approach all of these

15   pharmacovigilance issues.

16            Well, yes, he was a medical reviewer.  He

17   also rose to the level of Deputy Director within FDA

18   in CDER.  So, you know, his CV needs to be re-looked

19   at, I think, and these statements as to snippets of

20   his alleged lack of qualifications, although they -- I

21   think they said at the beginning they are not really

22   challenging his qualifications, so.

23        THE SPECIAL MASTER:  I think my first question

24   was:  You are not really challenging that he is

1  qualified to be an FDA expert?  And I think

2  Mr. Horowitz said no to that, so, that they were not

3  challenging that.

4       MR. PENNOCK:  Okay.  Thank you.

5            So I'd like to turn next to the

6  methodology employed and described in the report

7  regarding his evaluation of the evidence in this case.

8            He is initially looking at, in this entire

9  body of evidence, as to whether or not there was a

10  basis under the law, under the regs for a warning that

11  had to be issued by these companies regarding anything

12  about renal toxicity and, you know, well, these drugs

13  and renal toxicity or chronic kidney.

14     THE SPECIAL MASTER:  Well, that's something --

15  Paul, I don't mean to interrupt you.

16     MR. PENNOCK:  That's all right.

17     THE SPECIAL MASTER:  But that's something that,

18  as I said earlier, I feel like there is a disconnect

19  between the two sides on this, and if you can, I'd

20  like you to state what exactly your failure to warn

21  claim is.  Is it just that the word, you know,

22  "chronic kidney disease" had to appear?  I mean, your

23  expert seems -- Ross seems to say that ATIN and CTIN

24  are things that should have been warned of earlier.

```
 1              I mean, I do -- I think the papers talk --
 2   I mean, at least having sat down and read them, they
 3   seem to talk past each other on that, and, you know,
 4   their points -- the points that Mr. Horowitz and
 5   Mr. Ruttinger were making were that -- that it is not
 6   the same thing, and I get that it is not the same
 7   thing, but I think it would be helpful if you could
 8   address sort of what exactly is your failure to warn
 9   claim here?
10        MR. PENNOCK:  Absolutely, Special Master, and I
11   was getting to that and I apologize I was unclear.
12              I was talking about we initially asked
13   him, look at this evidence that exists and he applied
14   his methodology to look at it and see if there were
15   any evidence of renal toxicity and then I will talk
16   about what he found.  And I know exactly the question
17   that you are asking, and I think I can adequately
18   address it.
19              But as far as his methodology is
20   concerned, I'll quickly say, it is laid out numerous
21   times in the report at Paragraph -- he discusses it at
22   Paragraph 69, 71, he discusses it at Paragraph 255,
23   120, 123, 270, 259, all of these places he discusses
24   how, if you are trying to evaluate if there is
```

April 11, 2022

 1    reasonable evidence of a causal association between a

 2    drug exposure and anything, these are the steps that

 3    you go through in looking at the evidence and the type

 4    of evidence that you looked at.  And he did that.

 5              I'm not entirely sure there is quarrel

 6    with whether or not he followed that particular

 7    method.  It looks at temporality, biologic

 8    plausibility, mechanism of injury, similarity to other

 9    drugs, the, you know, nonclinical evidence, and then,

10    of course, case reports and challenge, rechallenge and

11    all of the things that we see in his description, but

12    he laid out as a method that's what you do.

13              Now, I'll turn to the conclusions.  So

14    based upon his review of the evidence, Dr. Ross found

15    that by 1995 there was reasonable evidence of a causal

16    association that these drugs -- with these drugs and

17    acute interstitial nephritis, also known as acute

18    tubulointerstitial nephritis.

19              This is a disease entity or an injury

20    entity that has been known for a very long time, it is

21    associated with other drugs as well, prominently

22    NSAIDs, and by 1995, and there is -- this is in the

23    record throughout this case, by 1995 it was black

24    letter medicine that if you suffer from a severe

April 11, 2022

```
1    enough case of acute interstitial nephritis, you can
2    have damage to your kidney that will ultimately
3    continue to compromise your kidney throughout your
4    life and result downstream in chronic kidney disease.
5    That cannot realistically be disputed by defense
6    experts.
7              AIN, if it is severe enough, can cause
8    downstream chronic kidney disease, that one event over
9    a period of what, days or weeks, can happen.  Okay.
10   So he says, if you look at the evidence that existed
11   to the companies, both internally and the published
12   evidence, there is no question that there was a
13   reasonable causal association between AIN and the use
14   of these drugs and, therefore, that's why he
15   mentioned, therefore, in his opinion the sequelae
16   should have also been mentioned in a warning that
17   should have gone into effect, that the warning should
18   have said, reasonably -- these drugs potentially can
19   cause AIN and AIN can potentially cause downstream
20   chronic kidney disease, the sequelae.
21              Now, there is a final common pathway to
22   chronic kidney disease that is itself a chronic kidney
23   disease and that is chronic tubulointerstitial
24   nephritis.  The definition, as was mentioned earlier
```

1    by Stephanie, of chronic kidney disease when looked at

2    by nephrologists, they look and they say, Okay, does

3    my patient have an estimated glomerular filtration

4    rate of less than 59 -- I'm sorry -- less than 60 and

5    if he or she does I'll repeat it in three months and

6    if it is still such I'm going to say she has chronic

7    kidney disease.  This is a clinical description of

8    what's happening in a patient.  But what the

9    underlying process is for those instances,

10   particularly in PPI, what underlying processes for

11   certain drug-exposed cases and PPIs is chronic

12   tubulointerstitial nephritis.  It is a condition that

13   is being created by the drug year after year after

14   year after year and ultimately all of that reserve

15   that you are born with in your kidneys has been

16   destroyed and now you present to your doctor and

17   you've got an eGFR of 58, 56.  Now you are in that

18   realm.  It repeats and you've gone chronic kidney

19   disease.

20           So the final -- but this -- so what --

21   what the process is from these drugs that results in

22   that clinical diagnosis is chronic tubulointerstitial

23   nephritis, and that is what Dr. Ross identified in the

24   case reports that that had come out by the, you know,

1    approximately 14 or 15 of them, by early 2003.  And in

2    addition to the published reports, reports from a

3    clinical trial, I believe it was from Takeda, in early

4    '03.  They found in the histopathology evidence of

5    this chronic damage to the kidney that was occurring,

6    it is called chronic inter -- tubulointerstitial

7    nephritis.  That's what it is.  That's what was

8    happening in a number of patients.  That is what was

9    identified histopathologically and that together with

10   the other evidence that he describes in this section

11   of his report is what led him to conclude that by

12   early '03 a warning should have gone in place that

13   said, these drugs, something along the lines, and I

14   don't have the exact language here, but the -- these

15   drugs have the potential -- these drugs potentially

16   cause chronic interstitial tubulo nephritis.

17            Now, at that time, and this is important,

18   and it was Riggs, and I think, Special Master, you

19   pointed it out, I think, but in case we were missing

20   each other, there had not yet been epidemiology that

21   was extant that found an association between diagnosed

22   chronic kidney disease in people at that time, that

23   did not occur indeed until 2016.  That's when the

24   first published literature came out saying -- and by

1    the way, that published literature didn't happen by

2    accident.  It happened because of all of this other

3    evidence that was building in the medical literature

4    that the companies never warned about.

5             And so they go out and they look and they

6    say, Hey, if these drugs really are causing an acute

7    interstitial nephritis in a lot of people or if they

8    are causing a chronic -- a chronic interstitial tubulo

9    nephritis, then let's look at and see whether this is

10   showing up in the diagnostic codes.  You are not going

11   to get diagnosed with chronic tubulointerstitial

12   nephritis.  You'd have to do a kidney biopsy and some

13   pathologist will have to say that.  You are going to

14   get diagnosed with chronic kidney disease.  So if

15   you're going to say let's see if that's showing up in

16   the epidemiology -- in the diagnoses of patients, then

17   that's where the epidemiology came in.  And they came

18   in -- there is a plethora of it, as you know.  Study

19   after study.

20        THE SPECIAL MASTER:  Can I ask a question, and

21   we are almost out of time, but, you know, his

22   experience is not as a nephrologist, right, Ross's

23   experience, and, I mean, I think a lot of his argument

24   and that you've described and that I've read is that,

Apr 11, 2022

 1  you know, there -- these other conditions are --

 2  result in chronic kidney disease or chronic kidney

 3  disease is a sequelae of these other conditions.  And

 4  I think he is qualified as an FDA expert, but is he

 5  qualified to make that judgment and, if so, why?

 6       MR. PENNOCK:  Yes.  And the -- well, the reason,

 7  it is multifactorial.

 8            No. 1, if you look at his training and

 9  experience, I mean, this is an immensely qualified

10  individual.  We are talking about somebody that he --

11  you know, he got his bachelor at NYU in biochemistry,

12  he then went on to -- I'm sorry -- bi -- he got his

13  Bachelor of Science at Yale in molecular biophysics

14  and biochemistry.  Then he went on ultimately to get

15  his MD at NYU, and went on from there to a fellowship

16  at Yale in infectious disease.  I mean, but the

17  breadth and depth of his understanding of various

18  aspects of science, medical science and -- and in

19  particular internal medicine I think really can't be

20  questioned.

21            Now, specifically, though, when you get

22  to -- when you get to the FDA, you are working, they

23  don't have -- they are not sitting around with

24  nephrologists reviewing everything that happens or a

1    cardiologist reviewing everything that happens.  When

2    you are reviewing case reports that are coming out,

3    adverse event reports and all of the other evidence

4    that you mentioned that is relevant to a review as to

5    whether there should be a warning, that is being done

6    by various types of internal medicine doctors,

7    typically, in FDA, which he did.  You know, they are

8    not specifically limited to the fields that they may

9    have been trained and specialized in.

10              And one reason is, and this is the punch

11   line, if you will, Special Master, they are not

12   calling causation.  I don't -- I would not argue that

13   I could necessarily bring Dr. Ross in to say, These

14   drugs indeed caused this problem.  They are calling

15   reasonable evidence of a causal association.

16              It is the very reason why Dr. Kessler has

17   been approved and has testified so many times

18   throughout the country in many different courts.  He

19   doesn't have -- he is not board certified nor does he

20   even practice in many of the fields that he has

21   testified in.  He testified in our case in Actos that

22   involved urology and bladder cancer.  He has testified

23   in cardiology cases, he has testified in -- probably I

24   can't name them all, but I know you realize, Special

1    Master, that when you are a regulatory expert, are you

2    trained to evaluate evidence, scientific and medical

3    evidence to come to an opinion on reasonable evidence

4    of a causal association, which is a step down from

5    saying:  In my opinion to a reasonable degree of

6    medical certainty that drug caused that problem.  And

7    he will not be giving that ultimate opinion.  He is

8    giving the ultimate opinion on the regulatory issue of

9    was your duty to warn triggered, was there enough to

10   trigger that warning.  And that's what he did, forgive

11   the expression, all day long when he was at FDA.  I

12   hope that at least begins to answer your question.

13            So I don't know if I'm out of time,

14   Special Master.

15            I think you are on -- let's not mute the

16   Special Master.

17       MR. BROWN:  Ellen, you are on mute.

18       MR. PENNOCK:  You are on mute, Special Master.

19       THE SPECIAL MASTER:  Okay.  Sorry.  Hi.

20       You are past time but that was because I was

21   asking questions.

22            Mr. Horowitz or Mr. Ruttinger, do you want

23   to give a short response.

24       MR. HOROWITZ:  I would like to address very

1    briefly two points and then turn it over to Mike if

2    that's okay.

3        THE SPECIAL MASTER:  Sure.

4        MR. HOROWITZ:  The first is I just want to

5    briefly address the quote/unquote innuendo that

6    Kessler wrote the report.  I don't know how he got to

7    that.  That certainly was not what I was suggesting.

8            My only point was that he -- "he" being

9    Dr. Ross slept at a Holiday Inn in the two-month

10   period between when he was retained and generated his

11   274-page report and how that contrasts with the years

12   and years of FDA attention to this issue.

13           Secondly, the other point I'd like to

14   address is you asked very directly:  What is your

15   failure to warn claim and, honestly, Ellen, I'm still

16   not clear, it was very -- it sounded very similar to

17   what I heard from Dr. Ross during his deposition, but

18   suffice it to say, and I think Mike laid this out

19   clearly, our position, and it's the reality of the

20   science and the medicine as reflected in the FDA

21   reviews, that Dr. Ross does not address head on, CKD

22   is a distinct condition and this idea that ATN with --

23   ATIN with sequela or CTIN is somehow the same thing is

24   not true, that's not the science.

1          And, you know, that -- I guess I'll leave

2   you with this, Ellen, it is very much like when I was

3   fussing with Dr. Ross or he was fussing with me about

4   the 2020 label change and where that landed.  And, you

5   know, he said, not basically, he clearly said, I asked

6   him:  Do you think FDA doesn't know the difference

7   between CTIN and ATIN for purposes of labeling, and he

8   said:  Yes, they don't know what -- they don't know.

9   And that's just ipse dixit.  That's just a --

10  perfectly sums up what we are dealing with here with

11  Dr. Ross in the context of this regulatory record.

12  Thank you.

13          Mike.

14      THE SPECIAL MASTER:  Okay.  Thank you.

15      MR. RUTTINGER:  Special Master, if I may add

16  just a couple of very brief points.

17          You know, I heard Mr. Pennock say, and I

18  think this really nicely summarizes the moving target

19  that Dr. Ross's own opinions have been, that, you

20  know, chronic tubulointerstitial nephritis is itself a

21  chronic kidney disease.  And there is a distinction

22  here between what plaintiffs are referring to as I'll

23  call chronic kidney disease lower case and the actual

24  clinical condition upper case of chronic kidney

 1    disease which Dr. Ross himself acknowledges is a

 2    distinct condition.

 3            Plaintiff Freddy Bales was diagnosed with

 4    chronic kidney disease upper case.  He was never

 5    diagnosed with chronic kidney disease lower case,

 6    chronic tubulointerstitial nephritis, acute

 7    tubulointerstitial nephritis, or any of these other

 8    kidney conditions that plaintiffs are referring to.

 9            What it really drives back to me is that

10    point you raised, Special Master, about saying,

11    plaintiffs are really arguing here, you know what,

12    that a warning should have been made about some sort

13    of generalized renal toxicity.

14            Now, we are not arguing preemption today,

15    we'll talk about that tomorrow, but I just want to

16    preview that if that is plaintiffs' failure to warn

17    claim, I think they are in a lot of trouble, because

18    when the FDA reviewed all of the information out there

19    leading up to its 2020 label change and looked at

20    options, including options for potentially warning

21    about chronic kidney disease, what the FDA said in

22    response at that time was:  An unqualified chronic

23    kidney disease listing, separate and apart from

24    interstitial nephritis, might communicate a belief in

1   a predictable or a generalized renal toxicity from

2   PPIs which, if found, possibly countered clinical

3   experience.

4           The last point I want to mention with

5   respect to the methodology that Mr. Pennock said

6   Dr. Ross employed, he said he did what he would have

7   done at the FDA in determining that that reasonable

8   causal association threshold was met.  I see him say

9   that that is met, I see him cite the documents that he

10  claims meet them, but I don't see any discussion

11  anywhere in Dr. Ross's report as to why those reports

12  actually cross that reasonable causal association

13  threshold.

14          The FDA, as you know, has a lot of

15  different regulatory standards, including different

16  degrees of causal association that might be relevant

17  to, for example, a warnings or precautions indication,

18  as opposed to adverse events.  So the FDA knows that

19  it is not just a one short hop from data to a

20  reasonable evidence of a causal association.  And

21  that's the leap and inference that Dr. Ross makes here

22  that we believe is so unreliable.

23      MR. PENNOCK:  I would ask a minute to respond.

24  Can I have one minute to respond to that?

1          THE SPECIAL MASTER:  Yes, yes, go ahead.

2          MR. PENNOCK:  Thank you.

3              First, Dr. Ross's opinions as to what the

4    warnings should have been in '95 and 2003 are

5    explicitly stated in his report.  And secondly, to --

6    this -- this notion that he had to say chronic kidney

7    disease, this capital letter thing that has just been

8    thrown out, I think that it's -- it's belying their --

9    either their lack of understanding of the medicine or

10   their attempt to just confuse the situation

11   semantically here.  It would be like telling me that

12   there is a compound that causes atherosclerosis and

13   there should have been a warning 20 years ago that

14   this compound causes atherosclerosis.  And they say,

15   Well, wait a second, all of your plaintiffs suffered

16   heart attacks that required stenting or killed them,

17   so, I mean, what does that have to do -- they suffered

18   myocardial infarctions.  What does that have to do

19   with atherosclerosis.

20             And so his -- the warning is clearly

21   stated in his report, I think the Special Master has

22   seen that.  Thank you.

23        THE SPECIAL MASTER:  Okay.  Thank you.  So I

24   think we are going to Dr. Fine now, and who is arguing

1    for the defendants?

2        MS. RYDSTROM:  That's me, Special Master,

3    Jessica Rydstrom of Williams & Connolly.

4        THE SPECIAL MASTER:  Okay.  Hello, nice to meet

5    you.

6        MS. RYDSTROM:  Nice to meet you as well.

7            So I am -- I will try and be brief because

8    I know I am in that coveted before-lunch spot.

9        THE SPECIAL MASTER:  That's a bad spot to have.

10       MS. RYDSTROM:  It really is.  So I prefer to

11   think of it as I'm batting cleanup here, right, this

12   is the fourth, I'm batting cleanup here.  But I'm not

13   going to tread any ground that the Special Master

14   obviously knows well about specific and general

15   causation, and I, candidly, I don't think I need to

16   because there is no real dispute here that they have

17   to be separate inquiries and that the opinions that

18   are submitted here in the Rieder case, which is the

19   focus of this motion, have to be separately

20   admissible.

21           And, of course, I would assume that there

22   is also no dispute that plaintiffs understand that it

23   is, of course, their burden to prove specific

24   causation.  So not just that Nexium could cause CKD

APR 5 2022

 1   but, of course, that Nexium did cause Mr. Rieder's

 2   CKD.

 3              And part of that inquiry is that they have

 4   to adequately address the alternative risk factors.

 5   And so where, as defendants have done here, we point

 6   to alternative causes there aren't just plausible but

 7   that are, in fact, likely and conceded, they have to

 8   put something up to show that those alternative causes

 9   weren't causation here.  And I think the most -- one

10   of the things that makes this case different is that

11   the alternative causes that are raised and are not

12   just hypothetical alternative causes, right, they are

13   not just run-of-the-mill alternative causes, they are

14   among the most common causes of CKD and -- and that's

15   hypertension and obesity.

16              And honestly, Special Master, I don't

17   think that that is fairly disputed either.  So what we

18   have here is an expert, Dr. Fine, who not only agrees,

19   as of course he has to, that those risk factors can

20   cause chronic kidney disease, but he goes on to say

21   that they did contribute to Mr. Rieder's chronic

22   kidney disease.

23              And the quote from his report is at

24   Page 11 and he says, and I'm quoting here:

1              "More likely than not hypertension and

2    obesity," so the hypertension from which Mr. Rieder

3    had suffered for the vast -- the majority of his adult

4    life, and his obesity, his swinging from overweight to

5    obese during this period of time, that those "more

6    likely than not contributed to his development of

7    CKD."

8              So they weren't just everyday risk factors

9    here, Special Master.  They were enough that

10   plaintiffs' own expert, Dr. Fine, thinks that it is --

11   that they would have given him chronic kidney disease

12   regardless.

13       THE SPECIAL MASTER:  Well, I think, can I ask --

14   can I pause you there for a minute, because, I mean, I

15   think, you know, a lot of is made of that "it's hard

16   to say" quote that -- that -- from I guess his

17   deposition.  And, I mean, I went and looked at that

18   and it seems to me that what he is -- I agree with you

19   that he is not disputing that hypertension and obesity

20   are -- are causes of -- of his chronic kidney disease,

21   but I think what he is saying, and unless I'm

22   misreading it, isn't what he is saying is that the

23   taking the Nexium precipitated the -- the development

24   of chronic kidney disease or that it caused it to

1    occur sooner than it -- you know, it might have

2    happened anyway had he not taken Nexium but it might

3    not have happened at that time or it might have

4    happened down the road further or something like that.

5    And isn't that -- I mean, isn't that the kind of thing

6    you deal with in cross-examination, the extent to

7    which one cause versus another is more likely to be,

8    you know, that there is multiple factors and, you

9    know, what the role of the Nexium was is -- is

10   something I think you can deal with on

11   cross-examination here.

12            Isn't that the way to address this,

13   instead of excluding his testimony?

14       MS. RYDSTROM:  So, I suppose I -- a couple of

15   things.  The first is, and I agree with you, that

16   there is a lot baked into that "it is hard to say"

17   quote, right?  And it is certainly the case that he

18   goes on, after saying "it's hard to say," and one of

19   the things that he clarifies, Special Master, is that

20   it's -- he thinks that this GFR at 60, which we know

21   is very low, he is very careful to say that it is

22   normal for him, right.  He can't, of course, say that

23   that's a normal GFR for a man in his 40s because it's

24   not.  It is quite low.  And -- and what's missing

1    there on this -- on this -- his attempt to sort of

2    save the role of Nexium is whether what's normal for

3    him is normal for others, right?

4            And that's the question that considers

5    those risk factors, exactly the ones that he doesn't

6    get to, this hypertension and the obesity.  And what

7    you are asking, really, is, is this a weight and not

8    an admissibility question.  And I think that is --

9    that goes back to the cases that we've cited in the

10   brief, right, that talk about, as I know you were well

11   aware, this really fundamental nature, gatekeeper

12   nature, of course, that is as appropriate in the

13   specific causation question as it is in the general

14   causation, and I suppose the reason that it's

15   admissibility and not weight here, why this isn't

16   something that can be adequately addressed on

17   cross-examination but really needs to be held out at

18   this stage, Special Master, is because these aren't

19   obscure risk factors that we are talking about.  These

20   are among the main risk factors for chronic kidney

21   disease and they are the ones that he doesn't

22   adequately address in his report or at his deposition

23   testimony.

24           So when you look at the main question

1    here, which is:  What does he leave us with, right?

2    If it is -- if you take away, why does he tell us that

3    hypertension and obesity are not what is actually

4    causing chronic kidney disease, why those aren't the

5    sole causes of Mr. Rieder's kidney disease.

6              And he goes back to this temporal

7    relationship.  That's really what he resorts to.  And

8    he looks at the time that Mr. Rieder was taking the

9    medicine and he says, Well, he got worse while he was

10   on it and he stopped getting worse when he stopped

11   taking the medicine.

12             And what we know, of course, is that that

13   temporal relationship isn't enough.  It is not

14   sufficient except in very, very rare circumstances.

15   And, of course, this isn't the case that fits those

16   circumstances, this isn't, you know, someone going to

17   work in a cloud of chemicals and getting sick and then

18   going home and feeling fine and getting sick when he

19   shows up again for work the next day.

20             There are two data points in the timing.

21   There is two data points in this analysis.  The start

22   of the medicine and the stopping of the medicine.

23   And -- and what is not addressed here is why on that

24   second data point, the timing of the removal of the

APT-PLA 2022

1   medicine when he goes off Nexium, what's not

2   adequately addressed is all of the other factors that

3   are at play, all of the other steps that Mr. Rieder is

4   taking to improve his lifestyle, including losing that

5   significant amount of weight.

6       THE SPECIAL MASTER:  Yeah, I -- I hear your

7   point here, but it seems to me, just looking at this

8   expert, is that he does acknowledge that hypertension

9   and obesity are also contributing factors and he puts

10  the Nexium into the mix as well.  I mean, I don't

11  think -- you know, the fact that he doesn't conclude

12  that those are the sole causes, I don't think that's

13  necessarily a basis for exclusion.  Again, I go back

14  to, I think, isn't -- you know, maybe it's not the

15  strongest causation opinion in the world, but don't

16  you deal with that on cross-examination?

17      MS. RYDSTROM:  Well, one thing I would say is if

18  the question is:  What is the opinion that he is

19  giving here, right?  And what is what he is trying to

20  say?  Is he saying that the Nexium caused his CKD to

21  progress, because that's not necessarily the opinion

22  that he articulates in his report.

23          In his report he says it caused it to

24  develop, right?  And the evidence that he gives for

April 21, 2022

1    that is really just this temporal relationship that he

2    started taking the medicine and that his GFR declines.

3    So that is, I could suppose, one opinion.

4            That is clearly unsupported because the

5    only evidence that he gives for that is this temporal

6    relationship, the start and the stop, and that's what

7    we see repeatedly in these cases is not enough, right?

8    That's what the Eleventh Circuit says in -- in Gwyn,

9    that's what the court in Lipitor, in the Lipitor case

10   had to deal with, this question of when you start and

11   when you stop, if the stopping is confounded by these

12   other things, then the expert has to do what Dr. Fine

13   has not done here, and that is to take some effort to

14   explain why it wasn't the obesity, why it wasn't the

15   hypertension, and if he concedes, as he does, that

16   those two things played a role, he has to explain to

17   the court so that he can helpfully explain to the jury

18   what percentage or how much of it is due to his

19   stopping Nexium versus those other two factors, and he

20   doesn't do that.

21           What he does is he admits those two other

22   factors are at play as, of course, he has to, because

23   they are among the two biggest factors in -- for

24   someone developing chronic kidney disease, and he

APRIL 14, 2022

1    basically says, Okay, so why wasn't it those things,

2    well, his hypertension was treated, his obesity was

3    mild.  And what we see in those other cases, what we

4    see in the Lipitor case, what the Eleventh Circuit

5    told us in Gwyn is that you have to do more than hand

6    wave at the other two -- at the other factors, you

7    have to explain why it is that those aren't the sole

8    cause.

9            And as, Special Master, as you pointed out

10   earlier, he can't even really do that.  He struggles

11   with this, and that's what that "it is hard to say"

12   quote is about, right.  He is struggling to explain

13   and really provides no explanation for why in the

14   absence of his hyper -- in the absence of taking the

15   medicine he wouldn't have gone ahead and developed

16   that -- that chronic kidney disease in any event.

17           And so what we have here is -- is a

18   question where courts who have been presented with

19   these similar situations, what they tell us is that

20   the experts have to do more than what Dr. Fine has

21   done here in order for their opinions to be helpful.

22   And that's particularly true where we aren't dealing

23   with these obscure risk factors, we aren't dealing

24   with having to rule out some very hypothetical risk

1  factor, but these are -- this is a disease that has

2  clear and well articulated risk factors that no one,

3  of course, not even Dr. Fine, denies were at play and

4  they are not just any risk factors but they are among

5  the most prominent ones, and Dr. Fine ought to have

6  known that in order to get past causation here he

7  needed to meaningfully engage with those risk factors

8  and he did not.

9         So with that, I'll reserve the remaining

10  time for rebuttal.  I'm happy to take, of course, any

11  questions that you might have.

12      THE SPECIAL MASTER:  Okay.  Thank you.

13         Okay.  I'm guessing, Stephanie, are you

14  doing this one?

15      MS. O'CONNOR:  I am.

16      THE SPECIAL MASTER:  Good guess, right.

17      MS. O'CONNOR:  So I think one of the first

18  things I want to say is I'm less interested in what

19  the Eleventh Circuit has to say than I'm interested in

20  what the Third Circuit has to say.  And I think the

21  Third Circuit is a lot less dogmatic, if you will,

22  about what it is that the plaintiffs need to show.

23  And I would point out that the Heller case relied on

24  by the defendants actually supports that Dr. Fine did

1    a proper analysis, a proper differential diagnosis

2    that rests on, I believe the expression might be "good

3    grounds."

4              But let me go back a little bit, if I may,

5    Ellen.  I want to address some of the more specific

6    issues that were raised by counsel.

7              First of all, Dr. Fine, as I think you

8    know, is a board certified nephrologist.  He is at the

9    Johns Hopkins University and is most recently an

10   associate professor of medicine there.  He has been

11   treating patients for 30 years, nephrology patients in

12   particular, and is absolutely qualified to offer

13   opinions here from the outset.

14             In terms of how he approached the

15   differential diagnosis, he reviewed all of the records

16   that were available to him, the same ones as the

17   defense experts reviewed, he mapped out, very

18   significantly, he mapped out certain parameters that

19   he thought were key to arriving at his differential

20   diagnosis and ruling in Nexium, ruling out other

21   factors and ruling in certain factors as contributing.

22   And the two facts, he ruled in PPIs definitively and

23   he also states at Page 11 of his report that both

24   hypertension and obesity may have played a role.

April 11, 2022

1           Now, counsel is completely incorrect in

2   taking the position or stating it, she obviously

3   didn't read Dr. Fine's report, general report or any

4   of the other experts, for that matter, hypertension

5   and diabetes are the main causes of chronic kidney

6   disease, not obesity.

7           And by the way, at Page 11 cited by

8   counsel of Dr. Fine's report, he indicates under this

9   section called Obesity, which is Section B at Page 11,

10  that:

11          "While it's been implicated in the

12  development of CKD, the role of obesity in the

13  development of CKD is somewhat controversial."

14          All right.  Now, he doesn't say it doesn't

15  cause it, but he says it is controversial.  That is

16  far and away from being one of the most important or

17  one of the two most important risk factors for CKD.

18  And, in fact, diabetes has been ruled out both by

19  Dr. Fine as well as his treating doctor, Dr.

20  Stoycheff.

21          That being said, Dr. Fine at Exhibit D of

22  this report that we have -- can we bring up Dr. Fine's

23  report, and I would like to go to, if I may, Special

24  Master --

APRIL 14, 2022

1            And if we go to Exhibit D, all right, and

2   just come down.

3            As you can see, Special Master, Dr. Fine

4   mapped out Mr. Rieder's weight with all of the data

5   that he had available to him at the time starting with

6   April 25th, 2002, when we have the first note that he

7   started Nexium, up through March 15th of 2021, which

8   will be the last page, all right.

9            And you can see as we scroll through and

10  Dr. Fine actually describes Mr. Rieder's weight as not

11  being really bad, that he hovers, if you will, he is

12  on the side of obesity at times and other times not,

13  but basically, his -- and if we can just go back a

14  little bit, his BMI, body mass index, hovers at the

15  30, sometimes above -- keep going, please -- sometimes

16  below.

17           So the obesity that all of the hand waving

18  is about is at best borderline obesity, sometimes

19  obese, sometimes not obese.  And given Dr. Fine's

20  opinion that obesity itself is controversial, this is

21  not the level of obesity that doctors, nephrologists

22  are worried about when looking at causes for CKD, and

23  I believe that Dr. Fine says that.

24           I'd also like to talk about hypertension.

1    Can we go to Exhibit E of this report.  And let's come

2    down.  This is a chart entitled "Blood Pressure," and,

3    Special Master, Dr. Fine has mapped out and,

4    therefore, considered Mr. Rieder's blood pressures

5    beginning as early as April of 2002.

6              And if we can continue going down all of

7    the way through March of 2021.

8              He looked at all of these blood pressures,

9    not just two or three snippets of blood pressures that

10   were taken out by defendants' experts, but all of the

11   blood pressures over time.  And, in fact, in his

12   deposition, counsel may remember, he referred to

13   Mr. Rieder's blood pressure as being beautifully

14   controlled at times and not being that high to cause

15   such concern.  And that is throughout his deposition

16   and in his report.

17             Now, contrary to what counsel says, he

18   does rule out the two causes that he admits may have

19   contributed, but he does rule them out as the sole

20   cause.

21             And how does he do that?  He does it, for

22   hypertension, by saying:  Given the patient's

23   continuous use, PPI use, in conjunction with the

24   patient's underlying treated hypertension, in my

1    opinion PPI use is the, not are, is the substantial

2    factor in causing the development of CKD, but his

3    hypertension may have contributed in that it was an

4    underlying condition.

5              He has clearly ruled it out as the sole

6    cause.

7              The same thing with obesity, after telling

8    us in the same page, at Page 11, after indicating that

9    it is controversial, he also goes on to say it's more

10   likely that it associates with diabetes and

11   hypertension and that any association of obesity of

12   renal injury is driven by obesity's impact on these

13   two health conditions.  And, again, I remind Special

14   Master that he does not have diabetes.

15             He goes on in the same paragraph to talk

16   about:  "Mr. Rieder exhibited mild obesity that tended

17   to wax and wane at times, albeit he weighed more in an

18   earlier period of time when he was ingesting Nexium

19   daily."

20             Now, this is very key.

21             "The stabilization of his kidney function

22   after his discontinuation of Nexium is more consistent

23   with the removal of that exposure than with the effect

24   of his weight loss.  His kidney disease is currently

1    progressing and weight loss does have a role in

2    slowing that progression."

3              Mr. Rieder's weight is not that much

4    different today or in 2015 or earlier years when he

5    stopped taking Nexium.

6              What I'd like to do is, can we put up the

7    graph from Page -- I think it is Page 4.

8              In addition to mapping out all of the

9    parameters that address Mr. Rieder's health

10   conditions, Dr. Fine in Figure 1 entitled "Estimated

11   GFR Changes Over Time" shows us in a pictorial form, a

12   picture is worth a thousand words, that prior to 2006

13   Mr. Rieder's GFR is in the normal range.  Counsel may

14   not like that.  Their experts may not like that, but

15   Dr. Fine has opined that it was within the normal

16   range.

17             And, again, I spoke to this issue earlier,

18   CKD as an entity, and I'm not going to talk about

19   upper or lower case, but CKD as an entity is defined

20   as a GFR less than 60 for a period greater than three

21   months.

22             In this case we do not see this decline in

23   GFR until 2006 where it is at 51, according to the

24   graph, and this is fully four years after Mr. Rieder

1    began taking Nexium.

2              Now, his weight is pretty much the same,

3    his blood pressure, there are some rises, there are

4    some dips, but if you look at this graph, what you see

5    is a downward trajectory, clearly, of his kidney

6    function.  There are a few dips here and there and the

7    doctors will explain that these are physiological

8    differences, but the redline that we get to is in

9    2015.

10             Now, Mr. Rieder was taking PPIs daily and

11   continuously until his last prescription filled in

12   January of 2015 for 90 pills, he ingested 79 of those

13   90 pills, as the deposition testimony shows, which

14   took him to the end of March of 2015.

15             And then what happens?  We see a

16   stabilization, as Dr. Fine pointed out, of the GFR.

17   Blood pressure, weight, yeah, there was some weight

18   loss, yeah, maybe he is working a little bit harder on

19   his hypertension control.  Now he is under the care of

20   a nephrologist.

21             But look at that as you go across, it is

22   very, very stable until we get to about 2020 and now

23   we are seeing a downward decline, nothing else has

24   changed, his weight is pretty much the same, blood

1    pressure is pretty much the same, but by this point in

2    time he has advanced kidney disease.

3            Dr. Fine explains that aging does cause

4    loss of nephrons, but in someone who already has CKD,

5    and in our position induced by Nexium, that person

6    will get to the point of no return, and, in fact, that

7    is where Mr. Rieder is today.  He is on a transplant

8    list at age, I think 63 years old.

9        THE SPECIAL MASTER:  How do you square this with

10   the -- the -- the testimony where he says, you know,

11   "it's hard to say," because, I mean, they did -- he

12   was asked sort of the, Okay, is it your position that

13   but for the Nexium this wouldn't have happened to him.

14   And he says, you know, "it is hard to say."  And it is

15   a lengthy and somewhat complicated answer, but it

16   seems to me that, you know, there is an argument that

17   by saying, I can't -- he does say, I can't say that he

18   wouldn't have be here if he hadn't -- he wouldn't be

19   here today perhaps if he hadn't taken the Nexium?

20       MS. O'CONNOR:  One thing I would say is I'm not

21   aware that the Third Circuit is a but-for state in

22   analysis.  I believe it is a substantial factor

23   analysis.

24       THE SPECIAL MASTER:  Substantial factor, yeah.

1          MS. O'CONNOR:  I would also point out, I would

2     also point out that Dr. Fine, in his comprehensive

3     general opinion report, which by the way is not

4     challenged by the defendants, so Dr. Fine's opinions

5     on general causation come in no matter what if we

6     choose to put him on, but what he does also do in his

7     general opinion report is he addresses not only those

8     studies, of which there are droves of them that find a

9     connection between PPI exposure and chronic kidney

10    disease, chronic renal insufficiency, other forms of

11    kidney disease, including AKI, but there are several

12    studies that he cites here at Page 11 of his report

13    that show that in people that already have kidney

14    disease or at risk of it, it will actually enhance or

15    exacerbate the progression.

16          So Dr. Fine has given two opinions, one

17    that it caused the development of CKD and that it may

18    have played a role in the progression, more likely

19    than not played a role in the progression of his

20    disease.  It is a pretty rapid trajectory for a man

21    this age.

22          THE SPECIAL MASTER:  Okay.  Did you want to

23    respond, Jessica?

24          MS. RYDSTROM:  Very briefly, Special Master.

APRIL 14, 2022

```
 1              I guess I would start where Ms. O'Connor

 2     stopped, which is, it is true, we are not challenging

 3     Dr. Fine's general causation report here, but, of

 4     course, he has to do more than the general causation

 5     report to explain why it is that, if he believes that

 6     Nexium can cause CKD, why in this case on these facts

 7     with a plaintiff, Mr. Rieder, who had this particular

 8     health history and these preexisting risk factors,

 9     Nexium actually did cause Mr. Rieder's CKD.

10              And that's what he hasn't done.  He hasn't

11     explained why the other two -- it wasn't the

12     hypertension and it wasn't the obesity that caused

13     Mr. Rieder's CKD, and that's exactly what he is doing

14     with this quote.  That is the question that he is

15     struggling with, that is the question that he can't

16     adequately address.

17              So very briefly, Special Master, if I

18     suggested that obesity was the most common risk factor

19     for chronic kidney disease, then I misspoke.  What

20     I -- what I -- if it is, in fact, so controversial,

21     it's presumably not so controversial, Special Master,

22     that Dr. Fine didn't think it was necessary to say

23     explicitly in his report that obesity was more likely

24     than not contributing to Mr. Rieder's development of
```

1    CKD, not the progression of his CKD, but the

2    development of his CKD.

3              And that's the question that you asked me

4    earlier, is the opinion here that these risk factors

5    were simply making the CKD worse or is it that they in

6    the absence of Nexium wouldn't have led to his

7    developing CKD anyway.  And the opinion that he gives

8    us in his report is that hypertension and obesity more

9    likely than not contributed to his development of CKD.

10             And what he doesn't do, Special Master, is

11   tell us, when he says:  "Given the patient's

12   continuous PPI use," and this is in the report at

13   Page 11, "in conjunction with the patient's underlying

14   treated hypertension, in my opinion the PPI use is the

15   substantial factor in causing the development of his

16   CKD."

17             So what does he give us there, Special

18   Master?  He only gives us two things, that he

19   continuously used PPI, that's the temporal

20   relationship, right, that's collapsing the general

21   causation and the specific causation here, and that he

22   had an underlying treated hypertension.

23             And that's simply not what we see when we

24   look at the graph that Ms. O'Connor put up.  That is

 1    not what we see when we look at Dr. Fine's own data

 2    and chart.  We don't see that this person, this

 3    Mr. Rieder who had suffered from hypertension since

 4    his 30s, so since he was a young man, who was being

 5    treated with multiple medicines for hypertension and

 6    who is still experiencing the blood pressure spikes

 7    that Dr. Fine records in his chart, what we don't see

 8    it treated hypertension.  We see an individual who was

 9    struggling to treat that hypertension.

10            And so if you take out, as the cases say

11    that we have to, that temporal relationship, we aren't

12    left with an explanation as to why the hypertension

13    would not in and of itself have been enough, given his

14    long history of this and other risk factors for

15    Mr. Rieder to develop chronic kidney disease.

16        THE SPECIAL MASTER:  Okay.  Thank you.

17            So I think, happily, we are at lunch break

18    time, and I guess what we suggested is we'd come back

19    at 1:20.  I don't know if that assumed a 12:30

20    conclusion or not.

21            Okay.  All right.  Well, let's -- I don't

22    know, should we stay with the 1:20?  Yeah, does that

23    sound okay?  Does that work for folks?  Does anybody

24    have a problem with that?

APRIL 14, 2022

```
 1                Okay.  All right.  So let's get back on at
 2    1:20, okay.
 3                     (WHEREUPON, a recess was had
 4                      from 12:32 to 1:20 p.m.)
 5        THE SPECIAL MASTER:  Let's go back on the
 6    record.  And I think the first thing up on our
 7    schedule is AstraZeneca's motion for summary judgment
 8    on other grounds for Rieder.
 9                Who is going to handle that for AZ?
10                Hi Mike.  Go ahead, Mike Schissel.
11                Is he on mute?
12                You need to unmute yourself, Mike, I
13    think, I'm being told.
14        MR. SCHISSEL:  Okay.  I've done it.
15        THE SPECIAL MASTER:  There you are.
16        MR. SCHISSEL:  Can you hear me now?
17        THE SPECIAL MASTER:  Yeah.
18        MR. SCHISSEL:  Nice to see you, Special Master.
19        THE SPECIAL MASTER:  It is nice to see you too.
20                Okay.  Go ahead.
21        MR. SCHISSEL:  Okay.  So this is our motion on
22    summary judgment based on the issue of proximate cause
23    and we think that the issue has been adequately
24    briefed, but there were just a few points that we
```

1    would like to highlight for you, and I can do that, I

2    think, in a few minutes, and I have a PowerPoint that

3    hopefully you can see.  Okay.

4         THE SPECIAL MASTER:  Yes, I can see it.

5         MR. SCHISSEL:  Yeah, so just a few -- just a

6    couple of foundational issues.

7              Obviously the plaintiff has the burden to

8    prove that his ingestion of Nexium was proximally

9    caused by an inadequate warning, and if the plaintiff

10   can prove that the label was inadequate, and we, of

11   course, disagree that it was inadequate, we believe

12   that it was fully adequate, but if the plaintiff bears

13   that burden then under Ohio law there is a rebuttable

14   presumption that the failure to adequately warn was

15   the proximate cause for the ingestion, and then we

16   have an opportunity to rebut it if this so-called

17   adequate warning would have made no difference in the

18   decision -- the physician's decision to prescribe the

19   drug, and we can do that with unequivocal testimony

20   from the physician that he would have prescribed the

21   drug despite the adequate warning.

22              Now, there are two doctors, two

23   prescribers in this case that matter.  The first one

24   is Dr. Konold.  He was the original prescriber.  He

APRIL 14, 2022

```
 1   passed away before the litigation was filed and,

 2   therefore, by no fault of either party his testimony

 3   is unavailable to us.

 4            The plaintiff argues that Dr. Konold's

 5   death would preclude us from the ability to rebut the

 6   presumption, and, therefore, summary judgment should

 7   be denied.  And what they are trying to do,

 8   effectively, if that -- if that was to occur and if

 9   that was the law, then a rebuttable presumption under

10   Ohio law would be turned into an unrebuttable

11   presumption merely because the prescriber happened to

12   pass away before the litigation was filed.  And we

13   think that would be an unfair result, particularly

14   since I don't think anybody disputes that the -- that

15   the ultimate burden of proof on proximate causation

16   lies with the plaintiff.  And of course the plaintiff

17   doesn't have to --

18        THE SPECIAL MASTER:  What do you do when -- when

19   a doctor dies with the ceding presumption?

20        MR. SCHISSEL:  So, you know, we don't have a lot

21   of cases in this particular situation.  We've cited a

22   number of cases in, I think it was Footnote 6 of our

23   reply brief, where the case is made clear if the

24   prescriber's testimony is unavailable, either somebody
```

1    decides not to take his deposition, you know, he dies

2    during the litigation itself and his testimony is

3    unavailable, the cases do say that at the end of the

4    day the burden to prove causation lies with the

5    plaintiff and, therefore, they have to prove it

6    somehow.

7              And, you know, different jurisdictions can

8    deal with it different ways, reasonable doctor or some

9    other standard, but in no -- and we haven't found a

10   single case, and I don't think the plaintiffs have

11   cited a single case that said in a burden shifting

12   situation that just because the prescriber dies it

13   somehow turns the rebuttable presumption into an

14   unrebuttable presumption.

15        THE SPECIAL MASTER:  Okay.

16        MR. SCHISSEL:  And so that's the first doctor,

17   and that's really very much, I think, an issue for the

18   court.

19              The second doctor is Dr. Wallin, and he

20   took over the prescription from Dr. Konold

21   effectively.  He began prescribing in 2008 until

22   sometime in 2010.  His deposition was taken.  The

23   plaintiff took it first and then we examined the

24   doctor after the plaintiff took the deposition.

1         And his testimony, we think, is un -- is

2    unequivocal.  He says that he thinks that Nexium is --

3    was a safe and effective drug, it still is a safe and

4    effective drug, and, you know, he was examined by the

5    plaintiff and the plaintiff obviously, you know, in

6    the questions was suggesting that Nexium caused kidney

7    disease.  And then we asked him when we had a chance

8    to examine him whether there is anything that he has

9    seen or heard today that would cause him to question

10   his decision to prescribe Nexium and he unequivocally

11   and affirmatively said no.

12        And so we think that, you know, based on

13   this record, one, they can't carry the burden on the

14   first prescriber and the second prescriber we think we

15   have overcome the presumption based on the deposition

16   of the prescriber, which is what the cases allows us

17   to do.

18        THE SPECIAL MASTER:  Am I correct that he also

19   testified that if there had been a warning he would

20   have communicated that to Mr. Rieder and that

21   Mr. Rieder testified that if warned he wouldn't have

22   taken Nexium.

23        Does that -- does that change things?

24        MR. SCHISSEL:  I don't think so because even if

APRIL 14, 2022

1    we go back to the rebutting -- or the rebuttable

2    presumption -- or rebutting the presumption, the

3    warning, we rebut the presumption if the warning, an

4    adequate warning would have made no difference in the

5    physician's decision to prescribe.  It doesn't say

6    that, you know, whether or not the patient would heed

7    any information passed on by the doctor.  The question

8    is whether the doctor would prescribe, and that would

9    be the law -- that is the law in these learned

10   intermediary states.

11          So we think that that is a little bit of a

12   red herring or very much of a red herring in this case

13   because what you have to focus on is whether the

14   doctor would prescribe, and that's what the cases talk

15   about.

16       THE SPECIAL MASTER:  Okay.  So just to be clear,

17   if Rieder did -- if Mr. Rieder did testify that, you

18   know, if he had been given some kind of a warning he

19   wouldn't have taken it, you are saying that's

20   irrelevant given the learned intermediary doctrine?

21       MR SCHISSEL:  Yes, that's our view.

22       THE SPECIAL MASTER:  As long as the doctor says,

23   I still would have prescribed?

24       MR. SCHISSEL:  That's right.  That's right.

```
 1          THE SPECIAL MASTER:  Okay.  Okay.

 2               Sorry.  Go ahead.

 3          MR. SCHISSEL:  No, and really, you know, the

 4     third doctor, Dr. Oberlander, you know, the plaintiff

 5     concedes that that testimony is -- is not necessarily

 6     something that the court has to address, because at

 7     the time that that doctor prescribed, Mr. Rieder's CKD

 8     was fairly advanced at that point.  And so both sides

 9     sort of agree that, you know, that's irrelevant.

10               Now, if you want to consider it, you know,

11     that testimony, too, at the end of this long -- this

12     long back and forth, at the end of the day he says

13     that he would still prescribe the Nexium today.

14               So, you know, the testimony is there, but

15     at that point in time the plaintiff is saying, you

16     know, you don't even have to look at that one.  Really

17     what matters is Dr. Konold and Dr. Wallin.

18          THE SPECIAL MASTER:  Okay.

19          MR. SCHISSEL:  And I will save anything else for

20     rebuttal at this point.

21          THE SPECIAL MASTER:  Thanks, Mike.

22               Who is talking for the plaintiffs?

23          MR. AUTRY:  I am.  Good afternoon.  Pleasure to

24     meet you.
```

```
 1          THE SPECIAL MASTER:  Nice to meet you.

 2          MR. AUTRY:  And I also wanted to thank

 3     everybody, both defense counsel and yourself, for

 4     being accommodating with my schedule a couple of weeks

 5     ago.

 6          THE SPECIAL MASTER:  No problem.  My condolences

 7     on your family as well.

 8          MR. AUTRY:  I really appreciate it.  It means a

 9     lot.

10              Going straight into the argument here on

11     proximate causation for Mr. Rieder, I don't think it's

12     that complicated because we are in the State of Ohio

13     which has a rebuttable presumption that requires

14     defendants to produce evidence, unequivocal evidence

15     if they want summary judgment in their favor to show

16     that a stronger warning would have made no difference

17     in whether Rieder ingested Nexium.  That evidence just

18     doesn't exist here.  And, in fact, there is

19     substantial evidence, especially viewing the evidence

20     in the light most favor to Rieder, taking all

21     inferences in Rieder's favor, that a stronger warning

22     would have made a difference.

23              You know, starting with the first doctor,

24     which is several years, Dr. Konold, defendants'
```

1    position is basically that the rebuttable presumption

2    disappears if a doctor has passed away.  There is no

3    Ohio law to support that and they are arguing for a

4    change in the law and they should be the ones that

5    should produce cases to say that a death of a

6    physician eliminates their rebuttable presumption.

7             The Ohio Supreme Court --

8        THE SPECIAL MASTER:  Well, would you agree with

9    what Mr. Schissel says, that you are basically arguing

10   that it makes a rebuttable presumption irrebuttable

11   because obviously you can't get testimony from him, or

12   are there other ways you are saying that it could be

13   rebutted?

14       MR. AUTRY:  You could potentially rebut it with

15   the testimony of plaintiff, you could potentially

16   rebut it with other evidence from the medical records.

17   The -- we are not -- a physician's testimony is not

18   the only possible way for defense counsel or a

19   defendant to present causation evidence.  There is

20   plenty of evidence that can go to proximate causation.

21   And the issue right now, when we are talking about

22   what's unfair or fair, is defendants are seeking

23   summary judgment.  They are seeking judgment as a

24   matter of law in their favor that they have met their

1    burden of production to overcome this rebuttable

2    presumption.

3              So in the sense of fairness, we are not

4    seeking judgment in Rieder's favor on this

5    presumption.  We are asking for a trial.  And

6    trials -- they will be able to present their evidence

7    to a jury.  We are not seeking directed verdict on

8    this issue at this moment.  We are simply saying this

9    is a jury question, viewing the evidence in the light

10   most favorable to Rieder and taking the inferences in

11   his favor, and that's especially true when you factor

12   Rieder's own testimony.

13             You know, the record is not silent as to

14   what would have happened between 2003 and 2008 were

15   there an adequate warning that -- on Nexium's label.

16   Rieder says, If that was conveyed to me from the

17   beginning, I would not have taken the product.  If it

18   was conveyed to me after I had started taking the

19   product, I would have stopped taking the product.  His

20   testimony is, in fact, unequivocal, even though it

21   does not need to be because we are the party -- we are

22   the non-moving party on a motion for summary judgment.

23   That's just step one.

24             Step two is Dr. Wallin, although you don't

1    have to get there because they have to rebut the

2    presumption as to all three physicians, Dr. Wallin's

3    testimony is that he would have discussed all

4    medications that had a risk of kidney injury when

5    Rieder's GFR dropped.  He says that after two distinct

6    tests and he would have wanted to know whether

7    Rieder's medications had a risk of kidney injury.

8              Unfortunately for Dr. Wallin and for

9    Mr. Rieder, defendants did not warn about even acute

10   kidney injuries until the FDA required them to do so

11   in December of 2014, they did not warn about

12   tubulointerstitial nephritis until the FDA required

13   them to do that a year and a half ago.  So at this

14   point that Dr. Wallin was meeting with Mr. Rieder, he

15   did not have the information at his disposal in the

16   Warnings and Precautions section to see that this

17   medication carried a potential risk, a reasonable

18   causal association of kidney injury to determine

19   whether or not to take Mr. Rieder off of that.

20             Further, you have, again, Mr. Rieder's

21   testimony.  If this information was conveyed to me, I

22   would have stopped taking it.

23             And then you have Dr. Oberlander.  And,

24   again, you don't have to get to step three because

APRIL 2022

1    they have to prove, they have to rebut the presumption

2    at all three steps.  But if you get to step three,

3    Dr. Oberlander's testimony is that he had no

4    recollection of Mr. Rieder.  His testimony was

5    before -- in November, before the FDA required --

6    November -- sorry -- I'm getting the years mixed up.

7    But at the point of his testimony, he was unaware of

8    the potential risk of long-term kidney injury and

9    would not have associated that with Nexium even at the

10   point of his deposition.

11           When he was asked to assume that Nexium

12   could cause long-term kidney injuries, he gave a very

13   qualified response in which he said, Well, it was a

14   long time ago, I don't really remember Mr. Rieder.  It

15   is not the unequivocal testimony that you would need

16   to get judgment as a matter of law in your favor as a

17   manufacturer, viewing the evidence in the light most

18   favorable to the plaintiff, especially -- especially

19   where that plaintiff says, If I was told about this

20   risk, I would have stopped taking it.

21           And when you go to the learned

22   intermediary doctrine, that is important, because

23   defendants want judgement as a matter of law that

24   Rieder's doctors would have said, No, I am going to

APr 1 2022

1    prescribe this to you anyway even though you don't

2    want it.  That is not a reasonable inference, but

3    nonetheless it would be an inference in their favor

4    which they are not entitled to at the summary judgment

5    stage, that Rieder's doctors would have prescribed him

6    Nexium even if Rieder says, I didn't want to take it.

7              This is especially true when you consider

8    the fact that Rieder was able to change his eating

9    habits in 2015 so that he did not need Nexium anymore.

10   When Rieder stopped taking Nexium in 2015 it was

11   because he decided to change his diet, he got his

12   heart rate under control.  That could have happened in

13   2014, 2010 or 2006 if Rieder knew that there was a

14   risk of Nexium.

15             So the idea that Rieder's doctors would

16   have continued to prescribe him Nexium when he said he

17   didn't want it and even if he had got his heart rate

18   under control is an unreasonable inference and, again,

19   defendants at this stage are not even entitled to

20   reasonable inferences in their favor.

21             I need to mention a little bit this

22   Footnote 6 that defendants reference from their reply

23   brief.  I believe it was Footnote 6.  But there is a

24   footnote in their reply brief where they cite a lot of

1    cases to argue that the death of a physician goes

2    against the plaintiff.

3              It's important to recognize that they are

4    citing authority outside of Ohio and they are citing

5    cases that explicitly reject a rebuttable presumption

6    under various states' laws.  Defendants conveniently

7    ignore that from their footnote and ignore that from

8    their argument today.

9              They cite a South Carolina case that says:

10   "South Carolina courts would not apply causation

11   presumption."  They cite a Pennsylvania Common Pleas

12   County Court decision from 2005 that says:

13   "Pennsylvania courts have consistently declined to

14   apply any heeding presumption."  They site an Eleventh

15   Circuit from Georgia, that says:  "Deeds," referring

16   to a prior Eleventh Circuit case interpreting Georgia

17   law, "forecloses a holding that Georgia law provides a

18   rebuttable presumption that shifts the burden to the

19   defendant."

20             Defendants repeatedly cite authority in

21   their reply brief that explicitly rejects Ohio law and

22   rejects the rebuttable presumption that we are under

23   in this oral argument.

24             And I believe that is the gist of

 1   everything I had to say, but I would be happy to

 2   answer any questions, if you have them.

 3        THE SPECIAL MASTER:  Yeah.  One thing, and I

 4   don't know if it is necessarily relevant for this

 5   motion, but, you know, you've characterized what the

 6   warnings should be in a variety of different ways.

 7             I mean, for purposes of this motion, I

 8   guess, what is it, and I guess we talked a little bit

 9   about this this morning, I don't know if you were

10   listening --

11        MR. AUTRY:  I was.

12        THE SPECIAL MASTER:  -- you know, what is it

13   that plaintiffs in the Rieder case are saying the

14   adequate warning would have been?

15        MR. AUTRY:  Sure.  And I'm going to give a

16   caveat because under Ohio law we are not required to

17   draft the label language.  We are required to

18   demonstrate that the label was inadequate.

19        THE SPECIAL MASTER:  Okay.

20        MR. AUTRY:  But we do give several examples of

21   adequate -- of language that would be stronger that

22   would have, viewing the evidence in the light most

23   favorable to Rieder, changed the course of his -- of

24   his treatment.

APRIL 2022

1              So Rieder's doctors say and Rieder says

2    that if they had even -- and this is Dr. Wallin and

3    Rieder himself, if there was even knowledge of the

4    risk of kidney injury at the time, that he would have

5    stopped -- that that would have been relayed to him

6    and he would have stopped taking it.

7              So to the extent the defendants are

8    arguing that to show proximate causation we need

9    certain magic words in the label, viewing the evidence

10   in the light most favorable to Rieder, that is not

11   true.  If Rieder's Dr. Wallin had been aware that

12   there was a risk of kidney injury at all and had

13   relayed that to Rieder, Rieder is pretty unequivocal

14   that he would have stopped taking it.

15             But further, if you look at our Dr. Ross,

16   and, again, this was gone into pretty extensively this

17   morning, it will be touched on again tomorrow in

18   preemption because it sort of bleeds through

19   everything, there was reasonable evidence of causal

20   association when it comes to chronic

21   tubulointerstitial nephritis by 2003 and acute

22   tubulointerstitial nephritis by 1995 and at that time

23   there was also, at '95, evidence of downstream risk

24   that acute tubulointerstitial nephritis could lead to

APRIL 11, 2022

1    chronic kidney disease, and by 2003 there was evidence

2    of the chronic kidney disease risk.

3              And, again, as Paul talked about earlier,

4    chronic kidney disease itself is a term that we

5    ascribe to the nature of results from the tests.  So

6    chronic kidney disease is basically a diagnosis that

7    says your GFR has been below 60 for 90 days or more,

8    whereas a lot of the medical literature will use the

9    term "chronic interstitial nephritis" or "chronic

10   tubulointerstitial nephritis" instead because they are

11   more talking about the long-term degradation or

12   deterioration of the kidney or permanent deterioration

13   of the kidney.  But when it comes to --

14       THE SPECIAL MASTER:  Okay.

15       MR. AUTRY:  -- the label language itself, in

16   Rieder's case, viewing the evidence in the light most

17   favorable to him, there was plenty of language they

18   could have used that would have changed the course of

19   treatment.

20       THE SPECIAL MASTER:  Okay.  Thanks.  I didn't

21   mean to take us down a, you know, a path that may not

22   be all that relevant to this, but I was just curious.

23              Mike, did you have anything else you

24   wanted to make?

1        MR. SCHISSEL:  Yeah, very briefly just a few

2   points.

3              First of all, the rebuttable presumption

4   is rebutted by testimony from a physician that he

5   would have prescribed regardless of this so-called

6   adequate warning, whatever it is, and I think we still

7   don't know what that is in this case.

8              But what counsel said is that we could

9   rebut it by the testimony of the plaintiff.  Well,

10  there is certainly no law to suggest that a plaintiff

11  can get up and say what a doctor would have done,

12  okay.  So that's completely inadmissible testimony.

13  It makes absolutely no sense in this case.

14              Secondly, counsel says, Dr. Wallin would

15  have discussed.  Well, that's not the standard.  The

16  standard in these presumption cases is would he have

17  prescribed it.  Doctors discuss adverse effects and

18  warnings with patients all of the time, but what the

19  relevant inquiry is, would he or she have prescribed

20  it.

21              And I think in this case Dr. Wallin's

22  testimony was pretty unequivocal.  And they had an

23  opportunity at his -- they took his deposition first.

24  They could have said, If you had the following label

1    in front of you.  Well, they didn't do that because,

2    frankly, we still don't know what that label would

3    say, but they didn't even ask that question.  So what

4    we have is the un-refuted testimony from Dr. Wallin

5    that he thinks it is a safe and effective drug and

6    would prescribe it today.  The same testimony from

7    Dr. Oberlander if you get there.

8              And, you know, I think those are the

9    points.  I mean, the key points on the presumptions

10   you focus on, whether the doctor would have

11   prescribed.  We know with first doctor, we don't have

12   the benefit of that, and you shouldn't change the law,

13   which is, at the end of the day, says that the

14   plaintiff bears the ultimate burden for proximate

15   causation and you need to focus on the conduct of the

16   doctor and the second doctor says and the third doctor

17   says I would have prescribed it in any event.

18        THE SPECIAL MASTER:  You may not have asked this

19   at the deposition, no one may have, but was Dr. Wallin

20   asked whether he would have still prescribed it even

21   if the plaintiff didn't want to take it.

22        MR. SCHISSEL:  He was not asked that at his

23   deposition.  And -- no, he was not asked that.  He

24   just said he would have passed it -- I think he said

1    he would have passed on the information if there was

2    this warning that nobody can really describe to him.

3        MR. AUTRY:  Your Honor, if I could briefly

4    respond in less than 15 seconds?

5        THE SPECIAL MASTER:  Fifteen seconds or less, go

6    for it.

7        MR. AUTRY:  Sure.

8            Viewing the evidence in the light most

9    favorable to Rieder, Dr. Wallin's prescribing habits

10   would have changed.  Dr. Wallin did not know even at

11   the time of his deposition that this was a risk of

12   Nexium and Dr. Rieder -- Wallin did change his

13   prescribing habits of NSAIDs because he knew at the

14   time that this was a risk of NSAIDs.

15           So there was a reasonable inference in

16   Rieder's favor that Dr. Wallin would have changed his

17   prescribing habits and he did not testify that had the

18   label warned of CKD or kidney disease at all that he

19   would have prescribed it anyway.  That is nowhere in

20   the deposition.

21       MR. SCHISSEL:  Can I respond to that in a

22   similar amount of time?

23           Yeah, the cases they cite on a doctor

24   prescribing -- changing prescribing habits is very

1    different from this case.  It is not would you have

2    passed on a warning or would you have discussed a

3    warning with the patient.  It is things like, in the

4    cases they cite, the doctor says, I would have been

5    more cautious, I would have used maybe less of a dose,

6    I would have eased this patient up to the dose that's

7    prescribed, that's changing a prescribing habit, not

8    passing on information to a patient.

9             So I think it is a very different

10   situation, and there is no record here that any of

11   these prescribers would have actually changed their

12   prescribing habits.

13        THE SPECIAL MASTER:  Okay.  Thank you very much.

14        MR. SCHISSEL:  Thank you, I appreciate it.

15        THE SPECIAL MASTER:  So I think we are moving on

16   now to plaintiffs' omnibus motion to exclude experts,

17   and I don't feel strongly about which order we want to

18   go in.  I had Mann listed first but don't feel

19   strongly about that if folks on the plaintiffs' side

20   want to go in some other order?  Anybody?

21        MR. AUTRY:  I think that's fine.  I'm going to

22   handle the Mann argument for us.

23        THE SPECIAL MASTER:  Okay.  I mean, is there

24   somebody who needs to go before you?  I don't think

1    that there is any magic to the order, but...  No?

2         MR. AUTRY:  Speak now or forever hold your

3    peace.

4         THE SPECIAL MASTER:  Go for it.

5         MR. AUTRY:  Special Master, I think Mann's

6    opinion is a series of conclusions with no

7    methodology.  Mann repeatedly praises AstraZeneca,

8    PRAC and the FDA, although testifying in her

9    deposition that she did not review the things that

10   AstraZeneca, PRAC or the FDA reviewed.

11              So she says that AstraZeneca's submissions

12   to PRAC were very thorough and forth going --

13   forthcoming, that AstraZeneca's PRAC submissions were

14   very good.  A comprehensive report by AstraZeneca.

15   But she doesn't know what AstraZeneca had at its

16   disposable to submit to PRAC, she doesn't know what

17   AstraZeneca left out, she doesn't know what the

18   clinical trials say that AstraZeneca submitted in

19   writing.

20              She reviewed AstraZeneca's own PRAC

21   submission and said they must have reviewed everything

22   to get to this point.  That is like reading a book

23   report and grading it without reading the book.  It is

24   not a reliable expert opinion.

1          As an expert, you have to have -- if you

2     are going to have an opinion about an underlying

3     document, you should review that underlying document,

4     and that's what Mann repeatedly needs to do but

5     doesn't do.

6          She says PRAC's review was careful, that

7     PRAC's review was comprehensive and thorough, but she

8     did not know what PRAC considered, she did not know

9     what the records say that PRAC considered, she did not

10    know what the clinical trials say.  She ignored the

11    lion's share of the medical literature.  She took a

12    head-in-the-sand approach to the record and then gave

13    opinions that PRAC, the FDA and AstraZeneca adequately

14    and thoroughly and well summarized that record.  That

15    is not a reliable --

16        THE SPECIAL MASTER:  Let me stop you there --

17    let me stop you there, because I read your papers.

18    And a lot of your arguments, it seems to me, seem to

19    rely mostly on her -- her supposed failure -- either

20    the failure to identify certain missing information,

21    and what you are -- you are saying now kind of sounds

22    the same way, that -- I mean, you don't know what you

23    don't know, right.  And so she is presented with

24    reports and information that were submitted to the

APRIL 14, 2022

1    FDA, and if I was reading the papers, they seem to be

2    saying that, Well, somehow she -- she didn't take into

3    account what wasn't there.

4              And I wonder if that's really the right

5    standard to evaluate testimony.  I mean, you can only

6    look at what's there and evaluate whether that's

7    adequate or not.  And, you know, in her experience as

8    someone at FDA, can only look at a report and say,

9    Would I have found that sufficient.

10             Like I say, I feel like maybe your

11   argument is kind of saying, Well, we have to look at

12   what's not in the report and I'm not sure that's

13   really what experts do.

14        MR. AUTRY:  Special Master, I believe that's an

15   incorrect statement of what Mann did at the FDA.  When

16   Mann was at the FDA, she reviewed the medical

17   literature, she reviewed the clinical trials, she

18   didn't just review a one-page summary of the medical

19   literature by a manufacturer.  She didn't just review

20   a paragraph or two-paragraph summary of the clinical

21   trials, she reviewed the underlying data.  This is not

22   what she did at the FDA.  She had a methodology at the

23   FDA.  That's a reliable methodology.  That's not what

24   she did in this case.

 1              In this case she reviewed a manufacturer's

 2    summary of the record and then said that's a good

 3    summary of the record.  She says that's a thorough

 4    summary of the record, a comprehensive summary of the

 5    record.  That is not a reliable opinion of praise.  In

 6    order to say that AstraZeneca did a good job in

 7    reviewing the record, you have to actually review the

 8    record yourself.

 9        THE SPECIAL MASTER:  So you are saying that she

10    has to review all of the raw data that went into any

11    report in order to say that that report was adequate

12    or sufficient?

13        MR. AUTRY:  Not necessarily all.  I mean, we are

14    not talking about --

15        THE SPECIAL MASTER:  Where do you draw the line?

16    Where do you draw the line?

17        MR. AUTRY:  Daubert says that it needs to be

18    reliable.  If you completely take a head-in-the-sand

19    approach to the record, you can't have an opinion on

20    what that record says.  She is just regurgitating

21    AstraZeneca's opinions and saying they are her on, and

22    not only that, saying they are good opinions.

23        THE SPECIAL MASTER:  So I guess what I'm trying

24    to get to, you are describing it as a completely

1    head-in-the-sand approach.

2            What is that -- what are you saying --

3    where is the line that what the expert needs to look

4    at in the way of raw data, underlying data, studies

5    that support a report and what, you know, obviously

6    they can't review every piece of data that goes into

7    every report, and that's not what FDA reviewers do,

8    but where -- where is the line, that's what I'm trying

9    to understand.

10    MR. AUTRY:  Well, when it comes to medical

11    literature, we've identified about, I think, three

12    dozen relevant pieces of published peer-reviewed

13    literature.  That's not an insurmountable burden to

14    review those, but we would not be here and we would

15    not be filing a challenge to her if she reviewed 30

16    out of 32, but that's not what she did.  She reviewed

17    a summation of the medical literature and then said

18    that's a good summation.  You just can't -- that's not

19    a reliable opinion if you don't look at the underlying

20    record being summarized.

21            This is not -- our Daubert is not against

22    her because she should have spent 10,000 hours as

23    opposed to 2,000 hours.  You know, we are not going

24    down that road.  Her opinion is completely unsupported

1   and she is a mouthpiece for AstraZeneca to say -- I

2   mean, like, look at her opinion that AstraZeneca

3   appropriately labeled Nexium at all times.  I cannot

4   for the life of me determine how she reaches the

5   conclusion that AstraZeneca could not have warned

6   about acute interstitial nephritis before 2014.  I

7   have no idea how she gets there.  I have read her

8   report several times, I have read her deposition

9   several times.  How does she reach the opinion that in

10  2013 AstraZeneca's label was appropriate?  How does

11  she reach the opinion in 2002 that AstraZeneca's label

12  was appropriate?  I'm clueless.  And I've read her

13  report several times and I've read her deposition

14  several times.

15          You need a methodology to get from Point A

16  to Point B.  Your methodology cannot simply be the

17  manufacturer said it so I agree.  That's just not a

18  reliable opinion under Daubert.  The manufacturer can

19  say it to the jury just without an expert hired to say

20  the same thing and say we did a good job.  And if the

21  manufacturer -- and if the expert is going to say we

22  did a good job, the expert needs to review the same

23  thing you were reviewing as the manufacturer to come

24  to the conclusion that your summary was a reasonable

1    one.

2              I mean, she says it was correct,

3    thoughtful, extensive, comprehensive and careful.  I

4    don't know how she is reaching those opinions without

5    reviewing the underlying literature.  She is just

6    rubber stamping assessments without reviewing those

7    assessments.  Again, it is like saying a book report

8    is good without reading the book and this is not what

9    she did at the FDA.

10    THE SPECIAL MASTER:  Okay.  Let me ask you:  Can

11    she -- do you think she can testify as to what --

12    whether the process that FDA followed in certain

13    circumstances was appropriate?

14    MR. AUTRY:  I think her FDA opinions suffer the

15    same flaw as her AstraZeneca and PRAC opinions.  She

16    did not look at the underlying data to determine what

17    was being considered or not considered.  So I don't

18    think she can give a reliable opinion that the FDA

19    thoroughly reviewed what was out there because she

20    didn't and she didn't try to.  Like, how can you give

21    an opinion that the FDA conducted a thorough review if

22    you don't even attempt as an expert to conduct a

23    thorough review yourself.  I mean, it is not like she

24    made an effort and failed, it is not like she made an

APIL-14-2022

1  effort and fell short, she just didn't try to conduct

2  a thorough review herself.  She just jumped straight

3  to the conclusion that PRAC, the FDA and AstraZeneca

4  conducted a thorough review.

5      THE SPECIAL MASTER:  All right.  Anything else?

6      MR. AUTRY:  I believe that's it, your Honor.

7      THE SPECIAL MASTER:  Okay.  Thanks.  Who is

8  going to respond?

9      MR. MILLER:  I'll respond to those.

10          Can you hear me okay, Special Master

11  Reisman?

12      THE SPECIAL MASTER:  I can.  Nice to meet you.

13      MR. MILLER:  And for the record, I am Jake

14  Miller on behalf of AstraZeneca.

15          So there's a few things I'd like to say in

16  response to Mr. Autry's presentation.  The first is he

17  did not even mention, from what I could tell, anything

18  related to the first two arguments that are actually

19  made in their briefing.  So I will take from that that

20  plaintiffs have conceded that those two arguments have

21  been adequately and fully addressed and that they are

22  appearing to now shift the focus of their arguments.

23          For Mr. Autry's presentation, you might be

24  led to believe that Dr. Mann is somehow being put up

```
 1    as an expert whose sole job is to opine on PRAC
 2    issues.  And I just want to point out some context,
 3    right.  Dr. Mann is offering a regulatory opinion
 4    about the appropriateness of FDA's decisions vis-à-vis
 5    the content of the Nexium label when it comes to
 6    kidney disease.  PRAC is one piece of the data that
 7    goes into that analysis, it is just that, a piece of
 8    data.  And I'm going to talk about that but I just
 9    want to make sure that we are talking about the
10    correct context.  You know, Mr. Autry's presentation
11    seems to suggest or leave the listener with the view
12    that this is somehow an auditing opinion or something,
13    which it is not, it is a regulatory opinion.
14            Now, Mr. Autry said a couple of times that
15    Dr. Mann is simply regurgitating opinions or rubber
16    stamping opinions without doing her own analysis.
17    Frankly, Special Master Reisman, this is an absurd
18    position.  I'm going to start just by talking about
19    the FDA side of things and then I'll go into the PRAC.
20            Mr. Autry said that Dr. Mann essentially
21    didn't do any of her own homework, so to speak, failed
22    to review any of the relevant underlying information
23    and simply just regurgitates what FDA concluded, and
24    that is a gross, gross misrepresentation of the record
```

1    here.

2           So just as an example, if you look at both

3    Dr. Mann's written report and importantly her

4    materials considered list, it is littered, littered

5    with the leading studies discusses a potential

6    association between PPIs and kidney disease, the very

7    studies that form the basis of FDA's own analysis.

8    She reviewed the Lazarus study, which is MCL No. 103;

9    she reviewed both the Xie studies, which is MCL Nos.

10   160 and 161; she reviewed the Attwood publication,

11   which is MCL No. 14, which discusses the randomized

12   Zofran and Lotus studies; she reviewed the Moayyedi

13   publication, which discusses the randomized COMPASS

14   study.  And I don't mean to just make this a long list

15   of things that she reviewed, but just because I think

16   this was the focus of plaintiffs' presentation here,

17   she reviewed Simpson, MCL No. 153; Tomlinson, MCL

18   No. 157; Wu, MCL No. 159; Antoniou, MCL No. 1; Arora

19   MCL No. 3.

20          Special Master Reisman, I can go on and on

21   and on.  I don't want to belabor the point.  What I

22   want to suggest to you -- well, not suggest.  What I

23   want to affirmatively say is Mr. Autry's assertion

24   that Dr. Mann essentially didn't do any of her

APRIL 11, 2022

 1    homework and didn't review any of the underlying

 2    studies herself is simply a misrepresentation of the

 3    record and the report.

 4              Now, in addition --

 5         THE SPECIAL MASTER:  How do you respond -- hold

 6    on.

 7              How do you respond to plaintiffs' claim

 8    that -- where -- that she reached conclusions without

 9    supporting documentation for, I think some examples

10    that I saw were the PRAC submission and data relevant

11    to FDA's 2020 conclusion, and I think her deposition

12    testimony was cited by plaintiffs with regard to those

13    as areas where she did not -- or she said she did not

14    review support documentation.

15              Do you agree with them, disagree?

16         MR. MILLER:  I don't agree with plaintiffs'

17    characterization at all.  So there was a few -- there

18    were a few things that you flagged there, Special

19    Master Reisman.  I'll try to address them all.  If I

20    forget one, please remind me to address it.

21              But you mentioned, for example, the FDA

22    2020 decision.  So, you know, I started my

23    presentation by talking about all of the underlying

24    studies that she herself reviewed, not just FDA's

1    analyses but the actual studies themselves, and those

2    leading studies are the very things that FDA itself

3    was -- was primarily and principally focused on in its

4    sort of 2016 to 2020 timeframe in evaluating whether

5    there needed to be a label update in 2020.

6              Now, in addition to reviewing those

7    studies, Special Master Reisman, Dr. Mann also

8    reviewed internal FDA analyses themselves, right.  She

9    reviewed, for example, the FDA's internal analyses of

10   the Lazarus study, of the Xie study, of the Antoniou

11   study.  She reviewed FDA's 2018 mechanism paper by

12   Dr. Fanti, which by the way notes that FDA had and

13   considered the PRAC analysis, which I'll get to.  And,

14   I mean, again, not to belabor the point, Special

15   Master Reisman, but Dr. Mann reviewed copious

16   materials demonstrating FDA's analysis of the kidney

17   safety issues over many, many years.  Just as an

18   example, Item No. 66 on Dr. Mann's materials

19   considered list consists of more than 500 pages of

20   internal FDA analysis of renal safety issues spanning

21   many, many, many years.  And Dr. Mann's written

22   report, which Mr. Autry gives very short shrift to,

23   fully discusses the careful and thorough FDA analysis,

24   again, over many, many, many years.  I mean, we are

1    talking going back to, you know, the mid-'90s all of

2    the way up through 2020, the FDA performed numerous

3    internal analyses of these issues.  And the materials

4    that Dr. Mann reviewed clearly, clearly gives her an

5    adequate basis to say that the FDA was appropriately

6    and carefully assessing these issues and going over

7    them.

8            Now, Special Master Reisman, I believe

9    your question all touched on PRAC, and, okay, so let

10   me address that now.

11           You know, Mr. Autry, I think, really

12   ignores the scope of the information that is available

13   from the documents that Dr. Mann herself reviewed.

14   And I think it is important to mention those because,

15   again, plaintiffs would have you believe that what

16   happened is something completely different than what

17   actually happened.

18           Now, Dr. Mann's report includes an

19   in-depth discussion of PRAC's CKD assessment, the

20   accuracy of which plaintiffs do not and cannot

21   dispute.  And the PRAC materials that Dr. Mann

22   reviewed established the following undisputed facts, I

23   want to underscore that point, Special Master Reisman.

24           Now, first, PRAC's review was prompted by

1    the publication of the Lazarus and Xie articles in

2    2016, again, both of which Dr. Mann reviewed and

3    discussed in her report.  The information that

4    Dr. Mann reviewed establishes that AstraZeneca

5    submitted renal safety data to PRAC on more than ten

6    thousand patients and identified in that the number of

7    renal events observed in that universe of patients.

8              Now, the information that Dr. Mann

9    reviewed also shows that in addition to AstraZeneca,

10   Takeda and Eisai also submitted renal safety data to

11   PRAC.  And in reaching its conclusion, PRAC, this is

12   PRAC now talking, said that this is the information

13   that we reviewed.  And this can be found in the final

14   PRAC report.  I believe it is on Page 22 in

15   Section 3.2.

16             PRAC says across all submissions for all

17   PPIs 64 trials, 64 trials, including over two --

18   excuse me -- containing over 22,000 patients were

19   included.  They say 14 of these trials were more than

20   a year long and they included over 3400 patients and

21   four trials -- of those, four were more than three

22   years in length or three years or longer and included

23   over 1100 patients.

24             And PRAC went on to explain, Special

1  Master Reisman, that these trial timeframes are more

2  than sufficient to reach conclusions here because the

3  Xie study, which is one of the two studies that caused

4  PRAC to look into this, said that -- or showed that

5  the peak in the relative risk of renal outcomes,

6  including CKD, occurred after one to two years of

7  cumulative exposure.

8          So it was only after assessing all of this

9  data that PRAC reached its conclusion.  And this

10  universe of information, again, all of which Dr. Mann

11  had available to her and considered, it plainly and

12  clearly provides sufficient grounds for Dr. Mann to

13  offer her opinion here.

14          And, again, I want to underscore

15  plaintiffs do not and cannot dispute the accuracy of

16  the PRAC discussion in Dr. Mann's written report.

17  Instead, you know, what they've done, Special Master

18  Reisman, is they've sort of pivoted to this theory

19  that plaintiffs have about AstraZeneca purportedly,

20  you know, manipulating is the word they used,

21  manipulating the data, and, you know, they claimed

22  that essentially, as I understand it, it is tough to

23  fully understand the argument, but as I understand it,

24  they are basically saying that in order for Dr. Mann

1    to be able to offer any opinion at all, she has to

2    essentially effectively audit AstraZeneca's submission

3    in order to affirmatively rebut plaintiffs'

4    manipulation theory, for which, again, there is no

5    evidence or basis in the record.

6              And I just want to emphasize one or two

7    other quick things, Special Master Reisman, with

8    respect to this.  The materials that Dr. Mann reviewed

9    make clear that AstraZeneca enumerated the selection

10   criteria it was using to identify responsive

11   information to PRAC's request, and it is undisputed,

12   undisputed that PRAC has never raised concerns with

13   AstraZeneca's submission or AstraZeneca's selection

14   criteria.

15             And Dr. Mann also made clear in her

16   testimony that it is common for companies in response

17   to broad requests for data like it to identify a

18   universe of data in responding and that is precisely

19   what occurred here.  I hope that was responsive to the

20   Special Master's question.

21        THE SPECIAL MASTER:  Yes.  Thank you.

22        MR. AUTRY:  Your Honor, if I could briefly

23   respond?

24        THE SPECIAL MASTER:  I kind of thought you

 1   might.

 2       MR. AUTRY:  Thank you.

 3           Your Honor, I have no idea what

 4   AstraZeneca's counsel is talking about when he says

 5   that Dr. Mann reviewed the clinical trial data because

 6   she explicitly says in her deposition she did not.

 7   You know, on Page 300 of her deposition:

 8           "I looked at the summary of those trials.

 9           "Okay.  You looked at the discussion of

10   those trials in AstraZeneca's submission to PRAC?

11           "Correct, along with PRAC's review as well

12   as their assessment of those data."

13           She did not look at the data.  I don't

14   care what's on her clinical trials list.  She

15   testified under -- or what's on her materials

16   considered list.  She testified under oath as to what

17   she considered and what she didn't.  And under oath

18   she said she did not look at the clinical trial data.

19           Now, even though she didn't look at the

20   clinical trial data, her report in her deposition is

21   full of opinions about what the clinical trial data

22   shows or does not show.

23           "In clinical trials no significant

24   imbalances were observed for renal function and no

APRIL 14, 2022

1    cases of interstitial nephritis were observed."

2            She did not look at the data to reach that

3    conclusion.  She looked at what AstraZeneca said about

4    the data to reach that conclusion.

5            "No cases of interstitial nephritis have

6    been observed in clinical trials."

7            She did not look at the clinical trials to

8    reach that opinion about what the clinical trials

9    showed.  She looked at AstraZeneca's summary of the

10   clinical trials to reach that opinion about what is in

11   the clinical trials.  That is not a reliable opinion.

12       THE SPECIAL MASTER:  Hold on.  I just want to

13   ask -- I just want to ask you a question.

14           When you talk about clinical trial data,

15   are you talking about raw patient-by-patient data?

16   What exactly?  I'm just trying to understand what the

17   documents are that you think she really did need to

18   review.

19       MR. AUTRY:  Okay.  So there are -- when you have

20   a clinical trial there is obviously thousands of

21   potential pages to review.  All she reviewed was what

22   AstraZeneca put in as their summary to PRAC of what

23   those clinical trials show.  She did not go even one

24   step beneath that.  And then she looked at what PRAC

1    responded to AstraZeneca in their letter response.

2    These are summaries of summaries of summaries that --

3    and she is just taking them not only as face value.

4    She is saying they thoroughly, accurately and

5    correctly summarized the level beneath them.  That is

6    an unreliable opinion because she is not looking at

7    the level beneath them.  She looked at the summary.

8         THE SPECIAL MASTER:  And the level beneath it is

9    what?  It's the actual patient data?

10         MR. AUTRY:  Yes.  And she is not even looking at

11   how many trials were conducted.  Like she is not even

12   going a level above that, right.  So a level above

13   that and still relatively surface level would be how

14   many trials AstraZeneca conducted to determine if

15   AstraZeneca included all pertinent trials.  She is

16   giving an opinion that AstraZeneca included all

17   pertinent trials, but she does not know how many

18   trials AstraZeneca had.  She is giving an opinion that

19   AstraZeneca accurately summarized the trials but she

20   did not know what AstraZeneca was looking at to reach

21   those summaries.

22              And, you know, defense counsel is saying

23   that this is unreasonable to expert their expert to

24   audit their conduct.  But that's the opinion their

1    expert is giving.  Their expert is giving an audit

2    opinion that I've looked at what they did and they did

3    good.  That has to be a reliable opinion.

4         THE SPECIAL MASTER:  Thank you.

5              All right.  I think we can move onto the

6    next one.  I think it's -- the next one on my list was

7    Dr. Deo.

8              Hi.  Jessica, are you going to do that

9    one?

10        MS. RYDSTROM:  I am not, your Honor, because I

11   am opposing it.

12        THE SPECIAL MASTER:  Oh, sorry.

13        MS. RYDSTROM:  So I would rest, but I don't

14   think -- I don't know if that would go over very well.

15        THE SPECIAL MASTER:  I don't think so.

16        MR. PENNOCK:  Everyone will be able to rest

17   pretty quickly because my argument will be very short,

18   Special Master.

19        THE SPECIAL MASTER:  Okay, Paul.

20        MR. PENNOCK:  You know, the papers lay it out I

21   think pretty clearly and I think it boils down to

22   this:  If Dr. Deo wants to come to trial or I should

23   say if his lawyers intend to try to put him on the

24   stand to say that the causes, the only causes of the

1    chronic kidney disease in Mr. Rieder are the things

2    that he outlines, he can't do it.  He should be

3    excluded.  He should be precluded from offering that

4    view, that opinion because what -- because he didn't

5    rule in everything that he needed to rule in and then

6    rule them out.  This is sort of basic Daubert analysis

7    by any expert giving a causation opinion about

8    anything, whether it's a defense expert or a plaintiff

9    expert.  You have to rule things in.  You can then

10   rule them out.

11            You can say:  Yes, I considered PPIs?  And

12   do you think that that played any role in contributing

13   to his disease?  No.  Why not?  I reviewed all of the

14   literature, I reviewed everything that is out there,

15   et cetera, et cetera, and I don't find that there is

16   sufficient support that these drugs can actually cause

17   chronic kidney disease and, therefore, I ruled it out.

18   That's how he would do this.

19        THE SPECIAL MASTER:  So, Paul, is it your

20   position that Deo has to offer an opinion on whether

21   PPIs contributed or not in order to testify at all?

22        MR. PENNOCK:  No, and I was about to give that

23   up, Special Master.

24        THE SPECIAL MASTER:  Okay.

1          MR. PENNOCK:  He could take the stand and he

2     could take the stand to say, Look, I have reviewed his

3     medical history and I believe that, you know, this --

4     his cardiac issues were a substantial factor in the

5     development of his disease and whatever else he wants

6     to throw in the mix.  I think there are a couple of

7     other things in the mix.  He said, I think those

8     contributed to his disease.  But, you know, have at

9     it.  I mean, if he --

10          THE SPECIAL MASTER:  So, I mean, you were

11    anticipating my question.  Doesn't that just go to the

12    usefulness of his testimony to the jury, right?

13          MR. PENNOCK:  Yeah, then I think it's like,

14    okay, that's good.  And what about PPIs?  I don't have

15    any opinion on that.  Why not?  Because you didn't

16    read anything or review anything.  Nothing.  I mean, I

17    almost would invite him to give that opinion, but --

18    you know, to come to the stand for that.

19               But the bottom line is, I think certainly

20    if we put -- and they said this in their papers, and I

21    don't really disagree, if we put up the cardiologist

22    and say, Look, I looked at all of the cardiology here

23    and I really don't think that his cardiac issues were

24    substance or significant, and I don't think that they

1   in a meaningful way contributed to this kidney disease

2   and here is why.  Well, then they can put Deo up and I

3   can't attest that, to say, Look, I looked at all of

4   the cardiology stuff too and I do think it

5   contributed.  That's all fair game.

6       THE SPECIAL MASTER:  So this is -- Rinder is the

7   expert you are talking about, right?

8       MR. PENNOCK:  Yes.

9       THE SPECIAL MASTER:  And so, I mean, I think,

10   you know, as reading over this stuff, it seems to us

11   that the scope of his testimony is going to depend on

12   what -- if Rinder testifies what he says, right?

13       MR. PENNOCK:  I think that's exactly right.  And

14   that's why he could end up getting on the stand.  But

15   they are going to have -- they will have to be very

16   careful and circumscribe because they can't lead,

17   either deliberately give testimony or leave the

18   impression that he is giving an opinion that these are

19   the only causes of his chronic kidney disease, because

20   if they do that, then he is clearly opening himself up

21   to the cross of, like, Well, you don't have any idea

22   because you didn't even consider all of this stuff

23   that the jury now knows.  The jury now knows more than

24   you know about PPIs and chronic kidney disease because

APr-14-2022

1    they've actually heard it and you didn't.

2              So I think we are on the same page,

3    Special Master, and maybe I am with the defendants as

4    well.  I mean, sometimes with all of this briefing, as

5    you pointed out several times, we might be missing

6    each other, but that's where plaintiffs stand on Deo.

7              Thank you, Special Master.

8         THE SPECIAL MASTER:  Thanks, Paul.

9         MS. RYDSTROM:  I will be similarly brief,

10   Special Master.

11             I mean, from the amount of times that

12   Mr. Pennock mentioned cross-examination, I think we

13   are in heated agreement that that is the place to

14   address any deficiencies in Dr. Deo's opinion.  And,

15   look, certainly if Rinder is in, he is in.  There is

16   absolutely no question about that.  But he comes in

17   regardless of Rinder because he actually has opinions

18   that are -- exist separate and apart from the

19   responsive agreements to Dr. Rinder, and those are, of

20   course, that hypertension, the issue or the sort of

21   disease with which he is so intimately familiar, is

22   the likely cause of Mr. Rieder's CKD.

23             And separately, taking on two issues that

24   Dr. -- that Dr. Rinder -- I'm sorry, the Rinder/Rieder

1    thing is really going to trip me up here, so I'll have

2    to go a little bit slow.  Two issues that Dr. Rinder

3    raises in his report, Dr. Rinder says that

4    Mr. Rieder's blood pressure was well controlled,

5    right, that's obviously a very hotly contested issue

6    in the litigation.  It came up when I was talking to

7    you about Dr. Fine, it comes up here.  It is really

8    the key risk factor that we believe explains Dr. --

9    Mr. Rieder's development of chronic kidney disease,

10   and there is going to be a lot of discussion about

11   that.

12        THE SPECIAL MASTER:  Yeah, but to go back, to go

13   back to -- and I'm glad you mentioned Dr. Fine,

14   because I think in a lot of ways this is a mirror

15   image of the argument we had on that.  I mean, how --

16   how can Dr. Deo really address ultimate causation

17   without taking a potentially relevant alternative

18   cause into consideration?  I think, and I think

19   similar issues, as you will remember, came up in our

20   discussion of -- of Dr. Fine.  So, I mean, I think

21   these two are kind of related.

22        MS. RYDSTROM:  So here is the difference.  The

23   difference, Special Master, is that we don't have the

24   burden of proving causation, right.  We don't ever

1    have that burden, and that burden always remains with

2    plaintiffs.  And so what the cases say, and this is

3    true about the Third Circuit cases that are cited here

4    by plaintiffs with respect to Dr. Deo, all they say is

5    that once defendants, right, in a case of plaintiffs

6    who have that burden, once defendants have raised some

7    alternative cause, that the burden shifts back to

8    plaintiffs, right.  And that's all those cases say.

9    There are no cases that are cited by the plaintiffs

10   here that talk about what happened when -- what

11   happens when the defense expert does or does not pass

12   an opinion on the agent at issue.  And that makes

13   sense, right, because that -- that burden shifting is

14   one that is uniquely applicable to plaintiffs.  And

15   the only case that we found that's cited by either

16   side that talks about our situation, right, where the

17   defense expert has an opinion that is -- that

18   specifically, and this is not a secret, right, he is

19   open about it, that specifically is not passing an

20   opinion on whether the medicine specifically caused

21   the injury in this particular case is that Burton case

22   from the -- from Wisconsin.  And that case essentially

23   says it's fine for a defense expert.

24        THE SPECIAL MASTER:  What is the case relying on

April 14, 2022

1    for that proposition?

2       MS. RYDSTROM:  It is the Burton vs. American

3    Cyanamid case.  It is cited in the papers.  It is from

4    the Eastern District of Wisconsin.  And, of course, I

5    expect that I'm going to hear in just a minute from

6    Mr. Pennock that -- that that is not a Third Circuit

7    case.  Concededly, it is not.  Wisconsin is very far

8    from the Third Circuit, I agree.  But I would also

9    note that there is no cases cited by plaintiffs that

10   specifically say in our situation, right, a defendant

11   has to consider even all of the agent that's at issue

12   in the case.

13             And, of course, that makes sense for a

14   couple of reasons.  One, because most defense experts

15   are going to say general causation is not there,

16   right.  That's not this situation because Mr. --

17   Dr. Deo is not -- is not offering that opinion, but it

18   also is because most plaintiff experts, unlike this

19   case, right, most plaintiff experts don't try to -- to

20   avoid giving an opinion about whether or not a

21   particular agent has caused the -- the disease or the

22   injury in this case.  So it's actually you could see

23   in that respect not something that might come up all

24   that often.

1           Now, here, of course, Dr. Rinder doesn't

2    himself offer that opinion, that PPIs were

3    specifically the cause.  So that opinion that Dr. Deo

4    gives that it was hypertension that caused it is

5    absolutely in, whether or not Dr. Rinder ever shows up

6    at trial or not.  And -- and that opinion is -- is

7    separately admissible.

8           That's the issue here.  It's not purely a

9    responsive opinion, although, of course, it is, and I

10   have no doubt that Mr. Pennock at trial is going to do

11   exactly the cross-examination that he just did of

12   Dr. Deo.  Well, Dr. Deo, you know, what are you doing

13   here if you are not giving an ultimate opinion.  And

14   the jury may or may not weigh that as against all the

15   other information and all the other opinions that

16   Dr. Deo offers about the interplay of Mr. Rieder's

17   underlying CV disease, his longstanding hypertension,

18   and the kidney disease that he ultimately developed.

19       MR. PENNOCK:  May I reply, Special Master?

20       THE SPECIAL MASTER:  Sure.

21       MR. PENNOCK:  First, I just want to be clear, I

22   guess I haven't been, I am not suggesting that Dr. Deo

23   has to give an ultimate opinion on his evaluation of

24   the contribution of PPIs to the disease here.  He

1    could dispose of it by, as I would have expected, by

2    reviewing all of the general literature and then the

3    defense expert comes in and says, I ruled it out

4    because I don't think that it can cause chronic kidney

5    disease.  So I did not have to incorporate it in my

6    analysis of the individual factors that were involved

7    in this -- this person's disease because I don't think

8    he can do it.

9            So, but, again, I will say that other than

10   that Eastern District of Wisconsin case, there is --

11   we agree, there is no case law we can find where going

12   the other way or the way that that Eastern District

13   case went, which is you can put an expert on the stand

14   to testify to what caused something without ruling in

15   everything and then ruling out those things that have

16   to be ruled out.

17           Now, I do think it is different than the

18   Fine situation.  I think the Fine situation they are

19   trying to parse out this issue with Dr. Fine that I

20   think was addressed, but I don't want to start

21   restating or getting into Stephanie's argument.  Thank

22   you.

23       THE SPECIAL MASTER:  Okay.  Thank you.  I think

24   that's it on that one.

1              The next one I have is Palese,

2    P-a-l-e-s-e.

3         MS. MARTINES:  Dr. Palese.

4         THE SPECIAL MASTER:  Hi, Buffy.

5         MS. MARTINES:  Good afternoon, Special Master.

6    This is Buffy Martines on behalf of plaintiffs, and

7    I'm going to argue the motion to exclude Dr. Palese.

8              I took Dr. Palese's deposition last

9    summer, and the truth of the matter is she is quite a

10   puzzle to me.  She is not qualified to give her

11   opinions and her methodology is not reliable, so I'm

12   not sure exactly what she offers, but let me take each

13   of those piece by piece if I can.

14              She is not -- Dr. Palese is a

15   gastroenterologist.  She is not a nephrologist.  She

16   is not even a primary care physician for kidney

17   patients.  She has no experience evaluating patients

18   with CKD to determine if PPI is a cause.  During her

19   deposition she conceded to me that she often works in

20   one of these cross-functional teams where

21   nephrologists are used for -- for patients with kidney

22   disease.  So I'm not exactly sure why she was selected

23   for this, other than she is a big fan of PPIs, big

24   fan.

APRIL 14, 2022

1           The defendants response to that is you

2    don't need to be the best qualified expert to testify.

3    I agree with that.  I think that's what the case law

4    says, but you've got to be kind of qualified.  You

5    don't just get to pull anybody out and say, This is

6    pretty close, so we are going to put her up.

7           In support of her qualifications, the

8    defendants also say she routinely treats patients with

9    multiple comorbidities, including kidney disease, and

10   she is comfortable doing that.  Again, not the

11   standard to qualify an expert.  I'm glad she is

12   comfortable treating these patients.  I hope they are

13   comfortable with her, but, again, that doesn't qualify

14   her to take the stand and testify as an expert in this

15   litigation.

16          Now, even if for some reason that you are

17   to determine that she is qualified, in the second

18   prong of this analysis, her opinions are not reliable.

19   And let me just kind of walk you through my experience

20   and what I gleaned from Dr. Palese during her

21   deposition.

22          Her big opinion is that Mr. Rieder's CKD

23   was preexisting to the time he took the PPIs.  She

24   says that on Page 17 of her expert report.  During her

1   deposition she said she knows this because she did

2   some calculations.  I asked her about those

3   calculations and she couldn't tell me a whole lot

4   about -- I asked if she had documentation of the

5   calculations, and she said no, she did it on a

6   website.  I asked her what website she used and she

7   didn't remember.  She said she had to Google it.  When

8   I pressed her on that and continued to ask her about

9   documentation or the name of the website or any detail

10  about this calculation, she told me it doesn't matter,

11  she just knows.

12          Take that a step further.  The lab report

13  that she relies on to make these mystery calculations

14  don't show CKD.  And earlier this afternoon in your --

15  when we were talking you mentioned in another

16  argument, you said you don't know what you don't know,

17  and I've heard you say that before, and I'd add on in

18  the case of Dr. Palese, we are never going to find

19  out.  We are never going to find out what we don't

20  know.  We are never going to be able to test these

21  calculations or how she got to where she got.

22          During her deposition she repeatedly

23  stated that as part of these calculations she needed

24  to use his age, Mr. Rieder's age, and she said over

1    and over again that he was 30 years old.  Over and

2    over again.  Finally, I pushed her on that and asked

3    her what his birth date was and asked her to do the

4    math and she conceded that he was 44.  But she said

5    that mistake didn't matter either.  Well, we don't

6    know if it mattered or not because we don't have the

7    calculations.

8              So I'm just not sure how reliable it is

9    and how we can possibly depend on her analysis in

10   support of this opinion.  She -- you know, she says

11   that she did these calculations and that for a

12   44-year-old man the GFR shows that he has CKD.  I

13   guess we are just going to have to take her word for

14   it because there is certainly no paper to back that

15   up.  In fact, when plaintiffs counsel went back and

16   actually did the math with the one website she could

17   remember, not that she could confirm that she used,

18   but that she can remember, when plaintiffs counsel

19   went back and did the math, the GFR was fine.

20             So when you add all of this up, Dr. Palese

21   has no business testifying in front of a jury.

22             Now, in their brief I believe defense

23   counsel said in different pieces, Well, she briefly

24   misspoke.  Well, it is just like when you switch

1    Fahrenheit to Celsius.  Well, it is just like this.

2              I don't disagree that if you took any one

3    of these components and looked at them in a vacuum,

4    maybe it's just an honest mistake, maybe you just

5    briefly misspoke, maybe it is common sense, but not

6    when you take them all together.  You can't look at

7    each little piece in a vacuum and say, That's okay.

8    You look at it all together.

9              And you have an expert that's not

10   qualified, she is not a nephrologist, she is not even

11   close to a nephrologist.  She doesn't analyze CKD and

12   determine causation.  And her methodology, she can't

13   even remember how she came to the conclusion she came

14   to.  And for these reasons we would ask that she be

15   excluded, and I would like to reserve the rest of my

16   time for rebuttal.

17        THE SPECIAL MASTER:  That's fine.

18              Jessica?

19        MS. RYDSTROM:  Thanks, Special Master.  So let

20   me tell you why Ms. Martines raised the question why

21   is she here.  Let me tell you why she is here.

22              Dr. Palese is here because she is clearly

23   qualified to determine what caused Mr. Rieder's CKD.

24   She is a gastroenterologist, she is here in town at

```
 1    Georgetown Hospital, her -- she is as terrifyingly

 2    credentialed as most of the rest of these folks,

 3    right.  She -- she teaches at Georgetown Medical

 4    School, she went to Mt. Sinai School of Medicine, did

 5    an internship and a residency at Georgetown, and

 6    her -- her specialty there, your Honor, and her former

 7    board certification was in internal medicine, right.

 8    That is exactly the type of training that she

 9    received.  She now specializes in gastroenterology.

10          Now, what she said and what I think I

11    heard in the briefs was that Dr. Palese is somehow not

12    qualified to know whether PPIs caused -- caused

13    Mr. Rieder's CKD, and that's not what Dr. Palese said

14    at all.  What she said is that of course, as one would

15    hope any treating doctor would do, and that's one of

16    the main distinguishing characteristics of Dr. Palese

17    here, is that she is seeing patients all of the time

18    like Mr. Rieder, right, and she may not be seeing them

19    for their chronic kidney disease.  That is not the

20    disease state that she is treating, but she is

21    treating them for things like what Mr. Rieder had,

22    which is GERD, right, the kinds of diseases that cause

23    people to start taking medicines like PPIs.

24          And what she said, of course, was what you
```

1    would expect any doctor to do, which is all patients

2    should be evaluated for all causes of their kidney

3    disease or other diseases and if she needed help in a

4    particular case or a particular consult, she would

5    bring that in.

6        THE SPECIAL MASTER:  Can I stop you for a

7    minute?

8        MS. RYDSTROM:  Sure.

9        THE SPECIAL MASTER:  Leaving aside her

10   qualifications for a minute and, you know, I think the

11   crux of her testimony is supposed to be that his

12   chronic kidney disease was preexisting to his taking

13   Nexium.  And the basis, as I'm understanding it, the

14   basis for that conclusion is a calculation, a GFR

15   calculation.  And I think what I'm understanding from

16   the papers and what Ms. Martines says, no one can, as

17   we sit here today, know exactly what numbers she put

18   into that calculation, right.

19              And so if his, as I understand the

20   science, if the GFR is 60 or less, that's -- that's an

21   indicator that he has got chronic kidney disease.  And

22   I guess the question I have for you is:  If she puts

23   the right numbers in, you know, the -- I think

24   creatinine goes into it, I think age goes into it.  I

 1    don't know what else goes into it.  But if she puts

 2    the right numbers in, does she still come out with the

 3    same conclusion?

 4         MS. RYDSTROM:  Well, here is what -- we know

 5    what it's based on, right, we know what she put in

 6    because she says it was based on the fact that his

 7    creatinine was 1.4 and we know from her report that

 8    she had his date of birth, right?  So those are

 9    inputs.

10              And Ms. Martines is right, she cannot

11    remember the website that she -- that she -- to which

12    she inputted, but what she says is that for, in her

13    experience and, right, so combining her experience and

14    with the calculations that she did, it results in an

15    eGFR of 60.  And I should stop myself here --

16         THE SPECIAL MASTER:  Let me stop you.

17              How does experience come into this?

18         MS. RYDSTROM:  Because what she says --

19              (Indiscernible due to simultaneous

20               talking.)

21         THE SPECIAL MASTER:  -- doing the calculation?

22         MS. RYDSTROM:  That is the Fahrenheit to Celsius

23    is that Dr. Palese says is, Look, I see patients like

24    this and I have a sense, right, given my clinical

1    experience that when you have a creatinine of 1.4 and

2    you are roughly in, you know, a certain age group,

3    that she believes that gives you a -- that she would

4    know what someone's eGFR is.

5              But I'm going to stop right here because

6    it's not actually just Dr. Palese that says it.

7    Dr. Fine, you'll remember Ms. O'Connor put up the

8    chart, right, you'll remember Dr. Fine's chart with

9    the zigzags that she put up that show his eGFR and lo

10   and behold, right, at around the same time as we get

11   that 1.4 creatinine reading, Dr. Fine lists on his

12   chart an eGFR of 61.

13             So -- so here -- I guess I am surprised at

14   how hotly we are disputing two experts on opposing

15   sides who fundamentally come up with a very similar

16   number.  And I guess what I would say is all of this

17   question, if we are talking about testability, they

18   tested it, right.  The reply that was submitted to the

19   Special Master reproduced the plaintiffs' -- what the

20   plaintiffs got, the different number that they got

21   when they say they inputted into one of the websites

22   that Dr. Palese potentially used, they put in those

23   inputs and they got a different number.

24             And that, your Honor, is a

APL-114-1  2022

 1    cross-examination.  I mean, presumably that's an issue

 2    for cross.  They tested it.  It was a testable

 3    methodology, right.  They attempted to recreate it and

 4    they got a different number.

 5         THE SPECIAL MASTER:  But they don't know they

 6    are using the same formula or the same calculator,

 7    right?

 8         MS. RYDSTROM:  And presumably, Special Master,

 9    that's an issue for the cross-examination as well.  I

10    mean, there is a lot of stern -- wrong about this, you

11    know, this misstatement.  And I read the transcript

12    and, I mean, Lord help us all, as Ms. O'Connor pointed

13    out earlier, I may have misspoken and I was talking

14    for only 20 minutes.  After five hours or however many

15    hours of her deposition, Dr. Palese said, and I looked

16    at it, and she -- she didn't say it just once,

17    concededly, she said it and five pages later she fixed

18    it, right.  She fixed his age and -- and counsel,

19    Ms. Martines, had the opportunity to ask her whether

20    or not that error changed her opinion, had every

21    opportunity to interrogate whether that misstatement,

22    right, what she believed at the time and whether she

23    believed he was in his 40s or whether she -- she

24    believed he was in his 30s, that -- that was the time

1    to explore those, and I believe that Ms. Martines did.

2              And so what Dr. Palese answered about the

3    work that she did, the calculations that she did,

4    whether she could remember those calculations, those

5    are all those are all potential fodder for

6    cross-examination.

7              And ultimately, when you look at it, the

8    numbers that she came out with are not all that

9    dissimilar from what Dr. Fine concludes and puts in

10   his chart.

11         MS. MARTINES:  May I respond, Special Master?

12         THE SPECIAL MASTER:  Yes.

13         MS. MARTINES:  I wrote down a few things that

14   defense counsel said.  She is clearly qualified and a

15   list of all of the great places that she went to

16   school and she worked at.  At the end of the day

17   that's great.  She did go to some really high-end

18   schools and worked at some great hospitals.  And I'm

19   sure she is a fine gastroenterologist.  She is not a

20   nephrologist.  She is not qualified to determine

21   causation.

22             And by the way, on Page 17 of her report,

23   that's exactly what she tries to do, and I'm reading a

24   direct quote:

1              "In contrast, there is no evidence that

2    Nexium caused or substantially contributed to

3    Mr. Rieder's CKD."

4              That's exactly what she is trying to do in

5    this report and she is not qualified to do it.

6              Defense counsel said we know what she put

7    in the calculator.  No, we don't.  No, we don't.  She

8    said multiple times that Mr. Rieder was 30 years old

9    when I corrected her, not when she corrected herself,

10   when I corrected her.  She said, Oh, I meant 44.  And

11   I said, Which number did you put in the calculator?

12   And she said, I put in 44.

13             We don't know that for sure.  She

14   corrected herself.  We are never going to know what

15   she put in that calculator because she didn't keep any

16   documentation of it.

17             Defense counsel said that kidney.org is

18   the website she potentially used.  Again, we are never

19   going to know which one she used because she didn't

20   document it.

21             These are things that an expert in

22   litigation has to do.  Maybe if we are treating

23   patients we can do things a little bit different.

24   Maybe when we are treating patients you can rely on

1   your sense of what's going on, but there are rules in

2   litigation.

3              Daubert and its progeny laid out specific

4   requirements, and I have a right to depend on that

5   those specific requirements are met when an expert

6   takes the stand.  It's not a matter for

7   cross-examination.  Daubert is a gatekeeping function.

8   If Dr. Palese can't meet the basic requirements to get

9   through the gate, it is not a cross-examination issue.

10  It is a she doesn't come to trial issue.  She hasn't

11  met those qualifications.

12             With regard to whether or not we've been

13  able to test her hypotheses, we got as close as we

14  could without knowing the specific age she used and

15  the specific website she used, and you know what

16  happened.  The results were different than what she

17  said happened.  For those reasons we do believe that

18  Dr. Palese should be excluded.

19      MS. RYDSTROM:  Two points, Special Master.

20             The first is of course we allow experts to

21  testify based on their clinical experience and their

22  experience treating patients all of the time.  We

23  absolutely do that.  Many, many an expert comes to

24  trial and testifies just as Dr. Palese did about

 1    things that they have learned over their years of

 2    practice.

 3              And on the testability question, they

 4    tested it, Special Master, they got a different result

 5    and if Ms. Martines claims that she is unaware of what

 6    numbers that Dr. Palese put in, well, I don't know

 7    what more to give her except for her sworn testimony,

 8    which she said she put in 44.  Now, if Ms. Martines

 9    thinks that that is not credible, then that is

10    absolutely a jury issue and something that is for a

11    jury to decide whether or not they believe Dr. Palese,

12    but Dr. Palese testified under oath as to what she put

13    into that calculation.

14        THE SPECIAL MASTER:  Okay.  Thank you.

15              So I think the next one that's -- that I

16    have on my list is Lamsita, L-a-m-s-i-t-a.

17              And, Tracy, are you going to be arguing

18    that?

19        MS. FINKEN:  Yes.  Good afternoon, Special

20    Master Reisman.  It is Tracy Finken from Anapol Weiss

21    on behalf of plaintiffs.

22        THE SPECIAL MASTER:  Okay.  Go ahead.

23        MS. FINKEN:  Okay.  As far as Dr. Lamsita's

24    testimony goes, there are three specific opinions that

1    plaintiffs seek to exclude, and I'm going to go

2    through them briefly because there has been some

3    concessions that have been made on behalf of

4    AstraZeneca so I just want to make it very clear on

5    what's been conceded and versus what we are still

6    seeking to exclude.

7              You are muted.  Sorry.

8         THE SPECIAL MASTER:  I said that's helpful.

9    Sorry.  Go ahead.

10        MS. FINKEN:  So I'll just go through the three

11   one by one.

12             The very first opinion that we were

13   talking about relates to the findings of chronic

14   progressive nephropathy in the animal studies.  And

15   AstraZeneca has conceded that Dr. Lamsita will not

16   offer an opinion on the pathological criteria of

17   chronic progressive nephropathy in the animal studies

18   or the significance of chronic progressive nephropathy

19   in rats to humans.

20             However, plaintiffs seek to exclude any

21   opinion by Dr. Lamsita as it relates to chronic

22   progressive nephropathy because by Dr. Lamsita's own

23   admission she is not qualified to offer such opinions.

24   She has testified that she is not an expert in kidney

1    function and not an expert in kidney function across

2    species.  She has testified that she is not a

3    pathologist and she doesn't feel qualified to speak to

4    the details around the pathology relating to chronic

5    progressive nephropathy.  That's on Page 109 of her

6    deposition.

7            She has testified that she is not

8    comfortable describing any of the inflammatory

9    components involved in chronic progressive nephropathy

10   in rats, and that's on Page 109.

11           She hasn't looked at any of the findings

12   under a microscope.  She admits that she doesn't know

13   whether her own description of kidney findings in

14   certain studies of nephrocalcinosis are similar to

15   other types of kidney injuries.

16           She opines, though, she doesn't just

17   regurgitate the findings in the animal study reports

18   that AstraZeneca created, she takes it one step

19   further.  So she finds that there's are

20   nephrocalcinosis in some of the short-term rat studies

21   but then she takes it one step further and opines that

22   that's an early precursor of chronic progressive

23   nephropathy.  And she has already testified multiple

24   times that she is not qualified to give that opinion.

1          She also attempts to explain away the

2    findings of a dose-dependent increase in chronic

3    progressive nephropathy in the treated animal groups,

4    and that's on Page 117.  But because she is not

5    qualified admittedly to discuss the pathological

6    findings of chronic progressive nephropathy and did

7    not actually do that, she should not be able to

8    testify as to the cause of those kidney findings in

9    the underlying clinical -- or preclinical animal study

10   reports.

11          Dr. Lamsita says that she relies on the

12   expert opinion of Dr. Sandusky.  However, the Third

13   Circuit law is pretty clear that for an expert to rely

14   on the opinion of another expert, they need to be able

15   to assess the validity of those opinions and

16   Dr. Lamsita could not assess the validity of the

17   opinions of Dr. Sandusky because she is not qualified

18   to do so and she admits that.

19          Because she did not assess the validity of

20   Dr. Sandusky's opinions, it renders her methodologies

21   unreliable in accordance with Third Circuit law and

22   you can look at the citation in our papers to In Re

23   TMI litigation which supports that.

24          The second opinion that plaintiffs seek to

1    exclude in terms of Dr. Lamsita is that she is not

2    qualified to give opinions about the cost of drug

3    development generally.  AstraZeneca concedes that

4    Lamsita will not testify on the cost of the

5    development of Prilosec and Nexium or PPIs, but they

6    oppose our motion to exclude her testimony as to the

7    cost of drug development generally.

8              And first, as it goes towards drug

9    development, putting the qualifications aside,

10   defendants have not provided any evidence that

11   Dr. Lamsita is qualified to give that opinion based

12   upon the preclinical work and experiences that she has

13   done.  There is no evidence that she has done drug

14   development soup to nuts to give that type of opinion.

15             She admits that she could not provide an

16   opinion on the cost of drug development a long time

17   ago at the time that Nexium and Prilosec were

18   developed, and that's on Page 85 of her deposition,

19   but she says that she may, may be able to offer an

20   opinion on the cost of drug development today.  That's

21   also on Page 85.

22             So putting aside her qualifications to

23   give the opinion of the cost of drug development today

24   based upon a single trade publication article, it's

 1   critical to recognize as a practical matter that the

 2   cost of drug development today is not relevant to any

 3   issue in this case whatsoever.

 4          So besides the lack of qualifications,

 5   there is a lack of fit.  And her opinion on this issue

 6   as to the cost of drug development today should be

 7   excluded.

 8          And then just going to the third point,

 9   and that's about Dr. Lamsita's testimony as to whether

10   Nexium or Prilosec will be approved by the FDA today,

11   defendants concede that -- that Dr. Lamsita would not

12   offer an opinion on whether Nexium or Prilosec would

13   be approved by the FDA today but only offer an opinion

14   as to whether the nonclinical studies would likely

15   result in approval today.  That's directly from their

16   brief at Page 36.

17          And this is misleading for a couple of

18   reasons.  One, Dr. Lamsita admits that when you seek

19   approval for a drug and drug development, I think

20   everybody on this call would probably concede this,

21   that there are multiple factors that the FDA considers

22   in approving a drug, only one of which is preclinical

23   studies.  The clinical studies in humans, you know,

24   Phase 1 through 4 studies are all highly relevant to

1    that inquiry.  And Dr. Lamsita has testified on

2    Page 144 of her deposition that the clinical studies

3    are a really bigger part of the drug approval process

4    than the preclinical studies.  And then she says that

5    she didn't review the clinical studies in this case

6    and she can't offer an opinion about the clinical

7    data.

8              So any opinion by Dr. Lamsita regarding

9    whether these drugs would or would not be approved

10   today based on preclinical studies is misleading to

11   the jury.

12       THE SPECIAL MASTER:  Would you agree that she

13   could give opinions about the adequacy of the

14   preclinical studies for FDA consideration?  I guess

15   what I'm saying is maybe even if she couldn't go to

16   the ultimate decision, Oh, yes, it would have been

17   approved, it seems like with her qualifications, could

18   she not say I've looked at these preclinical studies

19   and at least that portion of it would be fine -- found

20   adequate?

21       MS. FINKEN:  I think that there are opinions

22   that Dr. Lamsita gives in her report that are

23   appropriate for her area of expertise that we can

24   cross-examine her at trial on relating to, you know,

1  good laboratory practices and things of that nature,

2  the process generally of submitting preclinical

3  studies to the FDA, you know, whether or not these --

4  these clinical studies complied with the laboratory

5  practices or not.

6              But Dr. Lamsita should not be able to

7  testify that the drugs would be approved based upon

8  the preclinical studies that she reviewed because the

9  FDA can't approve a drug based on preclinical studies.

10 They would not, they could not, they cannot do it.

11 They have to evaluate the entire package, including

12 the clinical studies which Dr. Lamsita has not

13 evaluated and she has admitted as much during her

14 deposition.  And that's on Page 144 of her deposition

15 testimony.

16              And with that, Special Master Reisman, I

17 will -- I will turn over the floor to Ms. Althoff and

18 save any other time for rebuttal.  Thank you.

19      THE SPECIAL MASTER:  Thanks.

20              Hi, Katherine.

21      MS. ALTHOFF:  Hi, Special Master.  Yes, I'm

22 going to respond on Dr. Lamsita.

23              Again, Katherine Althoff on behalf of

24 AstraZeneca.  I'm going to take these in reverse order

     1    because I think it goes from the simplest to perhaps

     2    the most complex issue.

     3              Dr. Lamsita said in her deposition, I'm

     4    not testifying regarding any clinical data.

     5    Dr. Lamsita is a toxicologist.  She has years of

     6    experience at FDA, in industry, and consulting, in

     7    which she worked on helping companies get their drugs

     8    approved to put on the market.  She only works with

     9    animal studies.  This is what she does.

    10              And taken into context, that's exactly

    11    what she is saying here is that the nonclinical

    12    studies would have been sufficient to have these drugs

    13    approved, not that everything, the entire package

    14    would have been approved, but purely that the

    15    nonclinical program was sufficient and appropriate.

    16    So I think we agree on that, so I'm not sure --

    17          THE SPECIAL MASTER:  I'm going to make a bold

    18    statement, I think you are kind of in agreement on

    19    that.

    20          MS. ALTHOFF:  Yeah, I think so too, and so I'm

    21    not sure why, based on your our agreement, that we are

    22    having this argument today.  But in any event, I think

    23    she can testify to the level that she wants to testify

    24    to on that issue.

 1            Secondly, with regard to the drug

 2    development costs, I think this one is also pretty

 3    simple.  Again, Dr. Lamsita, this is what she has done

 4    throughout her entire experience is work as part of a

 5    team in helping to get drugs approved.  She said she

 6    had not reviewed any documents that specifically

 7    addressed how much Omeprazole costs to get to market

 8    nor how much Esomeprazole, that being Prilosec and

 9    Nexium, costs to get to market, and so she has no

10    intention of testifying as to those precise numbers.

11            But in terms of a general opinion, if

12    asked, about how long does it take to get a drug to

13    market and what does it cost, I think, you know, based

14    on her years of experience on a variety of compounds,

15    she has got the qualifications and the expertise and

16    background knowledge to testify to that.

17        THE SPECIAL MASTER:  Can I ask you a question

18    about that?

19            I mean, she is a toxicologist, right?  I

20    mean, how -- I'm -- how does she know what it costs?

21    I mean, she is not like in the finance group, has she

22    worked for companies?  I mean, how does she get that

23    knowledge?  And I think she was a toxicologist at FDA,

24    right?

1          MS. ALTHOFF:  Yes.  She was a toxicologist at

2    FDA for a few years, she has also worked in industry

3    and she has also worked as a consultant.  And so she

4    is part of a team.  She understands how long it takes

5    and generally what it costs.

6              Again, this is -- she is not going to come

7    in as some kind of an economist or something like

8    that, but I think at the level in which she would be

9    asked and at the level that she discusses it in her

10   report, I think she is qualified and got the

11   experience and background knowledge to testify to

12   that.

13        THE SPECIAL MASTER:  All right.  And so the

14   remaining thing I think is the CPN?

15        MS. ALTHOFF:  Yes, chronic progressive

16   nephropathy.  Again, I think to some extent we are

17   talking past each other, and as I think you mentioned

18   in one of the arguments earlier today.  She is a

19   toxicologist, she is not a pathologist, and so when

20   she would work at FDA, she would review pathology

21   reports, as she did in this case, she would review

22   nonclinical study reports, as she did in this case,

23   and if she had a specific question about the

24   pathology, she would go talk to one of the FDA

1    pathologists.

2              That's not really what she is doing here.

3    I mean, she is reviewing the study report, she sees

4    what's reported, she has familiarity, as she testified

5    in her deposition, I think it was Page 176, that from

6    her work at FDA she is familiar with chronic

7    progressive nephropathy, not as pathological

8    criterion, as we've conceded she is not going to

9    testify to, but to the determination that that's in

10   fact something that happens in rodents, she is aware

11   of it and she has seen it before.

12             And so I think to the extent she is

13   testifying about chronic progressive nephropathy, she

14   doesn't plan to step on top of Dr. Sandusky who is an

15   animal pathologist.  She is going to testify with

16   regard to what was seen and to the extent that

17   AstraZeneca provided that information to the FDA.

18   Again, I think we are talking past each other here.

19        THE SPECIAL MASTER:  Tracy, do you want to

20   respond?

21        MS. FINKEN:  If I could, please, just very

22   briefly.

23             Dr. Lamsita does not just regurgitate what

24   the animal clinical study reports say about chronic

1    progressive neuropathy.  That's not what she does.

2    She does that.  But she also takes it one step further

3    and she attributes what the cause is of certain kidney

4    findings in the animal studies.  While admitting in

5    the same breath that she's -- while she has heard of

6    CPN, or chronic progressive nephropathy, she is not

7    qualified to opine about it but yet that's exactly

8    what she does in her report.

9            And you can see that on Page 114 to 115 of

10   her report and 117 of her report where she talks about

11   different kidney findings that she observed in some of

12   the animal studies and this then she opines that those

13   are evidence of early precursors of chronic

14   progressive nephropathy, or CPN, which is the -- a

15   pathological finding.

16           And yet she admits throughout her

17   deposition that she is not qualified to evaluate the

18   pathological findings of chronic progressive

19   nephropathy nor did she evaluate them and she is not

20   comfortable giving opinions about that.  But that's --

21   you know, what she says in her deposition and what she

22   actually does in her report in terms of making those

23   leaps of just not regurgitating what's in the study

24   reports but actually attributing cause to certain

1    findings are two different things, and she is -- she

2    is simply not qualified to be able to give those types

3    of opinions.

4              So plaintiffs seek to exclude any

5    testimony by Dr. Lamsita about chronic progressive

6    nephropathy because by her own admission she is not

7    qualified to address that.

8         MS. ALTHOFF:  May I speak just very briefly,

9    Special Master?

10        THE SPECIAL MASTER:  Go ahead.

11        MS. ALTHOFF:  The problem with that is they

12   don't disagree that she is qualified to analyze the

13   reports and determine the adequacy of the preclinical

14   study program.  And in the preclinical study program

15   AstraZeneca's own investigators identified chronic

16   progressive nephropathy.  So you leave us in a strange

17   position if you say she can't utter the words "chronic

18   progressive nephropathy" because it's in the study

19   reports and she is familiar with it, she is familiar

20   with that condition from having worked at -- at FDA,

21   and if she had questions about it there, she would do

22   the same thing that she did here, which is talk to a

23   pathologist.

24             THE SPECIAL MASTER:  Okay.  Thank you.

APRIL 4, 2022

```
1        MS. FINKEN:  Can I just make one point, Special

2   Master, in response to that?

3        THE SPECIAL MASTER:  Oh, sure.

4        MS. FINKEN:  She is not familiar with chronic

5   progressive nephropathy.  She says she has heard of

6   chronic progressive nephropathy.  That's a big

7   difference and that's what she states in her

8   deposition testimony.  And hearing of chronic

9   progressive nephropathy does not render you qualified

10  to be able to evaluate findings of kidney toxicity and

11  determine that they are chronic progressive

12  nephropathy or attributed to chronic progressive

13  nephropathy, and that's exactly what Dr. Lamsita

14  attempts to do in her report if you look at it

15  critically.  Thank you.

16        THE SPECIAL MASTER:  Okay.  Thank you both.

17            Okay.  So the last one that we have is

18  Andrea Leonard-Segal, an FDA expert.  I believe that

19  this -- this expert is just as to Takeda.  Am I

20  correct about that?

21        MS. MARTINES:  That's correct, Special Master.

22        THE SPECIAL MASTER:  Okay.

23        MS. MARTINES:  Actually, I have kind of a dual

24  motion.  There is a motion to disqualify and then
```

1    there is one to limit her testimony.

2        THE SPECIAL MASTER:  Yeah, I'd like to take up

3    the motion to disqualify first, if we can.

4        MS. MARTINES:  Of course.

5        THE SPECIAL MASTER:  Okay.  Let's do that.

6            Can you identify yourself?

7        MS. MARTINES:  Okay.  Yes, ma'am.  Buffy

8    Martines on behalf of plaintiffs on their motion to

9    disqualify Dr. Andrea Leonard-Segal.

10           Special Master, to make a long story short

11   on this one, in the interests of time, I know you've

12   read all of the papers, the fundamental issue is that

13   this expert was a long-time employee of the FDA who

14   now purports to be an expert on the very matters that

15   she worked on at the FDA.  And under Federal law that

16   is prohibited under the code section that we have

17   cited, and I believe it's 18 USC 207.

18       THE SPECIAL MASTER:  Buffy, can I stop you there

19   for a minute?

20       MS. MARTINES:  Of course.

21       THE SPECIAL MASTER:  That's a criminal statute,

22   correct?

23       MS. MARTINES:  Yes, ma'am.

24       THE SPECIAL MASTER:  And I guess the question,

1    the fundamental question that I had when I was reading

2    through all of these materials is where is the

3    authority to use that statute to exclude an expert in

4    a civil case?  In other words, I mean, they might be

5    running afoul of a criminal statute by testifying and

6    not something most people would want to do, but where

7    do you get the authority from that statute that you

8    can exclude in evidence -- disqualify an expert from a

9    civil case?

10    MS. MARTINES:  I believe the case that we cite

11    you to is US v. Coleman, which is a Third Circuit case

12    from 1986, 805 F.2d 474.  And in that case they talk

13    about the fact that these revisions, these provisions

14    and then revisions to the provisions that Congress

15    made are used in order to vent even the appearance of

16    impropriety in these types of matters, that a former

17    public official cannot use their position for private

18    gain, personal or private gain.  And then we also cite

19    a couple of other cases within that same section of

20    our brief.

21    THE SPECIAL MASTER:  Yeah.  We looked at them.

22    I guess I didn't think, and I'll go back and look

23    again after we have this argument, I didn't think any

24    of them were exactly right on point here, and maybe

APRIL 4, 2022

1    this is sort of a first impression issue.  I don't

2    know.

3        MS. MARTINES:  And that could be.  There is a

4    grouping of cases that we cite that go to this.  And I

5    don't know if they are -- you know, if they are just

6    absolutely on point, but they certainly go to the

7    proposition that this statute -- in this statute

8    Congress forbids the exact kind of testimony that's

9    going to happen here or that's anticipated.

10           Dr. Leonard-Segal, as I said, from 2002 to

11   2013 worked for the FDA and was involved in -- with

12   PPIs, including the FDA's approval of Prilosec OTC, of

13   the OTC version of Prevacid, she oversaw labeling,

14   adequacy of the warnings, label changes, on each

15   product she considered renal failure as a risk, she

16   reviewed the safety and efficacy of those products,

17   she considered the adverse events, and she gave

18   opinions on all of those matters with regard to both

19   Prilosec OTC and the Prevacid OTC version.

20           She also oversaw the Prevacid switch from

21   Rx to OTC versions.  She discussed efficacy and safety

22   on that product as well, part of the labeling.

23           Importantly, with regard to Prevacid,

24   which is the product we are talking about here, during

1    her testimony in her deposition, she discussed the

2    fact that as part of the Prevacid switch she did a

3    comprehensive -- the FDA did a comprehensive review of

4    all safety data and that that included Prevacid and,

5    in fact, all of the PPIs.  So she was involved -- I

6    know that there is going to be an argument that, Oh,

7    she was just involved on the OTC side and that makes

8    it a lot different.  I'm going to talk to you about

9    why OTCs aren't different, which is a whole another

10   issue, but the fact of the matter is that during the

11   course of this work she did review Rx information, she

12   did review safety and efficacy labeling issues,

13   adverse event reports, and those were comprehensive

14   reviews.  And that is the very specific subject matter

15   that she is it going to try to talk about in this

16   litigation and that is the specific type of testimony

17   that the statutes preclude.

18        THE SPECIAL MASTER:  Have you made any effort to

19   contact FDA or the Department of Justice or anybody

20   and see if they are complaining about this?

21        MS. MARTINES:  I have not done that personally,

22   and I would -- I do not -- I am not aware that the USC

23   has done that either.

24              Again -- oh, go ahead.

1    THE SPECIAL MASTER:  Well, because as I read the

2    statute and some of the cases, they are the ones who

3    have the gripe about this, right, if she is out there,

4    you know, doing -- engaging in this conduct, aren't

5    they the ones who really have standing to complain?

6    MS. MARTINES:  Well, I think they certainly -- I

7    mean, obviously they certainly have standing to

8    complain.  I think plaintiffs also have the same

9    issue, because part of the reason why, and the cases

10    talk about this, the reason why this statute exists is

11    to limit this kind of revolving door concept from

12    governmental work to making your living off of kind of

13    the fruits of your labor, so to speak.

14         The plaintiffs' issue is going to be that

15    Dr. Leonard-Segal is going to come in, and this is

16    included in our Daubert motion as well, she is going

17    to come in and say, I was part of the FDA, I looked at

18    this stuff, this is what the FDA decided, everything

19    is great, fine and wonderful, let's go drink coffee.

20    And that is the exact type of testimony that this --

21    these code sections and the cases talk about is

22    improper.  And it leaves the jury with the opinion

23    that it is almost the FDA that's in there saying it

24    because this woman, this doctor has been doing this

APR 14, 2022

1    all of this time and she is going to rely on her

2    experiences in the FDA.  And the supposition, what the

3    jury is going to be left with is, Oh, well, the FDA is

4    in here telling us that everything is fine.

5            And in our Daubert motion we discuss the

6    fact that she is relying strictly on what the FDA says

7    about this drug.  She hasn't done any of her own work

8    on it.  She is just going with all of that.  And

9    that's the exact kind of testimony that -- that the

10   code sections and the cases discuss is improper.

11           The other item I would want to pick up,

12   and then I'll reserve the rest of my time for

13   rebuttal, is in Takeda's briefing they discuss the

14   fact that Takeda is off the hook, so to speak, because

15   it was actually Novartis that was applying for all of

16   these -- for the OTC version of Prevacid and those

17   types of things, and I just want to remind the Special

18   Master that the code sections and the cases discuss

19   that it doesn't have to be the exact party that --

20   that it's -- there is no identity of parties

21   necessary.  This isn't some kind of gotcha regulation

22   where if you can sneak by because it is a different

23   name, you are okay.

24           The fact of the matter is that when the

1    applications for the Prevacid OTC products were being

2    put in, yes, Novartis was the representative on behalf

3    Takeda and Takeda was actually listed as the supplier

4    and manufacturer.  So there is no escaping this issue

5    simply by saying, Well, we weren't the ones that

6    specifically were involved with Prevacid OTC

7    application.  They were certainly involved, and the

8    statute defines them as any other person that was

9    participating.  So that is not a means of escape, so

10   to speak.

11            And with that, I will reserve the rest of

12   my time for rebuttal.

13       THE SPECIAL MASTER:  Okay.  Thanks, Buffy.

14            Hi, Mike.

15       MR. RUTTINGER:  Good afternoon again.  Just for

16   the record, this is Mike Ruttinger on behalf of

17   Takeda.

18            Just to clarify, are we going to argue the

19   Daubert issues separate to Dr. Leonard-Segal following

20   this or do you want me to address those as well?

21       THE SPECIAL MASTER:  I think we are going to

22   argue them separately.  I don't think -- Buffy, I

23   don't think you argued all of your Daubert issues, did

24   you?

1        MS. MARTINES:  I did not.  I think it is a very

2   short argument on Daubert, but we can certainly

3   separate them up.

4        THE SPECIAL MASTER:  Let's do it separate.

5        MR. RUTTINGER:  Perfect.

6             So focusing on the disqualification

7   issues, Special Master, you hit the nail on the head

8   here.  This is a really unprecedented argument for

9   plaintiff to make, to request a disqualifying Takeda's

10  regulatory expert based on an assertion that she has

11  committed a crime when it is undisputed that there has

12  been no charge or pending proceedings or even a

13  request by plaintiff to the FDA to look into this.

14             If you look at the cases plaintiff cites,

15  there are some that come up in the context of a motion

16  to permit expert testimony under the exception that's

17  built into the statute when the regulation applies,

18  but we think that this case is a different one because

19  the regulation, Section 207(a)(1) doesn't apply in the

20  first place.  So plaintiff hasn't identified any other

21  case quite like this one where a court has

22  disqualified a former FDA expert from testifying just

23  based on her experience regulating what we believe are

24  different drug products.

```
 1        THE SPECIAL MASTER:  Okay.  Can I stop you for a

 2   minute there.

 3        MR. RUTTINGER:  Of course.

 4        THE SPECIAL MASTER:  You say that it doesn't

 5   apply, and I think you are going to talk about why you

 6   think that, right, but if it did apply, you would have

 7   to -- she would have to go seek permission under that

 8   regulation, correct, from FDA or from the court?

 9        MR. RUTTINGER:  Correct.  The regulation

10   exception built into the statute specifies that if

11   those initial three criteria that are required for a

12   finding disqualification under the statute apply, then

13   there is an obligation to affirmatively seek

14   permission from the court to testify.

15        THE SPECIAL MASTER:  Yeah, from the court, you

16   are right.  And to be clear, you have not done that,

17   right?

18        MR. RUTTINGER:  That is correct, yes.

19        THE SPECIAL MASTER:  She has not done that,

20   okay.

21        MR. RUTTINGER:  Now, we don't think that you

22   need to get into the question of whether or not this

23   statute can apply to disqualification when raised by a

24   plaintiff, in the first place, because, as I've
```

1    alluded to, we don't think that plaintiff has

2    identified that they can prevail under any of these

3    three requirements for the statute to apply.  And to

4    be clear, the statute requires proof as to -- or I

5    suppose to persuade the court that it applies as to

6    all three of those elements.

7              So I do want to address one item quickly

8    from plaintiffs' briefs that I believe to be a

9    misrepresentation before we get into those three

10   elements, and that's this repetition in both their

11   motion and their reply brief that Dr. Leonard-Segal

12   admitted she couldn't represent Takeda before the FDA.

13             If you actually look at her testimony, and

14   it is even quoted in plaintiffs' brief, she says she

15   couldn't represent Takeda before the FDA on the same

16   matter on which she worked at the FDA.  As I go

17   through those elements, one of which is the particular

18   matter requirement, I think you'll understand our

19   position as to why we don't believe that her testimony

20   there is at all inconsistent with the statute because

21   it is not the same particular matter.

22        THE SPECIAL MASTER:  This is the argument that

23   she worked on OTC, not on -- not on prescription?

24        MR. RUTTINGER:  In part, yes, that's correct.

 1                  So I think it makes sense to start with

 2     that particular matter issue, and so the first

 3     requirement under the statute is that, you know, the

 4     United States must be a party or have a direct and

 5     substantial interest in the particular matter at

 6     issue.

 7                  Well, the United States was not a party,

 8     so let's think about what does direct and substantial

 9     interest in a particular matter at issue mean.  And

10     there are two components to that, right.  So the

11     regulations here interpreting the Ethics in Government

12     Act, the 2641.201, it confirms the United States is

13     neither party to nor does it have any direct and

14     substantial interest in a particular matter, merely

15     because a Federal statute is at issue or the Federal

16     Court is serving as a forum for resolution of the

17     matter.

18                  So our position is that the United States

19     doesn't have a direct and substantial interest for

20     purposes of this statute just by virtue of the fact

21     that this is litigation involving, you know, failure

22     to warn claims, particularly when it's brought by a

23     private entity and not by a governmental entity.

24                  It's also worth noting, I think, and

1    Special Master, you raise this question of, you know,

2    what's sort of enforcement provision for the Ethics in

3    Government Act.  Well, that regulation,

4    2641.201(j)(2), actually sets for a procedure for an

5    agency to follow when it is unclear whether or not the

6    agency has a direct and substantial interest in a

7    matter.  And it states forth a process by which there

8    is actually a government procedure and a little bit of

9    a hearing process to determine is this an issue in

10   which the government has a direct and substantial

11   interest.

12            So the fact that there is no pending

13   proceeding here suggests to me that that first

14   element, the direct and substantial interest test,

15   can't be satisfied.

16        THE SPECIAL MASTER:  Hold on.  Who would be

17   bringing such a procedure?  The FDA, right?

18        MR. RUTTINGER:  So it could also be brought

19   by -- actually, if you'll bear with me for a moment,

20   2046 -- 2641.201(j) specifies that the proceeding must

21   be brought by, one moment here, coordination by

22   designated agency ethics officials.

23            So the ethics department has designated

24   ethics officials for the former employees's agency, so

1    the FDA has these officials, who have the primary

2    responsibility for coordinating the determination of

3    whether a substantial interest is at issue.  So it

4    would be brought by the FDA counsel.

5         THE SPECIAL MASTER:  Yeah, stop for a moment.

6              So they would have to know that she was

7    intending to give such testimony, right, and then

8    decide if they were going to do anything about it.

9    And I guess the question I have for you is, you know,

10   has she made the FDA aware that -- that this is

11   something she is going to be doing or wants to be

12   doing?

13        MR. RUTTINGER:  The record isn't clear on

14   whether there has been any correspondence with the

15   FDA, as far as I am aware, Special Master.  The

16   regulations themselves are also silent as to what the

17   obligation is to provide notice to the FDA or any

18   agency and how that information is followed up upon.

19        THE SPECIAL MASTER:  Yeah, but, I mean, I guess

20   just as a practical matter, how are they supposed to

21   know about it?

22        MR. RUTTINGER:  Right.  And the regulations are

23   silent on this, I think probably because this is, as

24   you noted, something of an unprecedented issue.

APL-1-1-1   2022

1            Now, this is also wrapped up in the

2    particular matter issue, though, and here is why I

3    don't think this has to be resolved on just the direct

4    and substantial interest.  When you look at the same

5    regulations for how to define a particular matter,

6    particularly this is Paragraph (h)(2) to that

7    regulation, the FDA provides -- or sorry -- the Ethics

8    in Government Act regulations provide an example that

9    we think is quite applicable to this situation.  And

10   the example they provide is one in which a former

11   government official while working at the FDA was

12   involved in promulgation of a rule applicable to a

13   category of a particular type of medical device made

14   by multiple manufacturers.  And the example goes on to

15   say, If the regulation was not limited in application

16   to the particular companies already existing but it

17   is, for example, open-ended, it would not be a

18   particular matter involving specific parties.

19            So an issue of a former FDA official

20   having spent time at the FDA regulating an open-ended

21   class of a drug or medical device does not arise to

22   the level of particularity required by the act to be a

23   particular matter on which the government has a direct

24   or substantial interest.

1            So we think that under either prong, under

2    either category of that first prong of the test,

3    plaintiff cannot show that it is applicable.

4            There is also the second category, and the

5    second prong of the test is the OTC issue that

6    plaintiffs counsel alluded to.  And essentially their

7    argument is premised on Dr. Leonard-Segal's

8    involvement in the over-the-counter switch of Prevacid

9    24-hour.  And plaintiff has taken the position in

10   their briefs that because Prevacid 24-hour involves

11   the same active ingredient as prescription Prevacid it

12   is functionally the same matter.

13           And you heard Ms. Martines refer to

14   Dr. Leonard-Segal as having worked on the same

15   labeling and same issues as she's opining on in this

16   litigation.  That is just unfortunately not true and

17   it, I think, it shows a misunderstanding of the

18   Durham-Humphrey Act under which over-the-counter drugs

19   are regulated.

20           So under the Act, the FDA actually

21   requires for an over-the-counter drug to be marketed

22   that there be meaningful differences within a

23   regulatory sense, "meaningful difference" is a term of

24   art in this context, from prescription drugs.  In the

APRIL 14, 2022

1    case of Prevacid 24-hour versus prescription Prevacid,

2    that includes different indications for use.

3    Prescription Prevacid has I believe ten different

4    indications for use versus just a couple for Prevacid

5    24-hour, different patient populations, different

6    labeling, and fundamentally different NDA numbers.  So

7    they are, within all respects regulated by the FDA,

8    different drug products.

9              So Dr. Leonard-Segal's involvement with

10   prescription Prevacid is simply not the same

11   prescription drug product or not the same drug product

12   at all that she is testifying on in this litigation.

13             As to the third criteria involving

14   specific party or parties, it is not our position, as

15   Ms. Martines suggested, that the parties have to be

16   identical for purposes of whether or not the statute

17   applies.  The fundamental issue here, and if you look

18   at the cases cited on Page 20 of plaintiffs' motion to

19   disqualify where they talk about cases of limited

20   expert testimony and other testimony in these cases,

21   all of these cases talk to the fundamental concern

22   underlying the statute of side switching.  It is the

23   idea that former FDA official or a former government

24   official of any kind has left government employment

APRIL 11, 2022

1    and is switching sides and offering testimony against

2    the government or against the government's interests

3    on the exact same issue.  When the government isn't a

4    party here, isn't involved in private failure to warn

5    litigation and the work that she did is on a different

6    drug product than is at issue in this case, different

7    warnings and different labels than are at issue in

8    this case, the whole side switching burden simply

9    isn't met here.

10            So as a result, we don't think that either

11    the first, second or third criteria of the Ethics in

12    Government Act are satisfied here, and if even one of

13    those doesn't favor disqualification of

14    Dr. Leonard-Segal, then plaintiffs' motion should be

15    denied as a whole.  They have to prevail on all three

16    of those prongs of the statute to even argue that

17    disqualification can occur, assuming in the first

18    place that this court can use a criminal Ethics in

19    Government Act statute as a basis for excluding expert

20    testimony.

21        THE SPECIAL MASTER:  So a couple of other

22    questions.

23            I mean, if -- if she -- if we said okay,

24    she can testify, does that expose the court, this

 1    process to any kind of risk?  I mean, should the court

 2    seek FDA approval, input on the question here?

 3         MR. RUTTINGER:  I don't -- I believe the answer

 4    to that is no, Special Master.  The statute itself,

 5    assuming that there -- the application of these three

 6    provisions is kind of a mixed question of fact and

 7    law, right.  So the court's determination of that

 8    will, you know, in any potential appeal or something

 9    of that issue, be subject to the same kind of

10    standards where it will be a, you know, an abuse of

11    discretion standard as to whether disqualification is

12    appropriate and a de novo standard as to any of the

13    legal issues underlying that.  But there is no, you

14    know, sanction for the court in determining this.  It

15    should be ultimately decided under the same

16    discretionary standard for admission of evidence that

17    would normally apply with the application of the

18    ethics in government issue being a legal issue that

19    the reviewing court would need to decide.

20         THE SPECIAL MASTER:  And I guess I might have

21    asked this before, but maybe not clearly, I mean, are

22    you aware of whether she has ever raised this with the

23    FDA?

24         MR. RUTTINGER:  I am not aware of that based on

1    the record that I have seen, but I can't speak

2    conclusively to that.

3        THE SPECIAL MASTER:  Okay.  All right.  Because,

4    I mean, in some respects, you know, if you were right

5    about all of this, then what's the harm in going to

6    FDA and, you know, saying this is what I'm doing, I

7    just want to make sure you're okay with it?

8        MR. RUTTINGER:  I guess I would say, in response

9    to that, that the harm it could extend is, it is not

10   unique to this case, it is that what plaintiff is

11   really suggesting here is, you know, an unnecessary

12   procedural obligation that doesn't have a basis in law

13   that could really quickly roll out of control.

14        A lot of the issues that Ms. Martines

15   identified as her concern for this, this notion of a

16   revolving door between the FDA and the government and

17   an expert stepping in, saying, Well, I worked at the

18   FDA and here is what the FDA would say about that, I'm

19   not sure I understand how that's really different from

20   someone like Dr. Ross coming in and offering testimony

21   when he is going to say I'm talking on my basis of

22   a -- on the basis of my experience at the FDA and the

23   imprimatur that brings.

24        Now we are not arguing that Dr. Ross is

1    disqualified under the statute.  We don't believe it

2    applies here and we don't believe it applies there.

3    But you can quickly see how this might get out of

4    control.

5        THE SPECIAL MASTER:  Yeah, but I think the

6    question is, here, is you say OTC and prescription are

7    very different matters.  And Ms. Martines says, no,

8    they are not.  You know, they are certainly a whole

9    lot closer than what most FDA experts that I've seen

10   over the years are willing to testify about based on

11   their experience.  So, I mean, I think -- you know, I

12   think that's the difference.  That's why it doesn't

13   apply to Dr. Ross or Dr. Mann.  I think it's -- you

14   know, you've got an expert here who undoubtedly was

15   involved with the OTC products and their labeling and

16   their adverse event review at FDA and I guess the

17   question is, as you've already discussed, you don't

18   think it is the same particular matter, but, you know,

19   I can see why someone would raise that question

20   certainly.

21           Anyway, Buffy -- or Mike, do you want to

22   add anything else?

23       MR. RUTTINGER:  Oh, I was just going to add a

24   single sentence there, which was, you know, I think

1    the similarities are misleading in this case because

2    ultimately this case boils down to labeling, right.

3    It boils down to failure to warn claims, at least in

4    the Bales case which is the only one in which

5    Dr. Leonard-Segal is being disclosed as an expert, and

6    the labeling issues between a prescription drug and

7    over-the-counter drug are fundamentally different

8    because they are different labels and different

9    products.

10              So I think that the dissimilarities here

11    are more pronounced when this court looks at the

12    labeling issue and that they are labels for different

13    products.  That's all I have.

14        THE SPECIAL MASTER:  Okay.  Thanks, Mike.

15              Buffy, did you want to follow up?

16        MS. MARTINES:  Yes, please.  Let's start with

17    switching sides, Item No. 1.

18              Dr. Leonard-Segal is absolutely switching

19    sides.  Her work at the FDA was on behalf of the

20    government, and as everyone on this call knows, the

21    process of getting a drug approved with the FDA is

22    inherently an adversarial process with the

23    manufacturer.  There are negotiations, there are

24    discussions, there are all kinds of things.  During

1    that process, while she worked there, she worked for

2    the government and she represented the FDA.

3              And she represented the FDA on a lot of

4    issues.  One -- a couple of things I forgot -- I

5    neglected to mention.  The 2011 citizens petition, a

6    very important issue, and the 2012 tracked safety

7    issue regarding PPI-induced AIN.  Dr. Leonard-Segal

8    testified that she more than likely would have been

9    involved in both of those issues, which are class-wide

10   issues.  She would have worked for the government

11   during that time on behalf of the FDA in opposition of

12   the manufacturers.

13             So now she has left the FDA, she has

14   switched sides, she is working for the manufacturers

15   now in a United States District Court.  She testified

16   that she wouldn't be able to be in front of the FDA

17   representing Takeda.  She cannot go in front of the

18   United States District Court either.  The government

19   is a single entity.  We've cited that in our brief.

20   The government is a single entity, whether it is the

21   FDA or the court, she can't do it.  She cannot switch

22   sides, which is exactly what she is trying to do.

23             Now let's talk about OTCs.  You just heard

24   the party line on prescription versus OTCs when it

1    suits the manufacturer, and this is an issue that I

2    have gotten into very deeply.  You'll hear more about

3    it in the next round of cases, but these manufacturers

4    have a history, a history of marketing these drugs,

5    whether it's a prescription drug or an OTC, however

6    they want.  They are interchangeable when they are

7    marketing them or when they are trying to steal

8    somebody else's market share.  When studies come out

9    that say there is something wrong with PPIs, all of a

10   sudden it is a big -- whole different issue, OTCs and

11   prescriptions are completely different.  When they

12   want to bring an expert to court who has worked on

13   this product who shouldn't be there, oh, all of a

14   sudden OTCs are different than prescription.  It is a

15   distinction without a difference.  We are talking

16   about the same type of warnings, we are talking about

17   the same injuries, we are talking about the same

18   formulation, we are talking about the same

19   manufacturers making money on these drugs, making

20   money on these drugs.  It is a distinction without a

21   difference and they should not be allowed to play some

22   kind of smoke and mirror games with whether these are

23   the same products or not.

24              Dr. Leonard-Segal worked on this product,

1    this specific product while she was at the FDA.  She

2    worked on OTC issues, she worked on prescription drug

3    issues, she did comprehensive evaluations, she looked

4    at the citizens petition, she looked at the track

5    safety issues.  She is up to her neck in this specific

6    issue and she -- under these statutes that we are

7    citing and under the case law that we are citing, she

8    is not allowed to do that and she should be

9    disqualified.

10           Thank you.

11       MR. RUTTINGER:  May I have a true 15 seconds?

12       THE SPECIAL MASTER:  You may.

13       MR. RUTTINGER:  Special Master, I'd encourage

14   you again to look at that CFR 2641.201(h)(2),

15   Example 5, about the former FDA official, that makes

16   clear to me that involvement in class-wide class

17   labeling and other types of issues is not involvement

18   in a particular matter within the meaning of the

19   statute.

20       THE SPECIAL MASTER:  Okay.  I will look at it.

21           Okay.  So Daubert, did you want to -- do

22   you have more to say about that?

23       MS. MARTINES:  Well, just a little bit.  I

24   don't -- I don't want to belabor some of these points,

1    and the papers, this was a short motion on

2    Dr. Leonard-Segal and I know that you've already taken

3    a look at those.

4             Just very quickly, she has basically got

5    two opinions, as best I can tell, that Takeda acted

6    appropriately in its labeling and that there is no

7    causal association between PPI use and the kidney

8    injuries.

9             And I want to start by saying the doctor

10   has already conceded that she is not qualified to

11   speak about causation in her deposition testimony,

12   Page 93, lines 18 and 19, she specifically says:  "I

13   don't testify as a medical -- as a medical officer

14   expert giving my opinions about causation."

15            I'm not -- it's a little bit hard for me

16   to tell in Takeda's papers, and maybe we'll get some

17   clarification on this, I think that they concede that

18   she is not qualified or she is not going to speak

19   about causation, but I'll -- I won't speak for them,

20   but she should -- she has conceded that she can't

21   speak to causation issues, that she is not testifying

22   as a medical officer or a doctor in that area.

23            So we believe at a very minimum she can

24   only testify to regulatory issues.  Now, I'm not

APRIL 14, 2022

1  waiving my argument that she shouldn't be testifying

2  at all, but for purposes of what we are talking about,

3  at a minimum limited to regulatory issues.

4      THE SPECIAL MASTER:  I think there was a

5  stipulation that she is not going to offer a medical

6  causation opinion.

7      MS. MARTINES:  And that may very well be true.

8  I hope so.  I hope that's the case because that makes

9  things a lot cleaner.

10      With regard to the opinions that she does

11  give and her methodology and how she did that, she

12  testified that she didn't review any underlying data,

13  she has reviewed no published literature and that she

14  relies strictly on the assessment or actions of the

15  FDA and Takeda as support for her testimony.

16      In fact, she said in her testimony that

17  she is not basing her review on any nephrology

18  information and any medical evidence on anything

19  related to kidney injuries and that she is only

20  testifying with regard to certain regulatory items,

21  including the label.

22      Now, with regard to those conclusions, the

23  problem with those opinions I believe is that she --

24  they are all supported by -- only by assumptions.  She

1    stated that -- she specifically stated in her

2    deposition, again, at Page 119, Lines 11 through 22,

3    that she comes to these conclusions because she

4    assumes the FDA must have seen data or had

5    discussions.

6              And you simply cannot base any kind of

7    expert opinion on assumptions and speculation that you

8    have no proof of.  That's certainly not a reliable

9    methodology that -- that she can bring to court

10   under -- under the applicable Daubert standards.

11             So with that, I will -- I will reserve the

12   rest of my time for rebuttal.

13        THE SPECIAL MASTER:  Thanks, Buffy.

14             Mike.

15        MR. RUTTINGER:  I will keep this very short.

16             So first off, to clarify,

17   Dr. Leonard-Segal will not be offering medical

18   causation or kind of regulatory causation opinions in

19   this case.  So that should make this all a little bit

20   cleaner.

21             What she is going to offer is testimony

22   based on her experience about what FDA did and what

23   various interactions between the manufacturer and the

24   FDA mean in terms of providing context for that, which

1    she can do as a former FDA official who has the

2    experience of being involved in those kinds of

3    interactions.

4              Now, what plaintiff has said is their main

5    Daubert challenge here is a criticism of the fact that

6    she didn't look at, say, some of the underlying

7    nephrology studies and data.  That's information that

8    might be important if she was offering the kind of

9    regulatory causation opinion that, say, Dr. Ross is

10   offering.  She is not.  The opinions she is offering

11   here, they are not based on assumptions.  They are

12   based on her experience at the FDA and having done

13   this kind of job and having worked with the FDA and

14   seen interactions between FDA and manufacturers and

15   being able to tell a jury, because these are

16   complicated issues after all, what it means when a

17   manufacturer submits X to the FDA and what it means

18   when the FDA reacts in such a way.  We think that

19   that's all based on her experience and qualifications

20   which plaintiff here doesn't appear to be contesting,

21   and we think that that's sufficient and that there are

22   many other cases cited in our Daubert reply in which

23   the kind of regulatory testimony that she is offering

24   has been readily allowed under Rule 702.

1          THE SPECIAL MASTER:  Okay.  Buffy?

2          MS. MARTINES:  Thank you very much for that

3     clarification.  We will certainly rely on that.

4               The problem is she is going to give an

5     opinion that the label was inadequate and to do that

6     she needs to base it more on what she assumes the FDA

7     saw and what she assumes they should have discussed

8     and what she guesses would have happened.  She needs

9     more than that if she is going to give an opinion on

10    whether or not the label was adequate.  And her

11    testimony is that that's all she did was rely on

12    assumptions and speculations and that's simply not

13    enough for an expert opinion to be presented to the --

14    to a jury.

15              So with that I will conclude.

16         THE SPECIAL MASTER:  Okay.  I think we are done

17    for today, unless I missed something.  I hope I

18    didn't.  Thank you all very much, and we will resume

19    at 10:00 a.m. tomorrow.

20         MR. BROWN:  Ellen, one quick issue.  I know we

21    have a court reporter.  This is Arthur Brown from

22    Arnold & Porter.  I'm hoping that you can circulate

23    the rough, to the court reporter, as soon as you can.

24    I'm happy if I need to sign anything, just to shoot it

1   over to my e-mail.

2       THE SPECIAL MASTER:  Juliana, or whoever is on

3   from Golkow, what's the process for that?

4       THE COURT REPORTER:  I will shoot an e-mail over

5   to him.

6       MR. BROWN:  Thanks, Juliana.

7       THE SPECIAL MASTER:  I'll forward -- maybe we

8   can forward it around to everybody who wants it.

9           Okay.  All right.  Thanks everybody, very

10  good.  See you tomorrow.

11                  ---

12          Thereupon, at 3:33 p.m., on Monday, April

13  4, 2022, the hearing was adjourned.

14                  ---

15

16

17

18

19

20

21

22

23

24

1                    CERTIFICATE OF OFFICER

2

3            I, JULIANA F. ZAJICEK, a Registered

4    Professional Reporter, Certified Shorthand Reporter

5    and Certified Realtime Reporter, do hereby certify

6    that I reported in shorthand the proceedings had at

7    the remote hearing aforesaid, and that the foregoing

8    is a true, complete and correct transcript of the

9    proceedings of said hearing as appears from my

10   stenographic notes so taken and transcribed under my

11   personal direction to the best of my ability.

12           IN WITNESS WHEREOF, I do hereunto set my

13   hand on this 8th day of April, 2022.

14

15           *Juliana F. Zajicek*

16           JULIANA F. ZAJICEK, Certified Reporter

17

18

19

20

21

22

23

24